UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ZUHTU ONUR TATARI,

                      Petitioner,

   -against-

NEVA DURUST,

                      Respondent.
-------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
24-CV-6930 (CBA) (SJB)

**AMON, United States District Judge:**

      This case concerns whether O.T., the six-year-old child of Petitioner (Tatari, the father) and Respondent (Durust, the mother), should be returned to Turkey pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670 (the "Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-11 ("ICARA"). Under those laws, my role at this stage is not to adjudicate the underlying custody dispute between O.T.'s parents, but to determine whether O.T. was wrongfully removed to the United States. 22 U.S.C. § 9001(b)(4); Hague Convention Arts. 3, 16. If he was, I must return him to Turkey, unless Respondent shows one of the recognized exceptions apply. Hague Convention Arts. 3, 12-13. The parties both move for summary judgment. Tatari argues that when Durust brought O.T. to New York to enroll in a new school she violated their Turkish divorce decree ("DD"); Durust believes that the DD allowed her to move O.T. to Brooklyn because she has sole custody. Alternatively, Durust argues I should stay this case to allow the Turkish courts to construe the DD before making my decision. For the reasons that follow, I find that Tatari is entitled to summary judgment on two issues—habitual residence and consent—but not on whether Durust's move to America was wrongful. Durust's motion for summary judgment is denied.

1

## BACKGROUND

### I. Family History

These facts are taken from the parties' Local Rule 56.1(a) Statements and Counterstatements (ECF Docket Entry ("D.E.") # 21-1 ("Pet. 56.1"), # 23-2 ("Resp. 56.1"), # 25-1 ("Pet. 56.1 Resp."), and # 26-1 ("Resp. 56.1 Resp.")), the declarations and exhibits filed therewith, (D.E. # 21-2 ("Tatari 1st Decl."), # 23-1 ("Ward 1st Decl."), # 25-2 ("Tatari 2d Decl."), # 26-2 ("Durust Decl."), and # 26-4 ("Ward 2d Decl.")), and Respondent's answer and exhibits filed therewith (D.E. # 17 ("Answer")). Unless otherwise indicated, the facts in this section are undisputed. Tatari and Durust were married in Turkey in 2016. (Pet. 56.1 ¶ 1; Resp. 56.1 ¶ 1.) Their son, O.T., was born in Florida in June 2018. (Pet. 56.1 ¶¶ 3-4; Resp. 56.1 ¶ 2.) Shortly after O.T.'s birth, the family returned to Turkey where they lived through spring 2024, except for certain short periods. (Pet. 56.1 ¶ 5; Resp. 56.1 Resp. 2[1].) In January 2022, the parties executed a divorce agreement which was approved by the Turkish court. (Pet. 56.1 ¶¶ 10-11; Resp. 56.1 ¶¶ 5-6.) The divorce agreement, entered as a court order, is reproduced in Turkish as well as in competing English translations. (Ward 1st Decl. Ex. C. ("Resp's Tr. DD"); Tatari 1st Decl. Ex. A ("Pet's Tr. DD").)

The DD provides Durust sole custody of O.T. and establishes Tatari's rights to parenting time as well as his obligations to Durust and O.T. (See Pet. 56.1 ¶ 21; Resp. 56.1 ¶¶ 11-12, 20, 23.) The parties dispute the correct translation of section 3.7.[2] Petitioner's translation reads: "Neva DÜRÜST TATARI irrevocably accepts, declares and undertakes that she will obtain the approval and opinion of Zühtü Onur TATARI in case she decides to live abroad with the common

---

[1] Unless otherwise noted, all pagination will refer to internal pagination if available, otherwise ECF pagination.
[2] In Turkish the section reads: Neva DÜRÜST TATARI, müşterek çocuk ile birlikte yurt dişinda yaşamaya karar vermesi halinde Zühtü Onur TATARI'nin onay ve görüşünü alacağini gayri kabili rücu kabul, beyan ve taahhüt eder.

2

child." (Pet's Tr. DD § 3.7.)  Respondent's translation reads: "Neva DÜRÜST TATARI irrevocably agrees, represents and undertakes that where she decides to live abroad together with the biological child, she will consult and seek the opinion of Zühtü Onur TATARI."  (Resp's Tr. DD § 3.7.)  Durust represents that her translation is the official translation provided by the Turkish court that entered the DD.  (Resp. 56.1 ¶ 7.)  Tatari says that there is no such thing as an official translation provided by the Turkish court, but only private translations of official documents.  (Pet. 56.1 Resp. ¶¶ 7-8.)

Around O.T.'s fifth birthday, his United States passport was set to expire.  (See Resp. 56.1 Resp. 5; see also D.E. # 17-4.)  Tatari refused to sign forms for renewal of the passport, and Durust filed an action in Turkish court to intervene.  (Pet. 56.1 ¶ 14; Resp. 56.1 Resp. 5.)  Durust, "over Petitioner's strenuous objection," travelled to Ivory Coast in December 2023, where she was able to obtain an emergency United States passport for O.T.  (Durust Decl. ¶ 6; Resp. 56.1 Resp. 7.)

In August 2024, Durust and O.T. left Turkey to live in the United States.  (Pet. 56.1 ¶ 18; Resp. 56.1 ¶ 24.)  Durust did not tell Tatari she planned to relocate O.T. to New York before (or shortly before) moving.  (Pet. 56.1 ¶ 20; Answer 13-14; compare Tatari 1st Decl. Ex. C (Durust email telling Tatari she and O.T. will move to New York) with id. ¶ 17 (describing O.T. at the Istanbul airport the day before Durust's email).)  Durust explains that she did not directly speak to Tatari about the move because of "the abusive dynamic" between them and her "fear[ that] Petitioner would seek to undermine the Child's admission" to the school in New York.  (Answer 13-14.)  However, she says that she and Tatari "had many conversations about the possibility of moving to the United States with" O.T.  (Resp. 56.1 Resp. 8.)  Since then, O.T. has been attending school in New York City.  (Tatari 1st Decl. ¶ 18; Resp. 56.1 ¶ 24.)

3

## II. Procedural History

Tatari and Durust are already parties to several custody disputes in Turkey. (See Tatari Decl. ¶ 21.) Two cases are particularly relevant here. In January 2024, Tatari petitioned the Turkish court for custody of O.T., a petition which is still pending. (Resp. 56.1 Resp. 4-5.) According to a recent filing, the Turkish court heard testimony from Tatari's witnesses on November 28, and is scheduled to hear from Durust's witnesses on February 7. (D.E. ## 44, 44-2.) In September 2024, Durust filed her own petition in Turkish court to determine how Tatari could access O.T. while O.T. was in New York (collectively, "Turkish Proceedings"). (Pet. 56.1 Resp. ¶ 27; Ward 1st Decl. Ex. H 77.) Tatari responded to Durust's petition in early November, arguing, inter alia, that she is in violation of DD § 3.7. (Pet. 56.1 Resp. ¶¶ 35-41; Ward 1st Decl. Ex. I § A(7).)

On October 1, 2024, Tatari filed a petition in this Court to return O.T. to Turkey. He requested that this case be heard on an expedited basis, as required by Article 2 of the Hague Convention. (D.E. # 1 ¶ 45.) The parties conducted expedited discovery, anticipating a hearing on December 11 and 12, 2024. (Minute Entry dated Oct. 10, 2024.) Both parties have moved for summary judgment. Tatari's petition urges me to declare that Durust wrongfully removed O.T. from Turkey in violation of the DD and Turkish law. (D.E. # 21 ("Pet. MSJ").) In support of that petition, he provides memoranda of law (id.; D.E. # 25 ("Pet. MSJ Rep.")), statements of facts pursuant to Local Rule 56.1 (Pet. 56.1; Pet. 56.1 Resp.), and the following evidence[3]:

- His own declarations of facts (Tatari 1st Decl.; Tatari 2d Decl.);
- His preferred translation of the DD (Pet's Tr. DD);
- Emails between himself and Durust from June 2024 and August 2024 (Tatari 1st Decl. Exs. B and C);
- An order from the Turkish Directorate of Judicial Support and Victim Services dated September 6, 2024 (Id. Ex. D);

---

[3] Both parties submit evidence duplicative of each other's filings as well as earlier filings in this case, which I have considered but do not need to specify here.

4

- A declaration from Talat Yazici, who translated Respondent's preferred DD translation, explaining that that translation was mistaken (D.E. # 21-4 ("Yazici Decl."));
- A declaration from Ecegül (AJ) Elterman supporting Petitioner's preferred DD translation of § 3.7 (D.E. # 21-5 ("Elterman Decl."));
- An expert report from Mert Yurust, a Turkish lawyer practicing family law, opining on Durust's move to the United States with O.T. under the DD and Turkish law (D.E. # 25-6 ("Yurust Rept.")); and
- An expert report from Burak Huysal, professor of law at Bahcesehir University, opining on the same subject as the Yurust Rept (D.E. # 25-7 ("Huysal Rept.").)

Durust also moves for summary judgment, arguing that her move to the United States with O.T. did not violate Turkish law because it was permitted by the terms of the DD. (D.E. # 23-3 ("Resp. MSJ") 10-16.) She also argues that Tatari has not shown that Turkey was O.T.'s habitual residence and that Tatari consented to O.T.'s relocation to America. (D.E. # 26 ("Resp. MSJ Rep.") 16-21.) In support of her motion, she provides memoranda of law (id.; Resp. MSJ), statements of facts pursuant to Local Rule 56.1 (Resp. 56.1; Resp. 56.1 Resp.), and the following evidence:

- Her preferred translation of the DD (Resp's Tr. DD);
- Filings from the Turkish Proceedings (Ward 1st Decl. Exs. E-I);
- An expert report from Recai Aytaç Akbay, a retired Turkish judge, opining on Durust's move to the United States with O.T. under the DD and Turkish law (Id. Ex. J ("Akbay Rept."));
- An expert report from Emrehan Inal, professor of law at Istanbul University, opining on the same subject as the Akbay Rept. (Id. Ex. K ("Inal Rept."));
- An expert report from Faruk Kerem Giray, also professor of law at Istanbul University, opining on the same subject as the Akbay and Inal Repts. (Id. Ex. L ("Giray Rept."));
- A declaration from Asli Cavlak supporting Respondent's preferred DD translation of § 3.7 and offering a similar new translation (D.E. # 26-3 ("Cavlak Decl.")); and
- An expert report from Dr. William Kaplan, opining on O.T.'s acclimatization to New York (D.E. # 26-4 ("Kaplan Rept.").)[4]

---

[4] Respondent also requested to supplement the record on summary judgment to include a November 4, 2024 order of the Turkish family court. (D.E. # 31.) I will not allow her to supplement the record on summary judgment because she has not shown that "her failure to submit such evidence in a timely fashion was the result of excusable neglect." Desrameaux v. Delta Air Lines Inc., No. 15-cv-347 (CBA) (VMS), 2018 WL 1224100, at *6 (E.D.N.Y. Mar. 18, 2018) (quotation omitted). She does not deny that she or her Turkish counsel had access to the one-page order on November 4 and does not explain why I should excuse the delay to obtain a translation before her summary judgment reply brief was submitted on November 14. And even if I were to consider her supplemental evidence, I would not find it relevant because the Turkish court did not rule on the merits of the case. It instead declined to expedite a hearing on the custody

5

In the alternative, she argues I should dismiss, abstain from, or stay Tatari's petition in favor of the Turkish Proceedings, which she believes will resolve the instant dispute. (Resp. MSJ 16-26.) Petitioner disagrees, arguing that the Turkish Proceeding will not determine whether he has stated a prima facie Hague Convention case and that I may not abstain from hearing this case. (Pet. MSJ 15-18; Pet. MSJ Rep. 12-20.)

**STANDARD OF REVIEW**

"Summary judgment is appropriate where the submissions of the parties, taken together, 'show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Gustavia Home, LLC v. Hoyer, 362 F. Supp. 3d 71, 78 (E.D.N.Y. 2019) (quoting Fed. R. Civ. P. 56(a)). "When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration." Id. (citing Morales v. Quintel Ent., Inc., 249 F.3d 115, 121 (2d Cir. 2001)). When the moving party shows the absence of a genuine issue of material fact, the opposing party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact," which is "more than simply show[ing] that there is some metaphysical doubt as to the material facts." Bryant v. Steele, 462 F. Supp. 3d 249, 258 (E.D.N.Y. 2020) (quotations omitted). Thus, the opposing party "may not rely on conclusory allegations or unsubstantiated speculation." Id. (quotation omitted).

In considering motions for summary judgment, I may rely only on evidence that would be admissible at trial. Minto v. Molloy Univ., 715 F. Supp. 3d 422, 430 (E.D.N.Y. 2024). The Hague Convention and ICARA modify the ordinary standards of admissibility. In Hague Convention

---

dispute and to order that O.T. be placed in Tatari's custody in the interim because "it is related to the essence of the case and requires a trial." (See D.E. # 44.)

cases, "any petition to a court under section 9003" of Title 22, "or any other documents or information included with such . . . petition or provided after such submission which relates to the . . . petition" do not need to be authenticated to be admissible in court. 22 U.S.C. § 9005; see also Nowlan v. Nowlan, 543 F. Supp. 3d 324, 356-57 (W.D. Va. 2021) (discussing § 9005 and Hague Convention Art. 30). However, most courts have assumed that the Federal Rules of Evidence otherwise apply to Hague Convention proceedings. Jacquety v. Baptista, 538 F. Supp. 3d 325, 339 n.8 (S.D.N.Y. 2021).[5] Relevant here, restrictions regarding hearsay and the admissibility of expert testimony apply. Id. at 338-39; Nowlan, 543 F. Supp. 3d at 357, 371. However, expert testimony on foreign law may be considered regardless of its admissibility under the Federal Rules of Evidence. Fed. R. Civ. P. 44.1; see J.R. Simplot Co. v. McCain Foods USA, Inc., 713 F. Supp. 3d 904, 977 (D. Idaho 2024); see also Branch of Citibank, N.A. v. De Nevares, 74 F.4th 8, 14 & n.5 (2d Cir. 2023).

## DISCUSSION

"The Hague Convention was adopted in 1980 to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . ." Gitter v. Gitter, 396 F.3d 124, 129 (2d Cir. 2005) (quotation omitted). It was "especially aimed at the unilateral removal or retention of children by those close to them, such as parents." Id. The Hague Convention, implemented through ICARA, provides a right of action to institute judicial proceedings for the return of a child to her habitual residence. 22 U.S.C. § 9003(b). To compel the return of a child to her habitual

---

[5] Petitioner quotes a First Circuit decision for the proposition that "the summary character of Hague Convention proceedings does not require application of the Federal Rules of Evidence regarding hearsay." (Pet. MSJ 7 (quoting Danaipour v. McLarey, 386 F.3d 289, 296 (1st Cir. 2004)).) The First Circuit there was quoting the District of Massachusetts rather than the First Circuit's holding, which expressed some "doubts" as to that proposition. Danaipour, 386 F.3d at 296.

7

residence, a petitioner must show by a preponderance of the evidence that "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." Gitter, 396 F.3d at 130-31 (citation omitted). If a petitioner makes this showing, return is mandatory unless the respondent can show one of the Hague Convention exceptions apply. Souratgar v. Lee, 720 F.3d 96, 102 (2d Cir. 2013). Durust has not affirmatively sought summary judgment on an exception but opposes Tatari's motion on the ground that he consented to O.T.'s removal in the divorce decree. (Resp. MSJ Rep. 18-20.) Tatari seeks summary judgment on each element of his prima facie case as well as on consent.

## I. Habitual Residence

Tatari urges me to resolve the issue of O.T.'s habitual residence, citing that O.T. has lived in Turkey for six years, with the exception of a few weeks. (Pet. MSJ 7.) Durust even admits in her papers that Turkey was "the country of the Child's habitual residence at the time of the move." (Resp. MSJ 9.) Nonetheless, she argues there is a genuine dispute of material fact as to habitual residence because the Supreme Court has labeled habitual residence "a fact-driven inquiry." (Resp. MSJ Rep. 18 (quoting Monasky v. Taglieri, 589 U.S. 68, 68 (2020)).) She argues that O.T. has become acclimated to America over the last three months. (Id. 19-20.) Her argument fails because habitual residence is set "at the time of removal or retention," here when O.T. came to America. Monasky, 589 U.S. at 77. It is well-recognized that because O.T. lived in Turkey until he was brought to America, Turkey was his habitual residence. Pozniak v. Schwartsman, No. 20-cv-2956 (AMD) (RML), 2021 WL 965238, at *8-9 (E.D.N.Y. Mar. 15, 2021); Lukic v. Elezovic, No. 20-cv-3110 (ARR) (LB), 2021 WL 466029, at *5 (E.D.N.Y. Feb. 9, 2021) (finding habitual

residence in Montenegro at summary judgment where it was "undisputed that [the child] resided in Montenegro for her entire life, up to the point when respondent took her to the United States more than eighteen months ago"). The cases Durust cites concern situations where the wrongful removal or retention is alleged to have occurred subsequent to the move from the habitual residence. (Resp. MSJ Rep. 19, 21); see Grano v. Martin, 443 F. Supp. 3d 510, 530-31, 541 (S.D.N.Y. 2020), aff'd 821 F. App'x 26 (2d Cir. 2020) (child was wrongfully retained in United States under Spanish divorce decree post-dating removal by a year where the parents' last shared intent was for the child to be domiciled in Spain); Spica v. Viera, No. 20-cv-21284-UU, 2020 WL 13401915, at *3-4 (S.D. Fla. June 4, 2020) (discussing whether consensual trip to Florida was a temporary visit or a change in habitual residence). Acclimatization can be relevant in those cases where the child's habituation to the country precedes his wrongful retention there. Pozniak, 2021 WL 965238, at *8-9. In this case, Tatari has shown that the wrongful removal, if any, occurred when O.T. left Turkey. Durust can point to no fact that, prior to that moment, O.T. was habitually resident in the United States. Therefore, summary judgment is appropriate for Tatari's claim that Turkey was O.T.'s habitual residence.

## II. Wrongful Removal

The parties' main dispute centers on whether O.T.'s removal from Turkey in August 2024 was in breach of Petitioner's custody rights under Turkish law. (Compare Pet. MSJ 10-13 with Resp. MSJ 10-16.) Specifically, the parties dispute whether the Divorce Decree required Durust to obtain Tatari's permission in order to move to New York with O.T. A parent's ne exeat right—meaning the right to prevent the removal of a child from her home jurisdiction—is a custodial right under the Hague Convention if it is recognized under the applicable foreign law. Abbott v. Abbott, 560 U.S. 1, 10-12 (2010). When foreign law does not recognize a ne exeat right (or other custody

9

right under the Hague Convention), the second element of the prima facie case cannot be shown. Radu v. Toader, 805 F. Supp. 2d 1, 9-11 (E.D.N.Y. 2011), aff'd 463 F. App'x 29 (2d Cir. 2012).

Under historical principles of Turkish law, divorce orders do not provide for joint custody. E.g., Matter of Yaman, 105 A.3d 600, 611 (N.H. 2014) (Turkish law does not permit joint custody in divorce cases); (Inal Rept. ¶ I.3.) The parent with sole custody has the constitutional right to determine the child's domicile, while the non-custodial parent only has visitation rights. (Inal Rept. ¶¶ I.5, 7, II.4; see also id. ¶ I.9 (collecting authorities); Yurust Rept. ¶ A.8.) As stated by the Turkish court whose decision Professor Inal provides, for "the spouse who is the custodial parent . . . taking the child abroad does not, as a rule, require the consent of the spouse from whom she is divorced." (Inal Rept. ¶ II.4 (quoting Yargitay 2. HD. E.2023/1718).) Yurust, Petitioner's expert, also agrees to this general principle. (Yurust Rept. ¶¶ A.8-A.12.) Following changes in European human rights protocols and a 2017 Supreme Court decision, Turkish courts have begun to enforce at least foreign joint custody orders. (Yurust Rept. ¶¶ B.1-B6; Inal Rept. ¶ I.3). Nonetheless, there is no independent procedural vehicle for joint custody under Turkish law. See C. Agaoglu, Have Turkish Courts started to Enforce Foreign Joint Custody Judgments?, 71 ANNALES DE LA FACULTE DE DROIT D'ISTANBUL 1 (2021) (discussing Turkish enforcement of foreign joint custody orders and the lack of Turkish procedure to implement joint custody).

Against that backdrop, Tatari and his experts argue that the couple tried to make a practical joint custody agreement since Turkish law does not allow them to make an official joint custody agreement. (Yurust Rept. ¶¶ C.2-C.4; Huysal Rept. ¶¶ 45-46; Pet. MSJ Rep. 10.) One of the rights that the parties included in their divorce agreement, Tatari argues, is the ne exeat right to veto O.T.'s moving abroad. (Pet. MSJ 10-13; Pet. MSJ Rep. 7.) He proffers a translation of the DD,

10

as well as translators attesting to its language, that suggests that the DD does in fact require Tatari's consent before O.T. can be taken abroad. (Pet. MSJ 10-13.)

Durust disagrees on the correct construction of the DD. She contends that the DD requires her to only to "consult and seek [Petitioner's] opinion" if "she decides to live abroad" with O.T., so the DD did not give Petitioner a veto, and thus no <u>ne exeat</u> right. (Resp. 56.1 ¶ 18; Resp. MSJ 11-14.) This, she claims, fits more in line with the Turkish law described above under which the parent having sole custody may freely move abroad without the permission of the non-custodial parent. (Inal Rept. ¶¶ I.10-12, II.6-7; Resp. MSJ 12.) Additionally, she argues that Tatari's statement during the divorce proceedings that he "understand[s] that [Durust] can legally decide alone within the scope of the right of custody in matters such as . . . moving his residence abroad" shows that section 3.7 of the DD was not meant to alter Durust's privilege under ordinary principles of Turkish law. (<u>See</u> Giray Rept. 3-8; Pet's Tr. DD 2.)

I cannot grant summary judgment on wrongful removal because there is a genuine dispute of material fact. Competing translations are considered genuine disputes of material fact at the summary judgment stage. <u>See</u> <u>Altvater Gessler-J.A. Baczewski Intern. (USA) Inc. v. Sobieski Destylarnia S.A.</u>, 572 F.3d 86, 90 n.5 (2d Cir. 2009). Here, the key word in the Turkish DD "onay" has several possible translations including "opinion" and "approval" (<u>see</u> Cavlak Decl. 9; Elterman Decl. 7), and the difficulty of rendering Turkish-language decisions in English is well-documented, <u>see</u> A. Atlay, <u>Difficulties Encountered in the Translation of Legal Texts: The Case of Turkey</u>, TRANSLATION JOURNAL (Oct. 2002), available at https://translationjournal.net/journal/22legal.htm [https://perma.cc/2LJK-3G2T]. Additionally, I cannot resolve the meaning of section 3.7 by resorting to the parties' statements at the divorce proceedings because Tatari's statements are arguably subject to more than one reasonable meaning. (<u>See</u> Resp. MSJ 13); <u>see</u> <u>Adipietro v.</u>

11

Chubb Life Am., 736 F. Supp. 29 (E.D.N.Y. 1990) (denying summary judgment based on ambiguous stipulation); see also Ruscoe v. Housing Auth. of City of New Britain, 259 F. Supp. 2d 160, 168 (D. Conn. 2003) (interpretation of statements in interview were ambiguous precluding summary judgment).

Tatari also argues that his right to jointly determine O.T.'s schooling and healthcare is independently a custody right under the Convention. (Pet. MSJ Rep. 8, 10; see Yurust Rept. ¶¶ C.3, C.5, D.3.) The Hague Convention recognizes as custody rights "right[s] relating to the care of the person of the child." Takeshi Ogawa v. Kyong Kang, 946 F.3d 1176, 1181 (10th Cir. 2020) (quoting Hague Convention Art. 5). It is Tatari's burden to prove that, under Turkish law, he has these rights and that they are custodial. Id. At this juncture, Tatari has not offered evidence that these rights, standing alone, were custodial under Turkish law. See White v. White, 718 F.3d 300, 305 (4th Cir. 2013).

For the foregoing reasons summary judgment on whether O.T.'s removal from Turkey was wrongful is not warranted for either party.

### III.   Consent

Durust also argues that I should "deny Petitioner's Motion because Petitioner consented to the removal of the Child from Turkey to New York by agreeing to terms of the parties' Divorce Decree, which gave Respondent sole custody of the Child and permitted her to move abroad with the Child without requiring Petitioner's approval." (Resp. MSJ Rep. 18.) She must show Tatari consented to O.T.'s move to America by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B); Hague Convention Art. 13(a). "The key to the consent inquiry is the petitioner's subjective intent" prior to removal. In re Kim, 404 F. Supp. 2d 495, 516 (S.D.N.Y. 2005). Courts have also recognized that consent must exist at the time of removal in order to satisfy the Article

12

13(a) defense. See Khalip v. Khalip, No. 10-cv-13518 (AC), 2011 WL 1882514, at *6-7 (E.D. Mich. May 17, 2011) (While petitioner "signed the consent application" to move to America after "discuss[ing] the move several times," respondent did not show consent because petitioner clearly revoked consent prior to removal by filing documents in Ukranian court); see also Re G, [2021] EWCA Civ. 139 [24]-[25] (Eng.) [6] (Jackson LJ) ("To be valid, such consent must still be operative at the time of removal. Consent can be withdrawn at any time before the actual removal.").[7] She argues that the same DD which allows her to move abroad shows that Tatari agreed for her to take O.T. abroad. Of course, Tatari disputes that this is what he agreed to in the divorce proceedings. Even assuming Tatari recognized that Durust may move abroad with O.T., he "reserve[d his] right to bring a lawsuit to ensure the alteration (change) of custody unless I am consulted by [Durust] and give my approv[al] as agreed" in the DD. (Pet's Tr. DD 1.) And after Durust took O.T. to Ivory Coast over Tatari's "strenuous objection," Tatari did in fact bring a lawsuit to make a change of custody. (Resp. 56.1 Rep. 4-5, 7.) Additionally, when O.T.'s American passport was up for renewal, Tatari refused to sign. (Id. 5.) Durust even admits that she purposefully did not tell Tatari about her move with O.T. for fear that he would sabotage O.T.'s admission into school. (Answer 13-14.) "The deliberately secretive nature of her actions is extremely strong evidence that [Tatari] would not have consented to the removal of" O.T. Friedrich v. Friedrich, 78 F.3d 1060, 1070 (6th Cir. 1996). All the more so when coupled with Tatari's mentioning of a lawsuit at the divorce hearings and continued objections to international travel. "Each of the words and actions of a

---

[6] Courts rely on other signatories' courts to interpret the Hague Convention. Abbott, 560 U.S. at 10-11.
[7] Accord De Casconcelos v. De Paula Batista, No. 4:10-cv-628 (DDB), 2011 WL 806096, at *1, 7-8 (E.D. Tex. Mar. 1, 2011) (not finding consent or acquiescence where petitioner consented to trip to the United States and signed the child's passport but withdrew that consent prior to the child's travel to the United States); Sacchi v. Dervishi, No. 19-cv-6638-SK, 2020 WL 3618957, at *9-10 (N.D. Cal. July 2, 2020) (when petitioner revoked his consent before removal, respondent could not show consent); Rosasen v. Rosasen, No. 19-cv-10742-JFW(AFMx), 2020 WL 12968435, at *12 (C.D. Cal. Mar. 31, 2020) (finding no consent because "even if Mother initially acquiesced in the relocation to the United States in July 2019, the Court has found that Mother withdrew any consent to relocate the Children" prior to removal).

13

parent during the separation are not to be scrutinized for a possible waiver of custody rights." Id. The combination of the evidence presented, namely, Tatari's reservation of a right to sue upon relocation during the divorce proceedings, the exercise of that right in January 2024, and the subsequent, repeated refusal for O.T. to go abroad, shows that there is no genuine dispute of material fact that Tatari did not consent for O.T. to move abroad in August 2024 because Tatari either did not give consent during the divorce proceedings or clearly revoked that consent before removal.[8] Velozny ex rel. R.V. v. Velozny, 550 F. Supp. 3d 4, 15-17 (S.D.N.Y. 2021) (finding no consent at summary judgment); Habrzyk v. Habrzyk, 759 F. Supp. 2d 1014, 1025 (N.D. Ill. 2011) (same); see also Currier v. Currier, 845 F. Supp. 916, 922 (D.N.H. 1994) (finding no consent, despite divorce agreement, where respondent knew that petitioner was concerned about the children moving abroad and respondent secretly left the country with the children).

## IV. Appropriate Forum for Determining Wrongful Removal

I am sympathetic to Durust's argument that the Turkish courts may be the best forum to resolve the meaning of the DD. (Resp. MSJ 21-26.) However, I recognize that resorting to the Turkish courts will delay the disposition of O.T.'s location, leaving him in limbo against the Convention's central goal of expediency. See Chafin v. Chafin, 568 U.S. 165, 180 (2013) (Ginsburg, J. concurring). Further, the Turkish Proceedings may not necessarily resolve the instant Hague Convention petition, a factor counseling against a stay of these proceedings. See Holder v. Holder, 305 F.3d 854, 868-69 (9th Cir. 2002) (reversing stay in favor of state court custody

---

[8] "Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense - on which the defendant bears the burden of proof at trial - a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case." Avail 1 LLC v. Varlas, 680 F. Supp. 3d 265, 272 (E.D.N.Y. 2023) (quoting FDIC v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994)). Tatari sought summary judgment on his Hague Convention case and argued that Durust cannot show her affirmative defense of consent. (Pet. MSJ 13-15.) Durust has responded to this argument in her brief, claiming she "can and did establish that Petitioner consented to the Child's relocation to the United States." (Resp. MSJ Rep. 16-18.) Therefore, summary judgment on consent is appropriate at this stage.

14

proceedings when it was uncertain that the state court would adjudicate all of the questions in the Hague Convention case).

However, the Hague Convention provides a mechanism to seek a Turkish adjudication of the question of wrongful removal. Article 15 allows me to "request that the applicant obtain from authorities of the State of the habitual residence of the child a decision or other determination that the removal . . . was wrongful . . . ." Courts have found that resort to an Article 15 request may be appropriate, before or after an evidentiary hearing, especially when there are difficult questions of foreign law.[9] See Holloway v. Holloway, No. 5:11-cv-30-H, 2011 U.S. Dist. LEXIS 68315, at *14-16 (E.D.N.C. Apr. 14, 2011) (discussing Article 15 request and relying on Bahamian court's decision); Stirk v. Lopez, No. 8:20-cv-2894-SDM-AAS, Order (M.D. Fla. Dec. 17, 2020) (ordering Article 15 request after holding two-day evidentiary hearing); see also In re Application of Adan, 437 F.3d 381, 394 (3d Cir. 2006) (remanding to the district court for proof of custody rights under Argentine law and noting that the District Court has the discretion to make an Article 15 request which "would be very helpful in properly determining the wrongfulness" of the removal). Although I recognize that an Article 15 request may result in delay, it is possible that the parties can, under Turkish procedure, consolidate an Article 15 request with the pending Turkish Proceedings which, Tatari represents, are mid-trial. The Turkish courts' familiarity with the parties and their claims may reduce the delay in answering an Article 15 request. Cf. Bardales v. Lamothe, 423 F. Supp. 3d 459, 473 n.10 (M.D. Tenn. 2019) (declining to order Article 15 request when there were no pending foreign custody proceeding, so the foreign court was unfamiliar with the record).

---

[9] In Turkey, an Article 15 request may be made through the courts. Hague Conf. on Private Int'l Law, 1980 CHILD ABDUCTION CONVENTION – COUNTRY PROFILE: TURKIYE (2023), available at https://assets.hcch.net/docs/62ed5651-19cc-4d7d-82d4-587832a51873.pdf [https://perma.cc/HTC2-5SXU].

At the pretrial conference scheduled in this Memorandum and Order, the parties should come prepared to discuss whether, given the complex issues of Turkish law, I should direct Petitioner to request a determination from the Turkish courts, pursuant to Article 15 of the Hague Convention, that O.T.'s removal from Turkey was wrongful because it violated Petitioner's <u>ne exeat</u> or other custody right. If it is determined to proceed to the hearing scheduled for December 11 and 12, 2024, rather than delay in favor of the Turkish courts, I expect the parties and their legal experts to come prepared to discuss:

1. Whether a Turkish court may create a <u>ne exeat</u> right in a divorce decree;
2. Whether a Turkish court would interpret the DD to have provided a <u>ne exeat</u> right given the tension in Turkish law cited above;
3. An explanation of the impact of Tatari's second-and-third-to-last sentences in his statement in the DD; specifically:
    a. How a Turkish court would interpret the right to sue Tatari references in the second-to-last sentence, and
    b. How a Turkish court would use Tatari's statement to interpret the DD's provisions; and
4. Whether the healthcare and education provisions in sections 3.4 and 3.8 of the DD gave Tatari custody rights under Turkish law and the Hague Convention.

## CONCLUSION

For the foregoing reasons, Tatari's motion for summary judgment is granted as to habitual residence and consent. Durust's motion for summary judgment is denied. A pretrial conference is scheduled for Monday December 9, 2024 at 2:30 P.M. in Courtroom 10D South.

SO ORDERED.

Dated: December 3, 2024
Brooklyn, New York

/s/Carol Bagley Amon
Carol Bagley Amon
United States District Judge