UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
ZUHTU ONUR TATARI,

                            Petitioner,

  -against-                                NOT FOR PUBLICATION
                                              **MEMORANDUM & ORDER**
NEVA DURUST,                          24-CV-6930 (CBA) (LKE)

                            Respondent.
------------------------------------------------------x

**AMON, United States District Judge:**

      Before me is the Petition of Zuhtu Onur Tatari pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670 (the "Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-11 ("ICARA"). Tatari seeks to have his son, O.T., returned to Turkey. I held a two-day bench trial on December 11 and 12, 2024 and received post-trial briefing to resolve a single, seemingly simple question: Whether or not Tatari and his ex-wife Durust's divorce decree ("DD") gave Tatari rights under Turkish law which the Hague Convention recognizes as custodial.

      The issue is not as straightforward as it appears. Although the terms of the Divorce Decree are unambiguous in awarding Tatari certain custodial rights, the terms are in tension with Turkish law that does not formally recognize joint custody. Resolution of this difficult case produces in the societal sense no real winners, especially O.T., who has been displaced once and will be displaced again. Nonetheless, I am required to answer the question. After carefully considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, I make the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)(1).

1

**FINDINGS OF FACT**

I assume the parties' familiarity with the background facts to this case, which I recounted in my summary judgment opinion. (ECF Docket Entry ("D.E.") # 45 ("SJO") 2-3.) In that opinion, I explained that the parties, who were married in 2016, had O.T. in 2018 and divorced in January 2022. (Id.) I found that Tatari had shown the first element of his Hague Convention case, that Turkey was O.T.'s habitual residence at the time Durust and O.T. moved to Brooklyn. (Id. 8-9.) My determination of the following facts is based on credibility determinations of the witnesses and a careful weighing of competing evidence. Although I generally found the witnesses credible, there were certain isolated incidents in which I did not credit their testimony, which I will note where relevant.

In Turkey, for a married couple to be granted an uncontested divorce, they must present a signed divorce protocol to the court. (Transcript of Trial ("Tr.") 45, 92; D.E. # 64 ("Tatari PTB") ¶ 6); see also Turkish Civil Code ("TCC") Art. 166/3. The Turkish court must review the protocol, hear the parties' statements regarding their decision to divorce and construction of the protocol, and decide whether to adjust any provisions of the protocol. (Tr. 92-94, 295; Tatari PTB ¶ 6); TCC Art. 166/3. Any adjustments by the judge will be recorded in the divorce decree, which then can be approved by the court and the parties. (Tr. 93, 299); TCC Art. 166/3.

In this case, the parties submitted a much-negotiated protocol to the Turkish family court. (Tr. 201-03, 369; Tatari PTB ¶ 7; Pet. Ex.[1] 30 ("Protocol").) Tatari testified that he was especially concerned with the provisions governing visitation, O.T.'s schooling, country of residence, and healthcare. (Tr. 202-06.) Durust testified she was most concerned about having sole custody of O.T. (Id. 347, 369-71.) After hearing the parties' statements and some discussion, the judge

---

[1] Exhibits will be referred to by "Ex.", and consist of Petitioner's trial exhibits ("Pet. Ex."), Respondent's trial exhibits ("Resp. Ex."), and exhibits to previously-filed motions.

2

modified the visitation schedule slightly, but did not adjust the other provisions of the Protocol. (Id. 211; compare Protocol with Pet. Ex. 29 ("Transperfect DD").[2]) The Protocol was included in the Divorce Decree according to TCC Art. 184/5, and the exclusion of the Protocol's visitation schedule was noted. (Transperfect DD 2, 5; Pet. Tr. DD 3, 7-8; Resp. Tr. DD 2, 5.)

## I. The Divorce Decree

The Divorce Decree contains two principal sections. First, the court summarizes the attorneys' and parties' statements made at the hearing, as well as the judge's findings. (Transperfect DD 1-2.) Next, it contains a section with the heading "DECISION," followed by seven numbered paragraphs. (Id. 2-5.) The fourth paragraph of the Decision contains the Protocol. (Id. 3-5.) The provisions in Paragraph 4 are identical to the Protocol, even though the judge adjusted the visitation schedule in Paragraph 2 of the DD. (Compare id. 2-3 with Protocol 1-2.) The parties' translations have somewhat different language describing how the Protocol is incorporated into the DD. Durust's preferred translation calls the Protocol "approved pursuant to Article 184/5 of TCC and [] deemed an attachment to the order," and later again says that the Protocol is "approved" and "an annex to the court order, pursuant to Article 184/5 of the Turkish Civil Code." (Resp. Tr. DD 2, 5.) Tatari's original preferred translation has similar approval and annex language, but his most recent Transperfect translation says the Protocol is "approved . . . in accordance with Article 184/5 of the [TCC], and [is] considered as part of the decision." (Pet. Tr. DD 3, 7; Transperfect DD 2, 5.) All the translations reflect that the court approved the remaining articles of the Protocol, the key requirement for the Protocol's validity. TCC Art. 184/5

---

[2] The parties dispute the accuracy of the various translations submitted. In this memorandum and order, I will generally refer to the Transperfect DD simply because it is the most clearly reproduced, not because I have determined it is as a whole more or less accurate than other translations. Courts have required the provision of certified translations, such as the Transperfect DD, to introduce foreign language documents at trial. See NV Petrus SA v. LPG Trading Corp., No. 14-cv-3138 (NGG) (PK), 2017 WL 1905820, at *2 (E.D.N.Y. May 8, 2017). Therefore, the three translations in evidence are the Transperfect DD, Pet. Ex. 28 ("Pet. Tr. DD") and Pet. Ex. 22 ("Resp. Tr. DD").

3

("Agreements as to accessory consequences of divorce . . . shall only be valid if they are approved by the judge").

The DD's first section contains the following details. Tatari stated that he accepted the signed protocol and acknowledged that the judge may adjust the terms of it. (Transperfect DD 1.) He understood that "in matters such as making important decisions regarding the child's health and the relocation of their residence abroad, [Durust could] legally make decisions alone under the scope of custody." (Id.)[3] Nonetheless, he "reserve[d] the right to file a lawsuit regarding the change of custody" if Durust "[did] not obtain [his] opinion and approval [in making those decisions] as agreed in the protocol." (Id.) Durust also accepted the signed protocol and acknowledged that the judge may adjust its terms. (Id. 1-2.) She said that she "[would] consider and take into account [Tatari's] opinion and approval, as pledged in the protocol" "in matters such as making important decisions regarding the child's health and the relocation of their residence abroad." (Id. 2.) The judge explained her findings of the appropriateness of a divorce and that "the custody of the joint child is awarded to the mother pursuant to Article 182 of the" TCC. (Id.) She also explained that she was not deciding on any alimony or other financial claims and approved the provisions of the Protocol except for those related to visitation. (Id.)

The next section of the DD describes the decision made by the divorce court. Paragraph 1 of the decision divorced Tatari and Durust. (Id.) Paragraph 2 gives custody of O.T. to Durust and provides the visitation schedule for Tatari. (Id.) Paragraph 3 clarifies that there is no decision made on compensation or alimony. (Id. 3.) Next, Paragraph 4 incorporates the Protocol. The Protocol indicates that Durust will have custody of O.T. and sets out a proposed schedule for

---

[3] Although Tatari testified he did not recall making the statement that is recorded in the Decree, there is no reason to doubt that Tatari said what was recorded in the Decree. Additionally, Durust testified about certain statements the judge made at the hearing, but these are nowhere recorded. (Tr. 347-49, 353.) I do not find her recounting of those details credible and at any rate, they are hearsay.

4

Tatari's visitation.  (Id. 3-4 §§ 3.1, 3.2.)  Section 3.4 of the Protocol dictates that O.T. "will attend schools determined by the mutual decision of the parties throughout [his] educational life, including but not limited to Enka Schools, Hisar Schools, Koc School, Pierre Loti French School, or equivalent schools."  (Id. 4 § 3.4.)  If the school is "determined by the mutual decision of the parties," Tatari is obliged to pay the tuition and fees.  (Id.)  Section 3.5 obligates Tatari to pay for health insurance "as determined by the mutual agreement of the parties."  (Id. 5 § 3.5.)  Section 3.6 obligates Tatari to pay the salary and insurance of O.T.'s caregiver.  (Id. § 3.6.)

At summary judgment, the parties disputed the correct translation of the next provision, Section 3.7.  (See SJO 10-12.)  Although Durust did not press this issue at trial, I will nonetheless resolve it.  (See SJO 10-12.)  Tatari's preferred translations obligate Durust to "obtain the approval and opinion" of Tatari if "she decides to live abroad together with" O.T., while Durust's preferred translation obligates her only to "consult and seek the opinion" of Tatari "where she decides to live abroad together with" O.T.  (Resp. Tr. DD 4; Pet. Tr. DD 6; Transperfect DD 5.)  At trial, Tatari presented two experts, Talat Yazici and AJ Elterman, who testified that his preferred translation was a truer rendition of the original Turkish.  Yazici testified that his original translation, on which Durust relied, was incorrect and that an accurate translation should read Durust "will obtain the approval and opinion" of Tatari.  (Tr. 146-152; Pet. Ex. 40 ¶ 6.)  He said the original translation was mistaken because it made it "seem[] that Neva [Durust] should only take consultation of Onur Tatari" before deciding to move abroad "[b]ut actually she has to take his approval."  (Tr. 153.)

AJ Elterman also testified to the accuracy of Tatari's preferred translation.  She has worked as a legal translator for decades and has been certified for simultaneous translation of Turkish to English by the State Department.  (Id. 168-72.)  She testified that the key Turkish word, "onay," might be used colloquially to mean "okay," but in a formal legal context will always mean

5

approval. (Id. 176-77.) Both experts also noted that in Durust's preferred translation in Section 3.8, the same word "onay" is translated as "approval." (See Resp. Tr. DD 4.) Durust offers no explanation for why "onay" would be translated differently here in Section 3.7. Accordingly, I find that Tatari's preferred translation of Section 3.7 is more faithful to the Turkish original.[4]

Turning to the remainder of the Divorce Decree's recitations in the Protocol, I note that Section 3.8 obligates Durust to "obtain the approval and opinion of" Tatari "when any decision is required with regards to the health status" of O.T. (Transperfect DD 5 § 3.8.) Sections 3.9 through 3.11 explain that there is no dispute about dividing property, alimony, or attorney's fees. (Id. §§ 3.9-3.11.) In the final terms of the Protocol, the judge added a line to Section 4.2, stating that the "provisions of the protocol dated 01/18/2022, except for those related to personal relationship [visitation], shall be approved in accordance with Article 184/5 of the Turkish Civil Code" and considered as part of or an annex to the decision. (Id. § 4.2; see Resp. Tr. DD 5; Protocol 4.) Finally, the last three paragraphs of the decision, which were not part of the submitted Protocol, deal with deposited expenses, fees, and litigation costs. (Transperfect DD 5.) The Decree ends by explaining that the "decision was read aloud and explained in accordance with procedure in the presence of the parties and their attorneys," and the right to appeal was explained. (Id.)

## II. Subsequent Events

After the divorce, O.T. continued to attend the Papatya school, which the parties had agreed upon before. (Tr. 215-16, 346.) At some point, O.T. was also enrolled in a school called "MEF" and ultimately enrolled in Koc, one of the four schools identified in Section 3.4 of the Protocol.

---

[4] I make this finding despite Durust's arguments about Yazici and Elterman's lack of credibility because Yazici offered one translation on which he later reneged, and Elterman only provided a limited review of the translations. (D.E. # 65 ("Durust PTB") ¶¶ 94-99.) While Yazici's reversal is notable, Elterman convincingly testified that Section 3.7's translation of "onay" was at odds with its plain meaning of approval in Turkish and with the similar translation in Section 3.8.

(Id. 356.) Tatari credibly testified that he was involved in O.T.'s life after the divorce and paid his required support. (See generally id. 199-231.) And although Durust at one point filed for an enforcement order for O.T.'s school and activity fees (Resp. Ex. O-1[5]), there was no evidence suggesting that Tatari did not provide and care for O.T.

In the fall of 2023, Durust asked Tatari to sign a consent form to renew O.T.'s American passport, which Tatari refused to do. (Tr. 230.) As a result, Durust filed a lawsuit in Turkish court to allow O.T. to receive an American passport without Tatari's signature. (Id. 231; Resp. Ex. K-1 ("Passport Complaint").) In her complaint she explained that the American consulate officials would require her to get Tatari's signature even if Durust has sole custody of O.T. (Passport Complaint 1.) In December 2023, Durust and O.T. travelled to the Ivory Coast, where she was able to obtain an emergency U.S. passport for O.T. without Tatari's signature. (Tr. 356.)

Following Durust and O.T.'s return to Turkey, Tatari filed a petition for custody of O.T. (Id. 227, 242; Resp. Ex. P-1 ("Custody Complaint").) He also sought a preliminary injunction for custody of O.T. (Custody Complaint 23.) The Turkish court rejected his request for a preliminary injunction "since the request is of the essence of the case and requires a trial." (Resp. Ex. M-3 ("Custody Interim Order") 2.) In July 2024, Tatari petitioned the Turkish court overseeing the passport case to prevent Durust from taking O.T. abroad and to notify the Turkish and American authorities of this. (Resp. Ex. N-3 ("July Petition").) Two days later, the Turkish court denied his request "since the parties were divorced, the mother has custody," and "the party with custody rights may use her rights arising from custody, and moreover, she has the initiative to go abroad." (Resp. Ex. L-3 ("July Order").)

---

[5] I take judicial notice of foreign court records cited herein that were not presented at trial. E.g. Giaguaro S.p.A. v. Amiglio, 257 F. Supp. 2d 529, 532 n.1 (E.D.N.Y. 2003) (taking judicial notice of Italian and Canadian complaints and decisions).

7

On August 20, 2024, Durust flew to America with O.T. She failed to advise Tatari of the move, much less seek his approval. The next day, she emailed him indicating her intention to remain in America. After Durust's move to America, she filed a third action in Turkish court to change Tatari's visitation schedule for O.T. given their move to America, which is currently pending. (Resp. Ex. F-1.) Finally, in October 2024, Tatari sought to expedite the custody case in Turkish court, which the family court declined to do. (Resp. Ex. W-1.) Nonetheless, Tatari's witnesses were heard in that case on November 28, 2024, and Durust's witnesses are scheduled to be heard in February 2025. (Resp. Ex. F-3.)

## CONCLUSIONS OF LAW

"The Hague Convention was adopted in 1980 to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . . ." Gitter v. Gitter, 396 F.3d 124, 129 (2d Cir. 2005) (quotation omitted). It was "especially aimed at the unilateral removal or retention of children by those close to them, such as parents." Id. The Hague Convention, implemented through ICARA, provides a right of action to institute judicial proceedings for the return of a child to her habitual residence. 22 U.S.C. § 9003(b). To compel the return of a child to her habitual residence, a petitioner must show by a preponderance of the evidence that "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." Gitter, 396 F.3d at 130-31 (citation omitted). If a petitioner makes this showing, return is mandatory unless the respondent can show one of the Hague Convention exceptions applies. Souratgar v. Lee, 720 F.3d 96, 102 (2d Cir. 2013). Durust has not argued that any exception

8

applies.  At summary judgment, I held that Tatari showed the first element of his prima facie case. (SJO 8-9.)  At the hearing, Tatari testified and showed, and Durust does not dispute, that he was exercising his rights at the time of the removal or would have been exercising those rights but for the removal.  E.g., Mota v. Castillo, 692 F.3d 108, 113 (2d Cir. 2012) (quoting Hague Convention Art. 3(b)).  The sole issue that remains is whether Durust's removal of O.T. from Turkey was wrongful.

The Hague Convention requires the return of a child if their removal is "wrongful," meaning "in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention."  Hague Convention Art. 3(a).  The text of the Convention bifurcates the legal inquiry courts must make. The definitions of wrongfulness and rights of custody are set by the Hague Convention and American caselaw interpreting it, while the substance of the potential rights of custody is determined by the law of the habitual residence, here Turkey.  Ozaltin v. Ozaltin, 708 F.3d 355, 367 (2d Cir. 2013).  What rights Tatari has are thus defined by Turkish law.  The Hague Convention recognizes rights that arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."  Hague Convention Art. 3.

The official Hague Conference reporter has explained that rights arising "by reason of an agreement having legal effect under the law of that State," can cover even "simple private transactions between the parties concerning the custody of their children."  Elisa Pérez-Vera, Explanatory Report: Hague Conference on Private International Law ¶ 70, in 3 Acts and Documents of the Fourteenth Session, 426, 447 (1982) ("Pérez-Vera Report").[6]  She explains that

---

[6] The Pérez-Vera Report is "an authoritative source for interpreting the Convention's provisions." Tereshchenko v. Karimi, 102 F.4th 111, 133 (2d Cir. 2024) (quoting Gitter, 396 F.3d at 129 n.4).

the Conference originally considered using the term "force of law," but settled on "legal effect" with the intention that the scope of the rights the Convention protects is "as flexible as possible." Id. The Convention therefore recognizes rights arising from agreements which are "not prohibited by" the habitual residence's "law and which may provide a basis for presenting a legal claim to the competent authorities." Id. The United States Department of State has expressed the same view in a notice issued as Congress adopted the Convention. Public Notice 957, 51 Fed. Reg. 10494, 10507 (1986).[7] The Department of State explained that the provision "should be interpreted expansively to cover more than only those agreements that have been incorporated in or referred to in a custody judgment." Id.

The text and interpretation of the Hague Convention control whether the rights Tatari had under Turkish law are custodial. See Lukic v. Elezovic, No. 20-cv-3110 (ARR) (LB), 2021 WL 466029, at *6 (E.D.N.Y. Feb. 9, 2021) (despite the fact that petitioner may not have had a parental right under Montenegrin law, he had a custody right under the Convention because he had a ne exeat right). The Hague Convention recognizes "all the ways in which custody of children can be exercised" and "allows the greatest possible number of cases to be brought into consideration." Abbott v. Abbott, 560 U.S. 1, 19 (2010) (quoting Pérez-Vera Report ¶¶ 67, 71). Finally, whether a removal under the Hague Convention is wrongful is determined based on the treaty's text and interpretation. Ozaltin, 708 F.3d at 369; see also Cunningham v. Cunningham, 237 F. Supp. 3d 1246, 1273-74 (M.D. Fla. 2017).

I. **Tatari's Rights Under Turkish Law**

Durust argues that Tatari only has a right for visitation with O.T., and, because she has sole custody, she has the right to make all decisions about O.T. in her sole discretion. (Durust PTB ¶¶

---

[7] Courts give this notice, as well as the Pérez-Vera Report, consideration in interpreting the Hague Convention. Tereshchenko, 102 F.4th at 134.

10

88-91, 101, 103.) Her expert, Professor Inal, testified that under Turkish law courts default to implementing sole custody in cases of divorce. (Tr. 291.) Recently Turkish courts have allowed joint custody on the consent of both parents and based on a finding that joint custody is in the child's best interests. (Id. 292.) Because joint custody is exceptional, a court imposing it would do so very explicitly and based on a finding of the child's best interests. (Id. 292-93.) He further testified that generally the parent having sole custody may make all major decisions for the child without the non-custodial parent's consent, so a divorce decree modifying the decision-making rights of the custodial parent should also do so explicitly and based on a finding of the child's best interests. (Id. 296-98.) Professor Inal explained that the provisions of a divorce protocol will not modify the custodial parent's rights because they contain "promises of the parties to each other" rather than judicial orders. (Id. 298.) The protocol is approved by the judge in order to provide its validity as "promises of the parties," but in the end, it is just a series of "promises" between the parties, not a judicial order. (Id. 298-99; see Durust PTB ¶¶ 28, 108, 110, 112, 124-26.) He argued that this accords with other principles of Turkish law which prohibit the court from imposing certain restrictions on the rights of custodial parents, specifically on the right to go abroad. (Tr. 297, 301; see Resp. Ex. X-1 ("Inal Rep't") ¶¶ II.3-4.)

Tatari's experts, on the other hand, contend that it is possible to alienate certain custody rights from the parent having sole custody. Mr. Yalcin explained that in his practice, parties typically approach sharing custody by trying to implement joint custody on certain decisions, like education or health. (Tr. 100-01; see also D.E. # 25-6 ("Yalcin Rep't") ¶ B.6.[8]) The judge's duty is to analyze each provision of the submitted protocol and she can adjust the protocol to comply

---

[8] Although Mr. Yalcin's expert report was not presented at trial, I may rely on it to aid my determination of foreign law. HFGL Ltd. v. Alex Lyon & Son Sales Managers and Auctioneers, Inc., 264 F.R.D. 146, 148 (D.N.J. 2009) ("Under Rule 44.1, the Court may consider a foreign law expert report to aid its determination of foreign law, whether or not the report is admissible under the Federal Rules of Evidence.")

11

with the best interests of the child. (Tr. 101-03.) In order for a divorce to proceed as uncontested, the judge and the parties must agree to the provisions of the divorce and the protocol, which then has legal force. (Id.) In this case, Mr. Yalcin and Tatari's other expert, Professor Huysal, contend that the parties shared custody on the issues of education, healthcare, and country of residence because those provisions were included in the Divorce Decree. (See Tatari PTB ¶¶ 74-75.)

It is clear that the provisions of the Protocol are enforceable in some manner. The provisions of the Protocol were approved by the judge according to TCC Art. 184/5, which provides validity to agreements as to accessorial consequences of divorce upon judicial approval. Because the judge approved the provisions of the Protocol, Tatari has at least some right to the interests established there. Durust does not seriously argue otherwise, nor could she since she sought to enforce Tatari's payment of school tuition and fees, which were only provided for in the Protocol. (Resp. Ex. O-1; see Durust PTB ¶ 108; see also D.E. # 17 at 12 ¶ 21.)

Based on the evidence presented at trial, I find that Tatari has the better argument: Under Turkish law, the provisions of the Protocol—and specifically Sections 3.7 and 3.8—provide Tatari "rights relating to the care of the person of the child." Mr. Yalcin, who is well regarded as an expert in the interaction between the Hague Convention and Turkish custody law,[9] credibly testified that joint custody in divorce has become more common in Turkey over the past decade and a half, especially since a Turkish Supreme Court decision in 2017 which endorsed the practice. (Tr. 90-92, 97; Yalcin Rep't ¶¶ B.3-4.) But because the TCC does not create an independent procedure for establishing joint custody, in practice many couples identify certain rights to exercise

---

[9] Mr. Yalcin is the author of the Chambers and Partners Global Practice Guides for Family Law: Law and Practice in Turkey and Family Law: Trends and Developments in Turkey, see About Mert Yalcin, CHAMBERS, available at https://practiceguides.chambers.com/author/details/0/TWVydCBZYWzDp8Sxbg, as well as the Reuters Practical Law article on Family Law in Turkiye, see Family Law in Turkiye: Overview, THOMSON REUTERS, Oct. 1, 2023, available at https://us.practicallaw.thomsonreuters.com/6-616-4228. He is also a fellow of the International Academy of Family Lawyers, see Mert Yalcin, INT'L ACAD. OF FAM. LAWYERS, available at https://www.iafl.com/find-a-lawyer/search-details/?id=20305.

12

jointly while granting primary custody to one parent. (Yalcin Rep't ¶ B.6; Tr. 98-99.) Tatari and Durust, in their Protocol, provided the "typical regulation that we put into settlement agreements on the joint custody regulations . . . among the lawyers." (Tr. 100.) Tatari and Durust's Protocol provides that certain rights—specifically those related to education, healthcare, and country of residence—are exercised jointly by the parties. (Id. 101; see also id. 49-52; Yalcin Rep't ¶¶ C.3-C5; Pet. Ex. 45 ¶¶ 37, 45.) Mr. Yalcin explained that divorce by consent is only possible if the judge approves each provision of the protocol, or if the judge makes any changes to the protocol that the parties agree to those changes. (Tr. 92-95.) In this case, the judge adjusted the visitation schedule but otherwise approved the provisions of the Protocol to govern the divorce. (Id. 103-06.) In sum, under the Turkish Divorce Decree Tatari has the right to approve, or disapprove, certain decisions about O.T.'s life, including whether he may live abroad.

Durust and her experts resist this conclusion on several grounds, none of which are persuasive. First, she points to the parties' statements recorded in the Divorce Decree, in which Tatari stated that he understood "that in matters such as making important decisions regarding the child's health and the relocation of their residence abroad, [Durust] can legally make decisions alone under the scope of custody." (Transperfect DD 1; see Durust PTB ¶¶ 100-06.) This, she argues, is more consistent with her explanation of the Divorce Decree: that it did not give Tatari authority to veto her move abroad with O.T. (Durust PTB ¶ 106.)

Tatari counters that the parties' statements are not a binding part of the Turkish decision under Turkish law. (Tatari PTB ¶ 22; D.E. # 66 ("Tatari PTR") ¶ 12.) Although Durust argues that the statements do have some legal import under Turkish law (see Durust PTB ¶¶ 104-06; D.E. # 23-1 Ex. L at 6), it is clear that the divorce judge was not bound by the parties' statements and the Divorce Decree as written is the governing order. (See Tatari PTB ¶¶ 21-26; Durust PTB ¶¶ 26,

13

108.) And under that governing order, the judge implemented the Protocol provisions that granted Tatari rights, including the right to veto O.T.'s move abroad. Tatari's statements at the divorce hearing do not unequivocally negate what the judge ordered because they reference his right to approve or disapprove of O.T.'s relocation and his ability to enforce that right. I do not credit Durust's assertions that the "Judge made Tatari acknowledge" Durust's ability to relocate or that the Judge told Durust "that Section 3.7 was not binding and Tatari did not have the ability to block her from moving abroad with O.T.," neither of which is supported by any record evidence. (Durust PTB ¶¶ 100-11.) Accordingly, I will not depart from the plain language of the Divorce Decree, which provides Tatari the rights explained in Sections 3.4, 3.7, and 3.8.

Durust next argues that the order of the Turkish court overseeing the passport proceedings is more consistent with her explanation of the Divorce Decree. In July, Tatari sought to "prevent the joint child from going abroad without [Tatari] and the court's knowledge" because Durust was "practically abducting [O.T.] abroad" and Tatari "heard that [Durust] plans to take the joint child abroad." (July Petition 2-3.) The Turkish court recognized Tatari's fear that Durust may take O.T. "abroad for short or long periods of time without [Tatari's] knowledge," but denied his request to prevent O.T. from going abroad. (July Order 1.) The court reasoned that "since . . . the mother has custody" she "may use her rights arising from custody" and "has the initiative to go abroad." (Id.; Durust PTB ¶¶ 63-74.) Durust argues that the Turkish court clearly recognized that Durust has the authority to move abroad without Tatari's consent under Turkish law. (Durust PTB ¶¶ 70-74.)

I do not find her argument compelling. First, Tatari argues that the July Order is more limited in scope, merely recognizing that per the Divorce Decree, Durust has the right to travel internationally with O.T., but not to relocate abroad. (Tr. 110-11; Tatari PTB ¶ 62; Tatari PTR ¶¶

40-42.) As such, he did not note Section 3.7 of the Protocol in his filing (see July Petition), and the passport court understood his request as seeking to limit Durust from abusing her right to travel with O.T. Indeed, Durust testified that she had not decided as of August 20, much less July 10, whether she and O.T. would move to America or just visit there. (Tr. 382; see also id. 364.) Second, the Second Circuit has explained that Turkish courts require changes in custody rights to be clear and explicit. Ozaltin, 708 F.3d at 370. The Turkish court's brief ruling on two days' notice does not evince a clear order permitting Durust to move abroad without Tatari's consent; instead, it reflects a denial of Tatari's request for extraordinary measures to prevent Durust from travelling.[10]

Finally, Durust argues that Tatari cannot have any rights to make decisions about O.T. because the Divorce Decree grants her sole custody. She explains that under Turkish law joint custody would be made very explicitly, and in its absence, she has the right to determine O.T.'s residence abroad over Tatari's objection. (Dursut PTB ¶¶ 115-29.) But Tatari has not argued that he has formal joint custody; he agrees that Durust has sole custody but argues that the Turkish court modified certain rights to provide Tatari a share in them. (Tatari PTR ¶ 28.) As Professor Inal explained, joint exercise of custody is possible in Turkey if the judge explicitly allows for it. (Tr. 307.) In this case, the Divorce Decree explicitly grants Tatari the rights listed in the Protocol.

## II.   Hague Convention Categorization of Tatari's Rights

The Hague Convention divides rights a parent may have into two categories: rights of custody and rights of access. Hague Convention Art. 5. Rights of custody include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of

---

[10] I do not need to defer to this opinion of the Turkish court because it was not an application of the Hague Convention, or even an adjudication of an attempt to relocate abroad, and thus it arose under different facts triggering different considerations. (See Tatari PTR ¶¶ 35-48; cf. Durust PTB ¶¶ 78-87.)

15

residence," while rights of access "include the right to take a child for a limited period of time to a place other than the child's habitual residence." Id.  The Supreme Court has determined that a ne exeat right is a right of custody under the Convention because "determine" can "mean to set bounds or limits to" and a "ne exeat right allows" a parent to ensure their child "cannot live at any street addresses outside of" the country. Abbott, 560 U.S. at 11 (cleaned up).  As the Abbott Court explained, the Hague Convention recognizes "all the ways in which custody of children can be exercised" and "allows the greatest possible number of cases to be brought into consideration," including rights such as ne exeat. Id. at 19 (quoting Pérez-Vera Report ¶¶ 67, 71).  In contrast, visitation rights are only rights of access and are thus not associated with the ability to make decisions (or limit decisions) about the care of the child.  See White v. White, 718 F.3d 300, 304-06 (4th Cir. 2013); see also Pfeiffer v. Bachotet, 913 F.3d 1018, 1024-27 (11th Cir. 2019).

Tatari's right to approve or disapprove decisions about O.T.'s residence, is precisely the type of right the Hague Convention recognizes as custodial.  In Abbott, the Supreme Court explained that a ne exeat right was a right to "determine" the child's place of residence because the parent can effectively limit the child's country of residence to only the home country. 560 U.S. at 11.  The child's home country may have important influences on the child's absorption of culture and traditions as well as his education. Id. at 11-12.  Therefore, a ne exeat right is the sort of custodial right that allows the parent to effect his influence on the child.  When a parent's "consent is legally required before the other parent may move the child to another country," that parent has a custodial right to determine the child's residence recognized by law. Radu v. Toader, 463 F. App'x 29, 30 (2d Cir. 2012).

The cases Durust cites do not support her position.  In Radu v. Toader, another court in this district found that a removal was not wrongful because the divorce decree in place removed any

16

ne exeat right that may have existed under background principles of Romanian law when it provided total custody to the respondent. 805 F. Supp. 2d 1, 9-11 (E.D.N.Y. 2011), aff'd, 463 F. App'x at 29. Here, by contrast, the Divorce Decree explicitly grants Tatari a custody right. Likewise, in Pfeiffer v. Bachotet, the father agreed in the operating divorce agreement that the mother may "tak[e] residence abroad [to the] []US or France" with the children, meaning that the "Respondent [had] the exclusive right to determine whether the children would remain in Switzerland or move to the United States or France." No. 18-cv-3446-RWS, 2018 WL 9563334, at *3 (N.D. Ga. Aug. 29, 2018), aff'd, 913 F.3d at 1018. There, despite the petitioner's custody rights under background principles of Swiss law, the divorce order allocated to the respondent "the sole rights of custody as they pertained to determining whether to move the children to the United States." Pfeiffer, 913 F.3d at 1025.

Even if I were to credit Durust's argument that the Divorce Decree only grants Tatari a right to petition the Turkish court for a change of custody if Durust moves abroad with O.T., rather than a right to prevent that move, Tatari would still have a custodial right under the Hague Convention. (Durust PTB ¶¶ 59-62, 76, 102-06, 110-18.) On Durust's reading, the Turkish court approved the Protocol and gave it legal meaning under TCC Art. 184/5, but only as promises between the parties. (Id. ¶ 110.) So, in order to move abroad, Durust was required to get Tatari's approval but had the authority to make the final say to move abroad. Because she had that authority to move abroad despite Tatari's objection, she claims his right to make that objection cannot be custodial.

Persuasive caselaw from other circuits shows that Tatari's ability to object to O.T.'s relocation abroad and present a claim subsequent to that relocation is sufficient to constitute a custodial right. In Palencia v. Perez, the Eleventh Circuit considered an unmarried father's custody

17

right of <u>patria potestad</u> under Guatemalan law. 921 F.3d 1333, 1339 (11th Cir. 2019). Guatemalan law provided that all natural parents, whether or not married, have the right and duty to exercise the parental authority of <u>patria potestad</u>, but that when the parents are not married, "the children shall be in the mother's custody." <u>Id.</u> at 1339-40. The mother argued that because she had custody over the children, the father could not have an effective <u>patria potestad</u>. The Eleventh Circuit rejected this conclusion because Guatemalan law "provides an unmarried father with certain obligations (and therefore certain rights) with respect to his child, with the caveat that . . . the mother [has] the final say when the parents disagree on a given issue." <u>Id.</u> at 1341. Because the father had the authority to participate in the decision-making about his child's residence, he had a right of custody, despite the fact that the mother had the final say. <u>Id.</u> at 1342. Here too, even under Durust's reading of the Divorce Decree, Tatari has the right to participate in making decisions about O.T.'s residence, even if Durust has the final say.

      My conclusion is bolstered by a recent case in the Fourth Circuit. In <u>Aluker v. Yan</u>, the parties executed a divorce agreement pursuant to Virginia law which provided the respondent "sole legal and primary physical custody" of their children and petitioner with "liberal and reasonable visitation" rights. No. 20-cv-1117, 2021 WL 972885, at *1 (E.D. Va. Mar. 4, 2021). The petitioner argued that because the divorce agreement was not binding on a Virginia court, it did not have a legal effect to adjust his custody rights under the Convention. <u>Id.</u> at *4. The court rejected his argument because Virginia law permits parties to make private custody agreements and considers them to be relevant to structuring divorce decrees. <u>Id.</u> at *5. Because the respondent could use this agreement as a basis for presenting a legal claim to Virginia authorities, it had legal effect under the Convention and provided the respondent with full custody. <u>Id.</u> at *5-6. The Fourth Circuit affirmed this finding on appeal, reasoning that because the agreement was valid under

18

Virginia law, it was recognizable under the Convention, despite the fact that the agreement would only provide Virginia courts with a starting point to make an ultimate divorce order. Aluker v. Yan, No. 21-1279, 2021 WL 3417968, at *3 (4th Cir. Aug. 5, 2021). Here too, even if Section 3.7 is merely a private agreement between the parties, because it was approved by the Turkish court pursuant to TCC Art. 184/5 and so provides a basis for Tatari to raise a claim in Turkey, it can give rise to a custodial right under the Hague Convention. The Divorce Decree here at least approves the parties' agreement under Turkish law and provides Tatari with a right to say 'no' to O.T.'s relocation abroad and to present a claim to that effect in Turkish court. That right is custodial under the Hague Convention.

## CONCLUSION

Tatari has shown that he had a custodial right, specifically a <u>ne exeat</u> right, under Turkish law which was infringed when O.T. was brought to the United States without his consent.[11] Therefore, I grant Tatari's petition and order that O.T. be returned to Turkey within fourteen (14) days of the date of this Order. The parties are directed to meet and confer to discuss the logistics of O.T.'s return. Upon mutual consent of the parties, the date of O.T.'s return to Turkey can be extended. The Clerk of Court has O.T.'s passport. (<u>See</u> Clerk's Docket Annotations dated Oct. 10, 2024 and Oct. 11, 2024.) Within seven (7) days of this Order, the parties shall file a joint letter advising to whom the Clerk of Court should release the passport. The Clerk of Court is respectfully requested to enter judgment in favor of Petitioner.

SO ORDERED.

Dated: January 29, 2025
Brooklyn, New York

/s/Carol Bagley Amon
Carol Bagley Amon
United States District Judge

---

[11] I decline to request that Tatari apply to the Turkish authorities for a determination of his custody rights pursuant to Article 15 of the Hague Convention. Mr. Yalcin credibly testified that Turkish courts do not accept Article 15 requests and he had not seen one in Turkey in his years of practice. (Tr. 128-36.) In any event, the Hague Convention's insistence on expediency would not be served by delaying consideration in favor of Turkish authorities when I have received competent expert testimony on Turkish law. <u>See</u> <u>Nunez Bardales v. Lamothe</u>, 423 F. Supp. 3d 459, 473 n.10 (M.D. Tenn. 2019).