1

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
 2    - - - - - - - - - - - - - - - X
                                    :
 3      In the Matter of O.T.       :   24-CV-6930(CBA)
                                    :
 4      ZUHTU ONUR TATARI,          :
                                    :   United States Courthouse
 5              Petitioner,         :   Brooklyn, New York
                                    :
 6          -against-              :
                                    :   December 11, 2024
 7      NEVA DURUST,                :   9:30 a.m.
                                    :
 8              Respondent.         :
                                    :
 9    - - - - - - - - - - - - - - - X

10          TRANSCRIPT OF CIVIL CAUSE FOR HEARING
          BEFORE THE HONORABLE CAROL BAGLEY AMON
11              UNITED STATES DISTRICT JUDGE

12               A P P E A R A N C E S:

13   For the Petitioner:  GREEN KAMINER MIN & ROCKMORE LLP
                           420 Lexington Avenue, Suite 2821
14                         New York, New York 10170
                      BY:  RICHARD MIN, ESQ.
15                         GIGI VARGHESE, ESQ.

16   For the Respondent:  BLANK ROME LLP
                          1271 Avenue of the Americas
17                        New York, New York 10020
                     BY:  BRETT S. WARD, ESQ.
18                        ALEXA B. LUTCHEN, ESQ.
                          PAUL H. TZUR, ESQ.
19                        ANDREW T. HAMBELTON, ESQ.
                          MARILYN B. CHINITZ, ESQ.
20
     REPORTED BY:
21
     Kristi Cruz, RMR, CRR, RPR
22   Official Court Reporter
     kristi.edny@gmail.com
23
     Proceedings recorded by computerized stenography.  Transcript produced by
24   Computer-Aided Transcription.

25                  *    *    *    *    *
```

PROCEEDINGS                                                    2

1            (In open court.)

2            THE COURTROOM DEPUTY:  Good morning.  This is

3    Civil Cause For a Civil Hearing, 21-CV-06930, *Tatari v.*

4    *Durust*.

5            Would the parties please state your name for the

6    record, starting with the plaintiff.

7            MR. MIN:  Richard Min, Green Kaminer Min &

8    Rockmore, on behalf of petitioner Onur Tatari.

9            Good morning, Your Honor.

10           THE COURT:  Good morning.

11           MS. VARGHESE:  Gigi Varghese, Green Kaminer Min &

12   Rockmore, for petitioner.

13           Good morning, Your Honor.

14           MR. MIN:  Your Honor, Ms. Varghese is not admitted

15   into this court, she's just assisting with the trial.  We

16   also have a paralegal from our office, Caroline Shephard,

17   who will be assisting with document management.

18           THE COURT:  When you say "assisting with the

19   trial," you're not talking about questioning witnesses or

20   anything like that.

21           MR. MIN:  No, I'm not, Your Honor.

22           THE COURT:  Okay, good.

23           MR. MIN:  Our client is also here in the back, and

24   he's ready to sit at the table.

25           THE COURT:  He can sit at the table now if he

PROCEEDINGS                                3

1    wishes.

2            MR. MIN:  Thank you.

3            MR. WARD:  Blank Rome by Brett S. Ward, Alexa

4    Lutchen, Paul Tzur, Andrew Hambelton, and Marilyn Chinitz,

5    1271 Avenue of the Americas, New York, New York 10020,

6    appearing today on behalf of the respondent, who is in the

7    back also, Your Honor.

8            Good morning.

9            THE COURT:  Good morning.  Everyone can be seated.

10           Are we prepared to proceed with the petitioner's

11   case?  Mr. Min, do you have a witness here?

12           MR. WARD:  Your Honor, may I be heard very briefly

13   on some issues?

14           THE COURT:  Yes.

15           MR. WARD:  Your Honor, there is an issue that has

16   arisen overnight that has a direct bearing on this case.

17   I'm not going to get into the why we are presenting this

18   information, the failures of discovery production to us of

19   this material and why we discovered it and how.  But we have

20   learned that in July of this year, petitioner made an

21   application to the Family Court of Turkey to prevent my

22   client from traveling abroad; everything they seek to have

23   this Court rule here.  The Turkish Family Court on July 12th

24   ruled that my client had the right to travel -- excuse me,

25   the right of custody, which means it was in her discretion

PROCEEDINGS                                    4

1    to travel as she saw fit.  That is the exact issue before

2    this Court.  We have the decision here.  Unfortunately it is

3    still in Turkish.  We are in the process of translating it.

4    We got it into our hands at about 11:30 p.m. last night.

5          I've spoken to Mr. Min this morning, I presented

6    him with the documents, and he agrees it says what I just

7    said, that she -- that the Turkish courts denied the

8    arguments presented by his client to this Court and found

9    that she had the right of custody, the very position they're

10   taking contrary in this matter.

11         This is the Rule 15 -- excuse me, the Part 15

12   decision you were looking for.  They have made a

13   determination of the very issue before this Court.  As a

14   result, we ask that this case be dismissed based on the

15   finding of the Turkish Family Court on this determinative

16   issue before this Court.

17         THE COURT:  Who made the application to the Court?

18         MR. WARD:  The petitioner made an application to

19   the Turkish Family Court.

20         THE COURT:  Okay.

21         MR. WARD:  Seeking to prevent my client from

22   traveling overseas.  This was related -- you've heard a

23   little bit in the papers about a passport issue.  My client

24   was trying to get a passport.  While that litigation was

25   going on, he went to the Turkish Family Court and said

PROCEEDINGS                                    5

1  please stop her from traveling.  The Turkish court said no,

2  she has the right of custody here, and that right of custody

3  comes with the -- I'm paraphrasing a little bit -- comes

4  with the right to travel, and they denied his application.

5  That is the very thing they're asking you to rule on here.

6              THE COURT:  Why is it that you're only learning

7  this as of today?

8              MR. WARD:  There's two reasons.

9              One, we asked for all of the petitions that he

10 filed in Turkey.  We were given, I don't know, maybe a dozen

11 petitions.  This wasn't produced to us.  This petition where

12 he made this --

13             THE COURT:  Well, in Turkey, doesn't the other

14 side get notice of orders?

15             MR. WARD:  That was my second point.  We had

16 requested from the attorney who is here today in court,

17 through an intermediary, we were working through an

18 intermediary to get all discovery.  What I'm told is he sent

19 it to the intermediary.  The intermediary couldn't open it.

20 It was his understanding we had it.  It was only, because he

21 is one of our witnesses, when we were meeting with him

22 yesterday about his testimony, did we say, nothing happened

23 with this?  He said, what do you mean?  There is decision.

24 In fact, we learned about eight months earlier he made a

25 different application to prevent her from traveling, which

PROCEEDINGS                           6

1    the Turkish Family Court denied, but it didn't say because

2    of her custody rights.  So it's obviously very helpful, but

3    not the same exact thing.  And so when we went to him, he

4    then searched his files last night, sent it to us, and we

5    received it at about 11:30.

6              First thing this morning I called Mr. Min, got him

7    this information.  He and I discussed this.  He doesn't

8    deny, because he has Turkish-speaking people here,

9    witnesses, and we also have an interpreter here, he does not

10   deny that this is what it says.

11             THE COURT:  Mr. Min, why isn't this dispositive?

12             MR. MIN:  Your Honor, I contest some of Mr. Ward's

13   representations.  I told Mr. Ward that I would like to see

14   an actual translation.  We do have interpreters.  I received

15   this, I'd say, about seven minutes before we commenced this

16   morning, Your Honor, so about 9:23-ish.  So I've had maybe

17   all of four minutes to speak to my client and to my Turkish

18   expert about this order.

19             Your Honor, I can't answer that question at this

20   moment because, honestly, this is the first time I'm laying

21   eyes on this document.  Mr. Ward explained why he had not

22   had it previously.  We had not had it previously either.

23             I do know that this is a proceeding, a passport

24   proceeding that the respondent mother had commenced.  It's

25   not in the change of custody proceeding.  My understanding

PROCEEDINGS                    7

1    is that there are some inconsistencies and errors in this

2    order.  Again, I can't verify that because it's not in

3    English, but apparently the judge in here said, well,

4    there's no change of custody case pending, which at this

5    moment in time there was a change of custody case pending

6    that was an issue for my client.  This is a temporary order,

7    from what I understand, not a final order.  That case is

8    still pending in the Turkish courts.

9              For all those reasons, this may not be dispositive

10   at all.  But --

11             THE COURT:  Well, I don't want to go through two

12   days of testimony if this is dispositive.

13             MR. MIN:  Your Honor, I understand.  What I talked

14   to Mr. Ward about prior to commencing today is, you know,

15   what is Mr. Ward seeking.  From my own due diligence and

16   obviously on behalf of my client, I can't simply accept the

17   Turkish document we just received.  I will need some time to

18   talk to either the interpreter we have here, the translator

19   we have here that's an expert, talk to my client, talk to

20   counsel in Turkey.  So if Mr. Ward's seeking some sort of,

21   you know, time to do all that, then I certainly would

22   consent to that.  I don't want to waste the Court's time, I

23   don't want to waste counsel's time, and be somewhat

24   productive about this.

25             But I can't sit here today and accept Mr. Ward's

1   representations about the impact of this document, having

2   just seen it.

3          THE COURT:  My proposal is I give you a day to do

4   this.  We'll adjourn the hearing until tomorrow and I'll

5   give you the opportunity.  That should give you enough time

6   to figure out what your view is about what the document

7   says, et cetera.  So I think that would give you enough

8   time.

9          But it seems like this could likely be

10  dispositive, and there's no sense wasting the Court's time

11  and the attorneys' time and generating more fees for

12  everyone.

13         MR. WARD:  Your Honor, I have no objection to

14  Mr. Min having some time.  Would it be more advisable just

15  to take the morning or to give up the whole day?

16         THE COURT:  Well, how long will it take you to

17  resolve it, do you think?

18         MR. MIN:  I don't know, since we haven't tried to

19  reach out to Turkish counsel that's in Turkey.  I mean, I

20  would prefer the day just because we'd like to go back to

21  the office and have some sort of space to work out of.  I

22  don't want to commit to coming back this afternoon if that's

23  not feasible.

24         Perhaps we can give an update to the Court in a

25  couple hours?

PROCEEDINGS                                                9

1          THE COURT:  Well, why don't we call the case at

2    2:00 and you can tell me if you've been able to resolve it

3    or if you need more time.

4          MR. MIN:  Sure.  That's fine, Your Honor.

5          MR. WARD:  And upon receipt of the -- we're

6    working on a translation as we speak, an official

7    translation.  We will forward same to the Court so the Court

8    can have these documents.

9          THE COURT:  Yes.  But I would understand if at

10   2:00 counsel hasn't been able to resolve this.  I mean, this

11   is a sort of last minute thing.

12         MR. WARD:  Sure.

13         THE COURT:  But we'll get a status update at 2:00.

14   Okay?

15         MR. WARD:  Thank you, Your Honor.

16         MR. MIN:  Thank you, Your Honor.

17         THE COURT:  All right.  Thank you.

18         (Court is in recess.)

19         THE COURT:  Good afternoon.  This is a re-call for

20   the Civil Cause for a Hearing, 24-CV-06930, *Tatari v.*

21   *Durust*.

22         Will the parties please state your name for the

23   record, starting with the plaintiff.

24         MR. MIN:  Richard Min, Green Kaminer Min &

25   Rockmore, on behalf of petitioner Onur Tatari.  Next to me

PROCEEDINGS                              10

1   is Gigi Varghese from the same firm, and next to her is

2   Mr. Tatari.

3              Good afternoon, Your Honor.

4              THE COURT:  Good afternoon.

5              MR. WARD:  Blank Rome by Brett S. Ward, Paul Tzur,

6   Andrew Hambelton, Alexa Lutchen, Marilyn Chinitz, appearing

7   today on behalf of the respondent, who is here in court with

8   us.

9              Good afternoon, Your Honor.

10             THE COURT:  Good afternoon.  Everyone can be

11  seated.

12             Mr. Min, have you had the opportunity to look over

13  the document?

14             MR. MIN:  Yes, Your Honor.  We've spoken, had

15  conversations about it.  We received a couple of

16  translations.  I believe two of the three documents we

17  received translations from --

18             THE COURT:  I thought it was just one.

19             MR. MIN:  I think they submitted only one to the

20  Court, but they submitted another one to us directly of the

21  three documents that we --

22             THE COURT:  I thought there was just one.

23             MR. MIN:  So there were three documents sent to us

24  this morning.  One was the judgment that was discussed; one

25  was the application that led to that judgment; and another

1   was an application in a different case with a preliminary

2   order from January 2024.

3            What was translated was the judgment that was then

4   sent to the Court, and also we received a translation of the

5   application itself -- of the interim order itself from

6   January.  What we're waiting on a translation of is the

7   claim that my client submitted that led to the judgment,

8   which is something I'm about to address.  And we are

9   awaiting the translation from TransPerfect internally, which

10  we've requested this morning and we should be getting today.

11           THE COURT:  So you're having all three documents

12  translated yourself?

13           MR. MIN:  Yes.

14           THE COURT:  And you have not had all three

15  documents?

16           MR. WARD:  So, Your Honor, we have received first

17  the document we sent to the Court, which is, to us, the

18  operative document.

19           THE COURT:  The order.

20           MR. WARD:  The order.  There is an earlier order I

21  referenced this morning from February, and the petition for

22  that is actually an exhibit, where the petitioner had

23  previously asked the Court to prevent our client from

24  traveling.  We have the February order that denied that

25  injunction.  We received that, you know, very shortly before

PROCEEDINGS                                    12

1    we left for court, so we got it over to Mr. Min right away

2    so he could see it.

3            THE COURT:  Wait a minute.  Is that what you're

4    talking -- I'm confused.

5            MR. WARD:  Okay.

6            THE COURT:  What is it that you just provided

7    today to Mr. Min?

8            MR. WARD:  Just now.  Not what we gave to the

9    Court --

10            THE COURT:  No, today.  When you came in this

11    morning, you said you had new documents.  What were those?

12            MR. WARD:  We gave three Turkish language

13    documents.  One was a February 2024 order from the Turkish

14    Family Court denying petitioner's request to prevent the

15    respondent from traveling with the child.  On their change

16    of custody motion, it also denies his request for a change

17    of custody.  That is the first document.

18            The second document we provided to Mr. Min is his

19    client's petition to the Turkish Family Court on July 10th

20    seeking, amongst other things, an order from the Turkish

21    Family Court to notify the authorities to help prevent my

22    client from traveling with the child because he did not

23    consent.  That we have not received, but we may receive it

24    any moment.  We have not received the translation.

25            The third document we provided, which the Court

PROCEEDINGS                                    13

1    now has the English translation, is the order on that

2    application denying the request, stating that the mother has

3    custody of the child and she has the right to travel abroad

4    with the child, has a right as a result of those custody

5    rights.

6              Those are the three documents.

7              THE COURT:  Now, that 2/24 order that you made

8    reference to.

9              MR. WARD:  Yes.

10             THE COURT:  That had never previously surfaced in

11   this case?

12             MR. WARD:  That had not previously surfaced.  We

13   had the petition, which sought the relief.

14             THE COURT:  So it's not just one order that's new,

15   it's two orders that are new from that, because this morning

16   I understood it just to be the one order.  Now you're saying

17   that there are two orders from the Turkish court that had

18   not previously been made a part of the record here.

19             MR. WARD:  Yes, that have not been previously made

20   part of the record or disclosed by the person in this case

21   who made the applications to the Turkish court, knew the

22   results of those applications, and then came to this court

23   and made representations in a Hague petition contrary to

24   what he knew the Turkish Court's rulings were.  That's the

25   problem here, Your Honor.

PROCEEDINGS                                    14

1          And when we asked for all of the petition

2     necessary that case, we got all of the petitions except the

3     one petition that would have put us on notice that there was

4     a decision in which the Turkish Family Court specifically

5     ruled on the very issue that is before this court.

6          THE COURT:  But you indicated this morning that

7     your client would have gotten copies of this order, her

8     lawyer knew about these orders and just didn't send them to

9     you, correct?

10          MR. WARD:  That is -- that is not exactly true.

11          THE COURT:  Okay.  Is that what you said this

12    morning?

13          MR. WARD:  What I said is that those documents, as

14    I understand it, were sent along with other documents to a

15    person who was helping us get translations and then sending

16    it to us, that those documents were in a format that weren't

17    opened, and instead of the communication saying send us new

18    ones, it was just dropped because we were dealing with

19    hundreds of pages of documents.  So no one on our side made

20    an effort to conceal this.  Trust me, Your Honor, I would

21    have --

22          THE COURT:  I'm not saying you made an effort to

23    conceal anything.  I'm just saying that your client should

24    presumably have been aware of these orders prior to now.

25    You would have thought this would have come up before the

1    day that we're having the hearing, and it seems to me that

2    the petitioner should have had them and made them available

3    too.

4              So what are we doing here, fellas?

5              MR. WARD:  Well, Your Honor, the timing is

6    unfortunate, but the order --

7              THE COURT:  To say the least.

8              MR. WARD:  The order says what it says.  The fact

9    is that I know there was argument this morning that this is

10   an interim decision.  It is not the decision that matters.

11   It's the reasoning of the Court within the decision, is

12   exactly the Article 15 request made.  And I want to note

13   that the position taken by the petitioner is you can't ask

14   me to file a petition asking the Court to rule on this

15   issue, they'll never do that.  That's what happened here.

16   He went to the Court, and in two days the Court gave him a

17   decision.  He said, I have custody, under the divorce decree

18   I have the right to consent, she wants to leave, stop her

19   from leaving because she doesn't have my consent.  And in

20   two days, the Turkish Family Court said, no, sir, she has

21   custody rights and those custody rights are absolute in the

22   right for her to travel.

23             I don't know how we can now have a trial where

24   they can put on witnesses to say, no, Judge, because their

25   experts with respect to Turkish law are going to argue to

PROCEEDINGS                                    16

1   you, because that's what's in their report, they had joint

2   custody.  This order specifically says they do not.  They're

3   going to tell you this Turkish divorce document, Your Honor,

4   means that they have the right to consent.  There is order

5   from the Turkish court saying, no, you don't have the right

6   to consent.

7           This document, again, as unfortunate as it is that

8   I'm pushing this on to the Court at this time, and I

9   apologize for this, and determinative of the issue before

10  this court.  I don't know what witnesses they can put on now

11  in good faith to say that te Turkish law would go their way.

12  It didn't.

13          THE COURT:  Apart from this document, just on the

14  Article 15 issue, counsel put in a statement from his expert

15  that the court, the Turkish courts do not accept Article 15

16  petitions.  You haven't responded to that.

17          MR. WARD:  I received it at 8:30 at night.  You

18  know, a lot of this is coming --

19          THE COURT:  Yes.

20          MR. WARD:  What my response would have been -- and

21  I was going to ask this morning if Your Honor wanted us to

22  put a formal response in or if Your Honor wanted us to just

23  deal with it on cross-examination -- the reasoning of that

24  expert was this is a civil law country.  Civil law countries

25  only allow things pursuant to statute.  Italy is a civil law

PROCEEDINGS                              17

1   country.  Mexico is a civil law country.  There are

2   published decisions where both of those countries responded

3   to requests under the Hague Convention.

4          THE COURT:  I think Turkey responded to what they

5   would prevent under the Hague Convention and specifically

6   said they would prevent an Article 15 proceeding.

7          MR. WARD:  That's what I believe.  They signed on

8   to the treaty.

9          What I want to say is, again, what your order

10  indicated is you were going to ask the petitioner to please

11  go to the Court and ask the Court, you know, all he has --

12         THE COURT:  I know your position now is they did

13  that and they got their answer.  That's your position now.

14         MR. WARD:  That's my position.  But I'm saying

15  they did it once.  If Your Honor feels they should do it

16  again, that's fine, but I don't know why we would.  I don't

17  see the Turkish Family Court going against -- again, it's

18  not what the decision is.  I don't care if the Court said

19  you have the right -- you don't -- she has custodial rights

20  and she could leave if she wants, but I'd like you to stay

21  here for next week because we're going to be holding a

22  trial.  The decision doesn't matter.  It's the reasoning

23  behind the decision which goes to the very heart of what

24  Your Honor will have to decide.

25         This is a very easy case.  If you decide my client

PROCEEDINGS                                                    18

1    has custody and the rights to travel, then this petition has

2    to be dismissed.  If you decide that the father had joint

3    custody, then he has custodial rights and she goes back.

4    This is black and white as it is.

5               But now we have a decision from the Turkish Family

6    Court saying she is the sole custodian and had the right to

7    travel and his argument about consent is rejected.  I don't

8    know what's left for this Court to try.

9               MR. MIN:  Your Honor, if I may respond.

10              THE COURT:  Yes.

11              MR. MIN:  Your Honor, I just noticed there is a

12   microphone.  Does Your Honor prefer that we come to the

13   front podium or --

14              THE COURT:  No, you can -- actually, you can be

15   seated if you want, because you have to be seated to really

16   be heard when you speak into the microphone.

17              MR. MIN:  Okay.  Thank you, Your Honor.

18              Your Honor, I think Mr. Ward's statements have

19   really crystallized the misunderstanding, and I don't

20   believe by any means purposefully, but the

21   misrepresentations of this order to this Court.

22              Mr. Ward has used the word "travel" nonstop in his

23   arguments.  This is not a case about traveling abroad.  This

24   is a case about relocation abroad, about setting up a new

25   residence abroad.  The translation that Mr. Ward has not

PROCEEDINGS                            19

1    provided is a translation of my client's claim and

2    application to this Court, which was to prevent her from

3    leaving and traveling outside Turkey.  That was what was

4    rejected.  A broad request of leaving Turkey in general for

5    a one-day trip, a week trip, for any purpose, and the Court

6    said no, she has sole custody, you can't do that.  It didn't

7    answer the question of whether she could set up a new

8    residence abroad, establish a new school abroad, you know,

9    make decisions on healthcare abroad.  None of those

10   questions were answered by this decision.

11          So when Mr. Ward says, oh, why would this Court

12   ask the same question again, it's not the same question.  If

13   the question was is she allowed to travel outside of Turkey,

14   we'll concede, yes, she does.  If the question is, is she

15   allowed to relocate outside of Turkey, that question has not

16   been answered by any court.

17          Now, the other decision that Mr. Ward references

18   is essentially just like this one, a TRO request, a

19   preliminary injunction request.  Those were denied, because

20   those are the subject of the main proceedings, the change of

21   custody.  Yes, we concede he has not obtained a TRO or

22   preliminary injunction to stop her from traveling or from

23   leaving Turkey.  But again, these are not the operative

24   questions that this Court has to answer.

25          It's the same issue in their expert reports, Your

PROCEEDINGS                    20

1    Honor.  Their experts focus on her right to travel, but they

2    don't address the right to relocate.  That is not the focus

3    of their report.  And it conflates those two issues, and

4    that's what our experts have focused on and talked about,

5    because in Turkey, joint custody is a thing; it's a right.

6    It's new, but it exists.  And it especially exists when

7    parties agree pursuant to a divorce protocol, which they did

8    in this case.

9             Now, at the end of the day --

10            THE COURT:  So you're not really disputing what

11   this order says.

12            MR. MIN:  No.

13            THE COURT:  Okay.

14            MR. MIN:  We're getting our own translation.  We

15   have some nitpicks, but the substance of it we're not

16   disputing.

17            The claim and the application that my client made

18   made no reference to 3.7, made no reference to relocation,

19   made no reference to the divorce decree in terms of why he

20   wants to stop her, right?  And so it's informative and

21   instructive about what he was really seeking, and that's why

22   it's important for this Court to see the context and the

23   full picture of what was going on in the Turkish

24   proceedings.

25            And as I alluded to before, even if Mr. Ward is

PROCEEDINGS                                          21

1   right that there's this acknowledgement that she can travel,

2   as I said before, the 3.4 and 3.8, which regard health

3   decisions and schooling decisions, are not addressed in this

4   order.  The advocates from the U.S. Supreme Court made it

5   clear simply one right of custody has to be violated for

6   there to be a wrongful removal; one right.

7            Included in Article 5 of the Hague Convention is

8   the right to determine the child's place of residence.  It

9   is not the only right of custody that can be violated.  It

10  includes that, and there's an emphasis on that.  But their

11  right to determine schooling together, and all the schools

12  on that list were in Turkey, in 3.4, their right to make

13  health decisions together, those are not a bridge.  Those

14  have been violated against my client by her decision to

15  unilaterally choose a school in New York.

16           So there are live issues here.

17           THE COURT:  What authority do you have for the

18  fact that choosing a school or health decisions constitute

19  custody rights?

20           MR. MIN:  Well, the Article 5 of the Hague

21  Convention says the right for the care and upbringing of the

22  child.  I might be paraphrasing here a little bit because

23  I'm not reading Article 5.

24           THE COURT:  Do you have any witnesses here?  Let's

25  just go forward.  Do you have your witnesses here?

PROCEEDINGS                 22

1        MR. MIN:  Your Honor, this is just to address this

2    before, my understanding of Your Honor's direction was that

3    come back at 2:00, discuss the order, and if we needed the

4    full day --

5        THE COURT:  And I see you let people go.  But do

6    you have anybody here ready to testify?

7        MR. MIN:  I mean, I do have my client --

8        THE COURT:  Well, call him.

9        MR. MIN:  -- and the Turkish expert.

10        THE COURT:  They know what the documents say.

11    They're prepared to opine on it, I take it.

12        MR. MIN:  Okay.  So what my preference would be,

13    then, if procedurally we can talk about this order without

14    the formalities, because we don't have our translation and

15    everyone sort of acknowledges that it might be subject to --

16    I don't know if we have hard copies of those translations

17    here.

18        MR. WARD:  We do.

19        MR. MIN:  We prefer to call our remote Turkish

20    expert because I know he's not available tomorrow.

21        THE COURT:  Okay.  Call him.

22        MR. MIN:  Your Honor, can we have, like, a

23    ten-minute recess just to get the logistics set up?

24        THE COURT:  Yes.

25        (Court is in recess.)

PROCEEDINGS                          23

1        THE COURT:  We're ready to proceed.  Everyone can

2   be seated.

3        MR. TZUR:  Your Honor, before we start with this

4   witness, there's an evidentiary issue that I need to address

5   with Your Honor about a couple of exhibits that I just found

6   out that the petitioners may want to use with this witness.

7   It has to do with the two translations, Exhibits 28 and 29

8   from the petitioners that are their translations of the

9   Turkish divorce decree.

10        THE COURT:  And?

11        MR. TZUR:  So the petitioners don't have any

12   witness to come in and testify about the accuracy of the

13   translations of that Turkish divorce decree.

14        THE COURT:  You mean today they don't have

15   someone?

16        MR. TZUR:  At all, at all.  They don't have a

17   witness to testify about the accuracy of these two

18   translations.  They've disclosed two witnesses who are going

19   to testify about translations.  One is the original

20   translator from 2023 of the divorce decree, Talat Yazici;

21   pardon the pronunciation.  That's the person who gave the

22   original translation who then --

23        THE COURT:  Who changed his mind, yes.

24        MR. TZUR:  Right.  The other one is AJ Elterman.

25   Elterman only testifies -- or the report from AJ Elterman

1  only talks about his testimony relating to paragraph 37.  It

2  doesn't say anything else about any of the other provisions

3  of the divorce decree.  So they don't have a single witness

4  who they've identified as an expert to come in and testify

5  about the accuracy of these two translations.

6          THE COURT:  You mean the translations in their

7  entirety.

8          MR. TZUR:  Correct.

9          MR. MIN:  Your Honor, we had extensive exchange of

10  exhibits.  They've never objected on these two exhibits.

11  The Joint Pretrial Order is clear.  They never objected.  If

12  they had objected in a timely manner, perhaps we would have

13  had witnesses called to testify.

14          But if they're not taking a position to object to

15  them, I'm not sure why they're standing up today taking said

16  position.  It's a little disingenuous and it's a little bit

17  late and prejudicial to us to make a late-stage objection.

18          MR. TZUR:  And, Your Honor, look, this is the

19  petitioner's case.  They know their witnesses.  They only

20  gave us a final witness list and final exhibit list last

21  night.

22          MR. MIN:  Your Honor, that's not -- that's not

23  true --

24          THE COURT:  Just go ahead.  We'll receive them

25  subject to some form of connection and we can deal with this

PROCEEDINGS                              25

1   later.  I'm not going to have this witness call back.  If

2   you have an objection, we can deal with it later.

3           Do you want to swear the witness in?

4           THE COURTROOM DEPUTY:  Yes, Judge.

5           Sir, could you raise your right hand, please.

6           THE COURT:  Can the witness hear the Court?

7           THE WITNESS:  Good evening, Your Honor.

8           THE COURT:  Can you hear me?

9           THE WITNESS:  Yes, I can hear you, no problem.

10          THE COURT:  Okay.

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  Would you raise your right hand,

13  please?

14          THE WITNESS:  Yes.

15          THE COURT:  Do you swear or affirm that the

16  testimony you're about to give will be the truth, the whole

17  truth, and nothing but the truth, so help you god?

18          THE WITNESS:  Yes, I would.

19          THE COURT:  Okay.

20          (Witness sworn.)

21          MR. MIN:  May I inquire, Your Honor?

22          THE COURT:  Yes, please do.

23  **BURAK HUYSAL**,

24          called as a witness, having been first duly

25          sworn/affirmed, was examined and testified as

1          follows:

2    DIRECT EXAMINATION

3    BY MR. MIN:

4    Q    Can you please state your full name for the record?

5    A    My name is Burak Huysal.

6    Q    What is your current occupation?

7    A    I'm working in Bahcesehir University in Istanbul as a

8    professor on international private law and international

9    family law, and I'm also the head of the Department of

10   Private International Law.

11   Q    Can you spell the name of that university, please?

12   A    Bahcesehir University, Istanbul.

13   Q    Could you spell it, please?

14   A    B-A-H-C-E-S-H-E-R [sic].

15   Q    And how long have you been a professor at that

16   university?

17   A    I'm a teaching professor since 2010 in this university.

18   Q    And since 2010, have you been a professor of law and

19   private international law at that university?

20   A    Yes.

21   Q    And in international family law?

22   A    Yes.

23        MR. WARD:  Your Honor, I just want to note that

24   the parties have stipulated that they're not challenging the

25   qualifications of any of the experts as expert witnesses.

1   We're also not adopting that what the work they did was

2   appropriate --

3            THE COURT:  Are you objecting to the question

4   being asked?

5            MR. WARD:  No.  I just wanted the Court to know --

6            THE COURT:  I know you're not objecting to his

7   expertise, but you're going to object to his opinion, so I

8   think counsel's entitled to bring out his expertise.

9            MR. WARD:  I'm not objecting to these questions.

10  I just wanted to make the Court aware of the stipulations.

11           MR. MIN:  We so stipulate, Your Honor.

12           Your Honor, is it helpful, perhaps, if we just

13  agree to put in CVs?

14           THE COURT:  I think it's better to just -- oh, you

15  mean to establish his credentials?

16           MR. MIN:  Yes.

17           THE COURT:  Yes, can you do that.

18           MR. WARD:  No objection.

19           MR. MIN:  Okay.

20           We'd like to show the witness a document that's

21  been pre-marked as Petitioner's Exhibit 45.  If I can ask my

22  colleague to bring up Exhibit 45.

23           (Exhibit published.)

24  BY MR. MIN:

25  Q    Professor, can you identify this document for the

1    Court?

2    A    Yes.  This is my curriculum vitae, and it shows my

3    experiences and my workings on private international law and

4    private international family law.

5            MR. MIN:  Your Honor, we'd --

6    A    And my proficiency.

7            MR. MIN:  I believe based on the stipulation, we'd

8    offer this into evidence.

9            THE COURT:  All right.  45's received.

10           (Petitioner's Exhibit 45 received in evidence.)

11    Q    Professor, have you published any articles or books on

12    the topic of international family law?

13    A    Yes.

14    Q    Okay.  Such as?

15    A    Especially, my first book is on international custody

16    law, and it was the first book that published in Turkey, and

17    I was focused on international custody matters, especially

18    on Hague Convention.  And also I have many articles about

19    divorce, international conflicts of laws and some other

20    international, private international law issues.

21    Q    You said you worked on a book that dealt with the Hague

22    Convention; is that correct?

23    A    Yes, yes.

24    Q    What was the name of that book?

25    A    Well, the first book -- that was the first book

1    published in Turkey.  The title of the book is Custody in

2    International Law.

3    Q    And when you say the Hague Convention, do you mean the

4    1980 Hague Child Abduction Convention?

5    A    Yes, yes.

6    Q    What sort of topics did you write about for that book

7    with respect to the Hague Convention?

8    A    Especially I focused on the application of Hague

9    Convention, and especially on the meaning of custody in

10   Hague Convention terms, and the conditions for the child.

11   And especially also I worked on habitual residence of a

12   child, how can we decide that, and impact of this convention

13   against other conventions of custody.

14   Q    Can you briefly go through your educational background?

15   A    Yes.  I was --

16         THE COURT:  Counsel, excuse me.  That's listed on

17   the curriculum vitae you just put in, so I don't think

18   that's helpful.

19         MR. MIN:  Okay.

20   Q    Have you ever testified as an expert witness in any

21   court in the world?

22   A    Yes; in Turkey.

23   Q    In Turkey?

24   A    Yes, but other courts, yes.

25   Q    Have you ever testified as an expert witness on the

1    topic of international family law?

2    A    Actually, as a witness, no.  But as expert, yes.

3    Q    What do you mean by not as a witness, but as an expert?

4    A    Yes.  In our law, general courts don't listen to

5    experts in oral way.  We give our reports by writing.  So I

6    make so many reports for the Courts as an expert and in

7    general, yes.

8    Q    When you write these reports for the Courts in Turkey,

9    are you hired by one of the parties or are you appointed by

10    the Court?

11    A    No, not by the parties; by the Court.  I'm appointed by

12    the Court.

13    Q    And how many times have you been appointed by the Court

14    to present expert testimony?

15    A    In family law situations, I guess about 20 times.

16    Q    About 20 times.  And you're talking about specifically --

17    A    Yes.

18    Q    -- on the topic of private international family law?

19    A    Yes, private international family law and custody

20    matters.

21    Q    Okay.

22    A    Custody case, yes.

23    Q    Does private international family law encompass the

24    1980 Hague Convention?

25    A    Yes.

1    Q    And so what sort of topics in private international

2    family law have you opined on in Turkish proceedings as an

3    expert?

4    A    Yes, especially on divorce matters, alimony, and

5    custody.

6    Q    The last one?  And custody?

7    A    Yes.

8    Q    So you're familiar with the custody laws of Turkey.  Is

9    that fair?

10   A    Yes, I'm familiar, especially if there's a family

11   element in this case, and a family issue.

12   Q    Were you asked to provide an opinion in this case?

13   A    Can you repeat the question, please?

14   Q    Were you asked to provide an opinion in this case, the

15   one in which you're testifying today?

16   A    Yes.

17   Q    And what opinion were you asked to opine on?

18   A    I'm asked for my opinion about the situation that the

19   mother's removal of joint child to America, was it lawful or

20   unlawful removal of the child, of the joint child, and if

21   she has that -- okay.

22   Q    I just didn't catch everything you said.  So can you

23   just repeat that, please, a little bit slower?

24   A    Okay.  Actually, my opinion asked about the question

25   that's in this case, the mother's removal of child to

1    America with regard to permission of father is lawful or

2    unlawful, especially under the terms of Hague Convention.

3    Q    Okay.  And --

4    A    And also --

5    Q    Go ahead.  And also what?

6    A    And also the power of parties on custody, joint or

7    sole.

8    Q    Just explain that a little bit more.  When you say the

9    power of the parties on custody, joint or sole, can you

10   explain what you mean by that?

11   A    Actually, in my opinion, first I have to solve the

12   mother has a sole power to bring the child permanently to

13   another state without the permission of father, did she have

14   that right or not, and I decided that she has not.

15            THE COURT:  You decided what?

16            THE WITNESS:  I decided that the mother has not

17   the sole power.

18   Q    So you were able to form an opinion in this case, the

19   one in which you're testifying here today?

20   A    Yes.

21   Q    And your opinion was that the mother was not permitted

22   to unilaterally relocate the child outside of Turkey.  Is

23   that a fair summarization?

24   A    Yeah.  According to my --

25   Q    Go ahead.

1    A    Yes?  Okay.  According to my professional opinion in

2    this case, according to the Hague Convention, the mother has

3    not sole power to bring the child to another country.

4    Especially I focused on Hague Convention, Article 5(a).

5    This article identifies the right of custody.  So in this

6    article, the Convention defines custody rights as the right

7    to determine the child's place of residence.  So when I look

8    to the Beykoz Family Court decision, the mother and father

9    has a joint power to decide where children live.  And so

10   it's obvious that I can see that the mother and father has a

11   joint power to decide if the children lives in Turkey or

12   outside the country.

13        So in my professional opinion here, the mother's

14   action is unlawful, according to the Hague Convention.

15        MR. WARD:  Your Honor, it looks like the witness

16   may be reading from something.  Can we just clarify whether

17   there's something he's reading from, and if so, what it is?

18        THE COURT:  You can ask him on cross.

19        MR. WARD:  Okay.

20   Q    Are you reading from anything, Professor?

21   A    You can see my hands.

22        THE COURT:  No, it's your eyes we were worried

23   about.

24        MR. WARD:  I haven't heard an answer, Your Honor.

25        THE WITNESS:  Sorry?

1      THE COURT:  He answered no --

2      THE WITNESS:  I have an empty paper and I am

3  writing the questions.

4      THE COURT:  Okay, fine.

5      Go ahead, Mr. Min.

6      MR. MIN:  I'm just trying to recall my last

7  question, Your Honor.  Give me one moment.

8  BY MR. MIN:

9  Q    Professor, did you review any documentation when

10 drafting your report?

11 A    Sorry?  Can you repeat the question?

12 Q    Sure.

13      In formulating your opinion and drafting your

14 report, did you review any documentation?

15 A    Yes.

16 Q    Okay.  Such as?

17 A    I reviewed especially the Beykoz Family Court's

18 decision.

19 Q    Any you formulated or you wrote an expert report

20 stating your opinions, correct?

21 A    Correct.

22      MR. MIN:  Your Honor, I'd like to show the witness

23 a document that's been pre-marked for identification as

24 Petitioner's 44.

25      THE COURT:  Okay.

1          (Exhibit published.)

2          MR. MIN:  If we can scroll down.

3    Q    Just let us know, is this the expert report that you

4    prepared in this case?

5    A    Yes.

6          MR. MIN:  Your Honor --

7          THE COURT:  Is this 44 on your exhibit list?

8          MR. MIN:  Yes, Your Honor.

9          (Pause in proceedings.)

10         MR. MIN:  Your Honor, I'm happy to go either way.

11   I don't know if it's convenient for the Court, and I don't

12   know Mr. Ward's position, just in terms of introducing the

13   written reports.

14         THE COURT:  Since the witness is on the stand, are

15   you objecting to his report coming into evidence?

16         MR. WARD:  Your Honor, it really is what the

17   Court's ruling is.  I do object on hearsay, but courts often

18   let expert reports in.  As long as it's uniform, it's okay

19   with me.

20         THE COURT:  44 will be admitted.

21         (Petitioner's Exhibit 44 received in evidence.)

22   BY MR. MIN:

23   Q    Professor, you mentioned you were reviewing the Beykoz

24   Family Court decision, right?

25   A    Yes.

1    Q    And that's the divorce decree, correct?

2    A    Yes.

3            MR. MIN:  Your Honor, I'd like to show the witness

4    a document that's been pre-marked as Petitioner's 28 for

5    identification -- 29, apologies, 29.

6            THE COURT:  29?

7            MR. MIN:  Yes.

8            THE COURT:  And this is the petitioner's

9    translation of the divorce decree?

10           MR. MIN:  Yeah.  For this witness, the operative

11   document will be the second half, which is the Turkish

12   divorce decree.  But yes, this document, Exhibit 29, does

13   include the TransPerfect translation.

14           MR. WARD:  I just want to be clear.  I will be

15   objecting to this witness translating from Turkish to

16   English before this Court, as he is not a translator, he was

17   not provided as an expert in translation --

18           THE COURT:  Yes, I think that would be a problem.

19   I think you're going to have to have him rely on what you

20   ultimately offer as the -- what you believe the translation

21   to be so we can do it subject to connection of your

22   translator coming in.  But I don't think he should now be

23   translating the Turkish document.

24           MR. MIN:  Well, yeah.  I mean, I'm not asking him

25   to read the Turkish language documents and say what it says,

1    but I am going to ask him -- I mean, you know, he's a

2    Turkish professor.  I was planning on asking him to look at

3    the Turkish language document to opine on what it signifies,

4    and I think those are two different things.

5              THE COURT:  What it is?

6              MR. MIN:  Well, no, what the meaning of the

7    provisions are.  I think that's the crux of the issue here.

8    I'm not asking him for a translation of the sentence.  I'm

9    asking him for --

10             THE COURT:  Well, do it with the English document.

11             MR. TZUR:  And, Your Honor, that's exactly the

12   point of the objection I had earlier.  The English document

13   in 28 and 29 is not going to be allowed into evidence

14   because they're not going to lay the foundation for those

15   translations.

16             THE COURT:  Well, the key provisions, you're going

17   to have an interpreter talk about the key provisions,

18   correct?

19             MR. MIN:  Yes, Your Honor.  There's also no

20   authentication rule under the Hague Convention.  We can cite

21   to that.  But authentication rules are not in place in Hague

22   Convention cases, and I can get the cite for that

23   immediately with a string cite of hundreds of cases in the

24   U.S. that have applied that rule.  Again, this is such a

25   last minute issue that we were not prepared until earlier

B. HUYSAL - DIRECT - MR. MIN                    38

1  today when we were informed that there would be a last

2  minute objection on this issue to address.

3          But yes, we do have an interpreter who was here

4  earlier and who will be here tomorrow who will address the

5  accuracy of the translations.

6          I will also note that I think one of the -- I

7  guess to me what was strange about their Turkish expert

8  reports was that they're Turkish people, but they were

9  relying on what we considered to be a very serious and gross

10 error in translation --

11         THE COURT:  Well, we can get to that when we get

12 to their case.  Let's not talk about that now.

13         But I think that your questions to him in terms of

14 what a specific phrase means should be directed to the

15 translation that you're contending is accurate that you will

16 ultimately be able to put in someone to say that's the

17 translation.  But to ask him about the English as opposed to

18 having yet another person translating, I don't think that's

19 appropriate because this witness hasn't been offered as an

20 expert to translate.

21

22         (Continued on the following page.)

23

24

25

1    (Continuing.)

2            MR. MIN:  Your Honor, I have a suggestion.  The

3    witness for this purpose could testify in Turkish and we have

4    a certified interpreter who is here on standby for --

5            THE COURT:  No.  You've got an English translation

6    that you want to rely on, correct?

7            MR. MIN:  I do.

8            THE COURT:  Then ask this witness questions about

9    your English translation that you want to rely on.

10           MR. MIN:  Your Honor, I'm not arguing this for any

11   other purpose, but do I find it odd that these are Turkish

12   lawyers or legal professionals who would be reading a

13   document in their second language instead of their native

14   language to explain what the native language means under

15   believe their own domestic laws.  But I'm happy to do that.

16   I'll move on.

17           MR. TZUR:  Your Honor, I just stand on the point

18   that if he goes this direction using Exhibit 28 or 29 with

19   this witness, and he doesn't lay the foundation for those

20   exhibits, he's going to be stuck where all of this testimony

21   is going to be have to be stricken later on in the case.

22           THE COURT:  We'll worry about that parade of

23   horribles later.  You don't need to tell me that.

24           Let's move on.

25           MR. MIN:  Thank you, your Honor.

1    BY MR. MIN:

2    Q    Look at Exhibit 29, when we get to the end if you

3    can -- I'll ask you the question once you've reviewed

4    everything.

5    A    You were asking me about the special provision on these

6    document?

7    Q    I'm asking you to review the document.

8    A    I can't hear you.

9    Q    I'm asking you to review the document.  We can start

10   again, but I'm asking you to look at the document and review

11   it that you understand what you're looking at so then I can

12   ask my question afterwards.

13   A    Yes, yes, I understand.  I'm looking to the court

14   decision of --

15              THE COURT:  That's a translation of the original

16   document, to your understanding, a translation in English;

17   is that correct?

18              THE WITNESS:  Yes, of course.  Yes, of course it's

19   in English.  We write it in Turkish in Turkey.

20              MR. MIN:  Your Honor, one second.  Your Honor,

21   we're actually going to show the witness a document marked

22   as 28 instead.

23              MR. TZUR:  Same objection, Judge.

24              THE COURT:  Okay.

25   BY MR. MIN:

1    Q    Professor, I apologize for the change in course.  We'll

2    pull up another exhibit and I'm going to ask you if this is

3    the document that you reviewed in preparing your opinion and

4    report.

5    A    Yes, that is the English version --

6    Q    Let me -- I'll pull up the document.  Wait for the

7    document to come up.

8    A    Okay.  Yes.  It is a little bit small.  Okay, that's

9    better.

10              (Witness reviewing document.)

11   Q    Is this the Beykoz Family Court decision that you were

12   referencing earlier?

13   A    Actually I used the original court document in my

14   opinion.

15   Q    When you say original, what do you mean by that?

16   A    The Turkish version.  And also this is the English

17   version, but I rely on the Turkish one.  This is the

18   original Turkish.

19   Q    And this is what you looked at when drafting your

20   report?

21   A    Yes, I looked at the English one and the Turkish one;

22   but of course, I rely on the Turkish one.  As a Turkish

23   lawyer, the binding decision is the Turkish decision in

24   Turkey of course.

25   Q    Did you review any other paperwork or -- withdrawn.

1    Did you review any other documentation or look at

2   any Turkish laws or any other laws in preparing your

3   opinion?

4   A    Yes, of course I rely on other Turkish court decisions.

5   Especially higher court decisions, Court of human rights.

6   And I use some American court decisions, French court

7   decisions.  Of course I checked for other documents and

8   academic writings and essays.  Also, I have a list, in my

9   opinion, I have a list that I check the papers that I

10  observed.

11  Q    So I'll ask you a general question.  When trying to

12  understand the range of Turkish custody rights, what laws

13  both Turkish and international would one be familiar with in

14  order to assess the range of Turkish custody rights?

15  A    Actually, the main court is Turkish civil court, which

16  identifies the custodies and the rights of the parents.  We

17  use this court in domestic situations.  Also, especially

18  joint custody issues, we primarily look for the European

19  Convention on Human Rights Article 5.  And if there is a

20  foreign element in this case, we also use, I call

21  (unintelligible) international law, Hague Convention, and

22  other conventions.  That's in general, like you said.

23  Q    Why do you say that do you look towards the European

24  Convention of Human Rights Article 5?

25  A    Because in Turkish civil court we have no provision on

1    joint custody especially.  But after, I guess 2016, we

2    became a part of protocol five of European Convention Human

3    Rights, and we accepted the joint custody in our law system.

4    Q    How is the European Convention of Human Rights

5    acknowledged or accepted under the Turkish legal system?

6    A    It has direct application in our Turkish law system.

7    It's at constitution of order.  According to the Article 19

8    of our constitution, the international conventions has

9    direct application and clear application to the domestic

10   laws.

11   Q    When you said direct application, I didn't catch a word

12   you said.  You said direct application and something else

13   related to Turkish civil --

14   A    Yes.  Direct application means there is no need of

15   approval of our senator to apply these.  That means sign

16   these documents in diplomatic ways, the court directed to

17   the European courts of Human Rights Convention.  And if

18   something challenge with this convention, if there are

19   domestic laws conflicts with this human right convention, we

20   have priority to the human rights conventions.  It's order

21   of our constitution law.

22   Q    So under Turkish constitutional law, priority is given

23   to the international conventions and international legal

24   instruments over Turkish domestic law if there is a

25   conflict?

1    A    Yes.

2    Q    And is there such a conflict when it comes to the idea

3    of sole custody versus joint custody in Turkey?

4    A    Yes.  Before that convention our courts not decided

5    joint custody.  They always use custody to a part solely.

6    But after we sign this convention, as a human right we

7    accept that mother and father as a human right have a right

8    of equal powers on their joint child even if they are

9    divorced.

10   Q    So what is the process for establishing joint custody

11   rights under Turkish law?

12   A    In Turkish law if parties have a protocol and both

13   parties accept the divorce decision or wants the divorce,

14   they can have joint custody.  But if parties are not agreed

15   upon the divorce and custody matters, the court decides sole

16   custody.  So joint custody only decided with the intentions

17   of the parties.

18   Q    Okay.  So if the parties resolve their divorce and

19   agree to joint custody, then the Turkish courts can grant

20   that.  But if the parties do not agree --

21   A    Yes.

22   Q    -- to joint custody, then the Turkish courts cannot

23   give joint custody?

24   A    Yes.

25   Q    Now, having reviewed the Beykoz Family Court decision,

1  in this case the parties agree to resolve their divorce?

2  A    Yes.

3  Q    By joint custody?

4  A    Yes, of course.

5         MR. WARD:  Objection, your Honor, the document

6  speaks for itself.  What it says is what it says.

7         THE COURT:  I'll allow him to explain his opinion

8  he's reached.  And then you can lay the foundation for why

9  he reached that opinion.

10  BY MR. MIN:

11  Q    Why do you say of course professor?

12  A    Yes, this is a divorce by the parties.  They make a

13  divorce by protocol.  It clearly writes in the decision.

14         MR. MIN:  Your Honor, we're going to show the

15  witness the document previously marked as 29.

16         MR. WARD:  Your Honor, same objection.  If I could

17  just have a standing objection for these two.

18         THE COURT:  You have a standing objection to the

19  use of 28 and 29.

20         Is the difference that 29 is the entire document

21  and 28 is a portion?

22         MR. MIN:  No.  I mean --

23         THE COURT:  What is the difference.

24         MR. MIN:  29 is from TransPerfect here in the

25  United States.  28 is a prior translation in Turkey.

1        THE COURT:  Both of them are translations of the

2   entire document?

3        MR. MIN:  Yes.

4        THE COURT:  Okay.

5   BY MR. MIN:

6   Q    Professor, we have open a document that was previously

7   marked as 29, which is another translation of the Beykoz

8   Family Court divorce decree.  I would like you to walk us

9   through why you say clearly that this was pursuant to a

10  divorce protocol that granted joint custody to the parties.

11  Can you point out what provisions lead you to say that?

12  A    First of all, in the second sentences it says the

13  plaintiff's attorney states a duty to hearing with the

14  protocol data, says.  So it's a divorce by protocol, first

15  of all, it writes on the decision.

16  Q    What is a divorce by protocol -- we're not familiar

17  with all the terminology in Turkish courts, can you explain?

18  A    As I said before.

19  Q    Hold on.

20  A    Okay.

21  Q    Just so I can finish my question and it's clear on the

22  record.

23        Can you explain what protocol means, what a

24  divorce protocol is?

25  A    As I said before, our civil court has not a provision

B. HUYSAL - DIRECT - MR. MIN                    47

1  on joint custody.  But by the convention, European

2  Convention on Human Rights, if the parties divorce by a

3  protocol mutual consent the court can decide joint custody.

4  So at the beginning I saw that, in accordance with the

5  protocol data, writes there, so I understand that this is

6  divorce by protocol so the court has the power to grant

7  joint custody.

8  Q    So protocol basically means by agreement?

9         MR. WARD:  Objection, your Honor, that is leading.

10 A    Yes, by agreement.  Yes, by agreement, as I said,

11 mutual consent.

12 Q    Professor, when --

13        MR. WARD:  I'm objecting and moving --

14        THE COURT:  Overruled.

15 BY MR. MIN:

16 Q    I apologized, I interrupted you before.

17        You were going through and explaining what

18 provisions of the document led you to opine that this was

19 clearly a divorce and custody order that recognized joint

20 custody.  You started with the protocol recognition, I

21 interrupted you, so please continue.

22 A    Okay.  Please go down.  Go down, please.  Go down.  A

23 little bit up.  The screen is a little bit small for me, a

24 little bit hard to read.  Okay.  Now I see half.  Okay.  Can

25 you go up again please, now I can see clearly.  Up, please.

1    You can stop here.  I can't see all page in my screen so I

2    can't read it exactly, maybe adjust.

3    Q    Professor, is it easier if you look at the Turkish then

4    we can get to the English corresponding page?

5    A    I prefer the Turkish one.

6    Q    When you point out what section you want to go to next,

7    then we'll go to the English language part of that.

8    A    Okay, go down.

9         With Article 1, the court decision starts here.

10   The final court decision starts here.  So you can go down,

11   please.

12   Q    While you're going through that, why do you say that

13   the court decision starts with number one?

14   A    Outside of this decision is a justification of the

15   court decision.  In Turkish courts we are several parts.

16   The first part is the part is claims and defenses.  The

17   second part is the justification of the court.  And the

18   third part is the decision.

19        In Turkish law, only the decisions become final

20   and binding in our law system.  And after a court decision

21   becomes final, the other parts have no legal meaning in our

22   Turkish system.  So the final and binding parts starts with

23   the Article 1 that I showed to you.

24        Okay.  We can go down.  First of all, in paragraph

25   3.4 --

1   Q    We're going to go back to the English language part of

2   this.

3   A    3.4.

4   Q    Please continue.

5   A    We find the part okay.  In this part -- actually, if

6   you let me a little introduction, the custody meaning in

7   Turkish law.

8            We have some of (unintelligible) about the

9   custody.  A custody occurs from education, healthcare,

10  decide the place of residence, and govern the child's

11  (unintelligible).  These four elements becomes a custody

12  right in Turkish law.  When I look at this paragraph in 3.4:

13  The joint child will attend schools determined by the mutual

14  decision of the parties.

15           So as I said, this is a mutual divorce:  Mutual

16  decision of the parties throughout their educational life,

17  including but not limited to Enka schools, Hisar schools,

18  Koc school, Pierre Loti French school, or equivalent

19  schools.

20  Q    Go slower.

21  A    Okay.  Especially here we have some schools which are

22  located in Istanbul.  And after this of wording in the

23  second sentence it says:  Provided this schools are

24  determined by the mutual decision of the parties; Zuhtu Onur

25  Tatari irrevocably agrees and undertakes to cover the fees

1    of the schools the joint will attend -- okay.

2              So the parties jointly decided that.

3              The joint child will have his education of life in

4    Istanbul, the schools that specifically write here.

5              So as a mutual says, one part of custody, which I

6    said was the  child's education, parties have the same

7    power to decide which school the child will go.  So it's one

8    of the elements of custody in Turkish law.

9    Q    Professor, I heard you mentioned there are four

10   elements to child custody writes in Turkish law I apologize,

11   I'm not sure I caught all four.  Clearly one of them is

12   education.

13   A    Okay.  Education.  Healthcare, place of residence, and

14   the goods of child.

15   Q    What is the last one, that's the one I'm missing?

16   A    The child's, if the child has a money or real estate to

17   manage it for the child.

18   Q    The financial interests of the child, for example?

19   A    Yes, financial interests, yes.  Four elements.  So one

20   of these elements is education, and parties have a mutual

21   decision about the schools that child will go.  So first

22   element the parties have mutual consent, the joint power to

23   decide which school the child goes; and especially they are

24   all in Istanbul, not in Turkey, specifically in Istanbul.

25   Q    And so I'll let you continue on pointing out what

1    provisions led you to opine that the parties here have joint

2    custody.

3    A    Okay.  Stop here.  Especially 3.7 we have to look and

4    3.8 also.

5    Q    What was the next provision?  I'm sorry, we had some

6    technical issues.

7    A    Okay.  Provisions of paragraph 3.8 and seven.

8    Q    3.8 and 3.7?

9    A    Yes.

10   Q    Okay we'll go back to the English language.

11   A    As I mentioned before, there are three elements of

12   custody.  In 3.7 it says:  Neva Durust Tatari agrees,

13   acknowledges, and undertakes irrevocably that if she decides

14   to live abroad together with the joint child, she will

15   obtain the approval and opinion of Zuhtu Onur Tatari.  So

16   according to Turkey law to decide where the child lives

17   gives the power of custody for the parents.  And at this

18   point I have to clarify that.

19            According to The Hague convention, child

20   abduction, custody rights especially covers the right of

21   the -- sorry, I closed my camera -- right to determine the

22   child's residence if include meaning rights of custody.  So

23   what in Turkish law and Hague Convention, the power to

24   decide of children residence is equal to the custody rights.

25            So here we say, we can see that Neva Durust Tatari

1    can't leave Turkey for a permanent time for living outside

2    with the joint child, has not a sole power.  By the decision

3    of the court, the court granted that Neva Durust Tatari has

4    to take approval of the father if she wants to live with the

5    child for a permanent time.

6            In 3.8 says:  Neva Durust Tatari agrees,

7    acknowledges and undertakes irrevocably that she will obtain

8    the approval and opinions of Zuhtu Onur Tatari when any

9    decision is required with regards to the health status of

10   joint child.  Education, place of residence, and also

11   healthcare.

12           So in this third part, in paragraph 3.8, the court

13   decided that the mother has to take opinion and approval of

14   the father in regards to the health of the joint child.

15           Also between paragraph 3.5 to 3.8, also father to

16   the obligation on financial service and financial custody

17   rights.  Also they have a joint power and obligation about

18   the child's finances.

19           So with all these paragraphs together, it's

20   obviously a joint custody, especially according to the

21   convention Hague Convention Article 5A.

22   Q    Professor, is there anything in this divorce decree as

23   far as you read that limits the mother's ability to travel

24   with the child outside Turkey, to go on vacation outside

25   Turkey?

1   A    No, there is no, no.

2   Q    So she doesn't need his approval to go on vacation with

3   the child outside Turkey; is that right?

4   A    Yes.  For example, she wants to go two-week travel,

5   there is no need approval or opinion of the father.  The

6   court especially decides when she wants to live outside

7   Turkey permanently with the child.  But she can make a

8   travel, of course.

9            MR. MIN:  May I have one moment?

10           THE COURT:  Sure.

11           MR. MIN:  No further questions, your Honor.

12           THE COURT:  Okay.

13           MR. WARD:  May I proceed, your Honor?

14           THE COURT:  Yes.

15   CROSS-EXAMINATION

16   BY MR. WARD:

17   Q    Good afternoon, Professor.

18   A    Good afternoon.

19   Q    I want to talk about the divorce protocol for a moment

20   and the divorce judgment.  You're aware, Doctor, that the

21   divorce protocol is an agreement that the parties reach

22   prior to coming to court to get their divorce, correct?

23   A    Yes.

24   Q    And you're aware, sir, that if the parties agree to

25   sole custody as part of their protocol, that could be

1   adopted by the court, correct?

2   A    Could be, not have to be.

3   Q    I'm asking you, sir, just because there is a protocol

4   agreed to by the parties it doesn't mean they have joint

5   custody, correct?

6   A    Can you repeat the question.  Can you speak a little

7   bit slowly so I can understand you much more clearly, if

8   it's possible for you?

9   Q    I will do my best, Professor.

10  A    Thank you.

11  Q    Isn't it true that just because the parties agree to a

12  protocol to resolve their divorce, it doesn't mean they have

13  joint custody, correct?

14  A    Yes.

15  Q    The Turkish civil code sets forth custody regulations

16  in a case of a divorce, correct?

17  A    Parts are correct.

18  Q    Okay.  Article 336 of the Turkish civil code provides

19  that a child born within a marriage, both parents

20  essentially have joint custody, correct?

21  A    Yes.

22  Q    The code then provides that once there is a divorce

23  only one parent is granted custody of the child according to

24  the Turkish civil code, correct?

25  A    Yes.

B. HUYSAL - CROSS - MR. WARD                    55

1  Q    And granting custody to just one parent is what we call
2  sole custody, correct?
3  A    Yes.
4  Q    And a parent who does not have sole custody under the
5  Turkish code, is granted visitation rights, correct?
6  A    Yes.
7  Q    And the parent who has sole custody of the child may
8  make all decisions for the child including educational and
9  medical decisions, correct?
10 A    No.
11 Q    You're saying if a parent who has sole custody of a
12 child they are not empowered to make educational decisions
13 for a child?
14 A    According to the Turkish civil court, judge has decide
15 in which topics the sole custody rights can be used by one
16 party, and some topics, some matters, the parties have the
17 joint power to decide on this matters.  It's not provision
18 of Turkish civil court.
19 Q    But I'm asking you, under Turkish law, if one party has
20 sole custody, isn't it true that they have the right to make
21 the educational decision for the child?
22 A    Even if not granted otherwise by the court, yes.
23 Q    Okay.  And if a party has sole custody, they have the
24 right to make education -- medical -- educational decisions
25 for the child, correct?

1   A    If not decided otherwise, yes.

2   Q    And another decision a parent with sole custody can

3   make is whether to relocate to another country with the

4   child, correct?

5   A    If not -- again, if the court not granted another

6   provision, yes.

7   Q    The right to travel is a constitutionally protected

8   right in Turkey, correct?

9   A    Yes.

10  Q    And custody encompasses the right to travel with the

11  child, does it not?

12  A    Yes, but --

13  Q    If a parent has sole custody they have the absolute

14  right to take the child abroad without the other party's

15  consent, correct?

16  A    No.  If you want only yes or nos, or do you want some

17  explanation from me?

18  Q    I would like the answer to the question in a yes or no

19  form.  Your attorney will have a chance --

20  A    Okay.

21  Q    I just want to make sure you are saying under oath to

22  this court that if a parent has sole custody they don't have

23  the absolute right to take the child abroad without the

24  other party's consent.  That's your testimony, sir?

25            THE COURT:  I think the question is confusing.

1   Could you restate the question?  I'm going to have him

2   restate it, too many negatives in there.

3   BY MR. WARD:

4   Q    If a parent has sole custody, do they have the absolute

5   right to take the child abroad without the other party's

6   consent?

7   A    When you say take the child out for travel or permanent

8   time, which one?  I'm not understanding exactly, if you can

9   clear that I can answer.

10  Q    So first of all, I'll ask, is it true they have the

11  absolute right to travel with the child without the other

12  party's consent?

13  A    Yes, she can -- she or he can travel.

14  Q    Isn't it true they have the right to relocate with the

15  child without the other party's consent?

16  A    If the court not granted; otherwise, yes.

17  Q    Okay.  And the principle of the custodial parent having

18  the absolute right to take a child abroad without the

19  consent of the other parent was established by the Turkish

20  Supreme Court in 2015, wasn't it?

21  A    I don't know this court decision 2015.  I can't recall

22  that --

23  Q    Okay.

24  A    -- this decision that you mentioned.

25  Q    Okay.  Let me ask you this, without giving the specific

B. HUYSAL - CROSS - MR. WARD                    58

1  year, the principle custodial parent having the absolute

2  right to take the child abroad without the consent of the

3  other parent is a principle established by the Turkish

4  Supreme Court, correct?

5  A    I can't answer that yes.

6  Q    So with your expertise in Turkish law and all of your

7  qualifications, you're not aware of what the Turkish Supreme

8  Court's position is on whether a parent can take a child out

9  of the state without the other parent's consent, is that

10 your testimony, sir?

11 A    But you ask me -- you want me to answer your questions

12 only yes or no.  So some decisions states that.  If the

13 other parent has the visitation right, you can't take the

14 child abroad.  So when you make it, you violate the other

15 parts with visitation rights.

16 Q    Sir --

17 A    And also in some decisions --

18 Q    Didn't you testify on direct that there are four

19 principles of custody?

20 A    Yes.

21 Q    One, educational, right?

22 A    Yes.

23 Q    Two, medical, right?

24 A    Yes.

25 Q    Fourth was financial matters relating to the child,

1  correct?

2  A    Yes.

3  Q    Remind me the third one?

4  A    To decide the residence of the child.

5  Q    To decide the residence of the child, whether it's

6  domestic or overseas, correct?

7  A    No.

8  Q    Okay.

9  A    When we are talking about a domestic case, the custody

10 the sole custody, gives the parent dual power.  But if a

11 party wants to leave the country with the child, it's always

12 violate the other party's visitation rights; and of course,

13 if the court not decided otherwise.

14              (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

 1  CROSS-EXAMINATION (Continued)

 2  BY MR. WARD:

 3  Q    I want to make sure I understand what you're saying.

 4        Are you saying that a party with the sole custody

 5  has the absolute right to take the child oversees unless a

 6  Turkish court tells them they cannot do it?

 7  A    Yes.

 8  Q    Okay.

 9        Now isn't it true, sir, that if a parent with sole

10  custody does take the child oversees, then action must be

11  taken, either automatically or upon notification of one of

12  the parties in the Turkish court, to address the other

13  parent's access schedule or visitation schedule, correct?

14  A    Right.

15  Q    One of those actions is that the moving party can apply

16  to the Turkish court to rearrange the schedule of the

17  visiting parent, correct?

18  A    Yes, correct.

19  Q    And I think it's what you were alluding to, sir.  A

20  remedy of the left-behind parent could be to fight the

21  relocation is to seek a change of custody of sole custody to

22  them so that they can then have a decision of where the

23  child can live.

24        That's a remedy correct, sir?

25  A    Yes.

*B. HUYSAL - CROSS - MR. WARD*                61

1    Q    And the left-behind parent could then go to the court

2    and seek a change of custody, because the relocation hinders

3    their ability for visitation, correct?

4    A    It depends on the parties.  Sometimes they can ask for

5    a new visitation schedule, or sometimes the party wants the

6    sole custody to itself.

7    Q    Okay.  Now you opine that joint custody is available

8    under Turkish law, correct?

9    A    Yes.

10   Q    And you say that even though there's no provision for

11   joint custody under the Turkish code, correct?

12   A    It's in the courts, yes.

13   Q    Would you agree, sir, that due to restrictions and

14   challenges of the Turkish law, courts in Turkey --

15   A    Can you speak a little bit slower, please.

16           MR. WARD:  I apologize, sir.  I'm going to try

17   again.

18           THE WITNESS:  I apologize for my English.

19           MR. WARD:  Not at all.  Not at all.

20   Q    Would you have knowledge that due to the restrictions

21   and challenges in Turkish law, courts in Turkey are

22   reluctant to approve joint custody?

23   A    The courts lock in you said.

24           MR. WARD:  Okay, I'm going to try it again.  And

25   if I have to change any words, I will, if it's a

1  comprehension problem.

2  Q    Would you agree that due to the limitations in Turkish

3  law, courts in Turkey are reluctant to approve joint

4  custody?

5  A    According to the civil courts or --

6  Q    Generally.

7  A    -- the old.

8          Generally, the court can allow to decide joint

9  custody if the parties have mutual consent on that;

10  otherwise, not.

11  Q    And, isn't it true, sir, that a court in Turkey could

12  reject the joint custody protocol if it concludes that the

13  protocols do not align with the public order?

14  A    Yes.

15  Q    Now if the parties do agree to a joint custody in

16  Turkey, and the court approves it, and one parties acts

17  unilaterally in contravention of the protocol, could the

18  aggrieved party, the party who did not have a say, go to

19  court and seek to enforce the Turkish protocol?

20  A    So enforce or to change the court's custody decree?

21  Q    So I understand that they can seek to change it.  My

22  question is, and I'll give you an example.

23          If a mother and father agree to joint custody and

24  the father goes and makes a doctor's appointment that the

25  mother objects to without her opinion, could the mother go

1    to court and say, no, my opinion should be given weight in

2    this decision?

3    A    Uh-huh.  Uh-huh.

4    Q    Can you answer "yes" or "no" just for the court

5    stenographer?

6    A    Yes.

7    Q    Okay.

8            Now do you agree, sir, that whether the father has

9    a right of custody under the Hague Convention in this case

10   comes down to whether the mother has sole custody in this

11   case, or whether the parties have joint custody in this

12   case?

13   A    Try repeat the question, please.

14   Q    Do you agree that the question of whether the father in

15   this case has, quote, rights of custody, unquote, under the

16   Hague Convention will be determined by whether it is

17   determined that the mother has sole custody of the child, or

18   the father has joint custody of the child?

19           Do you agree with that statement?

20   A    I'm trying to answer the question exactly.

21   Q    I'm going to try it again.

22           You talked about how there is a wrongful removal

23   if the father's rights of custody are violated under the

24   Hague Convention, right?

25   A    Yes.

*B. HUYSAL - CROSS - MR. WARD*                    64

1   Q    In this case, in this case, would you agree that if the

2   mother has sole custody of the child, that the father does

3   not have rights of custody under the Hague Convention?

4   A    No.

5   Q    I want to ask you a question, a hypothetical question,

6   sir.

7            If the judge in a divorce in Turkey were to order

8   the following, quote, the parties shall share custody of the

9   child in common, unquote.

10           In your opinion, what type of custody arrangement

11  would this be?

12  A    We're talking about a domestic case in Turkish law

13  or --

14  Q    A domestic case under Turkish law.

15  A    In the domestic case, like I said, this is a joint

16  custody.

17  Q    Thank you.

18           Same circumstances.  What if the judge were to

19  order, quote, the mother shall be appointed as the custodian

20  of the child, unquote.

21           What type of custody would that be?

22  A    Sole custody.

23  Q    Thank you.

24           Hypothetically, sir, if a party in court as a part

25  of a divorce states the following, I quote:  I understand

1  that the defendant may legally make decisions in her sole

2  discretion in line with her custodial rights, including

3  material decisions about the child's health care and moving

4  her residence to abroad, unquote.

5           What type of custodial arrangement would a

6  statement like that indicate is present?

7  A    In Turkish law?

8  Q    In Turkish law.

9  A    Parties statement, yes.  In Turkish law, parties

10 statements has no legal application in our system --

11 Q    Okay.  I'd like you to answer --

12 A    -- court decision.

13 Q    I would like you to answer my question.  My question is

14 very different.  My question is:

15          If a party stands up in court and acknowledges the

16 quote that I just gave you, does that indicate to you that

17 there is a sole custody situation?

18          MR. MIN:  Objection.  It's the relevance the

19 question, it has no bearing.

20          THE COURT:  Overruled.

21 Q    Sir?

22          THE COURT:  Can you answer the question?

23          THE WITNESS:  Yes.

24          I'm waiting for you repeat the question.

25          If the parties says that in the courts, the

1   parties says, right?

2   Q    Yes.

3        Do you want me to repeat the quote?

4   A    Yes.  Yes, please.

5   Q    I'm happy to do that, sir.

6        Quote, I understand that the defendant may legally

7   make decisions in her sole discretion in line with her

8   custodial rights, including material decisions about the

9   child's health care and moving her residence to abroad,

10  unquote.

11  A    This is sole custody.

12  Q    Thank you.

13       I'm going to move away from the hypotheticals and

14  talk about this case for a minute.

15       You testified earlier that the remedy for a

16  parent, without custody in the sole custody regime, to

17  object to unilateral action by the sole custodian is to seek

18  a change of custody from the courts, correct?

19  A    Yes.

20  Q    You also mentioned that a joint custodian could simply

21  seek enforcement of his joint custody rights.

22       That is a possible remedy, correct?

23  A    Yes.

24  Q    Are you aware, sir, that after Ms. Durust relocated to

25  the United States with the parties' child, Mr. Tatari filed

1   an application to change custody?

2           Are you aware of that?

3           MR. MIN:  Objection.  I think that's a

4   mischaracterization of the evidence.

5           I'm not sure that's a good --

6           MR. WARD:  Subject to connection, Your Honor,

7   we'll be putting that material into evidence.

8           THE COURT:  All right.

9   Q    Were you aware of that, sir?

10  A    Yes.

11  Q    And you testified that the proper procedure, when the

12  sole custodian properly relocates with a child, it's whether

13  there be a proceeding brought to rearrange the access for

14  the schedule for the left-behind party?

15  A    Can you speak please a little slowly.

16  Q    I apologize.  I will keep trying.

17  A    No problem.  You're welcome.

18  Q    Okay, thank you.

19          You also testified that the proper procedure, when

20  the sole custodian properly relocates with the child is for

21  there to be a proceeding brought to rearrange the access

22  schedule for the left-behind party, correct?

23  A    Yes.

24  Q    Are you aware, sir, that the after she relocated to the

25  United States, Ms. Durust filed a proceeding to arrange the

1   access schedules between the child and Mr. Tatari?

2   A    I have no details about this case.  I don't see that

3   files in that way details.

4   Q    Understood.

5            Now, sir, prior to issuing your report in this

6   case, did you carefully read the parties' divorce decree and

7   protocol?

8   A    Yes.

9   Q    And having read it carefully, it is your conclusion

10  that the divorce decree and underlying protocol provide that

11  both parties are obligated not to relocate with a joint

12  child abroad without the other party's consent, correct?

13  A    Yes.

14  Q    And this is one of the principal reasons why you

15  believe the parties have joint custody, correct?

16  A    According to the Hague Convention, yes.

17  Q    Okay.

18           MR. WARD:  And I'd like, if we could, bring up

19  Exhibit 22.  Make it as big as possible.

20           Mr. Min, I'm okay with him reading from the

21  Turkish for this part if you are.

22           Mr. Min, I'm pulling up our document, but I'm okay

23  with him looking at the Turkish and then going back like you

24  did for yours.  Okay.

25           Would you make it bigger, as big as you can, and

1   can you go --

2          THE WITNESS:  A little bit big.  I can see it.  A

3   little small, please.

4   Q    Okay.

5          I'm going to ask you to review this document and

6   tell me where it states that Mr. Tatari may not relocate the

7   child without the mother's consent?

8   A    You are asking me in this document where Mr. Or

9   Ms. Tatari, which one?

10  Q    Mr. Tatari, there is only, I don't think --

11  A    Mr. Tatari.

12  Q    Yes.

13         You said both parties aren't able to do so.  I'm

14  asking you, Mr. Tatari was one of the parties, where does it

15  say in this document Mr. Tatari cannot relocate without the

16  mother's consent?

17  A    Okay, Mr. Tatari cannot have the sole power to change

18  the residence of the child without the mother's consent.

19  Q    Where are you reading, sir?

20         Just give me the citation, the paragraph, the

21  page.

22         I know that's your conclusion that that's what is

23  this document says and that's why they have joint custody,

24  but I want you to tell me where it says on the document it

25  says that?

1    A    We don't need to write in the document in Turkish law.

2    Q    I just want to understand what you're saying.

3          You're saying under no circumstances, under the

4    law of Turkey, can a father relocate with a child without

5    the mother's consent?

6    A    Yes.  Not allowed.

7          MR. WARD:  Okay.  I just want to draw your

8    attention to page 13 of your report.

9          Can we pull it up, please?  Thank you.

10          Next page.  If I have the wrong page, I apologize.

11          And I'd like to you increase the size and focus on

12    paragraph 45, please.

13    Q    Isn't it true, sir, that the expert report that you put

14    forth to this court, based on your close review of the

15    Turkish document, you wrote in paragraph 45:

16          It is explicitly stated in the Beykoz family court

17    decision in the underlying custody protocol that both

18    parents are obligated not to relocate the joint child abroad

19    without the other party's consent.

20          That's what you wrote, sir, right?

21    A    Uh-huh.  Okay.

22    Q    That in the report that you put into -- that you had

23    put into evidence in this case, right?

24    A    Yes.

25    Q    And it's true, sir, that there's nothing in the Beykoz

1    family court decision, and the underlying custody protocol,

2    that states that Mr. Tatari cannot travel abroad -- cannot

3    relocate abroad with the child without the mother's consent,

4    correct?

5    A    No.  I'm not talking about travels.  Relocation.

6    Permanently.

7    Q    So I'm asking you, isn't it true that there's nothing

8    in the divorce decision, and the underlying protocol that

9    prohibits Mr. Tatari from relocating with the child without

10   the other -- without Ms. Durust's consent, correct?

11   A    There's nothing write in this protocol because this is

12   a provision of general rule of Turkish law.

13          But also --

14   Q    Sir.  Sir --

15   A    -- they can see, they can look --

16   Q    Sir, I want to say, you didn't write here, it is a

17   matter of general Turkish law, you wrote --

18   A    Uh-huh.

19   Q    -- the place we would find the mutual prohibition on

20   the parties' traveling, which underscored your joint custody

21   finding, is in the divorce decision and protocol.

22          That's what it says here, correct?

23   A    Can you repeat the last sentence you said?

24   Q    That's what it says in your report, that the place we

25   find in your report for your basis for joint custody, is in

1    the fact that the decision and underlying protocol provides

2    both parents are obligated to get the consent of the other

3    party before relocating abroad, correct?

4          You said that here.

5    A    Yes.  Yes, I said it.

6    Q    And there are no words in the decision of protocol that

7    state that Mr. Tatari cannot relate abroad without the

8    mother's consent, correct?

9    A    As words, not.

10   Q    Thank you.

11         Now, sir, did you have an opportunity to review

12   the decision dated July 12th, 2024, of the Istanbul 17th

13   Family Court related to Mr. Tatari's application to that

14   court to prevent Ms. Durust from -- and I want to get the

15   right words here -- from going abroad with the child?

16   A    No.

17   Q    You have not seen it.

18         Let me ask you then a hypothetical, sir.

19         If a Turkish court declared in a decision that

20   Ms. Durust has custody of the child and she may use her

21   rights arising from custody, and she has the right or

22   initiative to go abroad, is that an indication that

23   Ms. Durust has the right to go abroad without the father's

24   consent?

25   A    For what purpose?  I don't see the document, so I can't

1   really --

2          MR. WARD:  Put it up there.

3   A    -- say anything.

4          MR. WARD:  And, Your Honor, we're going to be

5   marking this as L3, I think for the convenience of the

6   record.

7          Can you make it bigger, please.  Thank you.

8          I'd like you to take a minute and review this

9   document, sir.

10  Q    You've never seen this before?

11  A    No.

12         Do you have the Turkish version of this decision?

13  Okay.

14         MR. WARD:  You can read the Turkish, but we're

15  going to go back to the English.

16         THE WITNESS:  Okay, please go down.

17         Okay.

18         MR. MIN:  Your Honor, can we just get like a

19  two-minute bathroom break while the witness is reviewing

20  this document?

21         THE COURT:  We'll wait until you get back.

22         (Pause in the proceedings.)

23         THE WITNESS:  Okay.

24         MR. WARD:  Sir, we're going to wait.

25         THE COURT:  We need to wait for Mr. Min to get

1    back.

2              THE WITNESS:  Your Honor, can I take a break?

3              THE COURT:  Yes, of course, you can.

4              (Pause in the proceedings.)

5              THE COURT:  Yes, go ahead.

6              MR. WARD:  Thank you.

7    CROSS-EXAMINATION (Continued)

8    BY MR. WARD:

9    Q    Have you had a chance to look at this document, sir,

10   and read it fully?

11   A    Yes.

12             MR. WARD:  Can we turn back to the English,

13   please.

14   Q    Now you can see from this document this is a court

15   order, sir, correct?

16   A    Yes.

17   Q    And you can see that when the judge was describing what

18   the plaintiff -- excuse me, in the case we're seeking, and

19   the plaintiff -- excuse me, what the defendant was seeking,

20   and in this case the defendant was Mr. Tatari, correct?

21   A    Yes.

22   Q    And the plaintiff was Ms. Durust, correct?

23   A    Yes.

24   Q    Mr. Tatari, according to the court's rendition, was

25   looking to prevent the plaintiff from abducting the child

1  abroad without waiting for the case to finish, right?

2  A    Yes.

3  Q    And was looking for an order to prevent the joint child

4  from going abroad without the knowledge of the client, which

5  was Mr. Tatari or the court, correct?

6  A    Yes.

7  Q    And his basis for seeking this relief was that he

8  didn't consent, correct?

9  A    Yes.

10  Q    And isn't it true that the court rejected that request,

11  correct?

12  A    Actually, I don't see the plaintiff's place clearly, so

13  we are just looking quick --

14  Q    Sir, focus on my question.

15        THE COURT:  Go ahead.

16  A    I don't know the details of the case, so just looking

17  at this decree, what father wants and what the mother

18  rejects, and the answers has been sealed in this case.

19        So just looking to this decree, I'm not sure about

20  your question.

21        So it's not to -- it's -- it will not be true to

22  answer just that paper, just with the paper.

23  Q    Are you saying, sir, you can't tell us what the court

24  order says by just looking at court order?

25  A    Yes, of course, I don't know the place and the finest

1   details.  So it's not -- so especially in this decree, this

2   decree is not finalized, so I don't know the procedure for

3   what's going on in Turkey.

4   Q    Sir, you read in this court order that it's been

5   decided to reject the request.

6        You see those words correct, sir, in the last

7   paragraph?

8        Yes or no?

9   A    First of all, sorry, I can't answer that question just

10  like that.

11  Q    Okay, I'll withdraw it.

12  A    See the English, Your Honor --

13          MR. WARD:  Your Honor.

14  A    -- just English translation.  I can answer your

15  question by looking at the Turkish version.

16       So at this point, I have not -- I'm not sure that

17  the English version is exactly the same with the Turkish

18  version.

19       You are showing me which one and you ask me some

20  questions.  If you show me the Turkish document, so I'm a

21  Turkish professor, I can answer your questions much more

22  better.

23          MR. WARD:  Your Honor, I have no further

24  questions.

25  A    And I'm not sure --

*B. HUYSAL - REDIRECT - MR. MIN*                    77

1        THE COURT:  Okay.  You don't want your question

2  answered then.  You're withdrawing the question.

3        MR. WARD:  If I didn't already, yes, I'm

4  withdrawing the question, Your Honor.  I thought I did it

5  already, but no further questions.

6        THE COURT:  Okay.

7        Mr. Min, do you have questions simply on the

8  questions that counsel asked?

9        MR. MIN:  Understood.  Just a few.

10        THE COURT:  All right.

11  REDIRECT EXAMINATION

12  BY MR. MIN:

13  Q    Good night, Professor.  I know it's late over there so

14  I won't keep you too long.

15  A    Good night.

16  Q    Mr. Ward was asking you some questions about Supreme

17  Court decisions in Turkey.

18        Do you recall that line of questioning?

19  A    Yes.

20  Q    Okay.  And you were talking about Supreme Court

21  decisions, before Mr. Ward cut you off, that spoke to some

22  of the issues you were testifying about, and spoke to the

23  prohibition against removal if parents have certain

24  visitation schedules.

25        Do you recall testifying about that?

1  A    Yes.

2  Q    Okay.  Can you talk about what Supreme Court decisions

3  were referencing?

4          MR. WARD:  Objection, Your Honor.

5          I was referencing a very specific Supreme Court

6  decision, which he didn't know, and that's all he said, it

7  was about one thing about the right to travel.  That's the

8  only thing I ever mentioned about Supreme Court.  He said he

9  wasn't aware of that, and we moved on.

10         THE COURT:  Overruled.

11  Q    Professor, can you elaborate on the Supreme Court cases

12  that you were testifying about earlier?

13  A    In my legal opinion, which write here, which writes on

14  my report.

15  Q    No, no.  You were earlier talking about Supreme Court

16  decisions that talked about a prohibition, or my

17  recollection from my notes was you were talking about

18  Supreme Court decision that reflected a prohibition against

19  international relocation if it disrupted the left-behind

20  parent's visitation.

21  A    Yes.

22  Q    Okay.  Can you elaborate on that Supreme Court

23  decision?

24         MR. WARD:  Objection.

25         THE COURT:  Overruled.

*B. HUYSAL - REDIRECT - MR. MIN*                    79

1  A    See in Turkish court decisions -- first of all, I have

2  to say -- I have to make it clear for you.

3           In Turkish law, the court decisions is not as

4  powerful as common law decisions.  So we could have

5  different court decisions, Supreme Court decisions, on the

6  same topic.

7           So in some decisions, Turkish Supreme Court

8  decided that if a court makes a visitation weekly for the

9  other side, and the other party brings the child outside,

10  you can't have the right to bring the child out of Turkey

11  unless a court decree rules a new schedule or schedule for a

12  visitation.  So during that, you don't have this right.

13           But I have to make it clear for you here.  We are

14  talking about domestic decisions.

15           Okay, in this case, we have an international

16  situation.  So we are talking about -- if we are talking

17  about domestic decisions, Supreme Court decisions, we cannot

18  use these decisions in this case.

19  Q    Why not?

20           MR. WARD:  Objection to this new question.  I want

21  to object.

22           THE COURT:  If you can't use it, then what's the

23  point in going into it.  Let's just move on to something

24  else.

25           I think the witness is saying that in this context

*B. HUYSAL - REDIRECT - MR. MIN*                    80

1   you can't rely on these decisions.

2          MR. MIN:  Yes, I can ask him why not.

3          THE COURT:  I mean, you're not opposing that

4   principal, correct?

5          MR. WARD:  Opposing the principal that?

6          THE COURT:  That you can't rely on these domestic

7   Supreme Court decisions in this context.

8          MR. WARD:  I'm not sure I understand what he means

9   by that, but I thought the answer was completely

10  non-responsive to the very limited question of:  Let me

11  clarify this.  That was the question.

12         So I believe the answer, for most of it, if not

13  all, was not responsive.

14         THE COURT:  Overruled.  Just go and get the

15  thought out that you want to get out.

16  Q    Professor, why not?  Why can't you apply that case law

17  or that decision?

18  A    The Turkish court decisions, on both sides, which

19  allows or not allows, is about domestic cases.  When it

20  becomes an international case, the Turkish Supreme Court

21  always applies Hague child abduction convention.

22         Internationally custody case, Turkish courts never

23  applies Turkish civil court rules, we apply Hague Convention

24  rules.

25         As I explained at the beginning, according to our

1  constitution, international conventions, agreements, have a

2  clear application against our domestic courts or acts.

3           So if you are talking about the child abduction

4  situation, a Turkish Supreme Court never relies on civil

5  court, it relies on child abduction convention.

6           That's why --

7           THE COURT:  Do you have anything else?

8           THE WITNESS:  -- we can't use it.

9           THE COURT:  I got that.

10          Do you have anything else, Mr. Min?

11 BY MR. MIN:

12 Q    Yes.  You had testified earlier that your opinion was

13 that Mr. Tatari, the father, was not able to take the child

14 or relocate the child outside of Turkey, even though it does

15 not state so explicitly in the divorce decree.

16          What was the basis of that statement, and what's

17 the basis of your opinion?

18 A    Because in the divorce decree, paragraph 3.2 states

19 that the child will only go to the schools in Istanbul.  The

20 parties mutually agree to that, and the court decided that.

21 The child will go to the specific schools in Istanbul.  And

22 any parent has a right to change it, change this school,

23 without another party's consent.

24          So if they decide that the child will go to school

25 just in Istanbul, and no party has a right to change it

1    without the other's consent, there is no need to write

2    another sentence for this situation.  So it's way practical

3    for the courts.

4              MR. MIN:  No further questions.

5              THE COURT:  Okay.  I think we're done?

6              MR. WARD:  Yes.

7              THE COURT:  Okay.

8              Thank you, Mr. Huysal.

9              THE WITNESS:  Thank you, Your Honor.

10             THE COURT:  You can go to bed now.

11             THE WITNESS:  Okay.  Have a nice day.

12             THE COURT:  Yes.  Okay.

13             Do you have another witness?

14             MR. MIN:  We could -- Your Honor, what time does

15    Your Honor plan to go to?

16             THE COURT:  We can go until at least 5:30.

17             We can call Mr. Mert Yalcin.

18             (Pause in the proceedings.)

19             THE COURTROOM DEPUTY:  Sir, raise your right hand.

20             (The witness takes the witness stand.)

21             **MERT YALCIN, called as a witness, having been**

22    **first duly sworn/affirmed, was examined and testified as**

23    **follows:**

24             THE WITNESS:  I do.

25             THE COURTROOM DEPUTY:  Please state and spell your

 1   name for the record.

 2           THE WITNESS:  Mert Yalcin.

 3           THE COURT:  Spell it, would you, please?  Spell

 4   your name.

 5           THE WITNESS:  It's, M-E-R-T, Mert, Y-A-L-C-I-N.

 6           THE COURT:  Thank you.

 7           THE COURTROOM DEPUTY:  And just pull the

 8   microphone close to you.

 9           MR. MIN:  May I have a moment just to set up.

10           (Pause in the proceedings.)

11           THE COURT:  Are you ready to inquire?

12           MR. MIN:  Yes.

13           Your Honor, if I may inquire?

14           THE COURT:  Yes.

15   DIRECT EXAMINATION

16   BY MR. MIN:

17   Q    Good afternoon, Mr. Yalcin.

18   A    Good afternoon.

19   Q    What is your current occupation?

20   A    I am the managing partner of the law firm Yalcin &

21   Toygar.

22   Q    And where is that firm located?

23   A    It is based in Istanbul, Turkey.

24   Q    And how long have you been with that firm?

25   A    I am that firm around 13 years.

1    Q    Okay.  And how long have you been an attorney?

2    A    Twenty-four years, since 2001.

3    Q    And what sort practice are you in as an attorney?

4    A    I deal international family law mainly, especially

5    since after 2005 this became my core practice.

6              In 2008, I was sent to the states by Department of

7    States for international child abduction cases.

8              And 2012, I became the first fellow of IAFL,

9    International Academy of Family Lawyers.

10             And I'm still in this practice, and I do mostly

11   Hague cases, high-profile divorce cases, all international

12   and family law matters.

13   Q    You said you became the first fellow in the IAFL from

14   Turkey?

15   A    Correct.

16             I am, at the moment, first one, the only one, from

17   Turkey.

18   Q    Okay.  And that's the International Academy of Family

19   Lawyers?

20   A    Yes, correct.

21   Q    And what is the International Academy of Family

22   Lawyers?

23   A    This organization is the top-level organization of

24   lawyers, which you become a fellow with your practice, and I

25   became a fellow through my international experiences and

1   with the referral of my international connection in that

2   field.

3            And also during that time, since 2012, I have a

4   chance to contribute to Thomson Reuters Blue Book, which is

5   on international and family law.

6            I also contributed to Chambers and Partners on

7   international location and international divorce.

8            And I have a chance to participate in a number of

9   on contracts on the Hague 1980 and international family law

10  practice in Turkey.

11           MR. MIN:  I'm going to pull up a document that's

12  been premarked as Petitioner's Exhibit 31.

13           THE WITNESS:  Your Honor, I can't see the screen.

14           THE COURTROOM DEPUTY:  One moment.

15           Are you using the lecturn?

16           MR. MIN:  Sorry.  I'm happy to use the ELMO.

17           THE COURTROOM DEPUTY:  Okay.

18           MR. MIN:  Thank you.

19           Thank you.

20  Q    Do you recognize this document?

21  A    Yes.  This is the memorandum that I typed up back in

22  September 2024.

23  Q    I'm really going to go to the last couple of pages,

24  starting with what's been Bates stamped as 636.

25           Do you see that?  Do you recognize this document?

1    A    Yes.  This is my CV.

2    Q    Okay.

3              MR. WARD:  No objection to it coming into

4    evidence.

5              THE COURT:  The entire document?  I think -- is

6    this the witness' report?

7              MR. MIN:  Report and the CV is annexed to it.

8              THE COURT:  So why don't you move the admission of

9    the entire document.

10             MR. MIN:  Okay.

11             THE COURT:  Which number is it?

12             MR. MIN:  31, Your Honor.

13             THE COURT:  All right, 31 will be received.

14             (Petitioner's Exhibit 31 was received in evidence.)

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2    BY MR. MIN:

3    Q    Have you ever testified as an expert witness?

4    A    Yes.  I had a chance to participate in different

5    countries' Family Court, from Canada, USA, Australia, U.K.,

6    Dutch courts, some Swedish courts, German and French courts,

7    and a chance to participate either in person as an expert

8    witness then, and also I provided my written expert opinion

9    on such file.

10   Q    On what issues have you given your expert testimony or

11   expert reports across the world?

12   A    Well, in my professional career, I had a chance to

13   participate in the very first examples of Hague 1980

14   application in Turkey, which was back in 2005.  Then it

15   became one of my major practices.  So I am Mr. Hague for the

16   expert witness stand, and most of the time I provide my

17   statement in Hague 1980 from Turkish prospective, and I'm

18   able to put Turkish practice accordingly.

19   Q    And how many times have you testified across the world

20   on the topic of 1980 Hague Convention?

21   A    I cannot recall my exact number, but I can say more

22   than ten.  This is around the world, in Turkey.  I also

23   advise the Family Court judges, and also from time to time

24   we have conferences, seminars, so I am able to participate

25   in these to train new fellows, new associates, and new bar

1    members.

2    Q    Have you ever testified before a U.S. court --

3    A    Yes.

4    Q    -- on this topic, 1980 Hague Convention?

5    A    Yes.

6    Q    Do you recall how many times you've done that?

7    A    About, let's say, three -- five times.

8    Q    You're a practicing attorney in Turkey, right?

9    A    Correct.

10   Q    And I think you said since 2005 you've been focusing on

11   international family law?

12   A    Correct, international family law.

13   Q    Yes.  Have you handled many Hague cases, 1980 Hague

14   cases in Turkey?

15   A    A lot.

16   Q    When you say "a lot," how many, approximately, would

17   you say?

18   A    More than -- I mean, with the expert opinions, I can

19   say more than hundreds to date.  For example, at the moment

20   I handle seven different Hague files in Turkey at the moment

21   as a counsel, and I can tell you more than hundreds.

22   Q    So you're including obviously those in which you acted

23   as a consultant as an expert, right?

24   A    Yes, correct.

25   Q    So I'm curious, how many Hague cases have you handled

M. YALEM - DIRECT - MR. MIN                    89

1  in Turkey where you were the lawyer involved, the litigator?

2  A    More than 50.

3  Q    Were you asked to provide an opinion as part of this

4  case?

5  A    Yes, correct.

6  Q    And what were you asked to provide an opinion

7  regarding?

8  A    I am asked to provide my opinion especially on

9  provisions on joint custody law and its application in

10 Turkey.

11 Q    And did you form an opinion as part of the process here

12 today?

13 A    Yes.

14 Q    And what was your opinion?

15 A    Well, again, Turkish custody law principles based on

16 two section, as Professor Huysal detailed in his testimony.

17 We have Turkey civil code, which rules the internal

18 procedures between Turkish citizens and both domestic cases.

19 And also we have conventions, and Hague 1980 is one of

20 these, such as Hague 1960 and '96.  And those conventions

21 became an internal legal courts as per the Article 90 of

22 Turkish Constitution, and the same clause stating that if

23 there is a conflict between the internal court, for example,

24 Turkish Civil Court, and the foreign convention, then

25 international convention rules are taken into consideration.

1    This is the Article 90 of Turkish Constitution.

2          Related to that, we have signed, and then in 2016

3    European Convention on Human Rights became an internal rule

4    as after it is published in official gazette, which is

5    requirement to adopt foreign legal principles into Turkish

6    law.  After 2016 especially, we started to see real

7    application of joint custody regulations as per the

8    convention.  And before that, I remember a decision back in

9    2009 from court ^ .  Of course with the parties agreement,

10   the Court decided to put joint custody regulations, and of

11   course that was really first application.

12          But after 2016, as the joint custody regulations

13   became an internal part of the law, we started to see

14   different court orders organizing these joint custody

15   regulations.  In my practice, I have a chance to apply these

16   principles to some of my clients, and I already shared this

17   information with your Honorable Court, with the current

18   references that ongoing relations between my previous

19   clients.

20          So, yes, there's a joint custody in Turkey.  Yes,

21   there's ongoing cases and ongoing decisions related to that.

22   Q    Okay.  You noted that there was a case as far back as

23   2009 where a court granted joint custody to the parties; is

24   that correct?

25   A    Correct.

1    Q    And what was the basis for a court in 2009 granting

2    that joint custody?

3    A    Well, there's a really thin red line on divorce with

4    settlement, with noncontesting divorce in Turkey.  The judge

5    is not public notary.  So this is not about the approval of

6    the agreement between the parties.  The judge, as per public

7    law principles, involves into the agreement that hearing

8    what the parties talked in this decision back in 2009.  The

9    judge has got a very special expert report, and the child

10   was in need of special treatment, so the expert stated in

11   the report that the child needs both parties' participation

12   in the life of a child.

13           Afterwards, this Judge made a very significant and

14   important decision for Turkish legislation and moved us to

15   joint custody regulations.

16   Q    So in 2009, you would agree that the Turkish Civil

17   Code, looking at the Turkish Civil Code by itself in a

18   vacuum, does not provide for joint custody; is that correct?

19   A    Correct.  The real -- the real application of European

20   Convention on Human Rights started from 2016.  That's real

21   timing of real joint custody application regulations.

22   Q    Since 2016, in your practice as a lawyer in Istanbul,

23   Turkey, have you seen joint custody be awarded in divorce

24   cases in custody cases?

25   A    A lot.  And as a counsel, I have a chance to deal with

1    such cases.  I have a chance to deal with such cases.  It is

2    very trendy at the moment between the parties, especially

3    who wants to be active in their children's life, they

4    started to pick the joint custody regulations, and we can

5    see different type of regulations under joint custody

6    management.

7    Q    Can you explain the process by which parties come to an

8    agreement and execute a joint custody provision that becomes

9    a divorce decree?

10            MR. WARD:  Objection to the foundation, Your

11   Honor.

12            THE COURT:  Overruled.

13   Q    Go ahead.

14   A    Well, in order to move along with the divorce, with

15   settlement, there should be a signed settlement agreement

16   between the parties.  Normally what we have, counsel

17   involving into negotiations and reach an agreement and both

18   parties signing this, and we submit it to Court and asking

19   the judge to check the protocol and approve it under Turkish

20   law.

21            So then after this application by the parties,

22   because the claimant must submit a copy of the signed

23   protocol to the divorce file, and then the judge wants the

24   parties for a hearing.  Most of the time the hearing is in a

25   really short time because there is no dispute and the

1    parties already agreed on specific conditions.

2              So the judge is calling the parties in for a

3    hearing and hears and also reads what is in the protocol.

4    Of course, if there's a common child, the evaluation should

5    be done very carefully.  Then after reviewing the protocol

6    conditions and asking the parties statements, then the judge

7    finalize the hearing and decides the verdict by sometimes

8    directly copying the conditions by the parties.  Most of the

9    time the judge intervenes and get into detail, and if

10   there's any need to change in the agreement, we see that

11   reflection in the final decision.

12             For example, the -- I mean, I can tell you with my

13   practice and my own clients, not related with that file, in

14   the same courthouse, because Beykoz Family Court is very

15   famous with the divorce, with the settlement, especially

16   with the public people.  It is quick and we are able to get

17   an early hearing date.  I have seen a case in the same

18   courthouse, and the judge didn't let us to discuss on a wide

19   personal visitation schedule.  She said, okay, I understand

20   your concerns, but I'm going to stick on Supreme Court

21   decision, which is every two weeks in the weekends, a

22   semester all day a week, and a month during the summer

23   holiday.  So besides that, she approved all the agreements

24   between my client and counterparty.  That's an example.

25             So the judge is not a public notary and it is not

1    automatic approval on the signed conditions.  The judge

2    intervenes, the judge checks what is agreed, then the final

3    decision goes along.

4            If one of the parties is not happy with the

5    decision, because we see that too in practical life, this

6    party has a right to appeal it.  This means that with the

7    appeal, you are able to change the case from noncontest to

8    divorce with contest and appeal court reverse the decree,

9    and the parties need to start from scratch to submit their

10   claims and demands with the exchange of the submissions.

11           So those are the basics, Mr. Min.

12   Q    So you're talking about a divorce, an uncontested

13   divorce versus a divorce with contest, which I assume means

14   a contested divorce, right?

15   A    Correct.

16   Q    Two different types of proceedings?

17   A    Correct.

18   Q    In this case, with this family, were you able to view

19   the Beykoz Family Court divorce decree?

20   A    While I was drafting my opinion.

21   Q    Okay.  So --

22   A    Yes, I saw it, of course.

23   Q    And was that the result of a contested or an

24   uncontested divorce process?

25   A    It is a result of uncontested divorce protocol.

1  Uncontested divorce case fit the protocol.

2  Q    So your testimony is that a judge, unlike a notary

3  public, a notary, has to view the agreement, or the protocol

4  as you call it, and see if it's against public policy,

5  right?

6  A    To rule the file, it is mandatory under Turkish civil

7  law to provide a signed agreement which consist of parties'

8  full agreements on the custody, financial composition,

9  acquire of property regime dissolution fundamentals.  This

10 is something you have to file with the first submission

11 because you start your filing by sharing this with the

12 judge.  That's the beginning of the filing.  Otherwise, your

13 application will be just dismissed without any proper --

14 Q    The judge is not under any obligation to accept

15 everything that the parties agreed to, correct?

16 A    Of course.  The public law principles is mandatory.

17 The judge represents the public, and every condition should

18 be revised accordingly.

19 Q    When you were drafting your report, did you do any

20 research, review any publications, review any court

21 decisions that guided you or helped you formulate your

22 opinions?

23 A    Yes, of course, of course.

24 Q    I want to direct your attention to a document that's

25 been pre-marked as Exhibit 32.

1          MR. MIN:  You know what?  That's a cue for me to

2     do something, which is put it up on the screen.

3     Q    Let me know if you see this document.

4          (Exhibit published.)

5     A    Yes, I see it.

6     Q    Is this something that you reviewed in preparing your

7     expert opinion?

8     A    Yes, of course.  Especially the decision that I

9     referred, Second Civil Chamber of Supreme Court, which is

10    related to Family Court, yes.

11    Q    And are you aware of that decision?

12    A    Yes.

13    Q    Okay.  What is that -- you don't have to look at it.

14    I'm asking you about that court decision that you're

15    speaking about.

16          What does that court decision speak to with

17    respect to joint custody in Turkey?

18          MR. WARD:  Objection, Your Honor.  I believe he's

19    referring to a document not in evidence.

20          THE COURT:  I don't know that the question

21    pertains to this document.

22          MR. MIN:  Right.  I'm asking him about a case that

23    was referenced in this document, but the question is now

24    about that case that he just talked about.

25          MR. WARD:  Oh.  It wouldn't have to be on the

1    screen anymore if he's just talking about --

2         MR. MIN:  I just told him he doesn't have to look

3    at the document.

4         MR. WARD:  Can we take it down now so he can

5    testify independently?

6         Thank you.

7    Q    You said the Second Civil Chambers of the Supreme Court

8    case?

9    A    That's the special chamber which deals with Family

10   Court files.  In Supreme Court, there are different

11   chambers.  Second Civil is the authorized one for the family

12   law cases.  That's why all decisions that we see are coming

13   from the same chamber.

14   Q    Okay.  What was it about this decision that was

15   pertinent or relevant to your legal opinion?

16   A    Well, this is a -- I have a chance to participate in

17   that file in person.  So I was one of the counsels.  It is

18   one of the very first examples of application of European

19   Convention on Human Rights, and there is a direct referrals

20   by the Supreme Court and also there are some direct

21   referrals to United Nations Child Convention, which again

22   Turkey is a party to.  So we started to see a real legal

23   grant of the joint custody regulations in Turkish

24   legislation.

25   Q    Was that a case in which joint custody was in effect?

1    A    Well, the local court dismissed the case as there

2    cannot be a joint custody under Turkish public law

3    principles.  And after European Convention on Human Rights,

4    the meaning of international element in the said divorce

5    decree, and in the meaning of the joint custody regulations

6    agreed by the parties, Supreme Court made a historic

7    decision.

8    Q    And the decision was what?  Just to be clear.

9    A    The decision was about apply the joint custody

10   regulations agreed by the parties.

11   Q    And so the Supreme Court acknowledged that joint

12   custody was a possibility in Turkey?  It was not against

13   public --

14   A    Better word, is it's not acknowledged.  After 2016, it

15   became an internal part of our legal principles.  So it is

16   there, and Supreme Court started to apply the convention

17   rules properly because Turkey started to apply the

18   conventions.

19   Q    In Turkey, what does having sole custody signify with

20   respect to decision-making authority?

21   A    Well, under Turkey civil court, during the marriage the

22   custody is used by the parents jointly.  And in terms of

23   divorce, one of the parties is entitled the custody of

24   right, and other party is entitled to get the visitation

25   order.  This is the general principle of Turkey civil court.

1    And in Turkey civil court itself, there is no joint custody

2    regulation.  Everything is drafted as per the sole custody

3    regulations.  This is what Turkey civil court directs us as

4    a practitioner.

5    Q    But I think my question is more, what areas of a

6    child's life does someone with sole custody have the right

7    to make decisions on?

8    A    Well, Professor Huysal put very good examples.  Again,

9    it has four legs.  The child custody is about deciding the

10   child's education, health, financial, and living decisions.

11   There are four legs.  And the custody and parent should obey

12   the general principles on applying the custody law.

13   Q    I'm going to direct your attention to a document that's

14   in evidence as 29.

15   A    I cannot see it.

16   Q    I'm going to put it on -- I believe it's subject to --

17            MR. WARD:  It's not in evidence.  It's being used

18   on the condition it gets into evidence.

19            THE COURT:  Yes.

20            MR. MIN:  Fair enough.

21   Q    You're familiar with paragraph 3.7, 3.8 of this divorce

22   decree?

23   A    Yes.

24   Q    And does paragraph 3.7 here signify to you whether or

25   not this is a joint custody or a sole custody arrangement?

1    A     This is typical regulation that we put into settlement

2    agreements on the joint custody regulations.  From time to

3    time parties will agree only the education or health or this

4    might cover everything such in that protocol.  So this the

5    standard usage of joint custody regulations among the

6    lawyers.  And I also referred to four different cases with

7    almost the same regulations, which we apply joint custody in

8    Turkey.

9                 (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2    BY MR. MIN:

3    Q    You say this is fairly typical or you say this is

4    typical in divorce agreements in Turkey.  Have you seen such

5    provisions in your practice?

6    A    Again, joint custody regulations should be carefully

7    read by the judge because it is related to child's future

8    life and the judge needs to make sure that this covers

9    everything for the best interest of a child.  This is

10    always, European and United Nations Children Convention

11    refers.  So yes, we have different application, but this is

12    a really standard form of such agreements.  So the parties

13    will be jointly decide on schooling and if Neva Durust

14    Tatari would like to live abroad that will be need of

15    Mr. Tatari's approval and of course opinion.

16              And also, this also goes to regulation with

17    health.  And in this protocol specifically it is underlined

18    that the child will go to school in Istanbul.  And that's

19    also agreed condition.  And in this protocol parties decided

20    to put the school names, namely --

21              THE COURT:  Where why don't you make reference to

22    the provision you're talking about.  Can you put that

23    provision on the screen?

24              THE WITNESS:  3.4.

25              THE COURT:  You're talking about 3.4?

1          THE WITNESS:  Yes, your Honor.

2     A    I mean, this is not a standard form that we use.  It is

3     much more detailed about parties intention for the best

4     interest of a child.  I also have a daughter and I know that

5     Enka school, Hisar school, Koc school and Pierre Loti are

6     the top schools in Istanbul.  That's the intention of the

7     parties, so the parties agree that the child will go into

8     that level of school.  So that's giving the example that the

9     parties will follow this as a road map for child's

10    education.  According to the document that I reviewed, the

11    child already got acceptance to Koc school, which is the

12    third school, in this article.  He is fully registered by

13    paying the tuition and all that stuff.

14    Q    So you have seen parties present the divorce protocol

15    to a family court judge in Turkey, correct?

16    A    It is mandatory; without that we cannot talk divorce

17    with settlement.

18    Q    And you've seen a Turkish family court judge reject

19    provisions in the divorce protocol, correct?

20    A    Correct.

21    Q    And if a court, if a judge rejects a certain provision

22    of a divorce protocol, that would be reflected in the final

23    divorce decree?

24    A    What happens is the judge advising parties orally to

25    find a way time to time.  Because the judge, again, is not a

1  public notary.  And judge presence is important to apply the

2  Turkish public law principles duly for the best interest of

3  a child, especially during the cases that child involves.

4  Those are the hard cases that the judge really needs to get

5  in, and time to time we see different cases that part to

6  party is forced to sign the protocol and forced to go into

7  divorce with settlement.  In that case, the judge feeling

8  that one of the parties is forced to do that, and

9  immediately stops the case and rule that this case should be

10  removed to divorce with consent, for example.

11         So, yes, the judge really needs to intervene with

12  the agreement and really needs to read and participate while

13  he or she will be drafting the verdict.

14         And from time to time I personally experienced

15  that the judge changes the agreement.  It's not

16  automatically copying and pasting the agreement.  No.

17  That's the usual procedure.

18  Q    But if the judge changes the agreement, it would be

19  reflected in the divorce decree, correct?

20         MR. WARD:  Objection.  Leading and speculating.

21         THE COURT:  Overruled.

22  A    We have to clarify one very important point because it

23  is missing.  Divorce decree is the document in that case

24  from the secret to down we see the divorce decree.  Okay.

25  It's a full decision.  However, verdict starting from point

1    1 is the core of this order.  Within that, yes, the judge is

2    writing down the final decision agreed by the parties.

3    Again, if one of the parties will not agree on that, and

4    might challenge that okay I don't agree with your

5    proposition, your Honor.  And then, the judge will say,

6    okay, ladies and gentlemen, there is no agreement in this

7    courtroom.  So I overrule the judgment from non-contested to

8    contested.

9            If the parties reaches an agreement, then it's a

10   basic sign-off agreement.  And the judge is writing the

11   verdict properly according to parties' final agreement

12   revised by the judge.  This is the process.  I tried to be

13   more generic.

14   Q    I think that was very clear.  The verdict, as you call

15   it, starts with Article 1; is that correct?

16   A    I can show it to you, if you scroll up.  There you go.

17   Starting from:  Decision for the reasons described above,

18   with the acceptance of the action this is going to be a

19   general acceptance of the general agreement between the

20   parties.

21            Then the details are put down after.

22   Q    Let's go through that.  So the decision is paragraph

23   one, paragraph two, yes, is part of the verdict or decision?

24   A    Correct, correct.

25   Q    And then paragraph three, yes?

1    A     Correct.

2    Q     Paragraph four?

3    A     Four, yes.

4    Q     Which includes the protocol language?

5    A     For example, I may comment personally.  The visitation

6    dates agreed in that protocol is a very good example of

7    applying joint custody rules because the judge decided to

8    freely, parties to involve as much as they can in the

9    child's life, so the judge let the parties agree on that.

10   In my previous experiences, as I said in the same

11   courthouse, the judge didn't accept and said I'm not going

12   to apply that.

13   Q     And so going on to page that's been Bates stamped 588,

14   this is continuing on with the verdict or decision?

15   A     Correct.

16   Q     And can you tell me where the verdict or decision ends?

17   A     After:  7. The litigation costs.

18             And:  The decision was read aloud and explained in

19   accordance with procedure in the presence of the parties and

20   their attorneys and made clear that the appeal can be filed

21   within two weeks.

22             So it is the final point of the verdict.

23   Q     So the decision starting from one to now was read aloud

24   in the presence of the parties and their attorneys.  Is that

25   your experience of what happens in family court?

1    A    Yes.  Everybody stands up and the judge is repeating

2    the agreed conditions.  And then the clerk is typing down.

3    And as you can see there is an E-sign of the clerk and the

4    judge.  And during the means of hearings of parties also

5    sign the paper.  Because it's an agreement, so if there is a

6    revision or what, because if the parties personally present

7    in the courtroom and participate in the discussions between

8    the judge there is a signature point for parties and their

9    counsels.  So I'm sure in the means of hearing there are

10   four signatures along with the clerk and judge.

11   Q    It also says that an appeal can be filed within two

12   weeks?

13   A    Yes.

14   Q    Is that typical?

15   A    Yes, this is procedure law principle.  Each party has a

16   right to appeal the decision.

17   Q    In this case are you aware if either party filed an

18   appeal?

19   A    No.  This is the finalized decree among the parties.

20   Q    I'm going to show you a document premarked Petitioner

21   49.  I don't believe this will be controversial, but are you

22   familiar with this?

23   A    Yes.

24   Q    What is this?

25   A    It's Hague 1980.  It's the convention related to that

1    file.

2    Q    I'm going to direct your attention to Article 5 of The

3    Hague Convention.

4         Your Honor, I'm not offering this, but Mr. Ward

5    has a problem me showing The Hague convention to the

6    witness.

7         MR. WARD:  I don't mind him relying on it.

8         THE COURT:  Is there an objection to at least

9    Article 5 of the document coming in?

10         MR. WARD:  I don't have an objection.  If he's

11    offering it --

12         THE COURT:  Then we'll receive Article 5 and you

13    can ask him.

14         That's the only relevant provision as far as the

15    parties are concerned?

16         MR. MIN:  It all should be read in conjunction

17    Articles 3 and 5 work together.

18         THE COURT:  I'll receive it.  It's The Hague

19    Convention of Petitioner 49, I'll receive it into evidence.

20    Ask whatever you want to ask.

21         (Petitioner Exhibit 49, was received in evidence.)

22    BY MR. MIN:

23    Q    You're familiar with Article 5 The Hague convention?

24    A    Yes.

25    Q    It states, I'll focus on 5A for the purposes this

1    convention, quote, "rights of custody," end quote, shall

2    include rights relating to the care of the person of the

3    child and in particular the right to determine the child's

4    place of residence.

5            When you consider rights of custody under Turkish

6    law, are rights of custody solely limited to the ability of

7    a parent to determine where a child lives?  Is that the only

8    right of custody that exists?

9    A    Well, as I informed you, the right of the custody is

10   either Turkish civil court or either European Convention of

11   Human Rights.  So related to that, in our example with the

12   current decision, the right of a custody is used by both

13   parties as per the joint of custody agreement between

14   Mrs. And Mr. Tatari.  So if there is an abduction case,

15   abduction from Turkey and New York, and the left behind

16   parent was not able to exercise either custody right and

17   visitation right properly, so the application is 100 percent

18   fits under Article 5.

19   Q    And so if, hypothetically, the parents share a joint

20   right to make joint decisions about a child's schooling,

21   let's take that as the premise.  A parent removes the child

22   from Turkey to another country preventing the parent left

23   behind in Turkey from participating in that decision-making

24   process of selecting schools, would that be a violation of

25   the left-behind parents --

A    Of course, Mr. Min.  As I informed you earlier, there
are four legs.  If you are talking about custody
regulations, joint custody regulations, which is widely
drafted in the said agreement.  Widely, it is a standard
usage of joint custody regulation.  Even the name of the
schools are mentioned in this decision, so of course.

Q    Is there anything in the parties divorce decree as far
as you've reviewed that prohibits the mother from traveling
outside of Turkey?

A    For the travel, there is no restriction.  For the
relocation there is a restriction.  That's a very thin line.
It of course depends on how you read it, but with the joint
custody regulation it is decided that the child will be
under the custody of Mrs. Tatari.  This means that
Mrs. Tatari will be able to freely travel with the child.
However, if there is a location issue arises out of the
dissolution of marriage, this is something that has to be
done jointly.  This is also openly written in the divorce
decree under 3.7.

          MR. MIN:  I'm going to show you a document.  If
Mr. Ward can remind me what the judgment this morning was
premarked as?

          MR. WARD:  L3.

          MR. MIN:  Thank you, counsel.

BY MR. MIN:

1    Q    I'm going to show you a document that's been previously

2    marked as L3.  I'm showing you the Turkish language version.

3    Are you familiar with this document?

4    A    Yes.

5    Q    I'm going to, for completeness, show you the last page

6    as well.  What do you understand this document to be?

7    A    It is an interim decision made under the protection of

8    child's property case.  And within that decision Mr. Tatari

9    asked to put a travel ban on a child he was, according to

10   the statement and this decision, he asked to put the travel

11   ban on child's travel to prevent possible abduction,

12   possible moving, and also asked the court to send an order

13   to relevant authorities, including U.S. embassy and U.S.

14   consulate in order to prevent issuing the passport for a

15   child because that's the -- this file is merged under

16   Turkish law is if there is a common sense on ruling to file,

17   the judge is able to merge them, and in that file we see the

18   affect of this original, the file is about protection of

19   child's assets.  It has nothing to do with the passport

20   case.  It seems like the judge merged these two files, and

21   there is a decision about not issuing a travel ban,

22   referring that there is no custody claim in that file.  And

23   as per the divorce decree there is no preventing rule the

24   travel of the mother, it doesn't refer anything about the

25   location in that decision.

1  Q    From your review of this document, and this order, did

2  the court grant the father's request to --

3  A    No.

4  Q    Hold on --

5  A    Simply, simply rejects it by referring that there is a

6  need of change of a custody case.  And according to

7  documents that I reviewed related to that file, the judge is

8  calling the change of the custody file.  And after seeing

9  that, the judge simply doesn't want to touch about the

10 custody related issues.  That's why there is a left open

11 conditions referring to travel of a child only, which is

12 already on Mrs. Tatari.  So there is nothing to decide on

13 that and there is a rejection.

14          MR. WARD:  Objection.  Anything to what the judge

15 thought is pure speculation.

16          THE COURT:  I'll sustain the objection to what the

17 judge thought.

18 BY MR. MIN:

19 Q    Mr. Yalcin, my question is whether or not in your

20 expert opinion as a practitioner in these courts in Turkey,

21 whether this order is an order recognizing that the mother

22 has the right to relocate with the child oversees?

23 A    No, it's about the travel, and prevention of further

24 travels.  That's all.

25          MR. MIN:  No further questions.

1          THE COURT:  Let's finish with this witness.

2    CROSS-EXAMINATION

3    BY MR. WARD:

4    Q    Sir, are you being paid in this case as an expert?

5    A    Yes.

6    Q    Because the disclosure made by your attorney with

7    respect to your compensation was that you weren't being paid

8    as an expert, but instead you were simply representing

9    Mr. Tatari in Turkey as his lawyer.  So which is it?

10   A    I didn't get paid for the expert fees.  But of course I

11   hold the representation and I got the payment on the very

12   first meeting.  But it's not about report.

13   Q    I'm not sure I understand what you just said.

14   A    I didn't get paid for the expert report, but I had the

15   payment for consultation.

16          THE COURT:  Consultation on what?

17          THE WITNESS:  Well, we had a meeting my office and

18   he --

19          THE COURT:  You don't have to tell me about what

20   you said.  What was the subject matter?

21          THE WITNESS:  About international custody law and

22   Hague Convention.  And I informed Mr. Tatari about aspects

23   and how the way we apply that.  I got the payment out of it,

24   of course, I don't do free pro bono.

25   BY MR. WARD:

1  Q    If you could in terms of U.S. dollars, even if that's

2  not the currency you received, how much did you receive for

3  that consultation?

4  A    I don't know.  But it's hourly fee so I think he paid

5  around 3,000, 4,000.

6  Q    Are you saying that's the only money you received for

7  your participation in this trial?

8  A    Yes, yes.

9  Q    And --

10  A    And also of course they covered my travel expenses and

11  accommodation expenses for New York normally.

12  Q    How long is your plan to stay here in New York?

13  A    Of course it depends on the hearing schedule.  I'm

14  flying back on Saturday.

15  Q    When did you arrive?

16  A    Monday night.

17  Q    I want to be clear about something with your testimony.

18  You don't dispute that Article 3 of the Hague Convention

19  requires when determining rights of custody to look to the

20  local laws of the place where the child was removed, right?

21  A    Correct.

22  Q    You also don't dispute that rights of visitation cannot

23  trigger a return of a child under the Hague Convention,

24  correct?

25  A    No, it's not correct.  It is a part of the visit of the

1   joint custody right.  This is the agreement that parties

2   reach in the separate accord.  Of course, it is related to

3   Mr. Tatari's personal visitations as well.

4   Q    Are you saying --

5   A    In such case, there should be a relocation case while

6   she was living in Turkey.  After abduction, she filed a

7   change of visitation dates case.

8   Q    Are you saying that the United States court, this

9   Court, can return the child to Turkey simply because

10  Mr. Tatari had visitation rights under the parties' divorce

11  decree?

12  A    No, I'm not saying that.

13  Q    Okay.  Because he couldn't, the court couldn't based on

14  that, correct?

15          MR. MIN:  Objection.  This witness is not a legal

16  expert.

17          THE COURT:  Overruled.

18  A    Again, there are different aspects while we apply for

19  Hague 1980.  The protocol itself is clear about the approval

20  of Mr. Tatari about location, this is point one.  Point two,

21  the schooling of the child.

22          MR. WARD:  Your Honor, I move to strike.  I asked

23  a simple question about visitation rights, not the

24  schooling.

25          THE COURT:  I think the question was about that

1    portion.

2              THE WITNESS:  I understand, your Honor, but it is

3    not about one sentence reply.  Because in Turkish law if you

4    are talking about custody, this is not only about approval

5    of Mr. Tatari.  It is about the choosing the school, it's

6    about --

7              THE COURT:  He just asked you about whether

8    visitation rights standing alone.

9              THE WITNESS:  Yes, yes of course.  It is one of

10   the effects, correct.

11   BY MR. WARD:

12   Q    I'm not sure I understand your question.  Is the fact

13   that a party has visitation rights alone under a divorce

14   decree, allow a Hague court to return that child?

15   A    It is solely it is not allowing.  There should be other

16   circumstances.

17             (Continued on next page.)

18

19

20

21

22

23

24

25

1   CROSS-EXAMINATION (Continued)

2   BY MR. WARD:

3   Q    Okay, thank you.

4        Have you ever appeared on Mr. Tatari's behalf in

5   any Turkish cases?

6   A    I didn't appear any of the court hearings, no.

7   Q    Are you doing work for Mr. Tatari on any of the Turkish

8   cases that are going on right now?

9   A    I don't do any work for him, and I didn't consult

10  anything on behalf of him.

11  Q    Okay.  So you have not in any way billed Mr. Tatari for

12  time, other than for that consultation that you had with

13  him?

14  A    Correct.

15  Q    All right.

16       So in your -- in the compensation disclosure that

17  we received from Mr. Tatari's counsel, it states -- and I'm

18  sorry if I pronounce your last name wrong -- Mr. Yalcin is

19  representing petitioner in Turkey for the process of

20  returning the child pursuant to the Hague Convention and is

21  being compensated for his representation.

22       Was that a misstatement?

23  A    Well, it is a very wide statement.

24       If the consultation to collect and enforce, I put

25  my legal opinion in the -- I put my legal opinion, the first

1   one, into the Central Authority application the Turkish

2   Minister of Justice, and my name is there.  Of course, my

3   fee covers the entirety.  That's why I didn't charge him

4   anything after this money.

5           But, of course, my name is under the Central

6   Authority application.

7   Q    Okay, so you did do work for Mr. Tatari for a

8   submission in Turkey?

9   A    Correct.

10  Q    Thank you.

11          You were present in the courtroom for the previous

12  expert's testimony; were you not?

13  A    Yes.  I was here.

14  Q    And isn't it true that the professor said something

15  about Turkish law with which you very much disagree -- let

16  me change that, with which you disagree, correct?

17  A    Well, can you repeat what he said and what the subject,

18  and I will make sure that I will give you the right answer.

19  I don't recognize it.

20  Q    He represented to this Court, in his expert opinion,

21  that a parent who has visitation rights with the child,

22  cannot relocate to a foreign country under Turkish law.

23          Do you recall that testimony?

24  A    Yes, I remember.

25  Q    He's wrong about that, correct?

1  A    Well, again, this is my point.  We cannot eliminate

2  this only one subject.

3          THE COURT:  Stick with just that one subject.

4          If that's the one subject, was that correct?

5          THE WITNESS:  This is from this thing, yes; one of

6  the things.

7  Q    And he was incorrect in his testimony about that

8  subject?

9          MR. MIN:  Objection, Your Honor, that's a

10  mischaracterization of the evidence.

11          He was citing to a Supreme Court case that he said

12  sometimes they are contradictory decisions.  And he said

13  this case stated just for the principle, which you could not

14  relocate if there was visitation in place.

15          That was not his testimony that this was, you

16  know, the law of the land.  And I don't believe the question

17  is proper.

18          MR. WARD:  We don't have the transcript yet, Your

19  Honor.

20          THE COURT:  If he said that, do you disagree with

21  that?

22          THE WITNESS:  Well, I don't disagree, but there is

23  a missing part of his statement.  We have to think why, this

24  is one --

25          THE COURT:  Assuming there's no missing statement,

1    assuming that he made that statement, that it's simply with

2    regard to visitation rights.  If somebody's been awarded

3    visitation rights in Turkey, that it violates the custody

4    rights if they come to the United States with the kid.

5            THE WITNESS:  I agree with that comment.

6            So if you want my answer to that, yes, breach of a

7    personal visitation is one of the reasons on applying the

8    Hague.  Because each case has a different separate, so I

9    don't think we decide accordingly.

10   Q    Sir, I don't believe you answered the question because

11   this has nothing to do with the Hague.

12           He said it was a violation of custody rights under

13   Turkish law if a party relocates abroad, oversees, if they

14   have visitation rights.

15           Is that an accurate statement?

16   A    A breach of the visitation right, is it the core of

17   1980?  Is this the question?

18   Q    No.  I'm asking under Turkish law, does Turkish law

19   prohibit a party with sole custody from relocating oversees

20   with the child, if the other party has visitation rights?

21   A    Yes, it's a breach of Convention.

22           MR. WARD:  Okay, could you bring up his report.

23           Go to the page where it says A10.  Right there.

24   Q    This is your report, sir, you recognize that?

25   A    Yes.

1   Q    True or not, sir, page 10 of the report states the

2   following:

3             While a custodial parent can relocate to another

4   country with the child without needing consent of the other

5   parent, the left-behind parent can apply to the Turkish

6   court for a reconsideration of custody.  This legal action,

7   known as a change of custody lawsuit, may be initiated by

8   the left-behind parent, if they can claim that the

9   relocation constitutes misuse of parental responsibility.

10            Correct?

11  A    Correct.

12  Q    So, again, in your report, you acknowledge that a

13  person with custody can relocate, and the mechanism to

14  challenge that.  Okay, it's not a violation when they leave,

15  the mechanism to challenge it is go to the court in Turkey

16  and seek a change of custody, correct?

17  A    Correct.

18            But this is one of the reasons to file a change of

19  the custody.  In that file is from the submissions.  There

20  are a number of allegations in terms of the change of the

21  custody.

22            So it's not about only obeying the divorce decree

23  principals, it's about not having a proper life as a mother

24  to protect the child's best interest.

25            So there are different aspects in that file on

1   change of the custody.  Yes, it is one of the reasons, and

2   it is one of the points that you may go into a change of the

3   custody.  But are there are so many other arguments in this

4   change of the custody.

5   Q    And I appreciate everything you just said there.

6            But you acknowledged in your report that a

7   custodial parent can relocate to the other country, without

8   needing the consent to the other parent, which would

9   indicate that it's not improper for a parent to relocate to

10  another country without the consent of the other parent who

11  has visitation rights, correct?

12  A    Yes, correct.

13  Q    Thank you.

14           You stated in your testimony that you had seen

15  joint custody -- leave that out, please -- you had seen

16  joint custody, I think you said, awarded a lot or agreed to

17  a lot in your practice.

18           Do you remember that testimony?

19  A    Yes.

20  Q    Is it true, sir, that in the report that is now in

21  evidence to this Court, you wrote, and I quote, "Due to the

22  restrictions and challenges in Turkish law, courts in Turkey

23  are reluctant to approve joint custody."

24           You wrote that, sir, right?

25  A    Yes.  Yes.

1          MR. WARD:  I want to take a second, if you could

2    pull up L3.  Put in the English.

3    Q    You acknowledge as the professor, the last witness

4    acknowledged, in presenting his arguments to the court in

5    July of this year to prevent Ms. Durust from going abroad,

6    the father spoke about the risk of abduction, correct?

7    A    Yes.

8    Q    You're familiar with abduction, correct?

9    A    Correct.

10   Q    Now, you would agree that someone traveling let's say

11   to Disneyland for two weeks, does not raise the risk of

12   abduction, correct?

13   A    Yes, it's a temporary travel, a joint travel.

14   Q    Abduction is a fear that the child is going to be taken

15   somewhere likely permanently, correct?

16   A    Yes, correct for relocation.

17   Q    Yes.  And he asked the court, because of this fear for

18   relocation, to not allow her to travel abroad, correct?

19   A    Correct.

20   Q    Okay.

21   A    But --

22   Q    And the court rejected that request, correct?

23   A    The court rejected that request by meaning --

24          THE COURT:  Just to the extent you can do it, just

25   answer it "yes" or "no".

1           THE WITNESS:  Can you repeat?

2    Q    The court rejected the request, correct?

3    A    Yes.

4    Q    And in rejecting the request, the court noted that the

5    mother has custody, correct?

6    A    Correct.

7    Q    The Court didn't say under the parties' joint custody

8    regime, this, that or the other, it said mom has custody,

9    correct?

10   A    Correct.

11   Q    That is a finding of the Turkish family court, correct?

12   A    I cannot say this is a finding.  In the verdict, it is

13   stating that again.  I mean -- may I?  Or shall I continue

14   with the answer?

15   Q    If your answer is "no," I'll move on to the next

16   question.  That's fine.

17   A    Okay, no.

18   Q    No?  Okay.

19           The court said, "Due to the mother's custody, she

20   has the right to go abroad with the child", correct?

21           MR. MIN:  Objection, that's not what the document

22   says.

23           MR. WARD:  I'm asking him.

24           MR. MIN:  You're implying that that document says

25   that.  I think that's a misrepresentation.

1           THE COURT:  Overruled.

2    A    Yes.

3           MR. WARD:  Give me one second, Your Honor.

4           (Pause in the proceedings.)

5           MR. WARD:  No further questions, Your Honor.

6           THE COURT:  Do you have anything further, Mr. Min?

7           MR. MIN:  Yes, Your Honor, just a few questions.

8    REDIRECT EXAMINATION

9    BY MR. MIN:

10   Q    I am turning to your report, and Mr. Ward was kind

11   enough to highlight your statement about the reluctance of

12   approving joint custody in Turkish courts, correct?

13          Do you recall that?

14   A    Correct.

15   Q    I think Mr. Ward, maybe inadvertently, forgot to

16   mention the second patrol of your statement there, so I

17   wanted to highlight it for you.

18          You talk about the reluctance of Turkish courts to

19   approve joint custody, right?

20   A    Correct.  And there are so many reasons behind that.

21   It's more practical point of judge's consideration that this

22   convention ruling, in terms of the joint custody, is

23   something you have to apply by guidance to local judges.

24          And Turkey is a big country, so we cannot say that

25   we have the same applications in Istanbul.  That's the

1   general frame of the legal structuring problems.

2   Q    But you went on to say in the next sentence:  "However,

3   in practice, many courts allow flexible arrangements where

4   the noncustodial parent still participates in important

5   decisions.  It puts joint custody into practice, although

6   not in name."

7   A    Correct.

8   Q    What do you mean by that?

9   A    Well, likewise, the conditions agreed between this

10  case, the parties, I mean the parties are flexible to put

11  any kind of measures related to the joint children's life.

12  And there are -- I mean I have seen cases that as the child

13  was in the special needs, or that was a special needs

14  preparation classes, which will be decided jointly by the

15  parties, for example, this related to education, but this is

16  just an example that this will cover a lot of different

17  things in order to jointly decide on the child's needs.

18  Q    I'm going to show you page 613.  I'm just trying to

19  focus, sir.  Here we go.

20       And you wrote, starting at A8:  "If one parent

21  holds full custody, they can take the child abroad without

22  requiring the other parent's consent," right?

23  A    Yes.

24  Q    And then A10, down below, Mr. Ward pointed out:  "You

25  stated that a custodial parent can relocate to another

1    country with the child without needing consent of the other

2    parent," right?

3    A    Correct.

4    Q    Now someone who holds full custody, as you stated in

5    A8; is that right?

6    A    Correct.

7    Q    Is, in your review of this case, and your review of the

8    divorce decree, is Ms. Durust a parent that has full

9    custody?

10   A    Correct.

11   Q    She has full custody?

12   A    Yes.

13            MR. WARD:  Objection.  Asked and answered.

14   Q    So she's able to relocate to another country without

15   the consent?

16   A    Correct.

17   Q    Even though 3.7 is in place?

18            MR. WARD:  Objection, Your Honor, I didn't go into

19   3.7.

20            THE COURT:  Overruled.

21   A    Yes, correct.

22            What do you mean, can you point to?

23   Q    3.7 of the divorce decree.

24   A    Current divorce decree?

25   Q    Yes.

1   A    Current divorce decree is defining the approval on

2   relocation.

3   Q    But your testimony just now is that she doesn't need

4   the father's approval?

5             MR. WARD:  Objection, Your Honor.

6             THE COURT:  Overruled.

7   A    I mean you are talking about in the example the wife

8   has -- the ex-wife has the sole custody.

9   Q    No, I asked you if Ms. Durust, the mother here, if she

10  has full sole custody in this case.

11            MR. WARD:  Objecting, Your Honor.

12  A    And if she will have full custody, yes, she will be

13  free.

14  Q    I said, does she have sole custody, full custody?

15            MR. WARD:  Objection, Your Honor.

16            THE COURT:  Overruled.

17  A    Related to current divorce part?

18  Q    Yes, this particular case.

19  A    No, she doesn't have sole custody.  She has a joint

20  custody with Mr. Tatari.

21  Q    My question to you, in pointing out A8 is, is the

22  mother, in this case, in this family, is she the type of

23  person that you were referring to that had full custody?

24  A    No, no, no, no, no, she's not.

25            MR. MIN:  No further questions, Your Honor.

*PROCEEDINGS*                                              128

1          THE COURT:  Do you have anything?

2          MR. WARD:  One.

3    RECROSS-EXAMINATION

4    BY MR. WARD:

5    Q    Yes or no, the second line of the order of the divorce

6    decree states that:  Neva Durust Tatari, the mother of the

7    appointed, has the custody O.T., the biological party of the

8    child.

9          That's what that agreement says, correct?

10   A    Yes.

11   Q    Do you recall that?

12   A    Yes.

13         MR. WARD:  Thank you.  No further questions.

14         THE COURT:  All right, I have just a brief inquiry

15   on a separate topic.

16         Mr. Yalcin, you submitted a memorandum to the

17   Court through counsel on the question the Court had about

18   referring the matter under Article 15.

19         Do you recall that you submitted that?

20         THE WITNESS:  Yes, Your Honor.

21         THE COURT:  And you said that there is nothing

22   specifically mentioned in Article 15 applications, that

23   simply put, there's no legal basis for an Article 15

24   application in Turkish courts.  You said that.

25         THE WITNESS:  Yes, this is directive of the

*PROCEEDINGS*                                                        129

1    Turkish court, however, this is a special request defining

2    the context of the custody and this might go to a Central

3    Authority.

4              THE COURT:  What --

5              THE WITNESS:  I mean the Central Authority in that

6    party is a party of the procedure.  So while -- what might

7    can be done is to check this with Central Authority.  But

8    there's no such case which goes to judge and the judge makes

9    a decision.

10             And I also checked this with the Turkish Central

11   Authority, until now in Turkey there is no such procedure.

12             THE COURT:  But there's something called a 1980

13   Child Abduction Country Profile.

14             Are you familiar with that?

15             THE WITNESS:  Yes.

16             THE COURT:  And at 10.2, now this is Turkey's

17   response.  At 10.2 it said:  "In your state, is it possible

18   for a decision or other determination to be made in

19   accordance with Article 15 of the convention that removal or

20   retention of the child is wrongful", and the answer is

21   "yes".

22             THE WITNESS:  Again, this is the Authority's

23   reply.  There's no such court procedure because --

24             THE COURT:  So they -- when they filed this reply

25   they were wrong?

1          THE WITNESS:  No, they were not wrong.  The

2   Central Authority is process with the judges, they are an

3   alternative consensus of judges, so they will put their

4   opinion about the Article 15.

5          THE COURT:  Who would one make the Article 15

6   request to?

7          Under Turkish law, you can make the Article 15

8   request, who would it be made to?

9          THE WITNESS:  Again, in order to define the proper

10  custody right, there should be an evaluation if the party is

11  entitled to apply.

12         So this evaluation is a matter of control.  While

13  the process the 1980 application, this is not an automatic

14  process, the Ministry of the Central Authority gets the

15  file --

16         THE COURT:  Right.

17         THE WITNESS:  -- they may make habitual residence.

18         THE COURT:  Habitual residence.

19         THE WITNESS:  And also if the applicant has any

20  writing from the Hague 1980.  That's the application process.

21  And there are a number of applications are dismissed because

22  of not complying with the custom and rule.  And also this is

23  on the same web page, joint case declaration to the Hague.

24         Same cite, sorry, different statement.

25         (Continued on the following page.)

1    (Continuing.)

2              THE COURT:  I don't think I understand any of

3    that.  But does anybody else want to make any further

4    question about that, what I asked the witness?

5              MR. MIN:  Your Honor, questions to the witness

6    or -- because I'd be happy to speak to the Court about

7    the --

8              THE COURT:  No.  I mean, if you think the witness

9    has something to add to it, fine.  I raised the issue with

10   him.  I'll give counsel the opportunity to ask a couple of

11   questions about it.

12             MR. MIN:  Sure.  Can I do it from here?

13             THE COURT:  Yes.

14   REDIRECT EXAMINATION (cont'd)

15   BY MR. MIN:

16   Q    In your experience, have you ever seen an Article 15 --

17   A    No.  In Turkey, there is no Article 15 applications to

18   date.

19   Q    Now --

20   A    This is the current information that we got in the

21   morning from Central Authority.

22   Q    You're aware Article 15 of the Hague Convention,

23   though, right?

24   A    Yes.

25   Q    And you were aware that in theory and in practice and

1    depending on which country we're talking about, Article 15

2    requests can be made to either the Central Authority in that

3    particular country or to a court in that particular country,

4    right?

5    A    Right.

6    Q    Now, your memo that you drafted was specific to the

7    fact that you don't believe a Turkish court could address

8    the Article 15 request, right?

9    A    Correct.

10   Q    What is your opinion on whether or not the Turkish

11   Central Authority might address the Article 15 request?

12   A    First of all, for Turkey, it is under the theory.

13   However, from professional point of view as a practitioner,

14   this Article 15 is related to directly filed Hague files.

15   In U.S., we have this opportunity, but with the files filed

16   through Central Authority, because this is something needs

17   to be controlled by the abducting court that if there is any

18   violation of custody rights.  As there is no proper

19   authority to check it if you file that direct in the U.S.

20   court, there should be a need of clarification from

21   authority.  That's why Article 15 refers that parties can

22   ask determination of custody rights.

23        However, for the files coming through Central

24   Authorities, it has already been reviewed by the judges, it

25   has already been processed by habitual residents, prevention

1   of custodial rights, and all possible aspects of the Hague

2   1980.  This is the difference.

3            So in my professional opinion, again, this is

4   something cases filed directly without Central Authorities

5   involvement.  At the moment for this file, there is a

6   Department of State and Turkish Minster of Justice

7   Enrollment.  This is a Central Authorities file at the

8   moment.  It's not a civil filing as far as I know.  I'm not

9   here to comment on the U.S. law aspect, of course.

10           So this is related to file, filed directly by the

11  parties in the foreign court.  Otherwise, how come the judge

12  will understand the correct custody regulations and correct

13  applicable legal principles?  This is my professional

14  opinion, and in Turkey there's not example of Article 15

15  process.

16  Q    If one were interested in trying to get for the first

17  time an Article 15 determination from the Turkish Central

18  Authority, what do you think would be the best process to do

19  that?  Like coming from the Court and the Judge here or in a

20  court proceeding or judge in the U.S. or --

21  A    As per the Hague --

22  Q    Or coming from the State Department?

23  A    As per Hague 1980, Central Authorities are the

24  authorized mechanism to run the convention procedures.  As a

25  party country, USA and Turkey needs to cooperate through the

1    Department of State and Turkish Ministry of Justice.  Those

2    are the Central Authorities as per the convention.  So the

3    process would be done through the authorities --

4            THE COURT:  All right.  So you've got the Central

5    Authority.  Why can't the Central Authority, in order to

6    answer the Court's question, refer it to the local court

7    that's dealing with it to get the answer?

8            THE WITNESS:  Again, in order to provide the

9    answer, there should be an evaluation of entire file.  It's

10   different than common law, Your Honor.  We have a civil law,

11   and within the civil law regulations you see every filing

12   and its legal ground.  For example, custody case, there's a

13   specific article that regulates that --

14           THE COURT:  So you've got all of these decisions,

15   you know the Court that has reached those decisions.

16           THE WITNESS:  It's not like --

17           THE COURT:  Why can't the Central Authority put

18   that question to the Court that issued the decision?

19           THE WITNESS:  First of all, there is no regulated

20   mechanism to transfer it to court and provide an opinion

21   about it because if it is one of --

22           THE COURT:  The second thing here, counsel, it

23   says:  Which authorities in your state can issue Article 15

24   decisions?  It says:  The Courts.

25           THE WITNESS:  Again, this is never done in Turkey.

1   It is a very wide answer, and this morning we had a call

2   with Turkish Central Authority; they don't have any

3   expertise, any knowledge about this.  This is my

4   professional opinion.

5           THE COURT:  Okay.

6           Do you have anything you want to ask on the issue

7   I raised?

8           MR. WARD:  No, Your Honor.

9           THE COURT:  Okay.  Thank you.

10          You can step down.

11          (Witness is excused.)

12          MR. MIN:  Your Honor, can you provide a link or a

13  site to the country profile response --

14          THE CLERK:  It's in the summary judgment opinion.

15          THE COURT:  It's in the summary judgment opinion.

16          What is your lineup for tomorrow, counsel?

17          MR. MIN:  Sure.  We had been talking earlier.  I

18  also invite, and if Mr. Ward doesn't want to do that or is

19  not suitable, but I know that he originally had witnesses

20  lined up tomorrow morning remote.  If those witnesses are

21  available another day, then fine.  If they have to go

22  tomorrow morning, we will accommodate.

23          MR. WARD:  We'd like you to finish your case.

24          MR. MIN:  That's fine.  Okay.

25          So then we have three witnesses left.  We have a

1   remote witness at 10 a.m. tomorrow and then we have two

2   in-person witnesses.

3               THE COURT:  Okay.  Who is the remote witness?

4               MR. MIN:  Talat Yazici, the translator.

5               THE COURT:  And then?

6               MR. MIN:  We have another expert

7   translator/interpreter who was here earlier.  She'll be back

8   tomorrow.

9               THE COURT:  All right.

10              MR. MIN:  And then we have our client.

11              THE COURT:  Okay.  So you should finish up in the

12  morning, for sure.

13              MR. MIN:  Yeah.  And those are all shorter than

14  the two witnesses today.

15              THE COURT:  Okay.

16              And how long do you believe your case will be,

17  counsel?

18              MR. WARD:  Well, Your Honor, and I just want to

19  let you know that there will be a motion for directive

20  verdict.

21              But we have a live -- my answer is we have five

22  witnesses; three live, two remote.  The remote we're

23  planning for tomorrow morning, I have to check with them,

24  but I will call my witnesses out of order to get live in the

25  evening, and if we have to get another morning.  But I'm

M. YALCIN - REDIRECT - MR. MIN                    137

1  going to really push hard to see even, because we had

2  someone on at 10:00 tonight, if our experts in Turkey can

3  testify tomorrow.  We're going to push for it, but I don't

4  know if that's possible.

5         THE COURT:  Well, why can't they testify in the

6  morning?  Because I guess you've got your --

7         MR. WARD:  Yes.

8         MR. MIN:  I mean, listen, I know they want us to

9  go first, but our experts have gone already, so, like,

10 whether the translators go I don't think is going to impact

11 on what their expert said, right?

12        THE COURT:  Well, just tell your experts that if

13 we can finish up tomorrow, they're going to have to get some

14 sleep tonight, okay?  Because we need to wrap this up.

15        MR. WARD:  Okay.  I understand that, Your Honor, I

16 do.

17        THE COURT:  We can't begin tomorrow morning, I'm

18 sorry, until 10:00.  So we'll begin at 10:00 tomorrow

19 morning.

20        Okay.  Thank you.

21        MR. WARD:  Thank you.

22        MR. MIN:  Your Honor, can we leave anything here?

23        THE COURT:  Is the closet open?

24        THE COURTROOM DEPUTY:  Yes.

25        THE COURT:  We're not going to be responsible for

1    your stuff, but you can put it in the closet if you want.

2              MR. MIN:  Of course.  Understood.

3              THE COURT:  We have cleaning people, things like

4    that.  Things can get messed up.

5              MR. MIN:  Understood.

6              MR. WARD:  I just want everybody to know, while we

7    were testifying, we got the transcript of the July and we'll

8    be circulating it momentarily; the July petition.

9              THE COURT:  Okay.  Thank you.  See you later.  See

10   you tomorrow morning.

11             (Matter adjourned until Thursday, December 12,

12   2024, at 10:00 a.m.)

13

14                        *     *     *     *

15

16

17

18

19

20

21

22

23

24

25

139

1                          <u>I N D E X</u>

2

3       <u>WITNESS</u>                                      <u>PAGE</u>

4

5       **BURAK HUYSAL**

6            DIRECT EXAMINATION BY MR. MIN              26

7            CROSS-EXAMINATION BY MR. WARD             53

8            REDIRECT EXAMINATION BY MR. MIN           77

9

10      **MERT YALCIN**

11           DIRECT EXAMINATION BY MR. MIN              83

12           CROSS-EXAMINATION BY MR. WARD            112

13           REDIRECT EXAMINATION BY MR. MIN          124

14           RECROSS-EXAMINATION BY MR. WARD          128

15           REDIRECT EXAMINATION (cont'd)

16           BY MR. MIN                               131

17

18

19

20

21

22

23

24

25

140

1                        **E X H I B I T S**

2

3

4        Petitioner's Exhibit 45                        28

5

6        Petitioner's Exhibit 44                        35

7

8        Petitioner's Exhibit 31                        86

9

10       Petitioner Exhibit 49                          107

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25