141

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
                    :
In the Matter of O.T.    :   24-CV-6930(CBA)
                    :
ZUHTU ONUR TATARI,     :
                    :   United States Courthouse
        Petitioner,  :   Brooklyn, New York
                    :
     -against-      :
                    :   December 12, 2024
NEVA DURUST,        :   10:00 a.m.
                    :
        Respondent.  :
                    :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR HEARING
BEFORE THE HONORABLE CAROL BAGLEY AMON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Petitioner:  GREEN KAMINER MIN & ROCKMORE LLP
                  420 Lexington Avenue, Suite 2821
                  New York, New York 10170
             BY: RICHARD MIN, ESQ.
                  GIGI VARGHESE, ESQ.

For the Respondent:  BLANK ROME LLP
                  1271 Avenue of the Americas
                  New York, New York 10020
             BY: BRETT S. WARD, ESQ.
                  ALEXA B. LUTCHEN, ESQ.
                  PAUL H. TZUR, ESQ.
                  ANDREW T. HAMBELTON, ESQ.
                  MARILYN B. CHINITZ, ESQ.

REPORTED BY:

Kristi Cruz, RMR, CRR, RPR
Official Court Reporter
kristi.edny@gmail.com

Proceedings recorded by computerized stenography.  Transcript produced by
Computer-Aided Transcription.

\*    \*    \*    \*    \*

PROCEEDINGS                                              142

1              (In open court.)

2              THE COURTROOM DEPUTY:  Civil Cause For Civil

3    Hearing, 24-CV-06930, *Tatari versus Durust*.

4              Please state your appearance for the record,

5    starting with the plaintiff.

6              MR. MIN:  Richard Min, Green Kaminer Min &

7    Rockmore.  Standing next to me is Gigi Varghese of the same

8    firm, and next to her is Caroline Shephard, a paralegal from

9    Green Kaminer Min & Rockmore, all on behalf of petitioner

10   Onur Tatari, who is seated at the end of the table, Your

11   Honor.

12             Good morning.

13             THE COURT:  Good morning.

14             MR. WARD:  Blank Rome by Brett S. Ward, Andrew

15   Hambelton, Paul Tzur, Alexa Lutchen, and Marilyn Chinitz,

16   1271 Avenue of the Americas, New York, New York 10020,

17   appearing today on behalf of the respondent, Neva Durust,

18   who is at counsel table.

19             Good morning, Your Honor.

20             THE COURT:  Good morning.  Everyone can be seated.

21             I understand we're ready to proceed.  Are the

22   witnesses on Zoom?  Is that right, Mr. Min?

23             MR. MIN:  The witness is, yes, on Zoom, and we are

24   ready to proceed, Your Honor.

25             THE COURT:  Okay.

PROCEEDINGS                                    143

1          MR. WARD:  Your Honor, very quickly to expedite

2    things, I wanted to put one stipulation on the record.

3          Both parties agree that nobody will be objecting

4    to the admission of a document based simply on the fact that

5    there's an English translation.  The English translation

6    will come in with the document.  We're not saying that we

7    can't challenge the admissibility on the grounds.  But the

8    fact that there's not someone who has translated other than

9    the divorce decree.  So all other documents other than the

10   divorce decree will not be objected to because it's coming

11   with an English translation.

12         THE COURT:  I have no idea what you're saying.

13   What documents are you referring to?

14         MR. WARD:  There's going to be documents we're

15   going to be putting in, which are Turkish court documents,

16   decisions and the like.

17         THE COURT:  Through this witness?

18         MR. WARD:  No -- well, through other witnesses.

19   What we're avoiding is having these witnesses having to go

20   through document by document saying I translated this, it's

21   accurate; I translated this, it's accurate.  We are

22   stipulating that other than the divorce decree, the English

23   translations come in with the documents as evidence, and all

24   those Turkish court documents.

25         The other thing I wanted to alert the Court, we

1    have a eliminated Dr. Giray from our witness list.  Assuming

2    we finish today, there's no way we could have fit in both

3    witnesses in the afternoon.  We're willing to just go with

4    one of our experts.  However, for any reason, an act of god

5    or what, we have another court date, we're reserving our

6    right to still call him, but we're going to try to get done

7    today.

8              THE COURT:  Well, whatever.

9              Could you swear in the witness, please?

10             THE COURTROOM DEPUTY:  Can you hear me?

11             THE WITNESS:  Yes.

12             THE COURT:  Mr. Yazici, can you please raise your

13   right hand?

14             (Witness sworn.)

15   **TALAT YAZICI**,

16             called as a witness, having been first duly

17             sworn/affirmed, was examined and testified as

18             follows:

19   DIRECT EXAMINATION

20   BY MR. MIN:

21   Q    Good afternoon, Mr. Yazici.  Can you hear me?

22   A    Yes, I do.

23             THE COURT:  Could you ask the witness please to

24   state and spell his name for the record?

25             MR. MIN:  Sure.

T. YAZICI - DIRECT - MR. MIN                    145

1    Q    And if you could speak a little bit louder, it's a

2    little bit quiet on your end.

3          Could you please state and spell your name for the

4    record?

5    A    My name is Talat Yazici.  I will spell it.  T-A-L-A-T,

6    and the last name is Y-A-Z-I-C-I.

7    Q    What is your current occupation?

8    A    I'm a translator.  I'm manager of company named Diltra.

9    Q    Can you spell the name of that company that you just

10   mentioned, please?

11   A    D-I-L-T-R-A.

12   Q    And what type of company is that?

13   A    It's public company.

14   Q    It's a what company?

15   A    Public company.

16   Q    Public company.  But what does that company do?

17   A    We do translations.

18   Q    Okay.  And where is that company based?

19   A    In Istanbul, Turkey.

20   Q    And what languages do you translate into, between

21   Turkish and what other languages?

22   A    Basically it's a company, we do also translations.

23   Q    What about you personally, do you translate documents?

24   Do you specialize in any other languages?

25   A    In English.

1   Q    And how long have you been working as a translator
2   professionally?
3   A    More than 30 years.
4   Q    And do you have any experience or training as a
5   translator?
6   A    I have gone to Istanbul University, Department of
7   English Literature, Language and Literature, and we had
8   translation classes in university.
9   Q    As part of this case in which you're testifying, did
10  you prepare a written affidavit?
11  A    Yes, I prepared the affidavit, yes.
12       MR. MIN:  If I could ask my colleague to put up on
13  the screen a document that's been pre-marked as Petitioner's
14  Exhibit 40 for identification.
15  Q    Mr. Yazici, we're about to show you a document.
16  A    Yes.
17       (Exhibit published.)
18  Q    Please look at this and tell me if you could recognize
19  this document.
20  A    Yes, that's right.  Yeah, of course this is the
21  translation I make, and the first document is my circular
22  signature, and the original document, the original, as I
23  said, the original is at Beyoglu.
24  Q    Okay.  Let's go to the top of this exhibit.  Let me
25  just focus on the first two pages.

T. YAZICI - DIRECT - MR. MIN                    147

1          Is this the affidavit that you prepared and

2   signed?

3   A    Yes, I did.

4          MR. MIN:  Your Honor, for convenience, I'd offer

5   this document into evidence.

6          THE COURT:  All right.  40?  40 will be received.

7   It is 40, correct?

8          MR. MIN:  Yes, Your Honor.

9          MR. TZUR:  And no objection on this one, Your

10  Honor.

11         THE COURT:  Okay.

12         (Petitioner's Exhibit 40 received in evidence.)

13  Q    What was the purpose of preparing this affidavit?

14  A    We realize that we made a mistake in the original

15  translation we did at the end of the last year.

16  Q    Okay.  And when you say "original translation," what

17  were you translating originally?

18  A    Court decision.

19  Q    And you recall, who asked you to translate court

20  decision?

21  A    It was sent by the 15th Notary Public of --

22         THE COURT:  I can't really understand anything

23  he's saying.

24  Q    Can you please speak up and speak a little clearer, if

25  you can?

T. YAZICI - DIRECT - MR. MIN                    148

1   A    The document was sent to us by the 15th Notary Public

2   of Beyoglu, which is also done by Neva Tatari.

3   Q    Can you spell -- you said the 15th Notary Public of, I

4   think it was Beyoglu?

5   A    Yes, that's right.

6   Q    Can you spell that, please?

7   A    B-E-Y-O-G-L-U.

8           THE COURT:  Do you want to elaborate, counsel, on

9   who that entity is?

10          THE WITNESS:  Sorry?

11          THE COURT:  I'm sorry, I'm asking counsel a

12  question.

13  Q    Who is the 15th Notary Public of -- and I apologize --

14  of Beyoglu?

15  A    The second name is -- I don't recall the name of the

16  notary now.  It's really not that easy to spell.

17  Q    I think the question really is:  Why would the 15th

18  Notary Public be sending you a document for translation on

19  behalf of somebody else?

20  A    Why?

21  Q    Why?

22  A    This is the way it works in Turkey.  Notary sent --

23  they work, the notaries, with certified translators.  When

24  we see the document, we translate it.  We are approved

25  translators.  We are one of the certified translators.

1    Q    Okay.  And so you received this document, and your

2    understanding was that it was on behalf of who you stated,

3    Neva Tatari?

4    A    Tatari, yeah.

5    Q    And what led you to believe that the request was made

6    on behalf of Neva Tatari?

7    A    They requested us to translate this document to

8    English.

9    Q    I'm sorry.  They requested what?

10   A    They requested us to translate the document to English.

11   Q    My question was:  What led you to believe or understand

12   that the request was made on behalf of Neva Tatari?

13   A    Because Onur Tatari asked us later that it was

14   translated by his ex-spouse and there was a mistake in the

15   original document, original translation, and asked us to

16   correct that error.

17   Q    Okay.  But at the time you translated it, you weren't

18   aware that you were translating it for Neva Tatari, as

19   you've stated?

20   A    Sorry, I couldn't understand that.

21        THE COURT:  Why don't you clarify which

22   translation he's talking about.  When he initially

23   translated it, I think is what you want to put the question

24   to.

25        THE WITNESS:  Yes, the initial translation, there

1  was a mistake, and we realized it when Onur Tatari applied

2  to us.

3  Q    Mr. Yazici, let's not get ahead of ourselves.  Just

4  focus on the question I'm asking you, okay?

5         When did you initially do the translation of the

6  Court judgment?

7  A    That was last year, I think in the beginning of

8  November, I think.

9  Q    In 2023?

10 A    Yes, that's right.

11 Q    Okay.  My question to you is:  At that time, did you

12 know that the request was being made on behalf of Neva

13 Tatari?

14 A    Yeah, I don't have the documents with me now, but it

15 has come up her name was written -- is different in our

16 office records.

17 Q    Okay.  Did you personally do the translation, the

18 initial translation of the Court document that you're

19 referring to?

20 A    Yes, I did.  You mean the first initial translation?

21 Yes, I did it.

22 Q    Did there come a time when you discovered that there

23 was a mistake with that translation?

24 A    Then Mr. Onur Tatari apply to us and advise us that

25 there was a mistake in the translation.

1   Q    So Mr. Tatari advised you that there was a mistake in

2   the translation?

3   A    Yes.

4   Q    Did you agree that there was a mistake in the

5   translation?

6   A    That made me check the translation, and we realized

7   that there was a mistake.

8   Q    What was the mistake that you realized in the original

9   translation?

10  A    At paragraph 3.7, there's a mistake that he has to have

11  the approval from her husband for the child abroad.

12  Q    I'm going to show you a document -- it's actually the

13  same document, Bates stamped ending 760 on the bottom right.

14  A    760?

15  Q    We're going to show it to you, don't worry.

16         Is this the original translation that your company

17  did?

18  A    Yes.  It seems so.

19  Q    I'm sorry, say again?

20  A    It seems so.

21  Q    Well --

22         THE COURT:  I'm sorry.  The number of that

23  document?

24         MR. MIN:  The exhibit is still Exhibit 40.  It's

25  just page 760.

1           THE COURT:  Oh, okay.

2    Q    Do you want us to scroll through so you can be certain?

3    A    Yes, this seems to be.

4    Q    We're going to direct you to 3.7 on page 763.

5           MR. MIN:  If we can scroll in, or zoom in.

6    A    Yes, I saw the translation.  I can see that.

7    Q    And is this the translation you now claim was a

8    mistake?

9    A    Yes, we made that mistake here.

10   Q    I'm going to turn to --

11   A    Original -- if you turn to original, it says that she

12   will ask for his approval.

13   Q    Let's go to the Turkish original, which is on 770.

14   A    Okay.

15   Q    Now, is this the original Turkish language that you

16   used as the source to do your initial translation?

17   A    Yes, this is the original document.  You can see that

18   it says Onur Tatari --

19           THE COURT:  We're not getting this down.

20           MR. MIN:  He's speaking Turkish.

21   Q    You don't have to speak the Turkish on the record

22   because the court reporter has to type it out.

23           Just the question to you was:  Is this the

24   original Turkish language --

25   A    This original, yeah.

1  Q    Can you specify what word in Turkish translates to --

2  withdrawn.

3         What was the correction that you felt needed to be

4  made from the original translation?

5         MR. TZUR:  Objection to the form, Your Honor.

6  That's not what his testimony was.

7  A    The correct translation, Neva Durust Tatari has to get

8  approval and consults of the Onur Tatari.

9  Q    Okay.  But my question to you was:  What was the error

10 in the original translation that you believed needed to be

11 corrected?

12 A    In our translation, the wrong translation, it seems

13 that Neva Tatari should only take consultation of Onur

14 Tatari.  But actually she has to take his approval.

15 Q    Okay.  I need you to please repeat that and go a little

16 slower and talk a little bit clearer.  If you can just maybe

17 turn into the microphone, because it seems like you're

18 positioned a little bit away from the microphone, and just

19 talk a little bit clearer and slower, please.

20        Just repeat your answer.

21 A    In our initial translation, which was incorrect, it

22 sounds that Neva Durust Tatari has to receive Onur Tatari's

23 consultation only.  But actually, the correct text says that

24 Neva Durust Tatari has to take approval of Onur Tatari to

25 take the common child abroad.

1   Q    Did the word "approval" appear in your original

2   translation of paragraph 3.7?

3   A    It say should consult, I think.

4   Q    Just listen to my question:  Did the word "approval"

5   appear in your original translation of paragraph 3.7?

6          MR. TZUR:  Objection, Your Honor.  Vague.

7          THE COURT:  Overruled.

8   A    I didn't understand.

9   Q    Did the word "approval" appear in your original

10  translation of paragraph 3.7?

11  A    It doesn't really appear the first initial translation.

12  Q    In your --

13  A    It doesn't --

14  Q    Hold on, Mr. Yazici.  There's no question pending.

15  Please wait for a question.  Please wait for a question,

16  okay?

17  A    Okay.

18  Q    In your sworn affidavit, did you correct 3.7 to include

19  the word "approval"?

20  A    Yes, we did.

21  Q    What word in Turkish translates as "approval" in this

22  context?  Go to the Turkish language page right in front of

23  you.  Can you please point out which word in 3.7 translates

24  to "approval" in this context?

25  A    Correct -- yeah, in that case should Neva Durust Tatari

1    decides to live abroad together with --

2    Q    Please repeat; we can't understand.  Please repeat and

3    speak slower and clearer.

4    A    Neva Durust Tatari irrevocably accepts the text that

5    she will obtain Onur Tatari's approval and opinion if she

6    decides -- if Neva Durust Tatari decides to live abroad with

7    the child in common.

8    Q    All right.  But my question to you, sir, is very

9    simple.  I just wanted you to identify the word in Turkish

10   in paragraph 3.7 that translates to the word "approval" in

11   English.

12   A    Onay, onay.

13   Q    How do you spell "onay"?

14   A    It is O-N-A-Y.

15   Q    Okay.  So does that word, "onay," appear in paragraph

16   3.8 in Turkish?

17   A    There is "onay" in the paragraph 3.7 --

18   Q    I asked you:  Does the word "onay" appear in paragraph

19   3.8 in Turkish?

20   A    Yes.

21   Q    Okay.  Sir, the document is right in front of you.  You

22   just need to look at the screen.

23   A    Yes, it does.

24   Q    Okay.  Now, in your original translation, and we'll

25   turn back to page 763, did you translate "onay" in paragraph

1   3.8 to the English word "approval" in paragraph 3.8?

2   A    She will consult or seek the approval of Mr. Onur

3   Tatari.

4   Q    So is that a yes or no?  I'm asking a very simple

5   question.  Did you --

6   A    Yes, yes.

7   Q    You translated the word "onay" in Turkish to the word

8   "approval" in paragraph 3.8?

9   A    Yes.

10          MR. MIN:  No further questions, Your Honor.

11   CROSS-EXAMINATION

12   BY MR. TZUR:

13   Q    Good evening, sir.  My name is Paul Tzur, I'm counsel

14   for Neva Durust who you identified as Neva Tatari.  Can you

15   hear me okay?

16   A    Can you repeat it?

17   Q    Can you hear me, sir?

18   A    Yes, I can.

19   Q    Okay.  I'm counsel for Neva Durust, or whom you know as

20   Neva Tatari.  Okay?  Can you hear me?

21   A    Yes, I do.

22   Q    Great.  So --

23          MR. TZUR:  Just one moment, Your Honor.

24          Oh, Your Honor, before I ask questions, I move to

25   admit Petitioner's Exhibit 22, as well.  It's just another

1    copy of Mr. Yazici's English translation of the Turkish

2    divorce decree with a couple other stamps on it.

3            THE COURT:  Excuse me.  Is this already in

4    evidence as part of 40?

5            MR. TZUR:  40 -- so it's another copy of the same

6    document, but it has some different stamps on the sides of

7    it, and so that's the significance of why I want 22 in as

8    well as 40.

9            THE COURT:  And what exhibit is this?

10           MR. TZUR:  Petitioner's Exhibit 22.

11           THE COURT:  All right.  So you're offering that?

12           MR. TZUR:  I'm asking to move to admit it.

13           THE COURT:  All right.  It will be received.

14           MR. TZUR:  Thank you, Your Honor.

15           (Petitioner's Exhibit 22 received in evidence.)

16   BY MR. TZUR:

17   Q    Sir, I want to take you back to your report, your

18   affidavit, and I'll pull it up in just a moment.

19           (Exhibit published.)

20   Q    Sir, do you see it on your screen?

21   A    Yes.

22   Q    And this is what you were just testifying about is your

23   affidavit, Petitioner's Exhibit 40, correct?

24   A    Yes.

25   Q    We heard you testify about paragraph 4 that I have

T. YAZICI - CROSS - MR. TZUR                                158

1    highlighted, and that's where you identified what you said

2    was an error in your original translation, right?

3    A    Yes.

4    Q    I'm going to direct you to paragraph 8 on page 2 of

5    that translation.  Do you see that on your screen?

6    A    Yes, yes.

7    Q    And I'll read it:

8              We confirm that we have thoroughly reviewed the

9    corrected translation and verified its accuracy to ensure no

10   further discrepancies.

11             Did I read that correctly?

12   A    Yes.

13   Q    And in that paragraph, you're saying that you looked at

14   the entirety of your translation, correct?

15   A    Yes.

16   Q    And other than the error that you said you identified

17   in 3.7, there were no other errors in your translation?

18   A    Yes, we actually reviewed and corrected the

19   translation.  There are some other discrepancy in the

20   translation --

21   Q    Well, sir, sir, sir, sir, that's not what you say here

22   in paragraph 8, right?  In paragraph 8 --

23   A    Yes.

24   Q    -- you say there are no other errors in your

25   translation.

T. YAZICI - CROSS - MR. TZUR                    159

1  A    We reviewed and corrected the translation and sent it

2  to Mr. Onur Tatari.

3  Q    Correct, right.  Mr. Tatari told you about the error

4  that he found, you looked at the translation, and you

5  corrected the translation, correct?

6  A    Yes.

7  Q    And you also confirmed that there were no other errors

8  in your translation.

9  A    We gave the corrected and accepted translations back to

10  Mr. Tatari.

11  Q    Right.

12  A    Together with other discrepancies.

13  Q    But this was the one discrepancy you found, the one in

14  3.7.

15        MR. MIN:  Your Honor, that's not what the witness

16  is saying.

17  Q    Sir, I'm asking you, your paragraph 8 says there are no

18  other discrepancies in your translation, right?

19  A    We have corrected the translation and sent it back to

20  Mr. Onur Tatari completely.

21  Q    Right.

22  A    Don't you understand, sir?

23  Q    I do, I do.

24        I now want to show you what's marked as

25  Petitioner's Exhibit 22.  Sir, do you see this on your

1   screen?

2   A    Sorry?

3   Q    Do you see Exhibit 22 on your screen?

4   A    Yes, yes, I can see.

5   Q    And you recognize this as another copy of your

6   translation, right?

7   A    Another copy -- another copy of the same translation?

8   Q    Yes.

9   A    Okay.

10  Q    And so I direct you to the bottom right corner of the

11  first page of this exhibit.  If you see in the bottom, there

12  are numbers OT000508.  Do you see those numbers?

13  A    I don't know anything about that number.

14  Q    I'm asking you if you see them.

15  A    Yes, I can.

16  Q    Just to the left of those numbers, there's a seal here

17  that says "Talat Yazici."  Do you see that?

18  A    Yes.

19  Q    What is that seal?

20  A    That's my official stamp.

21  Q    And why is your official stamp on this document?

22  A    It's part of me being translator.

23  Q    So it's verification that you translated this document,

24  right?

25  A    Yes, that's right.

1   Q    And, in fact, as I scroll through, you stamped each

2   page of this document, correct?

3   A    Yes.

4   Q    And there's a signature that's on top of the stamp.

5   Whose signature is that?

6   A    That's my signature.

7   Q    And why did you sign each page on top of your seal?

8   A    To approve that they are signed and translated by me.

9   Q    Great.  So I'm going back to the bottom of that first

10  page, the one that has the number OT000508.  Do you see that

11  again?

12  A    Yes.

13  Q    So just to the left of your seal with your signature,

14  we see two other stamps.  What are those two other stamps?

15  A    These are the stamps of the notary public.

16  Q    Okay.  Can you explain why those other people stamped

17  this document?

18  A    The notary also approved that they are -- the document

19  is translated by us.

20  Q    Okay.  And approved that the document was translated

21  correctly, right?

22  A    Yes.

23  Q    And so let me ask you this --

24  A    Actually, I have to correct a mistake.  The notary does

25  not approve the translation that it is correct.  Notary

1  approves the translation that it is translated by me.

2  Q   So did the notary sign the notary stamps and stamp the

3  notary stamps at the time that you also stamped the

4  document?

5  A   Yes, they do.  After we translated, the notary signs

6  and stamps it and saves their files.

7  Q   Files what?  What do you mean?

8  A   For example, if you need it a few years later, you go

9  there and take the original, or if you go to notary --

10 sorry, a court and ask the notary to prove the document,

11 they prove it.

12 Q   What do you mean by "prove it"?

13 A   I mean if you say that it's fake document, you can go

14 ask them if it is original or not.

15 Q   And how does the notary know that it's an original

16 document?

17 A   They save it.  They also check signatures, courts

18 decision, whether it's original or not.

19 Q   So what, in your experience, do these notary stamps

20 that are to the left of your stamp mean when --

21 A   It's procedure.  It applies to every document

22 notarized.

23 Q   Which means what, sir?  It means that the translation's

24 correct, right?

25 A   It doesn't prove that it is correct.  It proves that it

1   is translated by me.

2   Q    Okay.  And you are -- let's talk about you.

3        You said you've been translating documents for how

4   long, sir?

5   A    More than 30 years.

6   Q    Okay.  And what kind of documents over the course of

7   your 30 years have you translated?

8   A    All sorts of.

9   Q    Give us some examples, if you could.

10  A    Power of attorney, circular of signatures, agreements.

11  Q    A lot of legal documents?

12  A    Yes.

13  Q    Business documents?

14  A    Yes.

15  Q    Always Turkish to English?

16  A    Or vice versa.

17  Q    So sometimes English to Turkish?

18  A    Yes.

19  Q    Any other languages for you, or just Turkish and

20  English?

21  A    Sometimes I do other translations.

22  Q    Do you have any certifications for being a translator?

23  A    I didn't understand.

24  Q    Did you -- what training do you have for being a

25  translator?

1   A    I told you before.

2   Q    Can you tell us again, please?

3   A    I am a graduate -- I have graduated from Istanbul

4   University, Department of English Literature, Language and

5   Literature, and we had translations in our courses.

6   Q    Am I right that in 1997 you became a sworn official

7   translator?

8   A    1987?

9   Q    1997.

10  A    1997?

11  Q    I'm asking.

12  A    I didn't understand.

13  Q    Are you a sworn official translator in Turkey?

14  A    Yes, I am.

15  Q    And how did you get that designation?

16  A    In Turkey, it works in other ways.  It's not the same

17  in America, okay?  We have our own procedures in Turkey.  If

18  the notary see that you can translate a document, they

19  accept you as a sworn translator.

20  Q    I see.  So going back to those notary seals, they were

21  only stamped because you translated and you are a sworn

22  translator in Turkey?

23  A    That's right, yeah.

24  Q    I got it.  So because you're a sworn translator, they

25  knew that they could stamp because the translation was true

T. YAZICI - CROSS - MR. TZUR                          165

1  and accurate because it was you who did the translation?

2  A    How many times I should tell you --

3  Q    I'm asking a different question.

4  A    The notary don't approve accuracy of the translation.

5  It was translated by a certified translator.

6              (Pause in proceedings.)

7              MR. TZUR:  Thank you, sir.  Nothing further.

8              THE WITNESS:  Thank you, too.

9              THE COURT:  Anything further?

10             MR. MIN:  No, Your Honor.

11             THE COURT:  Thank you.  We can sign off with this

12  witness.

13             MR. MIN:  Thank you, Mr. Yazici.

14             THE WITNESS:  Thank you.

15             (Witness is excused; Zoom terminated.)

16             MR. MIN:  Your Honor, our next two witnesses are

17  in person.

18             Next we call AJ Elterman to the stand.

19             THE COURT:  Okay.

20             (Witness takes the stand.)

21             THE COURTROOM DEPUTY:  Please raise your right

22  hand.

23             (Witness sworn.)

24             THE COURTROOM DEPUTY:  Once you sit, please state

25  and spell your name for the record.

1           THE WITNESS:  My doing business name, d/b/a, is

2    capital A capital J, AJ, that's registered, last name

3    Elterman, E-L-T-E-R-M-A-N.  So people address me

4    AJ Elterman.  But my actual official name, first name is

5    Ecegul.  Obviously it's difficult to pronounce, so the

6    spelling is E-C-E-G-U with two dots, umlaut, L.  But they

7    know me as AJ.

8           THE COURTROOM DEPUTY:  Have a seat.  Just pull the

9    chair in and speak into the mic.

10   **ECEGUL (AJ) ELTERMAN**,

11          called as a witness, having been first duly

12          sworn/affirmed, was examined and testified as

13          follows:

14   DIRECT EXAMINATION

15   BY MR. MIN:

16   Q    Good morning, Ms. Elterman.

17   A    Good morning.

18   Q    Does the screen in front of you work?

19          MR. MIN:  If I could ask the Deputy Clerk to turn

20   on the --

21          THE COURTROOM DEPUTY:  It is on.  Is there

22   anything up?

23          THE COURT:  Is it white?  Is your screen white?

24          THE WITNESS:  It's a white screen.

25          THE COURT:  Okay.  It's working.  Put something

E. ELTERMAN - DIRECT - MR. MIN                    167

1   up.

2              MR. MIN:  I have something up.

3              THE COURTROOM DEPUTY:  Oh, so you're on the ELMO.

4              MR. MIN:  Yes, I'm on the ELMO.

5              Thank you.

6   BY MR. MIN:

7   Q    Ms. Elterman, what's your current occupation?

8   A    Mostly an interpreter, but I occasionally I do

9   translating too.  I started initially as a translator, but

10  I'm more interpreter now.

11  Q    And where do you do interpretation work --

12             THE COURT:  Would you excuse me for a moment?

13             Would the gentleman please sit in the back of the

14  court?

15  Q    Where do you do most of your interpretation work?

16  A    Mostly legal settings, sometimes in medical settings.

17  But business primarily and mostly legal, meaning in courts,

18  Federal, New York State, as well as depositions in law

19  offices.  And sometimes community interpreting; could be

20  schools, remote interpreting, in all kinds of settings.

21  Q    Okay.

22  A    There's very little I don't do, actually.

23  Q    And you said in the Federal Courts here in New York?

24  A    Yes.

25  Q    Are you on --

1    A    Outside of New York sometimes.

2    Q    Are you on any of the lists for the Eastern District or

3    Southern District?

4    A    Yes.  I am registered with background checks and

5    fingerprinting.  I also have an ID from the Southern

6    District of New York, Downtown Manhattan.  It was just

7    recently renewed.

8    Q    Okay.

9    A    And I've been working -- I started working with the

10   Eastern District I think it was in the 1993, '94.  To be

11   conservative, I would say '94.

12   Q    And the state courts of New York, as well?

13   A    New York State I started a bit later, and I was

14   officially approved 2006, I think the paperwork.

15   Q    Okay.

16   A    I had experience way before that.

17   Q    Sure.  How long have you been working as an interpreter

18   or translator?

19   A    How long I have been working?  Well, if you don't

20   include the studies, the translation studies,

21   translation-wise I worked eight and a half years in an

22   engineering company based in New York, which was an Austrian

23   engineering company.  I did their translations, because my

24   degree is based on German and English as primary languages

25   and French as a secondary language.  But because I'm a

E. ELTERMAN - DIRECT - MR. MIN                          169

1   native Turkish individual, I have, I mean, proficiency in my

2   own mother tongue, as well as in English, and both of them

3   are, like, my mother tongues.

4   Q    I'm going to show you a document that's been pre-marked

5   as Petitioner's Exhibit 43 for identification.

6           (Exhibit published.)

7   Q    I apologize.  Hopefully it will come into focus.

8           Can you see this document on your screen?

9   A    Yes.

10  Q    Can you identify it?

11  A    My resume.

12  Q    This is page 2 of your resume?

13  A    Yes, that's page 2.

14          MR. MIN:  Your Honor, we'd offer 43 into evidence.

15          MR. TZUR:  No objection.

16          THE COURT:  43 is received.

17          (Petitioner's Exhibit 43 received in evidence.)

18  Q    Can you go through some of your professional --

19  withdrawn.

20          You were mentioning German before.  What languages

21  do you interpret or translate in?

22  A    Actively speaking, English, Turkish, and German.

23  Q    Okay.

24  A    German is a bit less frequent, of course.  I do mostly

25  Turkish nowadays.

1  Q    If you had to sort of rank your proficiency between

2  those three languages, how would you rate them?

3  A    I would say Turkish and English are my A languages,

4  meaning native proficiency, and German being my foreign

5  language, because I learned, I acquired German after the age

6  of -- after graduating from high school, so my college

7  years.

8  Q    Let's go through some of your experience as an

9  interpreter or translator.

10  A    I'm sorry, what is the question?

11  Q    Can you go through some of your experience as an

12  interpreter or translator?

13  A    My experience as an interpreter or translator?  Okay.

14        Initially I started after my full-time employment

15  in early '90s, let's say about, you know, early '90s, I

16  started working as a freelancer, independent translator and

17  interpreter primarily doing translations from my home

18  office, and later on finding great in interpreting.  I

19  diversified, went to continuing education, took classes,

20  went to American Translators Association conferences,

21  traveled around, you know, and also continued education on

22  the computer.  Increasingly, most recently, of course,

23  things are remote.  And I'm a member of NAJIT, as well,

24  National Association of Judiciary Interpreters and

25  Translators for many years now, and I'm a lifetime member of

1   ATA.

2   Q    Have you ever done translation for the U.S. Department

3   of State?

4   A    Yes.  I'm sorry, my experience is based -- well,

5   translating was very different subjects.  I did a lot of

6   business documents and contracts, some patents.  I have

7   extensive experience doing also technical patents stuff,

8   mostly in German.

9           In Turkish, if we're concentrating on Turkish, I

10  have -- I started, you know, with my translation career

11  practically doing any sort of document that I had any

12  experience or expertise in handling.  Not military

13  documents, not -- you know, some very technical I wouldn't

14  do.  But otherwise, legal and business I would do.

15          (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

1   BY MR. MIN:

2   Q    So what I was asking you earlier about --

3   A    Yes.

4   Q    -- whether you've done any translation or

5   interpretation work with the U.S. Department of State?

6   A    Both, yes.  U.S. Department of State, I passed their

7   exam in 2007 or eight it was.  It was a one-week intensive

8   course at which I passed the simultaneous and consecutive

9   examines and became a seminar level contract employee for

10  Turkish.

11  Q    Explain what you mean, you passed the consecutive and

12  simultaneous tests?

13  A    Exams.

14  Q    What does that mean?

15  A    They give you gradual increasing complexity of spoken

16  that you listen to, and the first one is consecutive, you

17  take notes, it can go pretty long, you take notes, then you

18  have to interpret reading your notes.  That's one mode.  The

19  second mode is simultaneous interpreting, where you're

20  listening to the message in the original language, and it

21  has to go both ways, Turkish into English and English into

22  Turkish.  While you're listening to the message you're

23  simultaneously.  I passed both.

24          The one I didn't pass, I was hoping I had passed,

25  but the one at the highest level the presidential level

1    where it's called professional conference interpreting.  I

2    do conference interpreting outside, I do not hold myself, I

3    did not pass that level but I did pass the seminar level,

4    which is pretty much everything else except --

5    Q    Except for?

6    A    I could still theoretically do it if somebody was

7    absent and they needed me, I could still jump in and do it;

8    but would officially I have to pass a test, I have not done

9    that.

10   Q    Okay.  And so were you asked to provide an opinion in

11   this case?

12   A    Yes, I was.

13   Q    I'm going to pull up a document that's premarked as

14   Exhibit Petitioner Exhibit 42.  Do you recognize this

15   document?

16   A    Yes.

17   Q    What is this?

18   A    It's my expert opinion, the last one, of which I think

19   was the third or the sixth of November, I can't remember.

20   3.7 and 3.8 critical paragraphs.

21            MR. MIN:  Your Honor, we move Exhibit 42 into

22   evidence.

23            MR. TZUR:  No objection.

24            THE COURT:  42 is received.

25            (Petitioner Exhibit 42, was received in evidence.)

E. ELTERMAN - DIRECT - MR. MIN                        174

1    BY MR. MIN:

2    Q    What were you asked to examine, evaluate, and offer an

3    opinion on with respect to this case?

4    A    I was asked to review the Turkish original and the

5    corresponding two documents, and then a third one came, into

6    English.

7            I first reviewed the first into English

8    translation, then the second, and then the third.  We can

9    call them one, two, three if you wish.

10   Q    I'm going to show you this document that's I think now

11   in evidence as Petitioner 22.  Is this the first one that

12   you reviewed?

13   A    From the print I can recognize, the print was a little

14   more darkened.  This was the first one, yes.

15   Q    What was your problem, if there was a problem, with the

16   translation with this translation?

17           MR. TZUR:  Objection.  Specify the paragraph he's

18   talking about.

19   A    Paragraph 3.7 looking at that one and the original it

20   was not accurate, in that it says in 3.7 in English after

21   the comma:  She will consult and seek the opinion of.  That

22   is not correct.

23           Because in the Turkish it was expressly stating

24   the opinion and approval of, not consult.  Consult is not

25   the same.  I explained my reasoning in great detail in

1    hair-splitting detail in the paragraphs.

2    BY MR. MIN:

3    Q    In your report?

4    A    In my expert opinion.

5    Q    But you heard the testimony of Mr. Yazici before

6    earlier today, right?

7    A    Yes, I heard his testimony.

8    Q    And did you agree with him that the Turkish word for

9    approval is "onay", O-N-A-Y?

10   A    Yes, onay, as I explained in my opinion.

11   Q    I apologize.  Always bad to mispronounce a word in

12   front of a linguist.

13            Did you agree with him that his initial

14   translation was incorrect?

15   A    Yes.

16   Q    Did you believe that -- withdrawn.  Does that word

17   appear in the Turkish original of article 3.8 as well, the

18   Turkish word for approval.

19   A    Yes, the original in Turkish is clear, and they are

20   identical and consistent; but in the translation consult,

21   see this is wrong.

22   Q    Why?

23   A    Consult and seek the approval of -- no, the approval is

24   there.  Correct.  That has been corrected.  She will

25   consult, maybe so so, ask the opinion of, maybe we could

1  pass that.  But basically approval has been corrected.

2  Q    Would it be fair to say that when you're translating a

3  document or interpreting a language to another language

4  there is always some room for discretion?

5  A    There is some room sometimes, yes, but sometimes no.

6  In this case approval is very, very clear cut, very, very

7  clear, there is no other.

8  Q    Meaning sometimes a phrase might have two meanings

9  depending on context?

10  A    Yes.

11  Q    A word may have multiple meaning depending on context?

12  A    Yes.

13  Q    But here in 3, 7 the original Turkish language, is

14  there any context in which that word could be used as

15  anything other than approval?

16  A    No.  It's one of those few terms that is really crystal

17  clear to me.  It leaves no hesitation.  Because in any kind

18  of context that Turkish word for approval it would always

19  have been approval.  It could be the approval of an office,

20  an authority, some kind of, I don't know health-wise or some

21  other legal approval.  It's always the same.

22  Q    Is there any way in which that word could mean an

23  opinion?

24        MR. TZUR:  Judge --

25  A    I'm sorry, just.

E. ELTERMAN - DIRECT - MR. MIN                177

1    THE COURT:  What is the objection?  Is there an

2    objection?

3    MR. TZUR:  No.

4    A    Maybe I could add, maybe in a colloquial sense you

5    might say to receive somebody's okay, but in this context of

6    a legal document it's not okay.

7    Q    Use it in a formal setting, what do you mean by that to

8    get somebody's okay?

9    A    For example, did you informally -- this is not an

10   informal situation -- if somebody said:  Did you get your

11   father's approval, okay.  Let's say the child wanted to

12   drive the car and the mother is asking, did you get your

13   father's approval.  Same situation.  Did your get your

14   father's -- if you drive without the approval, you're doing

15   something out of line, same consequence.

16   Q    I'm going to show you a couple of other translations as

17   well.  You initially said you reviewed three translations --

18   you initially reviewed two, then there was a third that was

19   added?

20   A    Yes, correct.

21   Q    I'll show you a document that's been provisionally

22   admitted depending on certain future testimony --

23   THE COURT:  Which document exhibit number is this?

24   MR. MIN:  Twenty-nine.

25   MR. TZUR:  I am going to object to this, your

E. ELTERMAN - DIRECT - MR. MIN                    178

1    Honor.  This is outside the scope.

2          THE COURT:  Do you have someone who can

3    authenticate 29?

4          MR. MIN:  Your Honor, just to speak briefly on

5    this.  I mentioned this to opposing counsel when we were

6    talking about stipulations.  Opposing counsel offered

7    numerous TransPerfect translations during the course of

8    discovery on their initial exhibit list.  They did not

9    object to our TransPerfect translation.

10         We called TransPerfect last night to see if there

11   was someone to testify today to put this matter to bed.

12   TransPerfect said they have never done that, they have no

13   one to come and testify.  We can try and push that issue.

14         I find it disingenuous that they would use

15   TransPerfect themselves on a significant amount of

16   translation work expecting, I would have presumed, to have

17   offered those at some point without --

18         THE COURT:  What is the basis of the objection to

19   this document?

20         MR. TZUR:  He does not have a witness, the

21   petitioner does not have a witness, who says that the

22   translation is a true and accurate translation of the

23   original Turkish.  And there are parts of this document that

24   no expert has said they've reviewed and authenticated as

25   being a true and accurate translation.

1          He's talking about authentication.  We agreed to

2     the authentication of this document.  It is a copy of a

3     document that came from TransPerfect.  That has nothing do

4     with whether the translation is an accurate translation of

5     Turkish.

6          THE COURT:  Are you relying on this document to

7     prove a translation?

8          MR. TZUR:  Yes.

9          MR. MIN:  I mean the relevant terms, yes.  I mean,

10    their --

11         THE COURT:  Are you relying on this document for

12    the purpose of proving a translation of 3.7 and 3.8?

13         MR. MIN:  Yes.

14         THE COURT:  Well, I think --

15         MR. TZUR:  That's no objection there.  It's

16    everything else aside from 3.7.

17         THE COURT:  If there is no objection to 3.7 and

18    3.8, then what is your objection?  Is there something really

19    an issue about this?

20         MR. TZUR:  Yes.  Two points, your Honor.

21         Point number one, is that the report that we have

22    from this witness says that she reviewed two documents, not

23    three documents.  My understanding from the petitioner was

24    that the two documents were Exhibit 22 and 28.  Now he's

25    putting Exhibit 29 on the screen that she did not review,

1  according to the report that we got from her.  That's part

2  number one.

3        Part number two --

4        THE COURT:  Is 28 different from 29?

5        MR. TZUR:  There are differences.

6        THE COURT:  Are there any differences that are

7  critical?

8        MR. TZUR:  I think outside of 3.7 and 3.8, there

9  might be.  The real significance, your Honor, any testimony

10 that comes in about differences between Exhibit 22, on the

11 one hand, and 28 and 29 on the other hand, that are outside

12 of 3.7 and 3.8, that is out of bounds.  We do not have a

13 witness to lay the -- to explain the truthfulness, the

14 accuracy, of this 28 and 29 translations.  And we think that

15 they are wrong.

16       And this witness was explicitly told by the

17 petitioner not to review those other portions of 28 and 29.

18 That's the real problem.

19       It's 3.7 and 3.8 inbounds for Exhibit 28, that's

20 allowed.  It's everything elsewhere we do not have a

21 witness, we do not have an expert report saying that a

22 witness has said that anything else is true and accurate.

23       THE COURT:  It's being contested, then it's being

24 contested.  You don't have someone --

25       THE WITNESS:  Your Honor, may I make a remark?

E. ELTERMAN - DIRECT - MR. MIN                181

1          THE COURT:  No.  Nobody asked you anything, okay.

2          MR. MIN:  Your Honor, we have a witness here.

3    This is one of the statements yesterday, and your Honor

4    commented, we're going to have here testifying as a

5    translator as a language expert.  I mean, this is why the

6    witness is here.

7          I understand counsel's point, but like, frankly,

8    again if they did not object to it in their pretrial process

9    I'm not entirely sure what the basis is to object at the

10   last minute, your Honor.

11         This is something we could have rectified during

12   the weeks leading up to trial when they were given the

13   opportunity to put in objections to these proposed exhibits,

14   your Honor.  We do not feel like it's fair, it's certainly

15   very prejudicial to us, to then come into court on the day

16   of trial and say, hey, by the way we're objecting now, too

17   late, you don't have time to go find this witness that maybe

18   would have over the last couple of weeks to produce.

19         THE COURT:  There are no objections on 28 and 29.

20   I'm looking at the joint pretrial order, you didn't object

21   to either of these documents.

22         MR. TZUR:  On authentication, we're not like.  I

23   said a moment ago --

24         THE COURT:  You got notations next to the other

25   documents on issues other than authentication, hearsay,

E. ELTERMAN - DIRECT - MR. MIN                    182

1   subject to expert.  You've got nothing.

2          MR. TZUR:  This is the petitioner's case.  We've

3   given him every chance.  We would not have objected if they

4   gave us a late expert report here --

5          THE COURT:  I'll let the witness testify.  If she

6   can authenticate either of these documents, I'll let her do

7   it go ahead.

8          MR. MIN:  Thank you.  Your Honor, I need a little

9   bit of leeway --

10          THE COURT:  Are you going to do 28 and 29?

11          MR. MIN:  We'll rely on 29.

12          THE COURT:  So you're just offering 29?

13          MR. MIN:  Yes.

14          THE COURT:  Not offering 28.

15          MR. MIN:  Not at this time.

16          THE COURT:  Come on --

17          MR. MIN:  I want to show her one document.

18          THE COURT:  Are they the same thing essentially?

19          MR. MIN:  Slight differences with language; but

20   yes, this is the --

21          THE COURT:  29, authenticate, you can ask her if

22   she can do it.  I don't know.

23   BY MR. MIN:

24   Q    Ms. Elterman, I'm going to show you --

25          MR. MIN:  Your Honor, is it okay if I hand her the

1   document?  It may be easier than using the Elmo.

2          THE COURT:  Yes, that's fine.

3   BY MR. MIN:

4   Q    If you can take a look at that document, please.  Are

5   you familiar with it?

6   A    Yes, I see did.  I reviewed the whole document, I read

7   it briefly comparing with the original, and it was a

8   relatively high quality.

9          THE COURT:  It was or wasn't?

10         THE WITNESS:  I'm sorry.  A high quality

11  translation.

12         THE COURT:  It is a high quality translation?

13         THE WITNESS:  Yes, that's my opinion.  Also having

14  looked specifically at 3.7 and 3.8 on page 505, as you see

15  here the Turkish terms for obtain the opinion of an approval

16  are reflected here; albeit, maybe in reversed order, I'm not

17  sure.  But both approved and opinion are stated correctly in

18  the translation.

19         MR. TZUR:  Judge, again, I object outside of 3.7,

20  3.8.  One thing I'd like to show the witness on cross.  She

21  was directed by petitioner not to issue an opinion on any

22  other part of 28 or 29 outside of 3.7.  We relied on that in

23  connection with everything that we've done in this case.

24  There is an email from petitioner, from petitioner's

25  counsel, Mr. Min's office, to this witness saying only

1   review 3.7, 3.8 -- that's a paraphrase -- it's not review

2   anything else.

3          THE COURT:  Did you review the entire document to

4   see if this was correctly translated?

5          THE WITNESS:  I mean, yes, out of curiosity for

6   myself.  I read the English translation.  And with a few

7   points that are not so relevant or important, minor points,

8   it was quite high quality.  And I standby my opinion.  I

9   haven't fine-combed it, but it reads more grammatically, it

10  appears to be an okay translation in my opinion.

11         If you have any specific questions, if you want me

12  to compare the original with the English translations, just

13  randomly speaking, you can point out and I can give my

14  opinion.

15         MR. MIN:  Your Honor, I'm happy to spend the time

16  and have her go through point by point.

17         MR. TZUR:  Objection.

18         MR. MIN:  If counsel wants to critique some it,

19  let him do that, but I think that would be better use of

20  time.

21         We have the witness here.  We're simply trying to

22  get to the truth of the matter.  It seems like counsel is

23  trying to win something on gamesmanship, that's fine.  But

24  at the end of the day this is about a child abduction.

25         THE COURT:  I'll receive the document.  And the

1    respondent can cross-examine on the issues that are raised.

2            Go ahead.

3    BY MR. MIN:

4    Q    I'm going to show you a document that you haven't seen

5    yet.

6            MR. MIN:  Your Honor, I'm asking this out of turn.

7    I don't want to recall the witness.  She's an expert.  I

8    understand that they will be calling their own translator.

9    In anticipation of what I expect there to be testimony, I'd

10   like to show this witness their --

11           THE COURT:  -- translation is what you want to

12   show her?  You want to show her the --

13           MR. MIN:  The other side's translation.

14           MR. TZUR:  Your Honor, may we have a brief sidebar

15   on this?  Or excuse the witness -- it's fine, she can stay.

16           The issue is, we haven't made the decision whether

17   we're going to introduce that translation in our case.

18           THE COURT:  We're going to wait and call the

19   witness back?

20           MR. TZUR:  I don't know.

21           THE COURT:  You haven't made a decision whether to

22   introduce that?

23           MR. TZUR:  We're responding here.

24           THE COURT:  No.

25           MR. TZUR:  We have exhibit 22 in evidence, that is

1    our translation.  That's a translation that our client got

2    in 2023.  We can make a decision not to put any more

3    translations in.

4              THE COURT:  Okay.  Then he can ask her about that

5    translation and whether that trans -- you're talking about

6    the original translation?

7              MR. TZUR:  I'm talking about the original.  He's

8    talking about still another translation.

9              THE COURT:  It's the same thing, isn't it?

10             MR. TZUR:  No, it's not.

11             MR. MIN:  I don't know why it's not, your Honor.

12   I really don't.  When I spoke with opposing counsel about

13   their witness order --

14             THE COURT:  Go ahead, Mr. Min.

15   BY MR. MIN

16   Q    Ms. Elterman, you have not seen this document before,

17   but I'm going to represent to you that this is a translation

18   from another translation company, ASL Translation, and that

19   one of the translators from this company will be testifying

20   or expected to testify later today.  Okay.

21   A    Yes.

22   Q    You're familiar with the original Turkish, right?  I

23   don't need to show you?

24   A    That much, not word by word, not concentrating on the

25   items.

1   Q    We're focusing on 3.7 for now.

2   A    Yes.

3   Q    Do you believe this is an accurate translation of 3.7

4   from Turkish to English?

5   A    No.  It says consult and seek the opinion of.  3.8, she

6   will consult and seek -- no.  No absolutely not.

7   Q    So 3.7 is incorrect in your expert opinion?

8   A    Yes.

9   Q    And it's incorrect for what reason, what main reason?

10  A    If we look at the original, the original says:  Will

11  obtain the opinion and approval of.  That's the sequence and

12  that's the way it's expressed in Turkish, approval not

13  consult, not anything else.  It says what it says.

14          And 3.8 says the same thing here in English, which

15  is wrong.  It does not reflect the original.

16  Q    What is incorrect about 3.8?  It does say approval

17  there.

18  A    I'm so sorry.  No, the approval part is correct.

19          The consult part, again, this is as we discussed

20  previously the same, it reflects it in the same wording.

21  The first one, 3.7, being wrong.  The second one, being

22  acceptable because consult may take the place of "get the

23  opinion" of sort of, same synonym, meaning-wise they cover

24  each other.  But seek the approval of, that's correct, in

25  3.8.  The person made it consistent with the Turkish, the

1  translator.

2          MR. MIN:  One moment, your Honor.

3  A    The 3.7 is not, because it says consult instead of

4  approval.  The same as the first Turkish into English

5  translation we discussed, same inaccuracy.

6          MR. MIN:  No further questions for this witness at

7  this time.  Thank you, your Honor.

8  CROSS-EXAMINATION

9  BY MR. TZUR:

10 Q    Hello, Ms. Elterman.

11 A    Yes.

12          MR. TZUR:  Your Honor, may I approach?

13          THE COURT:  Yes.

14 Q    I'm handing you Petitioner Exhibits 22 and 29, you may

15 have them already.  Mr. Min, petitioner's counsel, asked you

16 if those were the two documents that you were comparing for

17 your original report.  Am I right?  Not the original, those

18 are two of the documents that you compared as part of your

19 work here, correct?

20 A    Not really.  TransPerfect came as a third one.

21 Q    So it's 22 and 28?

22 A    Two looks like the very original, the one that had the

23 mistakes.

24          MR. TZUR:  May I approach?

25 A    So this one, 22, is the original translation with the

1    mistakes; 29 is TransPerfect.

2    Q    And 28 is the one that you did the only comparison for?

3    A    Yes.

4    Q    You were hired by the petitioner to do this comparison,

5    correct?

6    A    Yes, the company.

7    Q    The law firm who is representing Mr. Tatari, the

8    petitioner?

9    A    Petitioners.

10   Q    You were paid $155 an hour for your testimony?

11   A    That's my rate, yes.  I haven't been paid yet, I

12   haven't invoiced yet.

13   Q    That's your rate.  You will be invoicing them at the

14   end of your work here?

15   A    Yes.

16   Q    Before being hired you spoke with Mr. Min and his

17   colleagues representing Mr. Tatari?

18   A    Yes, I did speak with him.

19   Q    As you were preparing your report they told you what

20   they needed you to say in the report?

21   A    No.  They told me to direct my attention to the

22   paragraphs and let them know in my expert opinion if the

23   translation reflects accurately the original.

24   Q    That's right, on those paragraphs 3.7 and 3.8?

25   A    Yes.

1    Q    Do me a favor, let me finish before you give an answer.

2           I'm going to show what you is marked as Respondent

3    Exhibit Y2.  I'm putting this one up on the Elmo.  Do you

4    see that on there?

5    A    Y2?

6    Q    You see a document on your screen?

7    A    I see my email address.

8    Q    This is an email, in fact this is an email from you, I

9    just highlighted, correct?

10   A    Yes.

11   Q    This is to Megan Acovino?

12   A    Yes.

13   Q    Who is Megan Acovino?

14   A    Who?  An employee or colleague who works with

15   petitioner's law firm.

16   Q    With Mr. Min's law firm?

17   A    I think so, yes.

18   Q    You know how emails work, when you print them out the

19   oldest are on the bottom and they go in reverse?

20   A    Yes.

21   Q    I'm going to direct you to page three of Respondent

22   Exhibit Y2.  You see that on your screen?

23   A    Yes.

24   Q    Am I correct that's an email to you, right?

25   A    Yes.

1    Q    You're the AJ who is listed and highlighted on the top

2    of that email?

3    A    Yes.

4    Q    It's from Megan Acovino at Mr. Min's law firm, right?

5    A    Yes.

6    Q    And in this email, I have the first point highlighted,

7    can you read what that first point is telling you?

8    A    The highlight?

9    Q    Yes.

10   A    AJ.  1.  The translation of page one of the Turkish

11   document and page two of translation two should be removed

12   from the expert report as they are not relevant to the

13   purpose of your report.

14   Q    So you were actually directed by Mr. Min's law firm not

15   to give opinions on certain portions of the two documents

16   you were asked to compare?

17   A    Yes, because I thought I could --

18   Q    You don't know the reason why.  They just told you not

19   to do it, right?

20   A    Yes.

21   Q    I'm going to put Exhibit 22 on the screen.  Do you see

22   that on your screen?

23   A    Yes, that's the first translation.

24   Q    First page of the first translation, right?

25   A    Yes.

1  Q    I'm going to move down to the paragraph toward the

2  bottom.  You see the highlighting there?  I'm going to read

3  it quickly.  It says, Exhibit 22:  I understand that the

4  defendant may legally -- let me back up.  Withdrawn.

5        Who is the plaintiff in Exhibit 22?

6  A    The plaintiff is Zuhtu Onur Tatari.

7  Q    The petitioner in this case?

8  A    Yes.

9  Q    And the defendant is who?

10  A    Neva Durust Tatari.

11  Q    The respondent in this case?

12  A    Yes.

13  Q    This is the English translation of the Turkish divorce

14  decree?

15  A    Yes, which is in my opinion is the lowest quality of

16  all three.

17  Q    I'm asking you, you were directed by the petitioner's

18  counsel to limit the scope of your work, correct?

19  A    Yes, because it could --

20  Q    And so where it says here, toward the bottom:  The

21  plaintiff stated the following during the hearing.

22        This is the judge's recitation of what the

23  petitioner, Mr. Tatari, told the judge in Turkey during the

24  hearing, correct?

25  A    Yes.

1  Q    According to translation one, the Petitioner Exhibit

2  22, Mr. Tatari said:  I understand that the defendant may

3  legally make decisions at his sole discretion in line with

4  his custodial rights.  The defendant, meaning Ms. Durust,

5  correct?  Defendant Durust?

6  A    Uh-huh.

7  Q    Including the material decisions about the child's

8  healthcare and moving his -- meaning her residence --

9  abroad.

10         I'm still willing -- I being Tatari -- to seek a

11  decision for non-contentious divorce.  However, I reserve my

12  right to bring a lawsuit to ensure the alteration, change of

13  custody, unless I'm consulted by the defendant and give my

14  approval as agreed with the defendant in the protocol.

15         Ma'am, am I correct -- first of all, I did read

16  that correctly?

17  A    Yes, I read it.

18  Q    Am I correct that Mr. Min and his law firm directed you

19  not to give an opinion on this translation?  Am I correct

20  because you were told not to give an opinion on 3.7 and 3.8?

21  A    I guess so.

22  Q    It's yes or no.

23  A    I was looking at the word "approved."

24  Q    In 3.7, correct?

25  A    Yes.

1    Q    Go to page two.  On the top -- withdrawn.

2            Bottom of page one, this is the defendant stating

3    the following, so this is where the judge recited what

4    Ms. Durust said.

5    A    It's not clear, the print.

6    Q    The bottom, the defendant stated the following, this is

7    the section where the judge decided what Ms. Durust said

8    during the hearing?

9    A    Yes.

10   Q    I go to the top of page two, the same section:  I agree

11   and undertake that I will consult and take into account the

12   opinions of the plaintiff, Mr. Tatari, as submitted by me in

13   the protocol including material decisions about the child's

14   healthcare and moving his residence to abroad.

15           Did I read that correctly?

16   A    Yes.

17   Q    That's another section that Mr. Min and his law firm

18   directed you not to give an opinion on in this case, am I

19   right?

20   A    I cannot recall that.

21   Q    Well, again, should I put the email back up where they

22   told you what not to give an opinion on?

23   A    Is that one of the pages?  Is it page two?

24   Q    I believe so.

25   A    If they said so.

1    Q    Again, you testified that you were directed to give an

2    opinion on 3.7 and 3.8.

3    A    Those were the criticals, I was told.

4         MR. TZUR:  One moment, your Honor.  Nothing

5    further.

6         MR. MIN:  Just a couple of questions, your Honor.

7         THE COURT:  Okay.

8    REDIRECT EXAMINATION

9    BY MR. MIN:

10   Q    I'll try not to put up any of the documents.  But do

11   you recall the email that counsel just showed you from my

12   office about removing some portions from your report?

13   A    Yes.

14   Q    That was based upon the two initial translations you

15   had reviewed, right, which was the initial translations that

16   you just saw, one of them you just saw, and then the one we

17   provided you initially, not the TransPerfect one, right?

18   A    Yes, that's correct.

19   Q    And so based upon your review of those two

20   translations, which were both done in Turkey, correct?

21   A    I'm sorry?

22   Q    Both of those initial translations you saw were both

23   done in Turkey, correct?

24   A    I don't have personal experience; but if that's so, it

25   must be so.

E. ELTERMAN - REDIRECT - MR. MIN                    196

1   Q    I'll withdraw the question.

2        The point is, you took issue with both of those

3   translations that you initially reviewed would, that be fair

4   to say?

5   A    Especially the first one.  Because the second one

6   reflected more or less the original, because we had that

7   terminology was correct, the terminology was properly

8   reflected.

9   Q    You were commenting on what you were trying to correct

10  were some of the issues in translation that you observed,

11  aside from 3.7 and 3.8?

12  A    Yes.  I was looking to see how accurate the first one

13  as opposed to the second one, how they compare.  My opinion

14  was definitely the second one was a higher quality, even

15  though they had some commonalities in certain terminology,

16  which I didn't quite agree style-wise, whatever.  But the

17  first one had many more issues.

18  Q    Then the third one, the one from TransPerfect, is it

19  your opinion that was of the highest quality?

20        MR. TZUR:  Objection, your Honor.

21  A    Yes, definitely.

22        MR. TZUR:  Objection.  That's not in her expert

23  report.

24        THE COURT:  Overruled.

25        MR. MIN:  No further questions.

1        MR. TZUR:  Just a brief recross?

2        THE COURT:  Sure.

3   RECROSS-EXAMINATION

4   BY MR. TZUR:

5   Q    I'm putting Petitioner 42 back on the screen.  Do you

6   see that up there?

7   A    Yes.

8   Q    That's your report, right?

9   A    Yes.

10  Q    Could you please read that first paragraph to the

11  Court?

12  A    The two translations compared here against the source

13  document Turkish divorce decree.PDF are "17-1 Government

14  translation.PDF", herein after called "Transl.1".  And

15  translation of apostille decree and finalization statement

16  document.PDF, transl 2.

17        I was just identifying which was translation one

18  and two.

19  Q    Right.  And so these are the two translations you were

20  asked to opine on, right?

21  A    Yes, initially.

22  Q    And this the only report that you have drafted in

23  connection with this case, correct?

24  A    Yes.

25  Q    There is no other report that Mr. Min asked you to

1   draft for this case, right?

2   A    I mean I don't recall, but --

3   Q    I'm asking, is there another?

4        THE COURT:  Let her finish her answer.

5   Q    Is there another report that you drafted for this case?

6   A    My final report is my final report.

7   Q    This one?

8   A    What is the date at the end -- yes, appears to be.

9        MR. TZUR:  Nothing further.

10       THE COURT:  You can step down.

11       (Whereupon, the witness was excused.)

12       MR. MIN:  Your Honor, we only have one more

13  witness left, which is our client.  Can we take a short

14  five-minute comfort break?

15       THE COURT:  All right, fine.

16          (Brief recess.)
         THE COURT:  Are we ready to proceed?
17       MR. MIN:  Yes, your Honor.

18       THE COURT:  Just on timing, we are going to have

19  to break today at quarter to one and we'll resume about ten

20  after two.

21       MR. MIN:  Our next witness is Zuhtu Onur Tatari,

22  petitioner.

23       (Witness takes the witness stand.)

24       **ZUHTU ONUR TATARI, called as a witness, having**

25  **been first duly sworn/affirmed, was examined and testified**

1   **as follows:**

2          THE COURTROOM DEPUTY:  Have a seat.  State your

3   first and last name.

4          THE WITNESS:  Zuhtu Onur Tatari, Z-U-H-T-U,

5   O-N-U-R, T-A-T-A-R-I.

6   DIRECT EXAMINATION

7   BY MR. MIN:

8   Q    Good morning, Mr. Tatari.  Where do you currently

9   reside?

10  A    Istanbul, Turkey.

11  Q    You know Ms. Neva Durust Tatari?

12  A    Yes, she's my ex-wife.

13  Q    When did you and her marry?

14  A    January 2016.

15  Q    You and Ms. Durust have a child in common?

16  A    Yes.

17  Q    How many?

18  A    One.

19  Q    Who is that child?  And let's use initials.

20  A    OT.

21  Q    When was OT born?

22  A    2018.

23  Q    How old is OT now?

24  A    Seven.

25  Q    Prior to August 2024, where did OT reside?

1    A    Istanbul.

2    Q    In Turkey?

3    A    Yes.

4    Q    Had OT ever resided anywhere else outside of Turkey?

5    A    No.

6    Q    Has he ever received an education or gone to school

7    anywhere outside of Turkey prior to August 2024?

8    A    No.

9    Q    As far as you're aware, has he ever received any

10   medical care after his birth and before August 2024 anywhere

11   outside Turkey?

12   A    To my knowledge, no.

13   Q    Did you and Ms. Durust ever discuss prior to

14   August 2024 OT residing in the United States or any other

15   country outside of Turkey while he was of minor age?

16   A    No.

17   Q    Did there come a time that you and Ms. Durust became

18   divorced?

19   A    Yes.

20   Q    About when did that process begin?

21   A    September 2021.

22   Q    I'm going to show you a document that's been premarked

23   for identification as Exhibit 30.  Do you recognize this

24   document?

25   A    Yes.

Z.O. TATARI - DIRECT - MR. MIN                    201

1   Q    I'm happy to go through it with you.  What is this

2   document?

3   A    This is the signed protocol that we agreed on.

4   Q    When you say, this is a signed protocol that we agreed

5   on, can you elaborate on that what is a signed protocol?

6   A    After September of ongoing from October to our divorce

7   date --

8   Q    Mr. Tatari, what I'm asking you is what is a protocol

9   in general, not about this protocol, your protocol, what do

10  you mean "this is the protocol"?

11  A    The agreement we had with each other for our divorce.

12  Q    For your divorce, okay.  And you and Ms. Durust reached

13  an agreement with respect to your divorce; is that correct?

14  A    Yes.

15  Q    Where did that divorce take place?  In Turkey or

16  somewhere else?

17  A    Istanbul, Turkey.

18  Q    When did you and Ms. Durust reach a divorce agreement

19  in Turkey approximately?

20  A    Just a day or two before our exact divorce date

21  hearing.  We signed the agreement there.

22           MR. MIN:  Your Honor, I offer and move this

23  document into evidence, Exhibit 30.

24           THE COURT:  It will be received.

25           (Petitioner Exhibit 30, was received in evidence.)

1    BY MR. MIN:

2    Q    I'm going to go to the English language portion.

3    Mr. Tatari, if you have any need or desire to look at the

4    Turkish language provisions, you let me know.  Okay?

5    A    Okay.

6            MR. HAMBELTON:  Objection, your Honor.  It's

7    unclear if this is an original document or a translation

8    being offered.

9            MR. MIN:  I offered Exhibit 30 in its entirety,

10   which includes the translation.

11           MR. HAMBELTON:  We don't have an expert report

12   authenticating this document and the voracity.

13           MR. MIN:  Co-counsel, Mr. Ward, stipulated this

14   morning, first thing in court, that all translations will

15   not be contested aside from the ones related to the divorce

16   decree.  That was the stipulation offered by Mr. Ward.  We

17   agreed.

18           MR. WARD:  We'll withdraw the objection based on

19   the stipulation.

20           THE COURT:  Go ahead.  Exhibit 30 is in evidence.

21           MR. MIN:  Thank you, your Honor.

22   BY MR. MIN:

23   Q    You said this was signed a couple of days before your

24   court hearing?

25   A    Yes.

1   Q    Your court hearing for what?

2   A    Divorce.

3   Q    So you had a scheduled court hearing as part of the

4   divorce process, and a couple of days before you Ms. Durust

5   reached an agreement?

6   A    Yes.

7   Q    For how long were you and Ms. Durust negotiating the

8   terms of this agreement?  I'm not asking you to go into what

9   the negotiations were like, I just want to know how long

10  were you and Ms. Durust negotiating the divorce agreement?

11  A    Months.

12           THE COURT:  You said months?

13           THE WITNESS:  Months.

14  BY MR. MIN:

15  Q    What were the most important aspects of this divorce

16  agreement that you and Ms. Durust reached during the

17  negotiation process?

18           MR. HAMBELTON:  Objection.

19           THE COURT:  I'll sustain the objection to the form

20  of the question.

21  BY MR. MIN:

22  Q    What provisions of the divorce agreement were most

23  critical to you?

24  A    For me it was, first, the visitation rights, ongoing

25  with vacations.  And the other three were the mutual

1  decision on his schooling, the mutual decision on where he's

2  going to live, and the mutual decision on his health.

3  Q    So if we look at article 3.2 of this divorce protocol.

4  This is the personal relationship between OT and his father,

5  meaning you, Mr. Tatari, correct?

6  A    Yes, agreed by both sides.

7  Q    This breaks down your visitation schedule?

8  A    Currently, no; but this is what we agreed on.

9  Q    What I mean is this broke down your visitation schedule

10 pursuant to the agreement you reached at the time?

11 A    Yes.

12 Q    It continued on to the next page.  This was all

13 negotiated and agreed between you and Ms. Durust?

14 A    Yes.

15 Q    Were these visitations contemplated to take place in

16 Istanbul or Turkey or anywhere else?

17 A    It was Istanbul.

18 Q    Would it be possible to have this visitation schedule

19 take place if OT resided anywhere other than Istanbul,

20 Turkey?

21         MR. HAMBELTON:  Objection.  Speculation.

22         THE COURT:  Overruled.

23 A    We have to be in the same country to do the

24 visitations.  He would have to be in Istanbul or I would

25 have to be wherever he is.

1   Q    So 3.4, you said three of the terms, aside from the

2   visitation schedule that were important to you.  One was the

3   mutual decision making regarding the school, yes?

4   A    Yes.

5   Q    Is that illustrated by paragraph 3.4?

6   A    Yes.

7   Q    Why was this decision making authority important to you

8   regarding schools?

9   A    Because I wanted to be a part of my child's life

10  together and we picked, we would pick the schools together,

11  and we would decide on his schooling together.

12  Q    How did these four examples of schools come about in

13  this divorce protocol?

14  A    They were picked by Ms. Durust.

15  Q    Did you have any conversations with her about why she

16  picked these schools?

17  A    We while we were married we always wanted, of course

18  still do, want the best for our son.  And these schools are

19  the top schools in Turkey.  So during the divorce she wanted

20  them listed to make sure that later on I would not change my

21  decision, I guess.

22  Q    Was there any discussion about school choices anywhere

23  outside of Istanbul, Turkey?

24  A    No.

25  Q    Going down to 3.7.  Another provision you said was

1  important to you was relocation, yes?

2  A    Yes.

3  Q    What is your understanding of the agreement you and

4  Ms. Durust reached pursuant to paragraph 3.7 here?

5  A    She could not move outside of Turkey with our child if

6  I would not approve it.

7  Q    And why was that important to you?

8  A    Because I want to be a part of my child's life and I

9  didn't want any risk of any sort.

10 Q    What about paragraph 3.8, why was that provision

11 important to you?

12 A    We would decide on his health together, it's important,

13 he's my son.

14 Q    Prior to reaching this divorce agreement, had you and

15 Ms. Durust ever made these decisions unilaterally?

16 A    Can you repeat again?

17 Q    Prior to reaching this divorce agreement, had you or

18 Ms. Durust ever made these decisions such as relocation,

19 healthcare for the child, educational decisions for OT, had

20 either of you made these decisions unilaterally or did you

21 make these decisions jointly?

22 A    While we were married?

23 Q    Up until you signed this divorce agreement.

24 A    We made together everything.

25 Q    Obviously when this divorce agreement was signed, OT

1    had already commenced schooling, correct?

2    A    Yes.

3    Q    Who chose the school that OT was going to at this time?

4    A    The school he was attending, we chose together.

5    Q    What age approximately did OT start attending school in

6    Turkey?

7    A    Two, two-and-a-half.

8    Q    And when he started attending school, who made the

9    decision for what school OT would attend?

10   A    We make together.

11   Q    What school was that?

12   A    Papatya.

13   Q    That is the school he went to starting at two, two

14   and-a-half?

15   A    Yes.

16   Q    How long did he stay at the Papatya school?

17   A    Four years.

18   Q    As far as you know, had Ms. Durust ever made any

19   medical decisions -- again, only up until the signing of

20   this divorce agreement -- any medical decisions for OT

21   without first getting your approval?

22   A    Can you repeat again?  The timing I did not understand.

23   Q    The time frame for all these questions is only up until

24   you signed this divorce agreement.

25   A    Okay.

1    Q    That date of divorce agreement, looking in the past.

2    A    We made everything jointly.

3    Q    So Ms. Durust never made any healthcare decisions by

4    herself for OT?

5    A    We made together.

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2    BY MR. MIN:

3    Q    Did there come a time after signing this divorce

4    agreement that you did have that hearing in court?

5    A    Yes.

6    Q    Okay.  And you said it was about two days later; is

7    that correct?

8    A    One, two.  I'm not hundred percent sure.

9    Q    I'm showing you a document that's already in evidence,

10   Petitioner's 29.  Is this the divorce decree that arose out

11   of that court hearing?

12   A    It looks like it, yes.

13   Q    Do you want to keep looking at it?

14   A    Sure.

15   Q    Is it easier if I come hand you a copy?

16   A    Yeah.

17          MR. MIN:  Your Honor, may I approach?

18          THE COURT:  Yes.

19   A    Yes.

20   Q    You can keep that there.  We're going to go back to the

21   English language pages.

22          You see here date of decision, January 19, 2022,

23   right?

24   A    Yes.

25   Q    Was that the date of the court hearing?

1    A    Yes.

2    Q    What was the date the decision, this decision was

3    written by the Court?

4    A    It was a month after.  Here at written February, 11th

5    of February.

6    Q    2022?

7    A    Yes.

8    Q    And so you signed your divorce protocol a couple of

9    days before January 19, 2022, and then you had the Court

10    hearing on January 19, 2022, and then the Court wrote its

11    decision on February 11, 2022; is that correct?

12    A    Yes.

13    Q    Did you personally appear in court on January 19, 2022?

14    A    Yes.

15    Q    And was the divorce protocol provided to the Court as

16    part of the Court's hearing?

17    A    Yes.

18    Q    Was this a contested or an uncontested divorce

19    proceeding?

20    A    Uncontested.

21    Q    And did the Court adopt all of the provisions from your

22    divorce protocol?

23         MR. HAMBELTON:  Objection.  He's not a legal

24    expert.  Whether the Court adopted something he's not in a

25    position to testify about.

Z.O. TATARI - DIRECT - MR. MIN                     211

1              THE COURT:  I'll allow him to answer.

2    A    They changed some of the visitation days.

3    Q    Okay.  So your visitation schedule was modified or

4    altered slightly, but the rest of the divorce protocol

5    remained in place?

6    A    Yes.

7    Q    Now, you heard the testimony yesterday of Mr. Yelcin,

8    right?

9    A    Yes.

10             (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  EXAMINATION BY

2  MR. MIN:

3  (Continuing.)

4  Q    Did you hear the testimony where he stated that

5  sometimes judges won't accept the protocol and they'll

6  suggest new language, new terms.  And if the parties either

7  agree and it stays uncontested, or the parts would disagree

8  and it becomes an contested proceeding, right?

9  A    Yes.

10  Q    Here, did the judge tell you that -- he or she -- was

11  proposing a modified visitation schedule?

12  A    Yes.

13  Q    Okay.  And did you and Ms. Durust agree to that

14  modified proposed schedule?

15  A    We did.

16  Q    Was there any amendments or proposals made to

17  Paragraphs 3.4, 3.7 or 3.8?

18  A    No, it was kept the same.

19  Q    Mr. Tatari, would you have agreed to a new divorce

20  protocol or new divorce agreement had Paragraphs 3.4, .3.7,

21  or 3.8 been charged?

22          MR. HAMBELTON:  Object, speculation.

23          THE COURT:  Overruled.

24  A    Never.

25  Q    Why not?

1  A    Because it's the -- basically, it was the whole

2  negotiation leading up to our divorce.  I always stated,

3  especially 3.7, if it was not desired, I would never sign

4  this agreement.

5  Q    When you say you stated that, who did you state it to?

6  A    To Ms. Durust and her lawyers.  My lawyers said to her

7  lawyers, to be more exact.

8  Q    Now, you said that the child attended Papatya School

9  for about four, four and a half years?

10 A    Yes.

11 Q    Until when?

12 A    This upcoming -- this summer it was finished.

13 Q    This summer coming up or this summer past?

14 A    This past summer it was finished.

15 Q    Summer of 2024?

16 A    Graduated, yes.

17 Q    Summer 2024, he concluded his time at Papatya.

18     He concluded meaning, he finished his time at that time

19 Papatya School?

20          THE COURT:  December?

21          MR. MIN:  Summer.

22 Q    Summer 2024 was the conclusion of his time at Papatya?

23 A    Yes.

24 Q    And was O.T. scheduled and enroll to go to school

25 somewhere in the fall of 2024?

1   A    Yes.

2   Q    Where?

3   A    Koc.

4   Q    How do you spell that?

5   A    K-o-c.

6   Q    Turning to Bates Stamp Page 588 or 587, excuse me.

7        Is that one of the schools listed here in

8   Paragraph 3.4?

9   A    Yes.

10  Q    Which one is that Anka, Hisar?

11  A    The third one.

12  Q    Okay.  And when did O.T. get accepted in the

13  Koc School?

14  A    Some time in between April or May.

15  Q    Of 2024?

16  A    Yes.

17  Q    Okay.  Can you explain the process in which O.T.

18  applied for and was accepted into the Koc School?

19  A    After we saw Koc, all of these schools have a lottery

20  system in Turkey.  Koc is the hardest lottery system in all

21  of them.  There is thousands of people who apply to these

22  schools, and every year there's a lottery where they let in

23  30 to 50 people.  And by chance, we were in the last four

24  people and he got accepted through them.  But we heard by

25  chance and we were both very excited about it and it was,

1   like, maybe one percent chance for him to get in and he did.

2   Q    How long had you and Ms. Durust been trying to get O.T.

3   into the Koc School?

4   A    From when he was born, I think we applied to -- I don't

5   know the exact timing, but basically, there's a timeline

6   where you have to apply to be in the lottery system and

7   that's way before he's in the age to attend the school.  So

8   it's two or three years before and where you apply to the

9   lottery system to be actually admitted into the lottery

10  system.  So I would say he was two or two and a half maybe

11  even when we were before sending him to Papatya, we got into

12  the lottery system.

13  Q    And you said April, around April 2024, he was accepted,

14  right?

15  A    Yes.

16  Q    So this is now two years after you and Ms. Durust were

17  divorced?

18  A    Yes.

19  Q    I want to direct you to that timeframe.

20       You got divorced in early 2022, O.T. got accepted into

21  this school in 2024.  So during those two years or so, were

22  you and Ms. Durust continuing to make decisions jointly?

23  A    Upon her Ivory Coast trip, yes.

24  Q    We'll get to the Ivory Coast trip.  When was that, just

25  to get a timeframe?

*Z. Tatari - Direct/Mr. Min*                    216

1   A    I forgot the date.  I don't remember the exact date

2   right now.

3   Q    Was that in 2022 or 2024?

4   A    2024, I believe.

5   Q    Okay.  So let's say rest of 2022, the year you were

6   divorced, you and Ms. Durust made decisions together?

7   A    Yes.

8   Q    Okay.  Health decisions regarding O.T., no problem

9   there?

10  A    Whenever he even had an emergency thing, we would be

11  meet up at the hospital directly and do everything together.

12  Q    Okay.  He continued to go to the Papatya School, no

13  disagreements, no conflicts with decision-making for his

14  schooling in 2022?

15  A    No.  And, actually, in the third year of Papatya, if he

16  was supposed to attend first grade.  But since the education

17  in Papatya was good and we didn't want him to have a big

18  change of schools since our divorce just happened, we

19  jointly signed an agreement with the school that was sent in

20  to the Turkish school government, et cetera, entity where

21  they have to accept O.T. to stay another year in Papatya

22  especially for this occasion.

23  Q    He was supposed to leave Papatya?

24  A    Yes.

25  Q    Okay.  Why?

1  A    Because it's like a kindergarten school.

2  Q    Okay.

3  A    And you can only stay there three years.  And when

4  you're age five and more, you have to start the first grade,

5  or you need to start the lottery schools because they have,

6  like, an orientation period as well.  That's why we signed

7  together jointly an agreement through the headmaster and she

8  accepted him to stay another year.

9  Q    And you did that because you believed it might be too

10 much of a change after your divorce to Ms. Durust, to his

11 mother?

12              MR. HAMBELTON:  Objection.

13 A    For some.

14              MR. HAMBELTON:  Your Honor, we gave Mr. Min a

15 little leeway to give some background here but habitual

16 residence and what life was like in Turkey is not an issue

17 for your summary judgment decision.

18              All that matters --

19              THE COURT:  This relates to the issue of

20 schooling, so I'll allow the answer to stand.

21              MR. MIN:  Your Honor, just generally, it relates

22 to the issue of making decisions together and their

23 historical patter of abiding by the divorce decree.

24              THE COURT:  Okay.

25              MR. MIN:  Okay.  But I'll move ahead.

*Z. Tatari - Direct/Mr. Min*                      218

1    Q    2023, still making decisions jointly?

2    A    It was up until the passport case between each other

3    that happened after which she started doing things without

4    telling me or with hiding things from me, I believe.

5    Q    When did that commence this passport case?

6    A    October or November 2023.

7    Q    Okay.  So until that time, everything, you were making

8    decisions jointly.  And then afterwards, less so.

9         Would that be fair to say?

10   A    Yes.

11   Q    I want to get back to the admission into the Koc School

12   in April or so of 2024.

13        You said you and Ms. Durust were both excited.  What

14   leads you to state that Ms. Durust was excited about this

15   new school?

16        MR. HAMBELTON:  Objection.  Calls for a state of

17   mind.

18        THE COURT:  That's why it's relevant.

19        He can answer.

20   A    It's the best school in Turkey.  You can ask any

21   parent, anyone in Turkey, where would you want to send your

22   child to, they would say Koc.

23   Q    I between focus on, you know, it sounds more like you

24   would assume that she was happy.  But did you observe

25   anything, or was there anything she said to you that led you

1    to believe that she was happy for this news?

2    A    Yes, and she was the one who always pointed out I put

3    him in the lottery and it's because of me he's accepted and

4    I'm very happy.  She was always happy about it.  She made

5    the application with me on e-mails with our lawyers even

6    present at that time and she filled out the forms herself.

7    Q    Once he was accepted, did Ms. Durust ever tell you that

8    she did not want O.T. to attend the school?

9    A    Never.

10   Q    Did you have to take any actions after being accepted

11   in April to have him formally enrolled in the school for the

12   coming school year?

13   A    We had speaking -- we spoke with the admissions of the

14   school.  There is a website where we did all of his

15   enrollment details together e-mailing each other back and

16   forth.  I made the payments that were required for me to pay

17   the school.  Everything was done together.

18   Q    Okay.  You talking about a meeting, did you and

19   Ms. Durust go to this meeting together?

20   A    No, we were e-mailing and we were talking to them on

21   the phone.  And it's like a panel where you get on the

22   website where you can both log in at the same time and put

23   information in.

24   Q    Okay.  And you were talking about payment to the

25   school.  Who is responsible for payment?

1    A    I am.

2    Q    Okay.  And did you, in fact, make payment for the

3    child's enrollment at the Koc School?

4    A    Yes.

5    Q    And in terms of your understanding, is it your

6    understanding whether O.T. is currently enrolled at that

7    school?

8    A    He is enrolled.

9    Q    Is it your understanding if O.T. were to return to

10   Turkey, would he have a placement at the school currently?

11   A    Yes.

12   Q    Are you aware of what school O.T. attends currently?

13   A    I have learned very late after he started attending.

14   Q    Okay.  But you did become aware of it at some point?

15   A    Yes.

16   Q    Okay.  And it sounds like you became aware of it after

17   he started at the school?

18   A    Yes.

19   Q    So would it be fair to say that you had no role in

20   selecting the school with Ms. Durust?

21   A    Yes; and still to this day, she's not allowing me to go

22   to school to even see my son.

23   Q    Have you had any contacts with the teachers or the

24   school administration at all?

25   A    No.

*Z. Tatari - Direct/Mr. Min*                    221

1   Q    Has Ms. Durust ever offered the opportunity to have any

2   interaction with the school or the teachers?

3   A    No.

4   Q    Did she ever seek your approval before enrolling the

5   child at the school in New York?

6   A    No.

7   Q    Did she ever seek your opinion about the school in

8   New York prior to enrolling the child there?

9   A    No.

10  Q    Did she ever consult with you prior to enrolling the

11  child at school in New York?

12  A    No.

13  Q    After --

14           MR. MIN:  Well, withdrawn.

15  Q    I think it's very obvious we're sitting in court here,

16  but at some point, your child was removed from Turkey and

17  brought to New York City; correct?

18  A    Yes.

19  Q    You have information as to when that occurred,

20  approximately?

21  A    Exactly August 20th.

22  Q    At some point, did you have communication with

23  Ms. Durust about her and O.T. being in New York?

24  A    I tried to contact her.  She did not give any

25  information until a day later where she just e-mailed me to

1  say we moved to New York together with O.T., and from now on

2  he will be attending school here and that's it.

3  Q    And her first communication about this, was her

4  statement to you that she was in New York already?

5  A    Our first communication was she actually tried to lead

6  me on just saying he's asleep and that he cannot talk at

7  this time.  And we had a lot of WhatsApp messages where she

8  just refused to let me speak to my son and did not give any

9  information about it.  When I put our lawyers in the

10  conversation, she gave that statement.

11  Q    Did Ms. Durust get your approval prior to bringing O.T.

12  to New York to live?

13  A    No.

14  Q    Did she get your opinion, did she seek your opinion

15  before coming to New York with O.T. to live?

16  A    No.

17  Q    Did she consult with you about the move to New York --

18  A    No.

19  Q    -- for her and O.T.?

20  A    No.

21  Q    Since O.T. has been in New York, I am going to show you

22  Petitioner's Exhibit 29 again.  Bates Stamp Page 586.

23  Page 587.  I'm going to ask you about this visitation

24  schedule.

25       Since O.T. has been in New York, have you been able to

1  on the first and third Fridays of each month, have you been

2  able to pick up O.T. from school at 4:00 p.m.?

3  A    So there were two parts of this, which one are you

4  showing?

5       Is this before primary or after primary?

6  Q    Before primary.

7  A    After primary, no, I was not able to exercise these

8  rights.

9  Q    Have you been able to pick up O.T. on the first and

10 third Fridays of each month from school at 4:00 p.m.?

11 A    No.

12 Q    On the second and third Mondays of each month, have you

13 been able to pick up O.T. from school at 4:00 p.m.?

14 A    No.

15 Q    Have you enjoyed any of these holidays that are

16 mentioned here?

17 A    I have not seen my son for 120 days or more.  Just now,

18 this past week, I saw him for the first time since summer.

19 Q    Do you have any information about your child's

20 healthcare, health, wellbeing since he's arrived in

21 New York?

22 A    No, just when saw him at that time.  He had a metal

23 tooth.  He has been to the dentist.  He's had doctor visits.

24 He told me about this.  I have not received any information

25 about these whatsoever.

1  Q    Did Ms. Durust get your approval before sending the

2  child to the doctor or the dentist?

3  A    No.

4  Q    Having any procedures done?

5  A    No.

6  Q    Did she seek your opinion about e-mail, by phone call,

7  text message about sending the child to any of these

8  healthcare services?

9  A    No.

10 Q    Did she attempt to consult with you about any of these

11 decisions?

12 A    No, she does not even let me speak to him properly.

13 Q    I'm going to show you a document that's been pre-marked

14 as Exhibit 5.

15      Mr. Tatari, if you can identify this document for the

16 Court, please?

17 A    This is the e-mail Ms. Durust sent to me informing me

18 about her move to New York or U.S.A.

19      MR. MIN:  Your Honor, we move to admit the first

20 two pages of Petitioner's Exhibit 5 into evidence.

21      MR. HAMBELTON:  No objection.  But is it just a

22 two-page document.

23      MR. MIN:  No.  This is just the e-mails from

24 the --

25      MR. HAMBELTON:  Why don't we move the whole

*Z. Tatari - Direct/Mr. Min*                                225

1   exhibit in?

2            MR. MIN:  That's fine.

3            THE COURT:  So you are moving in all of Exhibit 5.

4            MR. MIN:  Yes.

5            THE COURT:  Received.

6            (Petitioner's Exhibit 5 was marked in evidence.)

7            MR. MIN:  Your Honor, this is the e-mail of --

8   Q    Mr. Tatari, this is the e-mail that Ms. Durust sent

9   you?

10  A    Yes.

11  Q    August confirming that she was in New York?

12  A    Can you ask again?

13  Q    Confirming that she was in New York?

14  A    Yes.

15           THE COURT:  You're talking about the e-mail dated

16  August 22, 2024, at 1:31 p.m., that e-mail?

17           THE WITNESS:  The first e-mail was at the top, and

18  this was the e-mail chain we had afterwards between each

19  other that's following down.

20           THE COURT:  So August 21, 2024, at 12:11 a.m.,

21  that's an e-mail that was sent to you from Ms. Durust.  If

22  you're talking about these e-mails, you can just put a page

23  up and talk about what e-mail.

24           MR. MIN:  Right.

25  Q    What was your reaction when she told you that -- about

1   her plan, New York, bringing O.T.?

2   A    I have an emotional reaction, of course.  I had tried

3   to write that he's in enrolled in Koc and that she should

4   not be -- he's -- this is best school in Turkey.  Tried to

5   basically talk sense into her.  But she presumably was just

6   saying that since I hate her for some reason, I'm not happy

7   for our son.  And she thought it would be natural for her to

8   take him to New York and me not being happy about it is

9   something that's normal.

10  Q    So I want to show you go to her e-mail dated, Thursday,

11  August 22, 2024, at 1:31 p.m. her response to you.

12       She says, "It was me as his mother who entered him in

13  the lottery for Koc Primary School," right?

14  A    Yes.

15  Q    Next paragraph, second sentence, says, "I applied to a

16  very good school in America."

17       Were you aware of prior to August 2024 that she was

18  applying to schools or applied to this school in America?

19  A    No.

20  Q    She never talked to you about that?

21  A    No.

22  Q    And she then goes, "And I was very happy when I learned

23  that it was accepted."

24       And prior to this, do you have any information that he

25  was accepted to a school in America?

1  A    No.  And even here, I didn't know the name.  It was not

2  given to me.

3  Q    She then goes to say and talk about the fact that you

4  could freeze Koc School for two years so that none of the

5  rights are lost?

6  A    Yes.

7  Q    Do you have an understanding as to what that might

8  mean?

9  A    Koc School gives you two years to freeze the enrollment

10 and that if he's somewhere else he can attend back to Koc.

11 Q    Did you have any understanding as to whether or not

12 this move to the United States was permanent or not for her.

13 Whether she intended to come back to Turkey with O.T.?

14 A    My idea of what she is doing due to our custody case,

15 she's afraid of losing custody in Turkey, so she ran away

16 from the States and she wants O.T., to be about 9, 10 years

17 old when he's more mature of an age.  While she's throwing

18 me away from him, she wants a court to hear O.T. say, I want

19 to be with my mother.  And no matter what she does, it will

20 not matter due to the sense so she's, I believe, she has

21 planned this all along.

22 Q    So you say you believe she was running away from the

23 custody case.  When she left in August 2024, was there an

24 open custody case in Turkey?

25 A    Starting from January 2024, yes.

1    Q    Who started that case?

2    A    I did.

3    Q    For what?

4         What was your request in that case?

5    A    Custody change.

6    Q    Okay.  Prior to leaving Turkey in August 2024, did

7    Ms. Durust ever seek a change in your access schedule to

8    accommodate a relocation, or did she ever seek a relocation

9    before the Turkish courts?

10   A    No.

11            MR. MIN:  Your Honor, one moment.

12            (A brief pause in the proceedings was held.)

13   Q    Mr. Tatari, just a few more questions.

14        Why did you file for a change of custody?

15   A    Because she failed to do the things that she was

16   supposed to on our divorce decree.

17   Q    Can you give some examples or can you be more specific

18   about what specifically you were alleging she was failing to

19   do that necessitated or preempted you to file for change of

20   custody?

21   A    The first thing is she violated 3.8.  She gave my son a

22   yellow fever vaccination to take him to Ivory Coast to

23   obtain an emergency passport by I believe to be fraudulent

24   means.

25   Q    Well, let's unpack that.

1      How did you become aware that she gave your son a

2   yellow fever vaccination?

3   A    She e-mailed me asking to go to Dubai for a vacation

4   with our son.  Because at that time O.T.'s American passport

5   was expired where I was not giving a signature for it to be

6   renewed.

7        So she asked me if she could fly to Dubai with him with

8   the Turkish passport.  I said okay and I gave a weekend of

9   my visitation, to my recollection.  One hour before the

10  flight, she e-mails me saying she's flying to Ivory Coast

11  with him.  I directly said I do not consent to you flying to

12  Ivory Coast due to being a very dangerous city and you need

13  to give vaccination to go to at that city, and I do not

14  consent to you giving my son a vaccination without my

15  approval.

16       She did not care; she did not give me any information

17  whatsoever in there about the vaccination how he was, et

18  cetera.  After which, she calls me one night saying O.T. is

19  very sick, I need to go to a hospital.  I don't know where

20  any hospitals are, please help me.  I need O.T.'s social

21  security number.  I knew it and I gave it to her.  She

22  didn't have it, I don't know why.

23       After that, she didn't reply to me for two days or

24  something.  I didn't know how he was, what was happening.

25  Later on now from e-mails and everything, we're seeing that

1  she has obtained an emergency passport from Ivory Coast and

2  she could not get the emergency passport because she needed

3  a social security number.  This is how, basically, this

4  trip, everything, it made me move on to suing for custody.

5  Q    Does the child have an American passport now?

6  A    Yes.

7  Q    Okay.  Was that a passport that you gave your consent

8  to obtain?

9  A    No.

10  Q    Was it your understanding that it required to obtain an

11  American passport, it required your consent?

12  A    Can you rephrase.

13  Q    Was it your understanding that in order to obtain an

14  American passport for O.T. it requires your written consent?

15          MR. HAMBELTON:  Objection, your Honor.

16          THE COURT:  I'll sustain the objection without

17  some foundation for that.

18  Q    Did Ms. Durust ask you to sign a consent to obtain a

19  passport for O.T.?

20  A    Yes.

21  Q    Around when?

22  A    September or October 2023.

23  Q    Did she file any court proceedings to require you to

24  sign a consent for the passport?

25  A    After I did not give consent, yes.

1   Q    When did she file that?

2   A    October or November 2023.

3   Q    Where?

4   A    In Istanbul, Turkey.

5   Q    Is that case still pending?

6   A    No.

7   Q    Have there been any orders requiring you to sign a

8   consent for the child's passport?

9   A    No.

10  Q    But the child has a passport now?

11  A    Yes.

12  Q    And you did not -- you have not signed ever a consent

13  for that passport?

14  A    No.

15  Q    Does the child have a Turkish passport?

16  A    Yes.

17  Q    Okay.  Is the child able to travel using that Turkish

18  passport?

19  A    There are visas sometimes needed, but yes.

20  Q    If you know, is a visa needed to travel from Turkey to

21  the United States?

22  A    Yes.

23  Q    Who has the child's Turkish passport?

24  A    Ms. Durust.

25          THE COURT:  Who?

*Z. Tatari - Cross/Mr. Hambelton*                    232

1          THE WITNESS:  Ex-wife.

2          MR. MIN:  No further questions at this time, your

3    Honor.

4          MR. HAMBELTON:  Your Honor, may I inquire.

5          THE COURT:  Yes.

6    CROSS-EXAMINATION

7    BY MR. HAMBELTON:

8    Q    Good afternoon Mr. Tatari, I am Andrew Hambelton.  I am

9    one of the counsel for Ms. Durust.

10         During your direct examination by Mr. Min, he was

11   asking you about the divorce decree; do you remember that?

12   A    Yes.  Can you please talk a little bit slower?

13   Q    Sure.  But you remember being asked about the divorce

14   decree by Mr. Min, correct?

15   A    Yes.

16   Q    And you were divorced from Ms. Durust in 2022, correct?

17   A    Yes.

18   Q    Okay.  And the Court issued a divorce decree

19   memorializing the divorce, correct?

20   A    Yes.

21   Q    As part of that decree process, you testified earlier

22   that you had an interaction with the judge concerning the

23   divorce protocol, correct?

24   A    Yes.  She asked us if you wanted to get a divorce.

25   Q    Okay.  And you also mentioned --

1     You also testified that the judge asked you about

2  various changes to the divorce protocols; do you remember

3  that?

4  A    I don't understand the question.

5  Q    During the divorce hearing, right, there was a

6  conversation with the judge that you testified about,

7  correct?

8  A    Yes.

9  Q    And in that conversation, the judge told you that they

10  were changing certain things in the divorce protocol;

11  correct?

12  A    Yes.

13  Q    And the one thing you mentioned when you were

14  testifying that the judge said they were changing the

15  divorce protocol was the access schedule, correct?

16  A    Before primary school, yes.

17  Q    Okay.  Did the judge say anything else to you about any

18  other changes they were making during that divorce hearing?

19  A    To my recollection, no.

20  Q    Okay.  To your recollection --

21            MR. HAMBELTON:  Withdrawn.

22  Q    Did the judge --

23     The judge asked you discussed about changes to

24  Section 3.7?

25  A    No.

1   Q    You don't recall?

2   A    No.

3            MR. HAMBELTON:  Let's do W-2, please.

4   Q    Do you see that document that's been marked for

5   identification as Respondent's W-2 on the screen,

6   Mr. Tatari.

7        Do you seen it on the screen?

8   A    Yes.

9   Q    And it's a series of e-mails between you and

10  Ms. Durust, correct?

11  A    Yes.

12  Q    Okay.  And please, go to the bottom of the first page,

13  please.

14       On the screen now is an e-mail --

15           THE COURT:  I'm sorry, what is this exhibit

16  number?

17           MR. HAMBELTON:  Respondent's W-2.

18           THE COURT:  I'm sorry.  Go ahead.

19  Q    So the e-mail, Mr. Tatari, is an August 22, 2024,

20  e-mail at 6:31 a.m. from Ms. Durust to you.

21       Do you see that?

22  A    Yes.

23  Q    Okay.  And in the fifth paragraph of that e-mail, she

24  writes to you and I quote, "While we getting a divorce,

25  honorable judge said that Article 3.7, which was written in

1    the protocol, does not bring any legal obligations."

2         Do you see that?

3    A    Yes, I see that.

4    Q    Does that at all refresh your recollection about any

5    other discussions you have with the judge during the divorce

6    hearing?

7    A    No.  Because this has not happened.  This is her way of

8    saying this.

9              MR. HAMBELTON:  Your Honor, I would like to move

10   into evidence Respondent's W-2.

11             THE COURT:  Is it just this one e-mail?

12             MR. HAMBELTON:  It's a series of e-mails the whole

13   chain, the whole exhibit.

14             THE COURT:  It will be received.

15             (Respondent's Exhibit W-2 was marked in evidence.)

16   Q    So during the divorce hearing, Mr. Tatari, you made a

17   series of acknowledgements in front of the Court, did you

18   not?

19   A    To what are you referring to?

20   Q    Did you stand up and make any representations to the

21   judge?

22   A    She asked me if I wanted to get a divorce.  I said yes.

23   Q    Okay.  Did you make any other statements in court that

24   day?

25   A    No.

*Z. Tatari - Cross/Mr. Hambelton*                236

1  Q    No other statements?

2  A    Not that I remember.

3  Q    Okay.  Let's go to, please, to Petitioner's Exhibit 22,

4  please?

5           THE COURT:  Why don't we take the recess now

6  because I know you're getting into a matter that will take

7  some time.

8           We'll resume at 2:10.

9           MR. HAMBELTON:  I would ask for an instruction

10 that the witness not talk about the testimony since he's

11 still on the stand.

12          THE COURT:  He's a party.  I don't know why that

13 instruction should be given.

14          I take it be, Counsel, you don't intend to talk to

15 him about his cross.

16          MR. MIN:  I'm sorry, your Honor.

17          THE COURT:  Counsel has just inquired he's asked

18 for a direction from the Court that he not speak to you

19 during the breaks since he's on cross.

20          Do you have any problem with that?

21          MR. MIN:  I mean, that's never been a rule that

22 we've abided by.  If your Honor orders it, then we won't do

23 it but I've never encountered that rule.

24          THE COURT:  I think he's a party, I don't know

25 that there's a basis to direct that they can't do that.  You

1  can certainly cross-examine him on whether he talked to his

2  counsel during the interim.

3            MR. MIN:  It didn't fall under sequestration rule.

4            MR. WARD:  Your Honor, we have one of our experts

5  in Turkey scheduled at 2:00 which we're going to try to push

6  it 2:10.  Because of the flow, we're going to push it back

7  further but we're getting to the 11:00 p.m., midnight.  If

8  we could not agree to get him to agree to push it back

9  further, Mr. Min agreed that we can call him at 2:10.  I

10 would like Court's permission.

11           THE COURT:  That's fine.  Okay.

12           (Witness leaves the witness stand.)

13           (Luncheon recess taken; 12:42 p.m.)

14           (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1          **AFTERNOON SESSION**

2          (In open court.)

3          (Parties present.)

4          THE COURT:  We're prepared to proceed?

5          MR. MIN:  Yes, Your Honor.

6          One minor thing.  Our expert, Mert Yelcin, is it

7    okay if he sits at counsel table for the rest of the

8    afternoon since he's already testified and there's some

9    experts that will be testifying that I may want to have him

10   observing and be close to me to let me know about their

11   testimony.

12         THE COURT:  Just so he doesn't yell at you across

13   the table.

14         MR. MIN:  I'll sit close to him.

15         THE COURT:  All right.

16         THE COURTROOM DEPUTY:  The witness can come up.

17         (Witness resumes the stand.)

18         THE COURT:  Do you want to continue?

19         MR. HAMBELTON:  Thank you, Your Honor, yes.

20   CROSS-EXAMINATION (Cont'd)

21   BY MR. HAMBELTON:

22   Q    Mr. Tatari, going back before the break, I just want to

23   bring you back a little bit.  Before the break, I was

24   inquiring whether during the divorce hearing you made any

25   acknowledgements to the Turkish judge.

1              Do you recall that?

2    A    You asked, yes.

3    Q    Can you remind the Court what your answer was, whether

4    you made any statements to the Turkish judge?

5    A    The judge asked me if I wanted to get a divorce from my

6    now ex-wife, and I said yes.

7    Q    Any other statements that you made to the Turkish

8    judge?

9    A    Regarding the visitation days, I first objected, but

10   she said no and that she needs to change it before primary

11   school, this way for it to be less of a change for O.T.

12   That's it.

13   Q    That was it?  No other statements that you made to the

14   judge?

15   A    Yes.

16   Q    I'm going to show you what's been admitted into

17   evidence as Petitioner's Exhibit 29.  It's a copy of the

18   translated divorce decree.  It should be on the screen in

19   front of you.

20              (Exhibit published.)

21   Q    Do you see that?

22   A    This is not that anymore --

23   Q    On the screen.  Do you see that?  Do you see the

24   document on the screen?

25   A    Yes, one of five page.

1    Q    I'm going direct you to page 1 of this document.  There

2    is a heading that says:  It has been considered that.  The

3    middle of the page.

4            Do you see that?

5    A    Yes.

6    Q    And then three paragraphs down, it says:  In their

7    statement at the hearing, the plaintiff stated that.

8            Do you see that?

9    A    Yes.

10   Q    You understand that you are the plaintiff in this

11   divorce petition, correct?

12   A    Yes.

13   Q    So if we go down a few sentences, and we'll highlight

14   it for you, it says:  I understand that in matters such as

15   making important decisions regarding the child's health and

16   relocation of their residence abroad, the defendant can

17   legally make decisions alone under the scope of custody.

18           Do you see that?

19   A    Yes.

20   Q    You made that statement to the Turkish court during the

21   divorce proceedings, didn't you?

22   A    I don't remember saying this.

23   Q    You don't remember saying this statement to the judge?

24   A    No.

25   Q    Is it your testimony that the Court inadvertently put

1   this in this document?

2   A    I don't know if this is standard thing that is put into

3   these documents, but I did not -- I do not remember saying

4   this.

5   Q    You had an opportunity to appeal this judgment, didn't

6   you?

7   A    Yes.

8   Q    Did you appeal this judgment?

9   A    At the verdict, I got what I wanted.

10  Q    You got what you wanted?

11  A    Yes.

12  Q    And what you wanted was, according to your own

13  statement, was to give the defendant, Ms. Durust, legal

14  decision-making alone under the scope of custody, correct?

15  A    No.  What I wanted was what I signed.  Looking at her,

16  her looking at me, we signed together 3.7, 3.8, 3.4.  We did

17  it together.  We decided months, our lawyers talked for

18  months, and she agreed, I agreed.  We went, we gave the

19  divorce decree to the judge, she agreed as well.  They

20  signed, I signed, she signed.  This is the verdict.

21  Q    Okay.  I'll ask you to answer my question.

22          So my question was:  You agreed, by your own

23  statement to the Turkish court, that Ms. Durust alone could

24  legally make decisions under the scope of her custody,

25  correct?

O. TATARI - CROSS - MR. HAMBELTON                242

1    A    I don't remember making such a statement.

2    Q    This divorce decree and the statement that you made to

3    the Turkish court wasn't the only time that you admitted to

4    the Turkish court that Ms. Durust has sole custody, correct?

5              MR. MIN:  Objection.  Assumes facts --

6              THE COURT:  I'll sustain the objection to the form

7    of the question.

8              MR. HAMBELTON:  Let's pull up Respondent's Exhibit

9    P-1, please.

10   Q    Mr. Tatari, you commenced a change of custody

11   proceeding in Turkey in January of 2024, correct?

12   A    Yes.

13   Q    And in that petition, you seek to change the custody

14   from Ms. Durust to you, correct?

15   A    Yes.

16   Q    And that change of custody proceeding was filed before

17   Ms. Durust moved with the child to the United States, right?

18   A    Yes.

19   Q    But this was after Ms. Durust received the child's

20   emergency --

21   A    Can you go a bit slower?  I'm sorry.

22   Q    But this was after Ms. Durust received the child's

23   emergency U.S. passport, correct?

24   A    I'm sorry, say it again.

25   Q    You filed the Turkish change of custody petition after

1    Ms. Durust had received the child's emergency U.S. passport,

2    right?

3    A    I did not know she acquired an emergency passport.  I

4    did not know her visit to Ivory Coast was for this and for

5    this sole purpose only.

6    Q    All right.  You admitted in your petition, did you not,

7    sir, that Ms. Durust has sole custody of the child?

8    A    Can you show me?

9    Q    I'm asking you.  Do you know?

10   A    Tell me again, please.

11   Q    Did you admit in your petition to the Turkish court

12   that Ms. Durust has sole custody of the child?

13   A    I asked for a change of custody, which means she has

14   custody, yes.

15   Q    She had sole custody of the child?

16   A    With the provisions in place.

17   Q    She has sole custody of the child, correct?

18   A    With the provisions put in place together that we

19   signed on.

20   Q    Can you just answer my question?  She has sole custody,

21   right?

22   A    I --

23   Q    Yes or no?

24   A    Yes.

25   Q    I want to direct your attention to page 3 of the

1    petition.  The top of the page, please.

2            So your testimony is that you don't remember

3    admitting in the Turkish court petition that Ms. Durust has

4    sole custody of the child, right?

5    A    Yes.

6    Q    Can you read out loud, please, the sentence in the

7    middle of the page, beginning with the word "during"?

8    A    Can you highlight it?

9    Q    Yes, we'll highlight it for you.

10           Can you read that, please?

11   A    Read the whole thing?

12   Q    Yes.

13   A    During the period when they decided to divorce, the

14   client highly desired to undertake the custody of the joint

15   child and suggested to the defendant that they should have

16   joint custody.  But after the defendant threatened the

17   client with threats of such as if you talk O.T., I will

18   commit suicide, and started to use physical violence against

19   the client by having nervous breakdowns, the client had to

20   leave the custody of the joint child to the defendant in

21   order to prevent the joint child from being in this

22   psychological trauma when the joint child was only 3.5 years

23   old.

24   Q    So you wanted joint custody of the child, right?

25   A    Yes.

1    Q    And you had a discussion with Ms. Durust about whether

2    you would have joint custody of the child, right?

3    A    Yes, during the first month when we first discussed, I

4    specifically asked we do joint custody.

5    Q    But ultimately you decided to give sole custody of the

6    child to Ms. Durust, right?

7    A    No, ultimately I made a way for this to work together

8    so she would not do these things.

9    Q    Excuse me, sir.  So the statement that you just read

10   from your own petition in the Turkish court --

11   A    This is by my lawyer.

12   Q    Sir --

13   A    This is written by my lawyer, not me.

14         THE COURT:  Just let him finish the question

15   before you answer it, okay?

16   Q    This is your petition, right?

17   A    My lawyer prepared it, yes.

18   Q    But it's on behalf of you, correct?

19   A    Yes.

20   Q    The lawyer represents you?

21   A    Yes.

22   Q    So this is your petition, right?

23   A    Yes.

24   Q    So in your own petition in Turkey, you are saying to

25   the Turkish court in your application for change of custody

1    that you have left sole custody to Ms. Durust, right?

2    A    Yes.

3            MR. HAMBELTON:  Your Honor, we'd like to move into

4    evidence Respondent's Exhibit P-1.

5            THE COURT:  P-1 will be received.

6            (Respondent's Exhibit P-1 received in evidence.)

7    Q    So in this petition, you asked the Court for a change

8    of custody, correct?

9    A    Yes.

10   Q    You also asked the Court for various forms of

11   precautionary or injunctive relief, correct?

12   A    Yes.

13   Q    And the forms of injunctive relief that you asked for

14   are to be granted temporary custody of the child pending the

15   duration of the lawsuit, right?

16   A    Yes.

17   Q    Alternatively, for the child to stay with you during

18   the pendency of the lawsuit, right?

19   A    Yes.

20   Q    To prevent Ms. Durust from sharing photos of the child

21   on social media, right?

22   A    Yes.

23   Q    And an injunction to enjoin the child from traveling

24   broad, right?

25   A    Can you repeat that again?

1  Q    And an injunction enjoining the child from traveling

2  abroad, right?

3  A    You mean the child traveling abroad?

4  Q    Correct.

5  A    Yes.

6  Q    Did the Turkish court award any of that relief that you

7  asked for?

8  A    No.

9  Q    So the Turkish court didn't give you temporary custody?

10  A    No.

11  Q    And --

12  A    They said it's the essence of the case.

13  Q    They didn't give you the right to have the child stay

14  with you during the pendency of the action?

15  A    They all said the same thing; essence of the case.

16  Q    And they didn't give you an injunction enjoining the

17  child from traveling broad, right?

18  A    Traveling, yes.

19  Q    Okay.

20        MR. HAMBELTON:  Let's go to M-3, please.

21  Q    Mr. Tatari, on the screen is what's been marked for

22  identification as Respondent's Exhibit M-3.  It's a

23  preliminary proceedings report that the Turkish Family

24  Court.

25  A    Can you go up, please?

1   Q    I draw your attention to section 14 on the second page

2   of this document.  Can you read section 14 for us?

3   A    Although the plaintiff's attorney requested custody as

4   a precautionary measure, since the request is of the essence

5   of the case and requires a trial, the plaintiff's request

6   for custody as a precautionary measure is rejected and the

7   plaintiff's attorney's other requests for precautionary

8   measures are rejected.

9   Q    So this is the Court's order rejecting all of the

10  injunctions that you asked for in your petition, right?

11  A    Due to it being the essence of the case and requires a

12  trial, yes.

13       MR. HAMBELTON:  Your Honor, we'd like to move into

14  evidence Respondent's Exhibit M-3.

15       THE COURT:  Okay, M-3 will be received.

16       (Respondent's Exhibit M-3 received in evidence.)

17  Q    Your change of custody proceeding, sir, is still

18  pending before the Turkish court, right?

19  A    Yes.

20  Q    In fact, you're trying to -- you've sought to expedite

21  that proceeding to get resolution as quickly as possible,

22  haven't you?

23  A    The judge has actually expedited it.

24  Q    But you made specific request to the Court to have it

25  expedited, right?

1   A    Due to the abduction, yes.

2        MR. HAMBELTON:  Let's go to T-1, please.

3        (Exhibit published.)

4   Q    On the screen is what's been marked for identification

5   as Respondent's Exhibit T-1.  This is your October 17, 2024

6   petition to have the custody proceedings heard urgently.

7        Do you recognize this document?

8   A    Can you show the full document?

9        Yes.

10  Q    And you're making this request because you claim that

11  the defendant has abducted the child to the United States,

12  correct?

13  A    Yes.

14  Q    And you're trying to have the Turkish court hear this

15  matter urgently, correct?

16  A    Yes.

17  Q    Did you make another request to the Turkish court to

18  have the matter heard urgently?

19  A    I'm not sure.  If you can show me, I can extent on it.

20       MR. HAMBELTON:  Before I do that, Your Honor, I'd

21  like to move into evidence Exhibit T-1.

22       THE COURT:  T-1?

23       MR. HAMBELTON:  Yes, T as in Tom.

24       THE COURT:  It will be received.

25       (Respondent's Exhibit T-1 received in evidence.)

1          MR. HAMBELTON:  V-1, please.

2          (Exhibit published.)

3    Q    So you just testified, sir, you don't remember making

4    another application in the Turkish court --

5    A    I said I didn't remember.  I said if you can show me, I

6    can comment on it.

7    Q    Do you remember making them?  Do you remember making

8    another application to the Turkish court to expedite your

9    change of custody proceeding?

10   A    My lawyers are doing these applications.  Sometimes

11   they do things without my knowledge.  So I need to see,

12   that's why I asked if I could see it.

13   Q    So your lawyer's doing things without your knowledge?

14   A    My lawyers were talking about things.  But if they're

15   filing some certain document, I might not know exactly that

16   day.  It happens time to time.

17   Q    Okay.  You don't authorize the documents before they

18   get filed with the Turkish court?

19   A    Not always.

20   Q    What other documents have you not authorized before

21   they've been filed with the Turkish court?

22   A    I don't know.

23   Q    So the document on the screen before you right now is

24   your October 31, 2024 application to the Turkish court to

25   expedite your change of custody proceeding and have all the

1   witnesses heard on November 28th.

2          Do you see that?

3   A    Yes.

4   Q    Okay.

5   A    And this I know.

6   Q    This one you know?

7   A    Yes.

8   Q    Okay.  Do you know of any other applications to

9   expedite the change of custody proceeding you made?

10  A    If you can show me --

11  Q    I'm asking you a yes or no question, if you know of any

12  more.

13  A    I cannot comment until I see.

14  Q    So you made an application on October 17th and on

15  October 31st to have your change of custody proceeding heard

16  on an expedited basis in Turkey because of your claimed

17  abduction that happened here, right?

18  A    Yes.

19  Q    Did the Turkish court expedite the proceeding?

20  A    No.

21         MR. HAMBELTON:  Your Honor, I'd like to move into

22  evidence Respondent's Exhibit V-1, Victor 1.

23         THE COURT:  It will be received.

24         (Respondent's Exhibit V-1 received in evidence.)

25         MR. HAMBELTON:  Let's do F-3.

1              (Exhibit published.)

2    Q    Are you aware, sir, that the Turkish court held a

3    hearing in your change of custody proceeding on November 28,

4    2024?

5    A    November 28th?

6    Q    Correct.

7    A    Hearing?

8    Q    There was a hearing in Turkey.

9    A    I was there.

10   Q    You were there?

11   A    Yes.

12   Q    And during that hearing, you and your lawyers put

13   witnesses up before the Turkish court in support of your

14   petition, correct?

15   A    Yes.

16   Q    And you put in a number of different witnesses, right?

17   A    Yes.

18   Q    And the witnesses testified about a number of different

19   things, including how Ms. Durust is on drugs and how she

20   dresses scantily and all of those things, right?

21   A    Right.

22   Q    Did any of the witnesses testify about the fact that

23   you have joint custody or any custody rights?

24   A    This was not what this was about.  This was not even

25   talked about.

1    Q    So you're changing --

2    A    I wasn't asked by the judge, I'm sorry.  Even better.

3    Q    So your change of custody proceeding wasn't about who

4    has custody?

5    A    It wasn't asked.

6    Q    It wasn't asked?

7    A    The judge asked questions, they answered.  This was not

8    one of the questions.

9    Q    So during that proceeding, the judge never asked any of

10   your witnesses whether you had any custodial rights over the

11   child?

12   A    To my knowledge or to my recollection, no.

13   Q    Did Mr. Durust have an opportunity to put witnesses up

14   during that hearing?

15   A    No.  She wasn't even present there.

16   Q    Is she going to have an opportunity to put witnesses

17   up?

18   A    Hopefully if she comes back, she can even testify

19   herself.

20   Q    So the Court didn't accept your application to have all

21   the witnesses heard on November 28th, including Ms. Durust.

22   A    Actually, I don't -- I don't know this to be hundred

23   percent, but I heard this from my lawyer.  The judge

24   apparently asked her lawyer to bring their witnesses as well

25   last minute, and they did not.  They could not file this due

1    to it being last minute, but due to the case being extremely

2    urgent, the judge asked this.

3              MR. HAMBELTON:  Your Honor, I'd like to object to

4    that as unresponsive and hearsay.

5              THE COURT:  Overruled.

6    A    Now, afterwards the judge actually -- after the Court

7    was finished, the regular date of the hearing was going to

8    be in May or June.  The judge decided this case is extremely

9    urgent and she opened a normal -- a new date in February.

10   She tried to put it in December, she tried to put it in

11   January; there were no dates available.  She said, there's

12   five witnesses of Ms. Durust, I'm going to open a whole day

13   for this, and she put 7th of February herself.  She turned

14   to us and said, I'm sorry, this is the best I can do, it's

15   very crowded inside the case filing, et cetera.

16   Q    So the hearing's being continued to February 7th?

17   A    Yes.

18   Q    So your original petition to change custody, you sought

19   the injunctive relief, correct?

20   A    Injunctive relief, you mean the asking the change of

21   things earlier?

22   Q    You asked for some precautionary measures, including

23   restricting the child from going abroad or to have temporary

24   custody or --

25   A    Traveling and other things, yes.

1    Q    That was denied, right?

2    A    Yes.

3    Q    And then you went and asked the Turkish court to

4    accelerate the Turkish custody proceedings in light of

5    Ms. Durust coming to the United States, right?

6    A    The problem here is you have to understand if you look

7    at the document --

8    Q    Sir, you have to answer my questions.

9              THE COURT:  Just answer the questions.

10   A    Yes, the judge's change indicates --

11   Q    Just yes or no, please.

12             THE COURT:  The question was:  Did you ask to

13   accelerate the case?

14             THE WITNESS:  Yes.

15   Q    And the Court accelerated it -- withdrawn.

16             The Court extended the hearing now until February?

17   A    Accelerated to February 7th, yes.

18   Q    That, in your view, is an acceleration?

19   A    It was regularly supposed to be in June or May.

20   Q    Between the time that you filed your change of custody

21   petition and then later, when you asked the Turkish court in

22   October to accelerate the proceedings, did you make any

23   other applications to the Turkish court to restrict the

24   ability of the child to relocate?

25   A    For relocation or travel?

O. TATARI - CROSS - MR. HAMBELTON                256

1   Q    Relocation.

2   A    Not to my knowledge, no.

3   Q    Is this another one of those situations where your

4   lawyers may have filed something and you don't know about

5   it?

6   A    If you can show me, I can --

7   Q    It's a yes or no question.

8        THE COURT:  I don't know how you answer that

9   question yes or no, so ask another question.

10       MR. HAMBELTON:  Let's do N-3, please.

11       (Exhibit published.)

12  Q    Sir, on the screen is a petition filed by you in the

13  Turkish court on July 10, 2024.  Do you see that?

14  A    Yes.  This is for the passport case.

15  Q    Okay.  Did you authorize your attorneys to file this

16  one?

17  A    Can you repeat again?

18  Q    Did you authorize your attorneys to file this petition?

19  A    I talked to them about my problems having with

20  Ms. Durust regarding her travel, because she had done many

21  travels without my knowledge, and I just wanted information

22  about my son on his whereabouts and she was refusing to give

23  me these details.  That's why I was talking to my lawyer,

24  and he told me I'll ask for this in the passport case, and I

25  said okay.

1  Q    But this document --

2          But your request to the Turkish court wasn't

3  limited just to travel, was it?

4  A    Can I read it?

5  Q    I'm just asking you.

6  A    I didn't write it.

7  Q    You didn't write it?

8  A    My lawyer wrote it.

9  Q    So you don't know what your lawyers put in the

10 petition?

11 A    If I can read it, I can tell you.

12 Q    You didn't read it before it was filed with the Turkish

13 court?

14 A    I don't remember.

15 Q    Let's scroll down.  Paragraph 3, please.  It says:

16         As the Honorable Court knows, the subject of this

17 case is that permission must be received from the client,

18 who is the father of the joint child, to obtain an American

19 passport for the joint child.  However, even in the current

20 situation, the plaintiff is practically abducting the joint

21 child abroad.

22         Do you see that?

23 A    Yes.

24 Q    So this is about more than just traveling on a simple

25 vacation for a week, isn't it, sir?

1    MR. MIN:  Your Honor, I'm just going to object.

2    The document's not in evidence.  I'm sure he'll move it into

3    evidence, but to the extent he's reading --

4         THE COURT:  Do you want to put it in evidence?

5         MR. HAMBELTON:  I offer Respondent's N-3 into

6    evidence, Your Honor.

7         THE COURT:  M-3?

8         MR. HAMBELTON:  N, as in Nancy.

9         THE COURT:  All right.  It will be received.

10        (Respondent's Exhibit N-3 received in evidence.)

11   Q    So my question, sir, is:  This petition is about more

12   than just seeking to enjoin Ms. Durust from taking the child

13   on a simple vacation, isn't it?

14   A    This petition was made after learning about

15   Ms. Durust's fraudulent emergency passport obtainship.  She

16   lied.  She went to the Ivory Coast, she lied even to the

17   U.S. Embassy by obtaining an emergency passport for our son,

18   O.T.  Her passport was expired.  The U.S. Embassy required

19   my signature.  I said no.  She went to Ivory Coast.  There,

20   she goes to the Embassy and says I lost my son's passport.

21   These are all written emails.  Maybe we can see those

22   exhibits as well at some point.  And she got this passport

23   by getting my social security -- my son's social security

24   number from me by lying to me at midnight saying he is sick,

25   that she needs to go to the hospital as quick as possible.

1    These are all happening, real.

2            So after this, yes, we were all scared about

3    everything.

4    Q    So you were scared that she was going to take the child

5    and move abroad?

6    A    I don't know what she was going to do.  I don't know

7    what --

8    Q    I'm not asking what you thought she was going to do.

9    I'm asking whether you were scared if she was going to take

10   the child and move abroad.

11   A    Not move abroad exactly.  I just wanted to know where

12   my son's whereabouts were.  Any parent would want to.

13   Q    So you weren't at all concerned that she might take the

14   child and move abroad?

15   A    At this point in time, regularly speaking with regular,

16   sound mind people talking to each other, he was signed into

17   Koc, Koc school.  I know the name is different.  So this was

18   maybe written by my lawyer in other format.  But my biggest

19   problem was she obtained an emergency passport, and at that

20   stage what I was thinking is she just wants to do vacations

21   with the child without telling me and without even allowing

22   me to go anywhere with him.

23           MR. HAMBELTON:  Let's do Petitioner's Exhibit 4,

24   please.

25           (Exhibit published.)

1   Q    So the document we just saw was a petition, right, that

2   you filed with the Turkish court on July 10, 2024, right?

3   A    Just before --

4   Q    The one we just looked at.

5   A    Yes.

6   Q    A few days earlier, were you having any communications

7   with Ms. Durust about whether she was going to live abroad?

8   A    In this email format --

9   Q    I'm just asking you.

10          MR. HAMBELTON:  Let's take the email down for a

11  second.

12  Q    I'm asking you:  Before you filed that petition with

13  the Turkish court seeking to enjoin her from relocating with

14  the child, were you having any conversations with her about

15  whether or not she was going to move abroad?

16  A    I had no idea.  Just only travel or anything else.  I

17  had no idea.  I just heard during our school graduation, my

18  son and her, she was present there, a friend of hers said

19  see you in New York.  I heard that.  After that, I

20  questioned what her motives were, trying to understand.  And

21  at this time we were speaking to our lawyers in emails,

22  where you just opened before, so it's all present there.

23  Q    So she was discussing it with you, right?

24  A    No.  That's not discussion.  If you look at that email,

25  you can see what she wrote as discussion.

1   Q    She told you she was going to move abroad.

2   A    No, she told -- she's never had the intention or even

3   the thinking of she's going to move abroad.  You want to

4   open that email again?

5   Q    I'm asking you, at any point in time prior to

6   Ms. Durust leaving Turkey to come to the United States with

7   the child, did you have any discussions at all with her

8   about whether she potentially may move abroad with the

9   child?

10  A    No.

11  Q    Not one?

12  A    No.

13  Q    She never mentioned it to you?

14  A    No.

15  Q    Ever?

16  A    No.

17         MR. HAMBELTON:  Let's put that exhibit back up.

18         (Exhibit published.)

19  Q    On the screen is what's been marked for identification

20  as Petitioner's Exhibit 4.  Do you see that?  Do you see

21  that series of emails?

22  A    Yes.

23  Q    So the date of this email chain is July 28 and July 29,

24  2024.  Do you see that?

25  A    I'm seeing 29 June in front of me.

O. TATARI - CROSS - MR. HAMBELTON                262

1   Q    Sorry if I misspoke.  June 28 and 29, 2024, right?

2   A    Yes.

3   Q    The date of the email chain?

4   A    Yes, that's what I'm seeing.

5   Q    Just to remind everybody, the date of the petition that

6   you filed to try to restrict Ms. Durust from moving abroad

7   with the child was filed on July 10th, right?

8   A    Can you repeat?

9   Q    The petition that you filed in Turkey to try to

10  restrain Ms. Durust from moving abroad with the child was

11  filed on July 10th, right?

12  A    Yes.

13  Q    So this is 11 days before, right?

14  A    Yes.

15  Q    And if we go to the second page of this document, let's

16  go to bullet point 3 there, you're accusing Ms. Durust,

17  right, of potentially kidnapping, in your words, the child.

18  A    This is her statement.

19  Q    I know it's her statement, but she's responding to your

20  overtures that she's going to kidnap the child.

21  A    Can I see my statement?

22  Q    I'm just asking you.  Did you make a statement to

23  her --

24  A    If you say --

25  Q    I'm asking you if you made that statement to her,

1   whether it's in the email or not.

2            THE COURT:  Well, this is not his email.

3            MR. HAMBELTON:  I'm just asking if he ever made

4   the statement, because she's responding to something he

5   said.  I'm just trying to ask if he ever made that

6   statement.

7            THE COURT:  Well, made what statement?

8            MR. HAMBELTON:  If he ever made a statement to her

9   that he was expressing concern that she was going to kidnap

10  the child.

11           THE COURT:  Okay.

12           MR. MIN:  Your Honor, can we move this document in

13  if he's reading from it?

14           THE COURT:  Pardon me?  What's the exhibit number?

15           MR. HAMBELTON:  It's Petitioner's 4.  But I'm not

16  reading from it.

17           THE COURT:  You don't want it to come into

18  evidence?

19           MR. HAMBELTON:  Not yet.

20           THE COURT:  Okay.

21           Do you understand the question?

22           THE WITNESS:  I understand, but --

23           THE COURT:  I think the question is:  Did you ever

24  say to your former wife that you believe she was going to

25  kidnap your son?

1      THE WITNESS:  I heard in our school graduation her

2   friend telling her, I'll see you in New York.  I don't know

3   time, place.  I don't know when or how this is going to

4   happen.  At this stage in time, she was always not telling

5   me or being transparent --

6      THE COURT:  No, the question is whether you

7   confronted her with it.

8      THE WITNESS:  I confronted her, but I don't know

9   if I said you kidnapping or you doing this.  I don't

10  remember the statement.  If I can read it, I can talk about

11  it.

12     MR. HAMBELTON:  Let's take this one down and we'll

13  go to Respondent's Exhibit V-2.

14     (Exhibit published.)

15     THE WITNESS:  Just here, the scenario in my mind

16  happened, apparently.

17  Q    So on the screen, Mr. Tatari, is your email to

18  Mr. Durust dated June 28, 2024.

19     MR. HAMBELTON:  Your Honor, I'd like to move this

20  into evidence as Respondent's Exhibit V-2.

21     THE COURT:  All right.  It will be received.

22     (Respondent's Exhibit V-2 received in evidence.)

23  Q    Do you see that?

24  A    Yes.

25  Q    Let's scroll down to number 3, claim 3.  You wrote here

1    in point 3, that you had concerns that she was going to

2    abduct the child, right?

3    A    Suspect, yes.

4    Q    And that's what precipitated your filing the petition

5    in Turkey 11 days later to stop her from moving abroad with

6    the child, right?

7    A    I said, yes, I overheard, yes, New York, I would like

8    to inform that I'm not consent to this travel, yes.

9    Q    Because you had the concern?

10   A    I would kindly request you to inform me, yes, yes.

11   Q    Because you had the concern that she was going to

12   abduct the child, you filed a petition 11 days later in

13   Turkey to have her restrained from moving abroad with the

14   child, correct?

15   A    Can you repeat the question?

16   Q    Sure.

17          As we can see by your document here, you had

18   concern that Ms. Durust was going to kidnap the child,

19   right?

20   A    Yeah.

21   Q    So to stop that, you filed a petition in Turkey 11 days

22   later seeking to have her restrained from moving abroad with

23   the child, right?

24   A    That petition has no -- how do you say?  Since it's a

25   passport case, the judge directly said I cannot do this, I

1   cannot provide you with this.  The judge said specifically

2   only the custody courts can do this, and this was when the

3   case had just started.  It was right when we had our first

4   hearing, and it was exactly on the date where the judge on

5   our custody case changed.  The judge said, I cannot decide

6   on anything before knowing the case.

7            If you look at the documents clearly, our first

8   judge in the custody case was (unintelligible), I don't know

9   the name, but the judge's name changed.  And in this case,

10  it's the passport case, and the judge said she cannot give

11  this, what you're saying, due to this reason.

12            (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Z.O. TATARI - CROSS - MR. HAMBELTON                267

1    BY MR. HAMBELTON:

2    Q    Sir, that wasn't my question.  My question was simply

3    whether you filed a petition because you had concern that

4    she was going to move the child abroad.  Yes or no?

5    A    Everything yes.

6    Q    You had concern that she was going to move abroad?

7    A    She was acting in bad faith.

8    Q    Did the Turkish court award your petition?

9    A    No.  I just explained before why.

10   Q    Okay.  Did it have anything at all to do with the fact

11   that she has custody and not you?

12   A    I don't believe so.

13   Q    You don't believe so?

14   A    No.

15   Q    Have you reviewed the decision from the Turkish court?

16   A    Yesterday with you guys, yes.

17   Q    With us?

18   A    You guys filed yesterday, didn't you?

19   Q    Okay.  All right.  Let's put up Respondent L3?

20        MR. HAMBELTON:  Your Honor, I'm sorry.  I may have

21   overlooked this, if I did not move into evidence Victor-2.

22        THE COURT:  V2 you moved.

23        MR. HAMBELTON:  Okay.

24   BY MR. HAMBELTON:

25   Q    On the screen is the interim decision from the Turkish

1    Family Court July 12, 2024, TWO days after you filed your

2    petition trying to stop Ms. Durust from moving to the United

3    States with the child.  Right?  You see that document?

4    A    Can you repeat again?

5    Q    I'm just asking if you see the document on the screen,

6    the interim decision of the court?

7    A    While I was reading I couldn't listen to you.  I'm

8    sorry.

9    Q    You understand this to be the decision of the court

10   denying your petition that you filed two days earlier on

11   July 10?

12   A    Yes.  This is the protection of the child property case

13   that Ms. Durust filed.  This is about OT's passport.

14   Q    This is the decision in response to the petition that

15   you filed two days earlier trying to stop her from moving

16   abroad, right?

17   A    Yes.

18   Q    Bottom of the page --

19          MR. HAMBELTON:  I'd like to move this into

20   evidence, Respondent L3.

21          THE COURT:  I'll receive it into evidence.  I

22   thought it had been received.

23          (Respondent's Exhibit L3, was received in

24   evidence.)

25   BY MR. HAMBELTON:

1   Q    Can you read the highlighted?

2   A    As a result of the trial it has been decided to reject

3   the request since the parties were divorced.  The mother has

4   custody.  There is no case regarding changing custody.  The

5   parties with custody rights may use her rights arising from

6   the custody.  And moreover she has the initiative to go

7   abroad.

8   Q    So the Turkish court decided that she has custody.

9   A    For me, I don't understand this.  There is a word in

10  here say there is no case regarding change of custody.  What

11  date is this?  Ten of July.  Is there a change in custody

12  case?

13  Q    That's not my question.  My question to you is whether

14  the Turkish court found find that she has custody of the

15  child.

16  A    I understand that.  But --

17  Q    Yes or no question.

18  A    I read it.

19  Q    Is the answer yes or no?

20  A    Yes.

21  Q    Yes, the Turkish court find that she has custody.

22  A    The Turkish did not find.  It's saying here, this case

23  is about a passport case.  This has nothing to do with the

24  custody case.

25  Q    Fair.  Is the Turkish court recognizing that she has

1   custody and not you?

2   A    In here?  In this case?  Yes.

3          MR. HAMBELTON:  Your Honor, just one minute.

4   BY MR. HAMBELTON:

5   Q    The Turkish court order that we saw on July 12 wasn't

6   the first time that the Turkish court recognized that

7   Ms. Durust has sole custody of the child, was it?

8   A    There were other interim decisions that we saw that

9   said it's the essence of the case, yes.

10  Q    That wasn't my question.  My question was whether the

11  Turkish court before July 12 in any orders in any of the

12  proceedings in which you had with Ms. Durust, has recognized

13  that she has sole custody of the child?

14  A    I just said what I saw were the interim decisions that

15  we filed.  And it said, due to the essence of the case, and

16  this is -- it cannot be decided.

17  Q    The Turkish court back in February of 2024 also

18  recognized that Ms. Durust had sole custody of the child,

19  right?

20  A    Where?

21  Q    Do you remember that?

22  A    If you can show me.

23  Q    I'm asking you.

24  A    I don't.

25  Q    You don't.

1   A    If you show me, I'll be happy to.

2   Q    Put up M1, please.

3            On the screen is M1, the hearing minutes from

4   November -- from February 29, 2024 of the Turkish Family

5   Court.  Do you see that on the screen?

6   A    I was not present --

7   Q    I'm asking if you see it on the screen.

8   A    Yes.

9            MR. HAMBELTON:  Move into evidence Respondent M1.

10           MR. MIN:  Your Honor, we have a hearsay objection.

11           THE COURT:  I don't know how you get this in

12  through this witness.

13  BY MR. HAMBELTON:

14  Q    I'm going to skip ahead in time to November of 2024.

15  You had petitioned the Turkish court for a third time to

16  have precautionary measures related to the custody of the

17  joint child pending the change in custody proceeding, right?

18  A    I'm going to say yes, but I would like to see the

19  document.

20  Q    The Turkish court again rejected your request for

21  temporary custody, right?

22  A    Essence of the case.

23  Q    But they rejected it.

24  A    Yes.

25  Q    Let's put up Exhibit W1.

1          THE WITNESS:  Can I get a glass of water?

2          MR. MIN:  We have extra water bottles.

3          THE COURTROOM DEPUTY:  Here you go.

4          MR. HAMBELTON:  On the screen is an interim

5   decision from the Turkish court from November 4, 2024.

6          I move into evidence Respondent W1.

7          THE COURT:  W1 will be received.

8          (Respondent Exhibit W1, was received in evidence.)

9   BY MR. HAMBELTON:

10  Q    This document, the interim decision of the court, they

11  are again rejecting your request for temporary custody of

12  child pending the change of custody proceedings, correct?

13  A    Yes.  This also spoken during the hearing, if this is

14  the one I think, apparently Mr. Ugur made a declaration to

15  the court here saying the interim decision is the final

16  decision.  The judge directly asked Mr. Ugur if he made such

17  a statement.  He said no in the case.

18  Q    The court rejected your request, right?

19  A    You heard what I said.

20  Q    We've seen now three times that you petitioned the

21  Turkish court for some type of precautionary measure, and

22  each time the Turkish court said no.  Right?

23  A    Essence of the case.

24  Q    They said no, right?

25  A    Yes, I said, yes.

1   Q    The petition gave you a remedy in the event that

2   Ms. Durust didn't do something that she was supposed to do,

3   right, under the divorce protocol, right?

4           THE COURT:  Which petition are you referring to?

5           MR. HAMBELTON:  The divorce decree.

6   A    I invite Ms. Durust to come back to the Turkey and see

7   the custody proceedings.  And we can see what happens

8   afterwards.

9   Q    Let's put up of divorce decree again.  On the screen is

10  received in evidence as 29.  The first page, please, the

11  last few lines of his statement, please.

12          Sir, can you read that the highlighted portion?

13  A    However, if the defendant does not obtain my opinion

14  and approval as agreed in the protocol, I reserve the right

15  to file a lawsuit regarding the change of custody.

16  Q    That's exactly what you've done, right?  You filed a

17  two change of custody petitions in Turkey, right?

18  A    In January 2024 I filed a custody change, yes.

19  Q    You filed another one in October of 2024, right?

20  A    What is that?  Sorry?

21  Q    You filed a change of custody petition in Turkey?

22  A    There is only one custody case.

23  Q    And you filed it.

24  A    I filed the case in January 2024.  The case started

25  January 2024.

1   Q    So you did what you said to the court you would do if

2   you thought Ms. Durust did something in violation of the

3   divorce protocol.

4   A    This is not something --

5   Q    Let me finish.  Did you do what you told the court in

6   Turkey you were going to do if Ms. Durust did something in

7   violation of the divorce protocol, by commencing a change of

8   custody proceeding in Turkey?

9   A    As I --

10  Q    Correct?

11  A    As I have stated before --

12  Q    Yes or no.

13  A    As I stated, I do not remember making the statement.  I

14  told this before at the start of my statement here, in this

15  statement.  I remember what I signed.  And you can see there

16  as the verdict 3.7 is very clear there.

17           MR. HAMBELTON:  No further questions, your Honor.

18  REDIRECT EXAMINATION

19  BY MR. MIN:

20  Q    Good afternoon, Mr. Tatari.  Are you ready?

21  A    Yes.

22  Q    Early on in the cross-examination counsel asked you --

23  A    I cannot hear you clearly.

24  Q    Early on in the cross-examination you were asked about

25  the statement, I know we just came back to it, but early on

1   you were asked about it as well.  And you stated that -- you

2   testified that you got what you wanted in the verdict when

3   you said you didn't appeal it.  You said, you know, I got

4   what I wanted in the verdict.  Right?

5   A    Yes.

6   Q    What were you talking about?  What verdict you were

7   talking about?

8   A    I got the visitation times I wanted.  Even though it

9   changed a little bit in the beginning.  Sorry, during the

10  hearing, the decree.  The other three things I wanted was

11  regarding schooling, living abroad, and health decisions.

12  And all of these were signed together and agreed upon.

13  Q    What I'm trying to focus on is what you meant by the

14  word "verdict"?

15  A    To my understanding, there is -- it's in front of me by

16  the way, what you gave before -- after starting page two

17  where it says the verdict, it is everything that is accepted

18  inside the verdict.  A statement, to my understanding, is

19  not the verdict.  The verdict is the verdict, what is

20  signed.

21  Q    You're talking -- you're looking at the Turkish

22  language document, right?

23  A    Yes.

24  Q    When you say verdict, you're doing your own internal

25  translation, right?

1   A    Yes.

2   Q    Are you talking about what?  Number one here?

3   A    Decision, yes, with the acceptance decision.

4   Q    So what you're saying is that because these terms, the

5   decision, incorporated what you were looking for, you were

6   fine with the document?

7   A    Yes.

8   Q    Ms. Durust didn't appeal this decision, did she?

9   A    No.

10  Q    You received this decision approximately a month after

11  the hearing, correct?

12  A    Yes.

13  Q    At least it was writted approximately a month after the

14  hearing, correct?

15  A    Yes.

16  Q    Here on page five, on the bottom, it says:  The

17  decision was read aloud and explained in accordance with

18  procedure in the presence of the parties.  Do you see that?

19  A    Yes.

20  Q    Do you recall if the decision was read aloud in court?

21  A    As I said before, I don't have that recollection.  I

22  remember signing.

23  Q    I want to go to the statement, what is called your

24  statement in 29, that counsel was focused on.  Where it

25  says:  I understand that in matters such as making important

1   decisions regarding the child's health and relocation of

2   their residence abroad, the defendant can legally make

3   decisions alone under the scope of custody.  Do you see

4   that?

5   A    Yes.

6   Q    Is there any mention here of making decisions for

7   schooling alone?

8   A    Not that I see.

9   Q    In any of the court decisions that counsel asked you

10  about, is there any reference to the mother being able to

11  make decisions on schooling alone?

12  A    Can you clarify?  Sorry?

13  Q    I don't want to put up every single one of these

14  documents, it's waste a time, but counsel showed a myriad,

15  several court filings and court orders, interim court

16  orders, that were issued in Turkey.

17  A    Yes.

18  Q    Rejecting your request for interim custody, rejecting

19  your request that the mother not travel abroad with the

20  child.  Do you recall those orders, right?

21  A    Yes, all of them were due to the essence of the case or

22  regarding the passport case it not being relevant to the

23  case.

24  Q    But none of them stated that she was allowed to move

25  abroad and live there permanently with the child, correct?

1    A    No.

2    Q    None of them said that she could chose the schooling of

3    the child alone without your input, correct?

4    A    No.

5    Q    None of them said that she could make decisions for the

6    child's healthcare without your input, correct?

7    A    No.

8              MR. HAMBELTON:  Objection.  Your Honor,

9    mischaracterizing the documents.  These are legal

10   conclusions that he's having the witness draw based on the

11   document.

12             THE COURT:  Overruled.

13   BY MR. MIN:

14   Q    You testified earlier that the custody judgment in

15   Turkey did speed up the case.  Originally it was supposed to

16   be later in 2025 and now it's in February; is that correct?

17   A    Yes.  It happened exactly like this.  When they first

18   say okay what date is coming up on the screen, the system

19   directly went to May, June, July, et cetera.  The judge

20   said, no, it's too late, we need to do it earlier.  She

21   first tried December, then tried January, and then earliest

22   she could do is February 7.  She opened up a special date

23   for that day.

24             MR. HAMBELTON:  Objection to that last answer,

25   your Honor.  Move to strike it as hearsay.

1          THE COURT:  What part are of you moving to strike?

2          MR. HAMBELTON:  The parts where he's discussing

3    what the Turkish court is saying and thinking.

4          THE COURT:  I think I'll have to sustain that

5    objection.

6    BY MR. MIN:

7    Q    Mr. Tatari, you were shown this exhibit before,

8    Petitioner Exhibit 4.  It was not offered into evidence.

9          MR. MIN:  Your Honor, I'm going to offer it at

10   this time.

11         THE COURT:  What is it?

12         MR. MIN:  Exhibit 4.

13         THE COURT:  Exhibit 4?

14         MR. MIN:  Yes.

15         THE COURT:  All right, 4 will be received.

16         (Petitioner Exhibit 4, was received in evidence.)

17   A    Yes.

18   BY MR. MIN:

19   Q    I will turn to an email exchange or email from

20   Ms. Durust to you on Saturday June 29 at 2:24 p.m.  Do you

21   see that?

22   A    Yes.

23   Q    You had concerns about her traveling to New York with

24   OT; is that correct?

25   A    Yes, after hearing the graduation.

1   Q    She had previously traveled abroad earlier that year on

2   some occasions causing you concern, correct?

3   A    Yes, I actually Facetime my son once and by chance I

4   saw an American-type plug behind him.  When I thought he was

5   supposed to be in when school in Turkey, he was in the

6   states with his mom where I had no idea.

7   Q    That's separate and apart from the Ivory Coast trip you

8   testified to earlier?

9   A    She obtained emergency passport, obtained regular

10  passport, then make the trip to U.S.; again, without

11  informing me.

12  Q    Right.  So this a separate trip from the Ivory Coast?

13  A    Yes, one of many.

14  Q    Was the Ivory Coast trip a trip you were made aware of

15  before them going?

16  A    One hour before.

17  Q    One hour before.  Was that a consultation or just a

18  notice one our before?

19  A    I asked her clearly, please do not board this flight.

20  Q    Ms. Durust on this day told you that she's going to New

21  York alone with Lale right now and I'll meet her there

22  myself.  Do you see that?

23  A    Yes.

24  Q    She goes on to say:  It has no connection with OT.

25  A    Yes.

Z.O. TATARI - REDIRECT - MR. MIN                281

1   Q    She is goes on to say:  The issue of kidnapping our son

2   has never even crossed my mind.  You're again creating a

3   scenario with your own imagination and trying to blame me.

4   Our son has an established routine here, and a parental

5   relationship with his parents, even though we disagree on

6   some issues.  Our child has been enrolled in Koc school.  I

7   would like to say again that I have never had any thought of

8   removing OT from the environment he knows and, quote,

9   abducting, him.

10           Do you see that?

11  A    Yes.

12  Q    How many weeks later would it be until she did actually

13  abduct OT to New York?

14           MR. HAMBELTON:  Objection.

15           THE COURT:  I couldn't hear the question.

16  Q    How many weeks later would it be before Ms. Durust

17  actually did abduct him to New York?

18           MR. HAMBELTON:  Objection.

19           THE COURT:  To what?

20           MR. HAMBELTON:  Use the word abduct.

21           THE COURT:  I'll allow him to answer.

22  A    Five, five and-a-half weeks probably.

23           MR. MIN:  No further questions.

24           THE COURT:  Thank you.  You can step down.

25           (Whereupon, the witness was excused.)

PROCEEDINGS                    282

1          THE COURT:  I understand we have one of the

2     respondent's witnesses now.

3          MR. WARD:  Your Honor, I believe they are resting

4     if I'm not mistaken.

5          MR. MIN:  Yes, we are resting.  I apologize.

6          THE COURT:  You're resting now.

7          You have your first witness?

8          MR. WARD:  May I make a brief directed verdict

9     motion, your Honor?

10          THE COURT:  Yes.

11          MR. WARD:  Your Honor, as this Court is well aware

12     under The Hague Convention it is the petitioner's obligation

13     to prove that he has custodial rights.  At this point, even

14     in the most light favorable to the petitioner, he has failed

15     to do so.

16          Your Honor, I am going to have to assume for the

17     purposes of this argument that the version of their

18     interpretation of the divorce decree that requires his

19     approval is true.  I am going to assume that Mr. Tatari's

20     belief that their relationship was perfect, working so well

21     together until they got divorced, is true.  But it is not

22     the issue before this Court.  It is whether or not

23     Ms. Durust had sole custody or whether this was joint

24     custody.

25          You heard from their expert that if Ms. Durust has

PROCEEDINGS                                          283

1   sole custody, she has the right to relocate without her

2   ex-husband's consent.  That is in their report.

3           What Mr. Huysal's report, 8/10, states that

4   specifically, he acknowledged it on the stand.  They

5   acknowledge with someone with sole custody gets to make the

6   decisions regarding education, the decisions regarding

7   health, the decisions regarding the ability to travel abroad

8   without consent, and the financial decisions.

9           You don't need to take my word for it.  The first

10  chance Mr. Tatari got to petition the court in January 2024,

11  his attorney acknowledged it, he specifically said:  I

12  wanted custody myself.  I wanted joint custody.  But I gave

13  her sole custody.

14          The reasoning doesn't matter, your Honor.  But

15  that she was so crazy, that's why I gave her sole custody.

16  But he acknowledges that.

17          Then every attempt he went to go to the court to

18  say, wait a second, speed things up, give me custody, she's

19  going places.  Every complaint that he made, no matter how

20  sympathetic they even might be, the court in Turkey rejected

21  it.

22          If there is one bit of doubt left of whether all

23  the rulings related to her sole custodial rights, that was

24  settled by the document of the interim decision dated

25  July 12, 2024, when he put this issue before this court

PROCEEDINGS                        284

1   right to the Turkish court.  And he said:  I'm afraid she's

2   going to abduct this child overseas.

3            Right after he had expressed in emails fear she

4   was abducting the child.  Then said:  Please, I do not

5   consent.  Keep her here.

6            He was asserting the very rights he is telling you

7   he had.  And the Turkish court --

8            MR. MIN:  Your Honor, I'm not sure this should be

9   done in front of the witness.

10           MR. WARD:  Your experts have been in this

11  courtroom for everything.

12           MR. MIN:  He's an expert?  Sorry.

13           THE COURT:  Are you all talking to each other or

14  to me?  If you're talking to me, direct your comments to the

15  Court, please.

16           MR. WARD:  Sorry, your Honor.

17           As the court stated in response to the objection

18  presented to this Court, the very argument they are

19  presenting to the Turkish court, it said the mother has

20  custody.  The party with custody rights may use her rights

21  arising from custody and moreover she has the initiative to

22  go abroad.  That is exactly what they are asking you to make

23  a finding she didn't have.  They are asking you to find

24  rights that he had, that the Turkish court has rejected, we

25  argue over and over, but here very specifically.

PROCEEDINGS                    285

1              So as a result, we are asking this Court -- and

2    none of their experts could contest that.  Even their expert

3    acknowledged, when you say it a Court, I'm worried about

4    abduction that is the right to relocate.

5              Mr. Tatari, on question about whether there was an

6    objection to the right to relocate, multiple times

7    acknowledged it was, on the stand.

8              Your Honor, this case should be dismissed because

9    Mr. Tatari does not have rights of custody, as defined by

10   the Hague Convention and the case law interpreting it

11   thereafter.

12             Finally, if this Court still has any doubt that

13   this could not be the case, that there could be some other

14   reading beyond that, then I ask the Court now to take the

15   step and certify that question pursuant to Article 15 to the

16   Turkish authorities.  Again, even though their expert

17   purported -- sorry to say it again -- Mr. Huysal submitted a

18   declaration to this Court saying you absolutely can't, the

19   Turkish courts will not accept it, yet the protocol for that

20   country says it will.  He said the courts won't handle.  It

21   the protocol says it will.

22             Your Honor clearly has the power, they will

23   receive it, we think the case should be dismissed right now.

24   But if the Court has any doubt, that is how this case can be

25   resolved, that doubt should be resolved.

PROCEEDINGS                    286

1           THE COURT:  You have a legal expert, correct, that

2    you intend to call?

3           MR. WARD:  That's the person on the screen.

4           THE COURT:  Are you going to have him address this

5    Article 15?

6           MR. WARD:  We're not, your Honor.  Our other

7    expert, who we cut, could have addressed the Article 15.

8    This is a Turkish law expert.

9           THE COURT:  Why did you cut that person?

10          MR. WARD:  Because the document speaks for itself.

11   The person was going to say that the Turkish courts have the

12   authority under the protocol.  That's what they would --

13   your Honor, asked the question.

14          THE COURT:  Well, I raised the document too.

15          MR. WARD:  We said we didn't think that him saying

16   what you said the document says that would be worthwhile.

17   So again, we have whatever amount of time -- your Honor,

18   made it clear you would like us to be clear today -- that's

19   why.  I rest on that, your Honor.

20          THE COURT:  Okay.  I'll reserve decision on that.

21   You can address it later.  I want to move through and get

22   the witnesses done.

23          MR. HAMBELTON:  Respondent calls Dr. Emehran Inal.

24          (Witness appears via Zoom video.)

25          **EMEHRAN INAL, called as a witness, having been**

1   **first duly sworn/affirmed, was examined and testified as**

2   **follows:**

3           THE COURTROOM DEPUTY:  State and spell your name

4   for the record.

5           THE WITNESS:  Emehran Inal, E-M-E-H-R-A-N,

6   I-N-A-L.

7           THE COURTROOM DEPUTY:  Thank you.

8   DIRECT EXAMINATION

9   BY MR. HAMBELTON:

10  Q    Good evening, Dr. Inal.

11  A    Thank you.  Good afternoon.

12  Q    I appreciate it, it's very late in Turkey where you

13  are.  We'll try to do this as quickly as possible.

14          Where do you currently work?

15  A    I work at the Istanbul University.

16  Q    What position do you hold at Istanbul University?

17  A    I'm a professor of civil law and vice dean of the

18  faculty.

19          MR. HAMBELTON:  Based on the parties' stipulation

20  that the experts are qualified to testify as experts,

21  respondent tenders Dr. Inal as an expert in Turkish law.

22          THE COURT:  He will be received as such.

23  BY MR. HAMBELTON:

24  Q    Dr. Inal, can you briefly describe your educational

25  background for the Court?

1   A    I graduated from the law school in 1995.  Joined the

2   Istanbul Bar Association in 1997, but instead of practicing

3   law I joined the academic staff of Istanbul University Law

4   faculty in the same year, 1997.  Since then, I've been

5   working at the university.  And I've been teaching civil law

6   courses including family law for more than 20 years.

7   Q    Dr. Inal, do you have a post-graduate degree in civil

8   law?

9   A    Yes, I have post-graduate doctorate and I'm a professor

10  of civil law.

11  Q    So you have a doctorate in civil law?

12  A    Yes.

13  Q    And in Turkey, does civil law encompass family law?

14  A    Yes.  Family law --

15  Q    Go ahead.

16  A    Well, family law is part of civil law, the field which

17  is regulated in the Turkish civil court.

18  Q    How long have you been a professor of civil law?

19  A    Since 2008.

20             (Continued on next page.)

21

22

23

24

25

*Dr. E. Inal - Direct/Mr. Hambelton*                289

1    EXAMINATION BY

2    MR. HAMBELTON:

3    (Continuing.)

4    Q    Let's do Exhibit Y-1, please.

5    A    Sorry?

6    Q    We're going to put an exhibit on the screen for you,

7    okay.

8         Dr. Inal do you see what's been marked as Respondent's

9    Exhibit Y-1?

10   A    Sir?

11   Q    I didn't catch that last answer?

12   A    I am having difficulty hearing you, sir.  What was your

13   question, please?

14   Q    My question is:  Doctor, do you recognize the documents

15   that's on the screen?

16   A    Yes.

17   Q    Okay.  What is this document?

18   A    This is about me, I think.

19   Q    Scroll through the document, Alexa, please, and we're

20   going to scroll through the document.

21        Do you recognize this document, Doctor?

22   A    Yes, it is my some -- yes, it's my CV.

23   Q    Did you prepare this document yourself?

24   A    Yes, with my assistants.

25   Q    Okay.  And is the information on this document

*Dr. E. Inal - Direct/Mr. Hambelton*                    290

1    accurate?

2    A    I believe so, yes.

3    Q    Okay?

4         MR. HAMBELTON:  Your Honor, respondent offer

5    Respondent's Y-1, Dr. Inal's CV, in evidence.

6         THE COURT:  It will be received.

7         (Respondent's Exhibit Y-1 was marked in evidence.)

8    Q    Dr. Inal, were you asked to prepare a written report of

9    your legal opinion in this case?

10   A    Right.

11   Q    Yes or no?

12   A    Yes, sorry.

13        MR. HAMBELTON:  Let's do Exhibit X-1, please.

14        Your Honor, there is a stipulation about

15   Dr. Inal's report coming into evidence.

16        THE COURT:  All right.

17        MR. HAMBELTON:  Respondent's Exhibit X-1.

18        THE COURT:  X-1 will be received.

19        MR. MIN:  Yes, your Honor so stipulated.

20        (Respondent's Exhibit X-1 was marked in evidence.)

21   Q    Dr. Inal, can you tell the Court what it was you were

22   asked to give your expert legal opinion on?

23   A    Well, generally speaking, who has the custody of the

24   child and whether there is a joint custody or not and

25   whether the custodial parent has a right to relocate abroad.

*Dr. E. Inal - Direct/Mr. Hambelton*                    291

1   Q      Did you reach an opinion on that question, Doctor?

2   A      Excuse me.

3   Q      Did you form an opinion on that question?

4   A      Yes.

5   Q      And can you please explain to the Court the opinion

6   that you reached?

7   A      Well, in general, as I stated in my opinion, the rules

8   regarding the custody of a child are laid down in the civil

9   court, and Turkish Civil Court recognizes only sole custody

10  system.  So there is no room, no civil court does not

11  recognize joint custody.  And the reason why the civil court

12  recognizes only sole custody is that to stop the child to

13  remain in between the parents.

14       So the law doesn't want the child to be a subject of

15  any discussion between the parents.  One party, one of the

16  parents, should have the custody and the other one should

17  have no say whatsoever regarding the child.  So there would

18  be no dispute and the child would not remain in between the

19  parent.

20       However, so the principle is the benefit of the child,

21  right?  That's why this civil court has the sole custody

22  system.  But recently, courts started accepting joint

23  custody demands when both parents apply together and ask the

24  Court, look, we are very good friends.  Although we want to

25  divorce, we are still good friends.  We want best for our

*Dr. E. Inal - Direct/Mr. Hambelton*                    292

1   children or child.  There's no dispute between us, so

2   please, for the benefit of the child, if you grant us the

3   joint custody.

4        And recently, courts started granting joint custody in

5   exceptional cases when the judge is convinced that the joint

6   custody is for the benefit of the child.  But in examining

7   the documents presented to me, there is no joint custody.

8   The sole custody was granted to the mother which means she

9   has every right to decide regarding everything about the

10  child without any consent from the non-custodial parent.

11  That includes taking the child abroad, relocating to abroad,

12  deciding about the child's residence, and so on.  So she

13  can, custodial parent, can do whatever she sees fit for the

14  benefit of the child.

15  Q    Dr. Inal, what is the basis of your opinion that

16  Ms. Durust has sole custody over the child?

17  A    The divorce decree, the Court decision, is so clear

18  that there can be no doubt about the sole custody no doubt

19  at all.

20            MR. HAMBELTON:  Petitioner's 29, please.

21            We're putting an exhibit on the screen, Doctor.

22            Sorry, 22.

23  Q    Dr. Inal, what's on the screen is what's been received

24  as Petitioner's Exhibit 22.  It's an English-translated

25  version of the divorce decree.

1   A    Yes.

2   Q    Is this what you reviewed to form your opinion?

3   A    Well, I think so.  I have to check the numbers.  But I

4   think if it's the divorce decree, yes.

5   Q    Okay.

6   A    I reviewed it.

7   Q    Can you explain, Doctor, where in the divorce decree it

8   says that the mother has sole custody such that you could

9   render the opinion that you did?

10  A    It should be below, down below, yes.  It should be

11  somewhere around here.  Yes, this is 2-A.  Between the

12  father and the biological child who is received by appointed

13  is custody.

14  Q    So Section 2-A of the agreement, in your opinion, is

15  what confers sole custody on the mother?

16  A    Yes, mother is appointed as his custody.

17  Q    Okay.  Dr. Inal, in your expert opinion, can a divorce

18  decree in any way can be read to confer joint custody with

19  Mr. Tatari?

20  A    No way.

21  Q    Why not?

22  A    Well, first of all, we don't -- in the law, in the

23  Court, we don't have joint custody.  It's only in

24  exceptional cases when both parties convince the judge it is

25  for the best benefit of the child.  Then, as an exception,

*Dr. E. Inal - Direct/Mr. Hambelton*                294

1    judges may grant it.  So since it's an exception, it is

2    always stated clearly, clearly, like, the custodial rights

3    to be used by both parents as a joint custody, it should be

4    as clear as this.

5        If it's then joint custody, it's a, well, it's custody

6    of a child, you know.  It's not a contractual issue, it's

7    not a monetary issue, it's child custody.  There should be

8    no room for any kind of ambiguity or any kind of, any need

9    for any interpretation.  It should be as clear as the

10   daylight who has the custody.

11       And it's the common practice in Turkey courts when they

12   grant or appoint someone as a custodian, it's always as

13   clear as the daylight.  It should be.  There should be no

14   room for interpretation and it is in this decree as well.

15   Only the mother has the custody.

16   Q    So, Doctor, in your expert opinion, if the Turkish

17   court was going to grant joint custody, that would be made

18   very explicit somewhere in the divorce decree?

19   A    Yes, very explicit and from judge's mouth.

20   Q    Okay.  And based on your review, and in your review of

21   the divorce decree, and in your experience as a professor of

22   civil law do you see anything in this divorce decree that

23   says that the father has joint custody of the child?

24   A    No, it would be written like that.  That they

25   had -- they would have the joint custody.  In most of the

1   cases, courts use both terms, joint custody and the custody

2   rights can be exercised or to be exercised by both parents.

3   Q    And you don't see any of that in this divorce decree

4   that you reviewed?

5   A    No.

6   Q    Okay.  Dr. Inal, can you explain to the Court what the

7   divorce protocol is?

8   A    Well, if it's a non-contested divorce, if it's an

9   agreed divorce, parties, spouses, could prepare a protocol

10  presenting to the judge saying, stating, that they agreed on

11  everything so that judge may grant an agreed divorce.

12       The judge then reviews this protocol, may ask for some

13  amendments, may make some amendments.  And when the judge

14  approves this protocol, she divorces or he divorces the

15  parties and orders about the custody and the visiting rights

16  of the non-custodial parent.

17  Q    Doctor, we're going to scroll down this document to the

18  divorce protocol.

19  A    You see, excuse me, do you see how detailed the

20  visiting rights were written down let alone the custody.

21  You know, how detailed the visiting rights -- from this hour

22  to that hour, et cetera.  So can you imagine that the

23  custody wouldn't be so precise.  Even the visiting hours are

24  so detailed, you know, every religious day and every holiday

25  are stated in detail.  It's, you know, it's the child's

*Dr. E. Inal - Direct/Mr. Hambelton*                    296

1  custody.  It should be, it is as clear as the daylight.

2  Q    So, in your opinion, Doctor, you would have expected,

3  if there was joint custody, for it to be a detailed term

4  written in the document the same way we see with the access

5  rights; right?

6  A    Definitely.

7  Q    Okay.  So let's go down to the divorce protocols,

8  Alexa, please.

9       Okay.  Can you tell us, Dr. Inal, where the divorce

10 protocol begins?

11 A    Here, Paragraph 4.  That the divorce protocol, which

12 was executed by the parties, in respect of the accessorial

13 consequences of the divorce.

14 Q    And you reviewed this divorce protocol, Doctor, in

15 rendering your opinion that Ms. Durust has sole custody of

16 the child, right?

17 A    Yes.

18 Q    And is there anything in the divorce protocol that

19 suggests that Mr. Tatari has any rights of custody

20 whatsoever?

21 A    No.

22 Q    Not one thing?

23 A    No, it's not possible according to Turkish law.

24 Q    And why is it not possible under Turkish law?

25 A    Unless, in exceptional cases, joint custody is granted,

1   is given to both parents.  Only the sole custody and the

2   sole -- since it's the sole custody, the other parents can

3   have no say before anything.

4   Q    So, is it your expert legal opinion as an expert in

5   civil law, Dr. Inal, that divorce protocol cannot confer

6   custodian rights?

7   A    No.

8   Q    No, it can't?

9   A    No, it can't.  In my report, I make reference to one of

10  the Supreme Court decisions.  The custodial rights cannot

11  and should not even be restricted by the Court unless it is

12  necessary for the benefit of the child.  The best benefit of

13  the child, unless the best interests of the child requires

14  it, the custodial rights shouldn't even be restricted by the

15  Court let alone the protocol.

16  Q    And in your review of the divorce decree, and in your

17  experience, you don't see anything in this divorce decree

18  that restricts the custodial rights of Ms. Durust?

19  A    No, it cannot.

20  Q    Okay.  I want to focus on a few provisions of the

21  divorce protocol, specifically, sections 3.4, 3.7, and 3.8.

22  A    Right.

23  Q    And these are relevant parts of the divorce protocol

24  you reviewed in rendering your opinion?

25  A    Right.

1  Q    Okay.  And is there anything in 3.4 that confers

2  custodial rights on Mr. Tatari?

3  A    No.

4  Q    Is there anything in 3.7 that confers custodial rights

5  on Mr. Tatari?

6  A    No, it's not possible.

7  Q    Is there anything in 3.8 that confers custodial rights

8  on Mr. Tatari?

9  A    No, it's not possible.  It's not possible in Turkish

10 law.

11 Q    And it's not possible because the divorce protocols do

12 not confer custodial rights?

13 A    No.  Unless it's ordered directly by the Court based on

14 the best interests of the child.

15 Q    So the fact that the divorce protocol is part of the

16 divorce decree, that doesn't make it a binding custodial

17 right that Mr. Tatari has?

18 A    No.

19 Q    Can you explain that?

20 A    First of all, it's a protocol, yes, it is incorporated

21 to the divorce decree.  But still, it contains the words of

22 parties towards each other.  Promises of the parties to each

23 other.  So there is no -- not the words, the orders of a

24 judge, right?

25        I don't know if it would make any sense, but let me

*Dr. E. Inal - Direct/Mr. Hambelton*                     299

1    give you an example.  Imagine they agreed, imagine they

2    agreed on this protocol and it's incorporated into the

3    divorce decree that one of the parties promised to ask for

4    one of the immobiles to the other party, promised to

5    transfer the title of the apartment, okay, or a house.

6         Unless the judge orders from her own mouth to the land

7    registry office, land registry officer, would not and they

8    don't make the registration, the land registry officer

9    demands that the judge orders that property to transfer to

10   the other party.  Do you see?  Do I make myself clear?  I

11   don't know if this example makes sense.

12        So these are just promises made by the parties within

13   themselves, right, so they can make sense.  They can make

14   sense if they're in accordance with the judge's order.

15        So they cannot contradict to the judge's order and they

16   should not -- they cannot contradict to the law.  If they're

17   against the law, or if they are, if they contradict with the

18   judge's as order then they are not valid anyway.

19   Q    Just to be clear, Dr. Inal.  The divorce protocol in

20   this document on the screen in front of you --

21   A    Yes.

22   Q    -- is not part of the judge's order granting custodial

23   rights to Ms. Durust; right?

24   A    No.  Because there's nothing spoken from the mouth of a

25   judge.

*Dr. E. Inal - Direct/Mr. Hambelton*                    300

1   Q    Okay.  Dr. Inal, under Turkish law -- I'm sorry?

2   A    It doesn't state anything about the joint custody

3   anyway.

4   Q    Under Turkish law, Dr. Inal, if one parent has

5   visitation rights or rights access, does that confer joint

6   custody?

7   A    No, no way.  No, just a right, access right, you

8   mentioned.  I don't know we call, it visiting rights.

9   Q    And under Turkish law if one party undertakes to

10  consult with the other party on various decisions, does that

11  mean that the party that's being consulted with has

12  custodial rights?

13  A    No.

14  Q    So, in your expert opinion, Dr. Inal, Ms. Durust has

15  sole custody of the child?

16  A    Exactly.

17  Q    Okay.  And what does having sole custody of the child

18  mean?

19  A    Sole custody.  Well, sole custody, the parent who has

20  the sole custody, as we call it custodial parent, can decide

21  about anything.

22  Q    Can the parent with sole custody decide about

23  education?

24  A    Everything.

25  Q    Can the parent with sole custody decide about health of

1   the child?

2   A     Everything.  Definitely.

3   Q     Can the parent with sole custody decide where that

4   child lives?

5   A     Definitely.

6   Q     Can the parent with sole custody decide to move abroad

7   even over the objection of the non-custodial parent?

8   A     Definitely.  Only a court order can prevent this.

9   Q     Okay.

10  A     And that court order should be based on concrete

11  evidence for the detriment of the child, you know, in order

12  a Court to prevent the child or restrict the custodial

13  parent's rights that has to be concrete evidence and a need

14  for the benefit of the child.  Otherwise, the right of

15  custody shouldn't be and couldn't be restricted even by the

16  Court.

17  Q     And is that procedure that you're referring to called a

18  "Change of Custody Proceeding"?

19  A     Change of custody or they're restricting the custody.

20  Q     Okay.  So, Doctor, we recently shared with you two

21  documents that weren't available at the time you rendered

22  your expert report.  It's what's been received in evidence

23  as Respondent's Exhibit N-3 and L-3.  Let's pull up N-3,

24  please.

25        Dr. Inal on the screen what's been received in evidence

*Dr. E. Inal - Direct/Mr. Hambelton*                    302

1   as Respondent's N-3.  It's a July 10, 2024, petition to

2   restrain Ms. Durust from relocating abroad with the child.

3          Have you had a chance to review this?

4   A    Yes.

5   Q    And let's go to L-3, please.

6          And what's before you on the screen now is received in

7   evidence as Respondent's L-3 it's an interim decision of the

8   Turkish Family Court dated July 12, 2024.

9          Have you had a chance to review this, Doctor?

10  A    Yes, I think it's one I reviewed, yes.

11  Q    Is there anything in the previous document we saw,

12  Respondent's N-3 or this document on the screen Respondent's

13  L-3 in any way changes your opinion in this case?

14  A    No, on the contrary.  They clearly, you know, prove

15  what I've been saying is true.

16  Q    And where does the document on the screen, Dr. Inal,

17  prove or confirm your opinion?

18  A    Well, the last paragraph.

19  Q    Can you read that for us?

20  A    "As a result of the trial, it has been decided to

21  reject the request since the parties were divorced, the

22  mother has custody, there is no case regarding changing

23  custody, the party with custody rights may use her rights

24  arising from custody, and moreover, she has the initiative

25  to go abroad."

1        That's the law.

2    Q    And that's consistent with the expert opinion in your

3    report and the one that you testified here today that

4    Ms. Durust has sole custody of the child.  And because she

5    has sole custody, she's able to move abroad with the child?

6    A    Definitely.

7    Q    Okay.  Dr. Inal, have you had a chance to review the

8    expert reports submitted by the petitioner in this case by

9    doctor?

10   A    Huysal.

11   Q    Huysal, yes.  Thank you.  And Mr. Yalçin?

12   A    Unfortunately, yes.

13   Q    Let's start with the Dr. Huysal's report.

14       Can you tell the Court whether you disagree with his

15   report or not?

16   A    Well, yes.  The part of the claim that the -- about the

17   joint custody.  That the mother had -- has not the sole

18   custody.

19   Q    So you disagree with his conclusion that the parties

20   have joint custody?

21   A    Yes.

22   Q    Okay.  Can we put up that report, please, Alexa.

23       Let's go to Paragraph 9 in that report, please.

24       On the screen, Dr. Inal, is the legal opinions provided

25   by Dr. Huysal in this case which has been received in

1    evidence.

2        I want you to look at Paragraph 9 here?

3    A    Okay.

4    Q    Specifically, the sentence starting, "However."  And

5    I'll just read it.

6        "However, in practice, many courts implement flexible

7    arrangements that allow the non-custodial parent to be

8    involved in significant decisions effectively applying joint

9    custody in practice."

10        See that statement?

11    A    Yes.

12    Q    Do you agree or disagree with that statement?

13    A    I disagree.  I presented Supreme Court decisions.  It's

14    not possible.  I presented a German Chamber of High Court

15    Supreme Court decisions.  Custody right cannot be

16    restricted.

17    Q    So it's not possible, in your expert opinion, to

18    effectively give joint custody by having a non-custodial

19    parent being involved in the child's life?

20    A    No way.

21    Q    Okay.  And what about Dr. Yalçin's report?  Have you

22    reviewed that one?

23    A    I think I have, yes.

24    Q    Do you agree with the opinions that he set forth in his

25    report?

*Dr. E. Inal - Cross/Mr. Min*                    305

1   A    Again, especially the parts regarding the sole custody

2   and joint custody dispute, I completely disagree.  As I

3   stated strongly in my report that, in my capacity as a

4   Turkish lawyer, I cannot imagine, not even in my wildest

5   dreams, how anyone claim that she has not -- she hasn't got

6   the sole custody and there is a joint custody.  I cannot

7   imagine.

8   Q    Thank you, Dr. Inal.

9            MR. HAMBELTON:  Nothing further, your Honor.

10           THE WITNESS:  Can I add something?

11           MR. HAMBELTON:  Sure.  Go ahead.

12           THE WITNESS:  My civil law --

13           MR. HAMBELTON:  I can't hear you.

14           THE WITNESS:  Can you hear me now.

15           THE COURT:  No.

16           MR. HAMBELTON:  The sound is faint.

17           THE WITNESS:  Can you hear me now?

18           MR. HAMBELTON:  Yes.

19           THE WITNESS:  Professor Huysal is not a professor

20  of civil law, by the way.  He's a professor of private

21  international law.  So probably since he's not an expert on

22  civil law, he probably made a mistake.

23           MR. HAMBELTON:  Understood.  Thank you, Dr. Inal.

24  Nothing further, your Honor.

25  CROSS-EXAMINATION

1    BY MR. MIN:

2    Q    Good evening, Professor.  Do you prefer Professor or

3    Doctor?

4    A    Doesn't matter.

5    Q    Professor, you made a distinction just now I would like

6    to ask you about.

7        You said Professor Huysal is a professor in private

8    international law, not Turkish Civil Law, right?

9    A    Yes.

10   Q    And you're a professor in Turkish Civil Law?

11   A    Yes, I'm not an expert on private international law.

12   Q    Are you familiar with the 1980 Hague Child Abduction

13   Convention?

14   A    Yes.  I wouldn't comment on it since I am not an

15   expert.

16   Q    Okay.  Are you familiar with Articles 3 and 5 of the

17   1980 Hague Convention dealing with rights of custody?

18   A    Not by heart, no.

19   Q    So you don't know what is determined to be a right of

20   custody under the Hague Convention; is that fair?

21   A    Yes, that's fair.

22   Q    So you wouldn't be able to opine on what a right of

23   custody under the Hague Convention would be under Turkish

24   law.

25       Also fair, correct?

*Dr. E. Inal - Cross/Mr. Min*                              307

1          MR. HAMBELTON:  Objection, your Honor.  He wasn't

2    tendered as an expert in the Hague Convention Law.  He was

3    tendered as an expert in Turkish Civil Law.

4          MR. MIN:  I think I am clarifying that.

5          THE COURT:  All right.  Go ahead.

6          MR. MIN:  Can the witness that the question?

7          THE COURT:  Can you read that back.

8          (Record read.)

9          THE COURT:  You can answer that.

10         THE WITNESS:  It's fair.

11   Q    Now, you spent a lot of your time talking about the

12   difference between joint and sole custody under Turkish law,

13   correct?

14   A    Right.

15   Q    And you did concede that joint custody is possible if a

16   judge permits it, correct?

17   A    If a judge, excuse me?

18   Q    If a judge permits it, correct?

19   A    Grants it, yes, explicitly.

20   Q    Right.  So you stated in your expert report that unless

21   otherwise ruled by the Court with a divorce verdict, the

22   Court entrusts the child's custody to one of the parents

23   only?

24   A    Yes.

25   Q    Let me ask you a little bit about your experience.

*Dr. E. Inal - Cross/Mr. Min*                308

1       What courses do you routinely teach at the university?

2   A   All civil courses.

3   Q   For example?

4   A   The Person's Law, federal law, Law of Obligations,

5   property law, and taxation.

6   Q   So you teach family law courses?

7   A   Yes, definitely.

8   Q   But none of your articles or seminars deal with family

9   law, correct?

10  A   Correct.

11  Q   Okay.  They all deal with other aspects of Turkish

12  civil law?

13  A   My writings, my publications, yes.

14  Q   Yes.  A lot of them in what's called the Code of

15  Obligations?

16  A   Yes.

17  Q   What is the Code of Obligations under Turkish Civil

18  Law?

19  A   It's part of the civil court.

20  Q   What does it deal with?

21  A   It's the contracts, the torts, and unjust enrichment.

22  The obligations as it is, you know, in general terms.

23  Q   Have you ever testified as an expert witness?

24  A   Not in the U.S., no.

25  Q   Have you ever testified as an expert witness anywhere

1   in the world?

2   A    Expert, yes, in Turkey, in many cases.

3   Q    On what issues?

4   A    Everything including family law.

5   Q    Okay.  How many cases have you testified as an expert

6   in family law?

7   A    Lots.

8   Q    Okay.  What issues specifically in family law?

9   A    Everything really.  Could be matrimonial disputes,

10  property disputes and also custody disputes.

11  Q    If you're testifying as an expert in Turkey on custody

12  disputes, what sorts of issues are prevalent in those cases?

13  A    Generally, the best interests of the child.  How to,

14  you know, how -- what's the scope of the custodial right if

15  it's restricted, or if it should be restricted, et cetera.

16  Q    So scope of custody rights is one of the topics?

17  A    It could be.  I mean, as I said, I'm working at the

18  university since 1997.  It's not possible to remember every

19  case which I presented expert reports since then but, yes.

20  Q    Okay.  But you have provided expert reports or expert

21  testimony on the scope of custody rights in Turkish courts?

22  A    Possible.  And, yes, it's probable.

23  Q    Possible and probable?

24  A    Yes, both.  As far as I remember.

25  Q    Okay.  But you can't recall any specific cases in which

*Dr. E. Inal - Cross/Mr. Min*                              310

1    you did that?

2    A    Not really, no.

3    Q    Okay.  That's fair.

4         Have you ever been a practicing attorney in Turkey?

5    A    No.

6    Q    Okay.

7    A    But I worked as a counsel, of counsel, to some of the

8    law firms.

9         I remember one case, by the way.

10   Q    Sure.  Tell me about it.

11   A    If you want to hear it.

12   Q    I'd like to love hear about it.  Thank you.  Go ahead.

13   A    There was this child she was sick, seriously ill, and

14   her father was a doctor, medical doctor.  And the mother had

15   the visiting rights but she needed a constant attendance of

16   her father.  So her father demanded that she should remain

17   with him all the time even during the visiting rights of the

18   mother.  The father was the custodial parent, he had the

19   sole custody and the mother had visiting rights, right?  But

20   he demanded that this visiting rights should be exercised in

21   his presence.

22   Q    Okay.

23   A    The best benefit of the child required in, et cetera,

24   et cetera.  So in the end, the judge ordered that the

25   visiting rights to be exercised every time in holiday, you

*Dr. E. Inal - Cross/Mr. Min*                    311

1   know, when they go to holiday and on the weekends, at night,

2   et cetera, et cetera.  He should be present all the time

3   when they go abroad, et cetera.  That was one of the

4   interesting cases I remember.

5   Q    Okay.  Thank you.

6        I want to direct your attention to Page 5 of the

7   report.

8             MR. MIN:  If I can ask the deputy clerk to turn on

9   the Elmo.  Actually, we have a remote witness, if I can ask

10  my colleague to put up his expert report.

11  Q    So I want to talk about this Yargitay HGK case, do you

12  see that that you referenced?

13  A    Yes.

14  Q    Scroll down a little.

15       This is one of the General Assembly Supreme Court cases

16  you talk about citing to in your report?

17  A    Right.

18  Q    You mentioned the European Convention on Human Rights,

19  right?

20  A    Yes.  It's the court-ordered the Yargitay decision

21  part.  Yargitay made reference to the convention.

22  Q    I'm sorry, apologies.  Say that one more time.

23  A    It is not my reference to the Convention it's part of

24  the decision.

25  Q    What is Turkish law's recognition of the

Dr. E. Inal - Cross/Mr. Min                  312

1   European Convention on Human Rights?

2   A    As far as I know, it recognizes the

3   European Convention.

4   Q    Turkish law recognizes international conventions and

5   international treaties that it's a partner to or signatory

6   to, correct?

7   A    Yes, unless there's a reservation.

8   Q    Unless there's a reservation I think you said?

9   A    Yes.

10  Q    Okay.  And that's encoded in the Turkish constitution,

11  right, that international instruments are automatically

12  recognized as part of the Turkish law?

13  A    That's true.

14  Q    Isn't it also true that, in fact, when there's a

15  conflict between international instruments and Turkish law

16  that international instruments take priority over domestic

17  Turkish law?

18  A    Yes, if it's on the same measure.

19  Q    Are you aware of any international instruments or

20  international conventions or treaties that Turkey belongs to

21  that teal with issues of joint custody?

22  A    No, I don't.

23  Q    You're not.  You're not an expert in international law,

24  correct?

25  A    No.

1  Q    You're an expert on domestic Turkish Civil Code of Law,

2  right?

3  A    That's true.

4  Q    Okay.  So the intersection between international law

5  and Turkish civil code is not your area of expertise,

6  correct?

7  A    Correct.

8  Q    Okay.  Thank you.

9            MR. MIN:  Your Honor, can I confer for 30 seconds?

10           THE WITNESS:  Are we finished?

11           THE COURT:  No, just the lawyer is talking to

12  someone and will be right back to ask you questions.

13           (Discussion held off the record.)

14           (A brief pause in the proceedings was held.)

15           MR. MIN:  Your Honor, no further questions.

16           THE COURT:  Okay.  Do you have anything further?

17           MR. HAMBELTON:  Nothing further, your Honor.

18           THE COURT:  Thank you.  You may retire.

19           THE WITNESS:  Thank you.  So I leave?

20           THE COURT:  Yes.

21           MR. MIN:  Your Honor, before my colleague calls

22  his next witness can we just take a three-minute bathroom

23  break?

24           THE COURT:  Yes.

25           (Recess taken.)

PROCEEDINGS                                    314

1   (Continuing.)

2          THE COURT:  All right.  Are we ready to proceed?

3          MR. WARD:  Yes, Your Honor.

4          We call to the stand Ali Ugur.  And, Your Honor,

5   he's going to be using an interpreter who is here in the

6   courtroom.

7          (Witness takes the stand.)

8          THE COURTROOM DEPUTY:  I'll start with you.

9          (Interpreter sworn.)

10          THE COURTROOM DEPUTY:  Please state and spell your

11   name slowly for the record.

12          THE INTERPRETER:  Eric, E-R-I-C, Vardar,

13   V-A-R-D-A-R, 5 Budding Place, Copiague, New York 11726.

14          THE COURTROOM DEPUTY:  Raise your right hand.

15          (Witness sworn.)

16          THE COURTROOM DEPUTY:  Please state your name and

17   spell it for the Court.

18          THE WITNESS:  Ali, A-L-I, Ugur, U-G-U-R,

19   Corbacioglu, C-O-R-B-A-C-I-O-G-L-U.

20          THE INTERPRETER:  Your Honor, pleasure being in

21   your courtroom.  It's been a long day.

22          MR. WARD:  May I proceed, Your Honor?

23          THE COURT:  Yes, you may.

24          MR. WARD:  Thank you.

25          (Continued on the following page.)

1   **ALI UGUR CORBACIOGLU**,

2              called as a witness, having been first duly

3              sworn/affirmed, was examined and testified as

4              follows:

5   DIRECT EXAMINATION

6   BY MR. WARD:

7   Q    Good afternoon, sir.  What is your profession?

8   A    I'm a lawyer.

9   Q    How long have you been practicing as an attorney?

10  A    14 years.

11  Q    Where do you practice?

12  A    Istanbul, Turkey.

13  Q    And do you represent Ms. Durust in matters in Turkey?

14  A    Yes, I do represent Ms. Durust.

15  Q    In what matters in Turkey do you represent her?

16  A    Yes, I represent her in the family court in a case

17  that's ongoing still.

18  Q    And is the matter you're referring to the change of

19  custody matter filed by Mr. Tatari in January 2024?

20  A    Yes, it's one of them.  That is one of the cases that I

21  represent her in.

22  Q    Did Mr. Tatari make other filings in the Turkish Family

23  Court with respect to Ms. Durust?

24  A    Yes, Mr. Tatari also has one more case.

25  Q    And were some of the filings before Ms. Durust left New

1    York -- left for New York?

2            MR. WARD:  Should I ask again?

3            THE INTERPRETER:  Can you do it again?

4            MR. WARD:  I'll do it again.

5    Q    Were there filings by Mr. Tatari in Turkish Family

6    Court before Ms. Durust left for New York?

7            THE INTERPRETER:  Wait a second.  Can we take that

8    again slowly?

9            MR. WARD:  Okay.

10   Q    Were there filings by Mr. Tatari in Turkey before

11   Ms. Durust left for New York?

12           THE INTERPRETER:  Can you say it again?

13   Q    Were there filings before Ms. Durust left for New York?

14           THE INTERPRETER:  Can you rephrase that?

15           MR. WARD:  I'm going to strike the question.

16           THE INTERPRETER:  All right.

17   Q    Did Mr. Tatari ever claim in any of the matters before

18   the Turkish court that the parties had joint custody

19   based -- prior to the Hague filing?

20           MR. MIN:  Objection, Your Honor.

21   A    No.

22           THE COURT:  What is the basis of the objection?

23           MR. MIN:  The basis of the objection is, number

24   one, the question to this witness is asking about the

25   father's allegations in the litany of all the Family Court

1   cases in Turkey.  I'm not sure this witness is qualified and

2   has knowledge to answer about all of the filings in the

3   Family Courts in Turkey and what was alleged in every one of

4   those filings.  And that I think also violates the best

5   evidence rule, and the documents, which we have extensive

6   documents, would be the best evidence for that.

7             THE COURT:  You can try and lay a foundation if he

8   represented the respondent in all of the proceedings in the

9   Court in Istanbul.

10             MR. WARD:  Can we have a brief sidebar related to

11   another issue that's been brought to my attention?  Would

12   that be possible very briefly?

13             (Sidebar conference.)

14             (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    318

1          (Sidebar conference held between counsel and judge

2     only.)

3          THE COURT:  Was it brought to Mr. Min's attention?

4          MR. WARD:  Both of our attention.

5          It has been brought to both of our attention by

6     every other person here who speaks Turkish that this

7     interpreter is not doing the proper interpretation.  This

8     witness does speak English.  He was really worried about

9     some of the nuances.  We've been dealing with that with

10    other witnesses.

11         I'm prepared to let this man be dismissed.  He was

12    a last-minute replacement.  The one from the Court list had

13    kidney stones and we found someone.  He is certified, but I

14    don't want it to be a disaster.  It's going to take forever.

15    I'm prepared with this witness to have him testify in

16    English.

17         MR. MIN:  I have a suggestion that if the Court

18    would allow, if the witness is comfortable testifying in

19    English and maybe he needs some words translated, maybe that

20    will be a compromise.  It's up to you.  It's your witness.

21         THE COURT:  I'm not sure what you want to do,

22    counsel.

23         MR. WARD:  I was suggesting we dismiss him and I

24    take the witness in English and deal with it that way.

25         MR. MIN:  It's your witness.

SIDEBAR CONFERENCE                    319

1          MR. WARD:  That's how I would like to proceed.

2    And he's a bit of a side show and he's been a side show

3    since he arrived.  I would hope that he'd be professional

4    when he was here, but --

5          THE COURT:  You mean the interpreter that you

6    hired?

7          MR. WARD:  Well, that --

8          MR. MIN:  We jointly hired.  Well, we went through

9    a list and he was probably the fourth or fifth option.

10         THE COURT:  So we don't want him to translate the

11   3.7, then?

12         MR. WARD:  Exactly.

13         THE COURT:  Okay.  Well, just say that you want to

14   examine him in English.

15         MR. WARD:  Yes.

16         (Sidebar ends.)

17         (Continued on the following page.)

18

19

20

21

22

23

24

25

A. UGUR - DIRECT - MR. WARD                320

1          (In open court.)

2          THE INTERPRETER:  Your Honor, it's a pretty big

3   courtroom --

4          THE COURT:  I think what we're going to do is try

5   and proceed in English without doing the interpretation.

6   Counsel wants to proceed in English with this witness.

7          THE INTERPRETER:  Okay.

8          THE COURT:  You speak English?

9          THE WITNESS:  Yes, correct.

10          MR. WARD:  Thank you.

11          May I proceed, Your Honor.

12          THE COURT:  Yes.

13   BY MR. WARD:

14   Q    Have you represented Ms. Durust in all of the Family

15   Court matters filed by Ms. Tatari since 2024?

16   A    Yes.

17   Q    And has his counsel on his behalf made multiple filings

18   to the Court in these proceedings?

19   A    Yes.

20   Q    Prior to the filing of this petition here, did

21   Mr. Tatari's attorney, on his behalf, ever claim the parties

22   have joint custody in any document he ever submitted to the

23   Turkish court?

24   A    No.

25   Q    Did Mr. Tatari, directly or through his attorney, ever

A. UGUR - DIRECT - MR. WARD                    321

1    argue in court that he had joint custody prior to the filing

2    of this Hague action?

3    A    No.

4    Q    When was the first time you ever already Mr. Tatari or

5    any legal representative on his behalf assert that he had

6    joint custody pursuant to the parties' divorce decree?

7    A    In here.

8    Q    Here being in this proceeding?

9    A    Yeah.

10   Q    Did Mr. Tatari or his counsel ever acknowledge that

11   Mrs. Durust had sole custody of the child in the proceedings

12   in Turkey?

13   A    Yes.

14   Q    How?

15   A    They give the document in that court.

16   Q    When you say the document, the documents they submitted

17   to the Court in the family court cases --

18   A    In Turkey.

19   Q    -- in Turkey, they acknowledged she had sole custody,

20   correct?

21   A    That's correct.

22   Q    Now, in the original petition that's in evidence,

23   Mr. Tatari argued that he gave Ms. Durust sole custody

24   because she had become increasingly violent and threatened

25   to kill herself if he didn't.  Was there any other

1  explanation that he ever gave in court through his attorney

2  as to why he gave Ms. Durust sole custody?

3           MR. MIN:  Objection, Your Honor.  These are all

4  asking for and inviting hearsay responses.

5           THE COURT:  Overruled.  I'll let him answer.

6  A    Can you ask it again, please?

7  Q    Was there any other explanation offered by Mr. Tatari,

8  by his counsel, as to why he gave Ms. Durust sole custody?

9  A    In the other --

10 Q    In the Turkish proceeding, did they ever explain why?

11 A    No, I don't recall.

12 Q    Did they ever make an argument that Ms. Durust was a

13 drug addict and the only way to get her help was to give her

14 sole custody?

15 A    Yes.

16 Q    In they argued that to the Court?

17 A    Yes.

18 Q    In your experience as an attorney, have you ever seen a

19 court give a mother sole custody because she was a drug

20 addict in the hopes she would get help?

21 A    No, never.

22 Q    Between the time the divorce decree was signed and

23 Ms. Durust coming to New York, did the Turkish court ever

24 make a finding that Ms. Durust had custody under the divorce

25 decree?

A. UGUR - DIRECT - MR. WARD                    323

1    A    Sorry?

2              MR. WARD:  I'm going to put up Exhibit M-1,

3    please.  Let's do it this way.

4              (Exhibit published.)

5    Q    Sir, do you recognize this document to be hearing

6    notes --

7    A    Yes.

8    Q    -- from a February 29, 2024 proceeding related to the

9    parties in this courtroom?

10   A    Yes.

11   Q    And were you there at that proceeding?

12   A    Yes.  You can see that my name.

13   Q    Is this transcript here an accurate reflection of the

14   statements made by the plaintiff's attorney, by the

15   defendant's attorney, and by the court on that date?

16   A    Yes.

17             MR. WARD:  Your Honor, I move this into evidence

18   as M-1.

19             THE COURT:  It's received.

20             (Respondent's Exhibit M-1 received in evidence.)

21   Q    If we could go about halfway up the page, if you look

22   in the paragraph that starts:  It was found out that.

23             Do you see that paragraph?

24   A    Yes.

25   Q    In that paragraph, does the Court state that it has

1    reviewed the divorce decree and note that it was decided to

2    grant the custody of minor, O.T., to his mother.

3          Do you see that?

4    A    Yes.

5    Q    And that was the Turkish Family Court acknowledging

6    that according to the divorce decree, Ms. Durust had

7    custody, correct?

8    A    Yes, that's correct.

9    Q    I'd like you now to, if we would scroll down, to:  The

10   defendant's attorney was asked.  In this proceeding, the

11   defendant's attorney is Mr. Tatari's attorney, correct?

12   A    Yes.

13   Q    And isn't it true that in this proceeding, Mr. Tatari's

14   attorney acknowledged back in February of 2024 that they

15   were objecting to the issuance of the passport because of

16   the fact that plaintiff party had stated that she wants to

17   go to the USA and wants to live there?

18   A    Yes.

19   Q    So according to Mr. Tatari's lawyers, Ms. Durust speak

20   to Mr. Tatari and told him she wanted to go to the USA and

21   live there?

22   A    That's correct.

23   Q    Did you ever respond to any of the Court filings on

24   behalf of Ms. Durust?

25   A    Which cases?

A. UGUR - DIRECT - MR. WARD                 325

1    Q    In the custody cases --

2    A    Yes.

3    Q    -- before the Turkish Family Court.

4    A    Yes.

5    Q    In those filings, what was your primary argument you

6    presented to the Court?

7    A    Mrs. Neva Durust has sole custody rights.  That's why

8    she make decisions to herself and her child.

9    Q    Why did you continuously assert that right as your

10   primary argument in these proceedings?

11   A    Because if you see the Beykoz Family Court decisions,

12   my client has sole custody right.

13   Q    What is the basis of that opinion?

14        MR. MIN:  Objection.  This is a fact witness, Your

15   Honor, not an expert witness, and the question was asking

16   for his opinion.

17        MR. WARD:  Your Honor, I'm asking, he asserted

18   something in papers.  I'm asking him why he felt that he

19   had -- let me change the answer.

20   Q    Why did you feel that you had a legal basis to assert

21   that claim in the responsive papers?

22   A    Because if you check the Beykoz Family Court, court

23   says my client has sole custody rights.  That's the most

24   important thing.

25   Q    Have you seen joint custody orders in Turkey?

1   A    Yes.

2   Q    What language, when you've seen those orders, what

3   language does the Court use in Turkey when they order joint

4   custody for parties?

5   A    It must says parties are have joint custody.  That's

6   the rule.

7   Q    And is that language found anywhere in the divorce

8   decree between the parties to this action?

9   A    No, never.

10  Q    In all of your legal experience, are you aware of any

11  decision of a Turkish court that found the parties had joint

12  custody when one party was awarded custody of the child?

13  A    No.

14  Q    Any cases where a court issued an order finding the

15  parties had a veto right to travel in circumstances similar

16  to the case here?

17  A    No.

18  Q    How many times did Mr. Tatari ask the Turkish court for

19  immediate relief related to the custody in the past year?

20  A    As I remember, three times.

21  Q    Okay.  And was the first one in the original custody

22  proceeding?

23  A    Yes.

24  Q    Is that where the previous testimony that he asked the

25  Court to restrict Ms. Durust's travel?

1    A    Yes.

2    Q    What was the response of the court?

3    A    The Court reject that demand.

4    Q    What, if any, significance did that rejection have on

5    this matter?

6    A    Court says my client has custody rights, sole custody

7    rights.

8    Q    And was there an emergency request to change custody in

9    October 2024 by Mr. Tatari?

10   A    Yes.

11   Q    And also request to expedite the hearing?

12   A    Yes.

13   Q    What was the result of that request?

14   A    Court also reject that request.

15   Q    Can I ask you, Mr. Tatari testified earlier today that

16   during that proceeding, the Court said she was going to

17   expedite it; was going to put the matter on for June, but

18   instead to expedite it, moved it way up to February.  Is

19   that what happened?

20   A    No.

21   Q    Were you at that proceeding?

22   A    They want to make trial December or January, but court

23   says, judge says that that months are full and they give us

24   February.

25   Q    Now, was the third time when Mr. Tatari asked the Court

1    to restrict Ms. Tatari's right to move abroad in July 2024?

2    A    Sorry, I don't understand question.

3    Q    Was the third time that Mr. Tatari asked for emergency

4    relief from the Court when Mr. Tatari asked that Ms. Durust

5    be restricted from traveling -- excuse me, from moving

6    abroad with the child?

7    A    And court denied that.

8    Q    But was that the third --

9    A    Yes.

10   Q    You said three times.

11   A    Yes.

12   Q    Was the third one when he tried to restrict her from

13   moving abroad with the child?

14   A    Yes, that's correct.

15   Q    Was that in July 2024?

16   A    Yes, I think so.

17   Q    And having been a part of that proceeding, was it clear

18   to you that Mr. Tatari was seeking to block Ms. Durust from

19   relocating out of the country with the child?

20   A    Yeah, he try.

21   Q    What was the decision?

22   A    Court denied that plaintiff.

23   Q    What was the basis of the Court's decision?

24   A    Because my client have sole custody rights.

25   Q    And what is the significance of that decision in this

1   matter?

2   A    I don't understand the question, actually.

3   Q    Okay.  I'm going to move on to the next one, then.

4        What is your response to Mr. Tatari's argument

5   that he has some form of joint custody of the child under

6   the parties' divorce decree?

7   A    My client has sole custody rights.

8   Q    And what do those sole custody rights permit her to do

9   under the law?

10  A    Everything.

11  Q    Make time medical decisions?

12  A    Yes.

13  Q    Without his consent or consultation?

14  A    Yes.

15  Q    Make --

16  A    School decisions, living situation decisions,

17  everything.

18  Q    And does the fact that the parties' protocol states

19  that Mr. Tatari may have a right to notification or consent

20  or anything in the protocol, does that in any way change the

21  answer you just gave?

22  A    No, that change nothing.

23  Q    And does the fact that Mr. Tatari had an access

24  schedule that he was happy with with the child in any way

25  change that answer you just gave?

1   A    No.

2          THE COURT:  I'm sorry.  Could you just restate

3   that question?

4          MR. WARD:  I will.

5   Q    Does the fact that Mr. Tatari had an access schedule

6   that he was happy with in any way change your answer that

7   Ms. Durust had the right to make all decisions for the

8   child?

9   A    No, that doesn't change anything.

10         MR. WARD:  No further questions, Your Honor.

11  CROSS-EXAMINATION

12  BY MR. MIN:

13  Q    Good afternoon.

14         You represent Ms. Durust in the Family Court

15  proceedings in Turkey?

16  A    Yes.

17  Q    And you were asked to testify here on her behalf?

18  A    Yes.

19  Q    About the Family Court proceedings in Turkey?

20  A    Yes.

21  Q    And your representation of her, correct?

22  A    Yes.

23  Q    Okay.  So I'm going to ask you about your

24  representation of her.

25         You had conversations with her regarding the

1    proceedings in Turkey?

2           MR. WARD:  Objection, Your Honor.  Anything about

3    their conversations would be privileged.

4           MR. MIN:  Your Honor, I think they've waived their

5    privilege by calling him as a fact expert and fact witness

6    on those proceedings.  Therefore, in order to properly

7    cross-examine him, I should be permitted to ask questions

8    about their conversations and information shared between

9    them.  And there's caselaw on this, especially when you're

10   calling your own lawyer as a witness, it waives the

11   privilege and it opens the door into these issues.  Your

12   Honor, I'm happy to pull those cites if you give me ten

13   minutes to do that.

14          MR. WARD:  If I may, this is someone who gave his

15   observations to what happened in the court proceedings.  He

16   did not talk about their relationship and what happened

17   between them.  It was strictly a fact witness who happened

18   to be in court to identify and lay the foundation for

19   documents, Your Honor.

20          THE COURT:  Yes, I'll sustain the objection.

21          MR. MIN:  Your Honor, will I have a chance to

22   brief the issue if I --

23          THE COURT:  Well, you're certain entitled to ask

24   this witness about the provisions of what constitutes the

25   divorce decree.  The witness is testifying in terms of what

1    the protocol said, but you can certainly ask him about what

2    the meaning of the divorce decree is.  But none of his

3    testimony has been based, as far as I understand it, in his

4    direct on anything that was said to him by his client.  If

5    it had been, I think you're correct, he would have waived

6    the privilege.  But I don't believe that any of his

7    testimony was based on conversations that he had with

8    Ms. Durust.

9             MR. MIN:  Not directly.  But there were questions

10   about legal filings he made on her behalf and bases for

11   those legal filings.  Certainly the bases for some of his

12   legal arguments and filings would be --

13            THE COURT:  You can ask him questions related to

14   that, not necessarily directly about what she said to him.

15   You can explore it and find out if some of his answers were

16   based on things that she told him.  I think you're entitled

17   to explore that.

18            MR. MIN:  Thank you, Your Honor.

19   BY MR. MIN:

20   Q    You're aware that in August 2024, your client and the

21   subject child, O.T., moved from Turkey to the United States,

22   correct?

23   A    Yes, correct.

24   Q    And in June, July 2024, there were several legal

25   filings in the Turkish Family Courts, correct?

1    A    Yes.

2    Q    And it's true that prior to your client coming from

3    Turkey to New York, she did not make any application for

4    relocation, correct?

5    A    Sorry.  Can you ask again?

6    Q    Of course.

7    A    Sorry.

8    Q    That's okay.

9         Prior to August of 2024, your client did not make

10   any applications for relocation with the child, correct?

11   Yes or no?

12   A    Application where?

13   Q    Relocation.

14   A    But application where?

15   Q    Application in the Turkish Family Courts.

16        THE COURT:  To relocate to the United States is

17   your question?

18        MR. MIN:  Yes.

19   A    She doesn't need one.

20   Q    She asked for a modification in access schedule,

21   correct?

22   A    Yes.

23   Q    And when did that happen?

24   A    After she moved to America.

25   Q    Do you recall the month?

1   A    No, sorry.

2   Q    Did you have any conversations with your client about

3   her moving to the United States?

4   A    What kind of conversation you ask?

5   Q    Any conversations.  Did you have any conversations with

6   Ms. Durust about her moving to the United States prior to

7   August 2024?

8            MR. WARD:  Objection, Your Honor.

9            THE COURT:  He can indicate whether he did or not

10   and I'll let the answer stand.

11            THE WITNESS:  Sorry, I don't understand.  Can you

12   explain to me?

13            THE COURT:  Prior to the time that your client

14   moved to the United States in August of 2024 --

15            THE WITNESS:  Okay.

16            THE COURT:  -- did you have conversations with her

17   relating to moving?

18            THE WITNESS:  She say to me --

19            THE COURT:  No, don't say what she said.  Did you

20   have conversations with her on that subject?

21            THE WITNESS:  Yes, yes.

22   Q    When was the first time you had such conversations?

23   A    I don't remember.

24   Q    Was it in 2024 or earlier in 2024?

25   A    Even in the marriage situation they talk about the move

A. UGUR - CROSS - MR. MIN                    335

1   to United States --

2   Q    Well, I'm not asking what they talked about.

3   A    Sorry.

4   Q    I'm asking what you and her talked about.

5   A    Yes, we talk about --

6            MR. WARD:  Objection.

7            THE COURT:  I think I will sustain the objection

8   to any further inquiry about what she said.  I don't

9   understand the respondent here to be claiming that she was

10  relying on advice of counsel in terms of moving to the

11  United States, correct?

12           MR. WARD:  That is absolutely correct.

13           THE COURT:  Okay.

14  Q    Family law is not your area of specialty, correct?

15  A    One of them, yes.

16  Q    One of them?  What else?

17  A    I make civil laws in Turkey that include real estate

18  law, family law, business law.

19  Q    What percentage of your legal practice is devoted to

20  real estate, would you say?

21  A    Real estate, 70 percent.

22  Q    70?

23  A    Yeah.

24  Q    And you said business law was one of them?

25  A    Yeah.

A. UGUR - CROSS - MR. MIN                              336

1    Q    And what percentage of your practice relates to

2    business law, would you say?

3    A    15/15, you can say that.

4    Q    15?

5    A    15 family, 15 business.

6    Q    Okay, understood.  And family law, you're talking about

7    divorce cases?

8    A    Yeah.

9    Q    Custody cases?

10   A    Yeah.

11   Q    What else encompasses family law?

12   A    That's more -- in Turkey, that's two more covers likely

13   everything.

14   Q    Do you also run a different business other than your

15   law practice?

16   A    No.

17   Q    You don't own any other companies?

18   A    I had my father's company.  I think you prefer that

19   one.  My father chemical engineer and he has business third

20   years.  I worked there about I'm age 15.  I know the

21   company, I know everything about it.  And in COVID, at my

22   father age, he's in the house, he can't leave, so I help my

23   father business, that's correct.  But my main business is

24   law.

25              (Continued on the following page.)

A. Ugur - Cross/Mr. Min                                337

1   EXAMINATION BY

2   MR. MIN:

3   (Continuing.)

4   Q    I'm going to show you a --

5           MR. MIN:  Well, withdrawn.

6   Q    You testified before that in cases of joint custody it

7   has to be explicit in the decree, right?

8   A    I don't understand.

9   Q    Sure.  You said when there's joint custody in a divorce

10  decree, it has to be stated explicitly in the order?

11  A    Yes.

12  Q    I'm going to show you a document that has been

13  premarked as a Petitioner's Exhibit 37.

14          MR. MIN:  Your Honor, if I may approach.

15          THE COURT:  Yes.

16          (Approaching the witness.)

17  Q    Are you aware of the Ninth Family Court of Istanbul

18  Anadolu?

19  A    Sorry.

20  Q    Are you aware of this court, the Ninth Family Court of

21  Istanbul?

22  A    Yes.

23  Q    Is this a court you practiced in?

24  A    Yes.

25  Q    What is this document that you are looking at?

*A. Ugur - Cross/Mr. Min*                    338

1  A    That's the divorce case.

2  Q    This is divorce case?

3  A    Yes.

4  Q    Okay.  And it's a decision in a divorce case?

5  A    Yes.

6  Q    And is this a fairly typical or common type of decision

7  in a divorce case?

8  A    Yes.

9  Q    I want to direct your attention to page on the bottom

10  right or the third, excuse me, you're looking at the

11  Turkish?

12          THE COURT:  What exhibit is this, Counsel?

13          MR. MIN:  Exhibit 37.

14  Q    I'm going to show you Bates Page 720.

15      You see here, joint children whose custody is granted

16  to the mother?

17          MR. WARD:  Objection, your Honor.  This document

18  is not in evidence.  This witness has not authenticated to

19  put it in evidence.  Neither person should be reading from a

20  document not in evidence.

21          THE COURT:  I will sustain the objection.

22          MR. MIN:  Your Honor, I'll ask the Court to take

23  judicial notice of a foreign legal decision that the witness

24  states is a court that he's practiced in and we're showing

25  it to --

*A. Ugur - Cross/Mr. Min*                    339

1          THE COURT:  Is it in this case?

2          MR. MIN:  I'm sorry, no, it's not in this case.

3          THE COURT:  It's not in this case?

4          MR. MIN:  It's to impeach the witness about his

5   credibility about divorce decrees typically look like.

6          THE WITNESS:  No, I'm going to sustain the

7   objection.

8          THE COURT:  Why don't you ask can him about this

9   divorce decree, Counsel.

10          MR. MIN:  Your Honor, the witness said that joint

11   custody orders have to state explicitly joint custody.  But

12   there is a Turkish court decision --

13          THE COURT:  I don't know anything about that.  No

14   one's laid a foundation for that document.

15          MR. MIN:  Okay.

16   EXAMINATION BY

17   MR. MIN:

18   (Continuing.)

19   Q    Counselor, is it possible for Turkish Family Court to

20   grant custody to one parent or another and give joint

21   decision-making on issues to both parents?

22          MR. WARD:  Objection.

23   A    No.  Because in Turkish law system, and family court

24   system, court gives the custody to one parent.  Parent have

25   all the right.  Other parent only have seeing rights.

A. Ugur - Cross/Mr. Min                    340

1   Q    So if the Ninth Family Court of Istanbul Anadolu and

2   the judge from that Court issued an order that said custody

3   is granted to the mother, but decisions regarding schools

4   will be made by mutual agreement between the parties, that

5   would be impossible according to you?

6              MR. WARD:  Objection, your Honor.

7              THE COURT:  Overruled.

8              MR. WARD:  This is not an expert witness to be

9   giving hypotheticals.

10             THE COURT:  Overruled.

11             THE WITNESS:  Can you ask to again?

12  Q    So you're saying that the if the Ninth Family Court of

13  Istanbul and a judge from that court issued a decision that

14  said that custody is granted to the mother but decisions

15  regarding schools will be made by mutual agreement between

16  the parties, that would be impossible according to you; is

17  that your testimony?

18  A    That's something that you understand that it says that.

19  But if they can't agreement, you think about that.  If there

20  is no agreement between the parents, in that case, you

21  prefer mother make the decisions.  Do you understand that?

22  I don't know I can't tell you that.

23  Q    So would it say that explicitly that if the parties

24  cannot come to an agreement the mother gets to make the

25  final decision?

1          MR. WARD:  Objection.  Calls for speculation.

2          THE COURT:  Overruled.

3    A    Like I said before, that's -- it's more like promises

4    not binding one.  If parents don't agreement to each other,

5    parents who has the custody rights make the decision.

6    That's it.

7    Q    So, I mean, your testimony, then, is that even though

8    the judge decides that, it doesn't really have any meaning;

9    is that your testimony?

10   A    Not even meaning.  If there is custody of one parent,

11   that's between the difference the show custody and joint

12   custody.  A lot of cases in Turkey that says that but, in

13   the end, if there is no argument and school decisions, hard

14   decisions, make custody rights parent.  That's it, I'm

15   saying that.

16         MR. MIN:  No further questions, your Honor.

17         THE COURT:  You don't intend to ask him about the

18   statements in this divorce decree?

19         MR. MIN:  In this divorce decree, no.  He wasn't

20   an expert witness; he wasn't the divorce lawyer.

21         THE COURT:  I'm sorry I thought he was.  I

22   apologize.  I thought he was the lawyer that did the

23   divorce.

24         You did not represent Ms. Durust at her divorce?

25         THE WITNESS:  In family court?

*A. Ugur - Redirect/Mr. Ward*                              342

1              THE COURT:  Yes.

2              THE WITNESS:  No, I'm not.

3              MR. HAMBELTON:  Can I ask one question to follow

4    up.

5    REDIRECT EXAMINATION

6    BY MR. WARD:

7    Q    Sir, do you recall the reason why you filed the request

8    to change access on behalf of Ms. Durust in September even

9    though she left in August at the end of August?

10   A    Because maybe she will return to Turkey.  She has to

11   decide to stay in U.S.A. or depends on the school.  That's

12   why we make decision -- make file in September to say.  I

13   don't remember earlier.  But if it says September, it's

14   September.

15   Q    Also, does it have anything to do the with Court's

16   vacation schedule in August in terms of when you would file

17   a petition?

18   A    Yes.  When we talk about my client, it says child if

19   his father right now and we can wait.

20             MR. WARD:  Thank you.

21             THE COURT:  You can okay.  You can step down.

22             THE WITNESS:  Thank you, your Honor.

23             (Witness leaves the witness stand.)

24             MR. WARD:  Your Honor, can we take a three-minute

25   break?

*A. Ugur - Redirect/Mr. Ward*                    343

1        THE COURT:  Are you calling the respondent?

2        MR. WARD:  We are talking to the respondent.

3    That's the next move and we will be done.

4        THE COURT:  We just came back, do you -- you can

5    take a minute or two.  I just don't want to leave.

6        MR. HAMBELTON:  We're not leaving the courtroom.

7    We just want to take a minute.

8        THE COURT:  Go ahead and talk to her now.  I'll

9    just wait.

10        MR. WARD:  We're ready, your Honor.  Thank you.

11        THE COURT:  Is this your final witness?

12        MR. WARD:  Yes, Your Honor.

13        (Witness leaves the witness stand.)

14        COURTROOM DEPUTY:  Please raise your right hand.

15        Do you solemnly swear or affirm that the answers

16    and the testimony that you are about to give to the Court

17    will be the truth, the whole truth, and nothing but the

18    truth.

19    **NEVA DURUST**, called by the Respondent, having been first

20    duly sworn, was examined and testified as follows:

21        THE WITNESS:  Yes, I do.

22        COURTROOM DEPUTY:  Before you sit, please state

23    your name loud and clearly.  Your first and last name and

24    spelled to for the record.

25        THE WITNESS:  I'm Neva Durust.  And it's spelled

1    N-e-v-a.  D-u-r-u-s-t.

2            MS. LUTCHEN:  Your Honor, may I inquire?

3            THE COURT:  Yes, you may.

4    DIRECT EXAMINATION

5    BY MS. LUTCHEN:

6    Q    Good afternoon, Ms. Durust.  What is your relationship

7    to the child who is the subject of this action?

8    A    I'm his mom.

9    Q    And you heard petitioner testify today that the child

10   is seven years old.

11           How old is the child?

12   A    No, he's not seven yet.  He's six and a half.

13   Q    Okay.  Where was the child born?

14   A    In Boca Raton, U.S., United States.

15   Q    Why was the child born in the United States?

16   A    Because we always wanted to move to U.S.

17   Q    Why did you always want to move to the U.S. ?

18   A    Because we wanted O.T. to attend school in the U.S.

19           MR. MIN:  Objection.  Objection as to what the

20   father wanted and the characterization of we and we as the

21   answer.

22           THE COURT:  Overruled.

23   Q    Who do you mean by we in the answer that you just gave?

24   A    With my ex-husband.

25   Q    And what is the basis for you saying that you and your

*N. Durust - Direct/Ms. Lutchen*                    345

1   ex-husband always wanted to move to the U.S. with your

2   child?

3   A    Can you repeat it?  I didn't hear the first part.

4   Q    Sure.

5        What is the basis for why you're saying that you and

6   your ex-husband always wanted to move to the U.S. with the

7   child?

8   A    Because we went to school in U.S. and we thought we

9   wanted his education to be held in U.S.

10  Q    And when did you and your ex-husband make the plan

11  that --

12  A    Before even he was born.

13  Q    Did you discuss that when you guys would move with the

14  child to the U.S. ?

15  A    After the kindergarten.

16  Q    And has your child finished kindergarten?

17  A    Yes.

18  Q    When did you and petitioner end your marriage?

19  A    Officially?

20  Q    Yes.

21  A    2022, January.

22  Q    And before you ended your marriage, who made the

23  decisions about the child?

24  A    Mostly me.

25  Q    So did you make the decisions about the child's

1   education?

2   A    Yes.  Papatya was our my first option.  My ex-husband

3   did not want Papatya at the beginning.  Yeah, I make most of

4   the decisions about the child.

5   Q    And you heard Mr. Tatari testify that you were able to

6   agree on decisions today during his testimony.

7        Do you agree with what he said?

8   A    No.

9   Q    What were your conversations like when you tried to

10  make decisions about the child?

11  A    He sometimes didn't agree with me.

12  Q    And then, what would happen if he didn't agree with

13  you?

14  A    He would be abusive physically and sometimes

15  psychologically.

16            MR. MIN:  Objection, move to strike as irrelevant.

17            THE COURT:  Yes, I don't think we want to get into

18  that portion of the case.

19            MS. LUTCHEN:  That's fine.

20  Q    Can you describe the process that you and petitioner

21  went through in order to get divorced?

22  A    We agreed on a protocol and we had a date and we went

23  to the courtroom and judge ordered our protocol.

24  Q    And what did the protocol provide with respect to

25  custody of the child?

1  A    Judge told me I have the full custody and it's written

2  in our divorce decree.

3  Q    Let's go back to the protocol.

4      What is the divorce protocol as opposed to a divorce

5  decree?

6  A    It's the agreement between me and my ex-husband.

7  Q    And what did the divorce protocol provide with respect

8  to who had custody of the child?

9  A    Me.

10 Q    What was the most important term to you in the divorce

11 protocol?

12 A    To have the custody of my child.

13 Q    Why was that the most important term?

14 A    Because I could decide about my child.  We never could

15 agree on anything with my ex-husband, that's why I wanted to

16 have divorce and O.T. is most important thing in my life.

17 Q    What happened?

18 A    My child, sorry, our child.

19 Q    What happened in court the day that you appeared to

20 discuss your divorce protocol?

21 A    We went there with my lawyer at that time.  My

22 ex-husband was with his lawyer at that time.  And then judge

23 asked us if we wanted a divorce and we both said yes.  And

24 then she reviewed our protocol and she said this is not

25 okay, I'm going to change the visiting dates of the dad and

1   she rewrote the protocol and she gave sole custody to me.

2   Q    Is there a document that reflects what the court

3   ordered that day?

4   A    Yeah, divorce decree.

5   Q    What is your understanding of the terms of the divorce

6   decree?

7   A    Divorce decree is what judge ordered to us and it says

8   I have the full custody of the child.

9   Q    Based on the divorce protocol, the divorce decree, and

10  what occurred during the hearing, what did you understand

11  was your ability to travel with the child?

12  A    I don't need any consent from my ex-husband.

13  Q    And based on the divorce protocol, the divorce decree,

14  and what occurred during the divorce hearing, what's your

15  understanding -- what did you understand was your ability

16  to --

17  A    Judge --

18  Q    Ms. Durust, you have to let me finish and then you can

19  answer.

20  A    Sorry.

21  Q    It's okay.

22  A    I get nervous, I guess.

23  Q    Don't worry.

24       So based on the divorce protocol, the divorce decree,

25  and what happened at the hearing, what did you understand

1   was your ability to relocate abroad with the child?

2   A    I do not need permission from my ex-husband to

3   relocate.

4   Q    And did your ex-husband make any statements in court on

5   the day that -- at the divorce hearing to acknowledge that

6   you could move abroad with the child without his consent?

7              MR. MIN:  Objection, move to strike.  Hearsay.

8              MS. LUTCHEN:  It's a statement of a party.

9              THE COURT:  Overruled.

10             MR. MIN:  I'm sorry.

11             THE COURT:  I overruled the objection.

12  A    Yes.  Yes, he said because -- judge said let me rewrite

13  that 3.7, 3.8 it's not binding we're just going to write

14  that it's not what I ordered.

15  Q    Based on the divorce protocol, the divorce decree, and

16  what occurred during the divorce hearing, what did you

17  understand was your ability to change your child's school?

18  A    I had full custody, so I can make the decisions.

19  Q    And based on the divorce protocol, divorce decree, and

20  what occurred during the hearing, what did you understand

21  was your ability to make medical decisions for your child?

22  A    I had the full custody of the child.  I can make

23  decisions about health of O.T.

24  Q    And did your ex-husband acknowledge at the divorce

25  hearing that you had the sole ability to make medical

1  decisions for your child?

2  A    Yes.  She wrote -- she spoke about the order.  She

3  repeated the order.

4  Q    Your ex-husband?

5  A    Yes.

6  Q    Did you ever seek your ex-husband's permission to

7  travel even though you have sole custody?

8  A    No.

9  Q    Did you?

10 A    Sorry, let me rephrase because I said no.  On my times,

11 I never asked his permission.  But if I wanted to travel on

12 his dates, I always asked him can I travel on these dates

13 because it's like the holiday.  Is it okay if we reschedule

14 your time and if he said yes, I traveled.

15 Q    Okay.  And you sought that permission even though you

16 had sole custody?

17 A    Yes.

18 Q    Why did you do that?

19 A    Because I wanted my child, our child, to see

20 ex-husband, the dad.

21 Q    Does your action husband require your permission to

22 travel with the child?

23 A    Yes, all the time.

24 Q    I'm going to pull up a document for you.  This is

25 Respondent's Exhibit A-1.

*N. Durust - Direct/Ms. Lutchen*                    351

1          Ms. Durust, do you recognize this document?

2    A    Yes.

3    Q    What is it?

4    A    This is my with divorce decree in English.

5    Q    Did you obtain this document?

6    A    Yes, I did.

7    Q    Can you describe how you obtained this document?

8    A    I went there with my divorce decree in Turkish to

9    notary and they translated for me, they stamped it, and they

10   apostille it.

11   Q    Are these the stamps that you are talking about?

12   A    Yes.

13   Q    And is this the apostille that you mentioned?

14   A    Yes.

15   Q    Did you understand whether the notary's office affirmed

16   the accuracy of the translation?

17   A    Yes.  If it's not good, they don't stamp.

18          MS. LUTCHEN:  Your Honor, I would like to move

19   Respondent's Exhibit A-1 into evidence.

20          THE COURT:  Is this another exhibit that's in

21   evidence under a different number?

22          MS. LUTCHEN:  So there is -- it's Petitioner's 22.

23   The document is the same but this is an earlier version that

24   she got at the notary's office so she went and got one copy

25   and then got a second copy stamped later which is the

1    version that's in evidence.

2              THE COURT:  All right.  A-1 will be received.

3              (Respondent's Exhibit A-1 was marked in evidence.)

4    Q    Why did you obtain an English translation of your

5    divorce decree?

6    A    In case they asked me about my custody.

7    Q    Who asked you?

8    A    When I travel.

9    Q    Did you ever have any difficulty traveling with the

10   child?

11   A    I did not but I obtained this previous to Africa

12   because my ex-husband did not consent to go to Africa.

13   Q    Did you travel with the child without petitioner's

14   consent?

15   A    Yes, I did.

16   Q    And did you have any issues doing that?

17   A    No.

18   Q    I'm going to address your attention to Section 3.7.

19        Do you see Section 3.7?

20   A    Yes.

21   Q    What is your understanding of what it means?

22   A    Do you want me to read or --

23   Q    No, I'm asking you what your understanding is that what

24   this means?

25   A    This means I need to tell, notify, my ex-husband to --

1    Q    You need to notify him if what?

2    A    3.7 or 3.8?

3    Q    3.7.

4    A    If I wanted to live abroad with the kid.

5    Q    Did you agree to Section 3.7 in your divorce protocol?

6    A    Yes.

7    Q    And why did you agree to that?

8    A    Because the judge and my lawyer said it's not binding.

9    Q    Is there any other reason you agreed to Section 3.7?

10   A    Because I wanted to include dad into

11   my -- our -- decision-making about our son.

12   Q    Why did you believe Section 3.7 was not binding?

13   A    Because it's not in the divorce decree.  I don't have

14   an application towards 3.7 because I have the full custody

15   of the child.

16   Q    Did you ever communicate to your ex-husband that you

17   could relocate abroad with your child without his consent?

18   A    Yes, I did.

19   Q    On how many occasions?

20   A    So many times.

21   Q    I'm going to pull up a Petitioner's Exhibit 22 which is

22   in evidence.

23        Do you recognize this document?

24   A    Yes.

25   Q    What is it?

*N. Durust - Direct/Ms. Lutchen*                    354

1  A     This is our divorce decree.

2  Q     Okay.  Can you tell me what the stamps are, the date

3  stamps on this document?

4  A     This is November 6, 2023, and it's the first and this

5  is the second one I obtained in August.

6  Q     So is this document the second divorce decree that you

7  obtained?

8  A     Yes.

9  Q     How did you go about obtaining this document?

10 A     Same procedure.  I went to notary and then told them

11 can I have my documents.

12 Q     And was the document stamped again by the notary?

13 A     Yes.

14 Q     Is that the stamp on the left?

15 A     Yes.

16 Q     And did you understand that the notary public affirmed

17 the accuracy of this translation again when you received

18 this second copy of the English translation?

19 A     Yes.

20 Q     Okay.  Why did you obtain a second version of the

21 English translation?

22 A     Because I gave the first one in American embassy in

23 Ivory Coast.

24 Q     I want to talk to you about the decision-making between

25 you and your ex-husband after you got divorced.

1    Can you tell me who made the decisions for your child

2    after you were divorced?

3    A    Me.

4    Q    Did you make medical decisions without your

5    ex-husband's consent?

6    A    Yes.  O.T. needed to have yellow fever vaccination and

7    he had.  And once he was very sick, we went to hospital and

8    he got tested with positive, positive, I forgot the virus,

9    and dad wanted to take his blood to have his blood retested

10    and I said no, so the doctors listened to me.

11    Q    Why did the doctors listen to you?

12    A    Because I have full custody of the child.

13    Q    Did you make any decisions related to your child's

14    school that petitioner objected to after your divorce

15    decree?

16    A    Yes.

17    Q    Can you tell me what those were?

18    A    I choose the first school, he got in.  He had, how do

19    you say, he had -- they wanted to see the child before they

20    accept the school.  So he had that meeting that day and he

21    badly behaved and the school rejected him.  And then we

22    explained the situation and then his dad called the school.

23    So the school said we want to see the child again.  And I

24    said, I told you this is not my child, like, I don't want to

25    bring my child again, I don't want your school.  So I said

*N. Durust - Direct/Ms. Lutchen*                     356

1  it's not my decision and there is another school, MEF.  He

2  was enrolled to MEF by me in Turkey and he did not consult

3  before Koc and Koc is the one I did, too.

4  Q    You're saying that you were able to enroll the child in

5  MEF over petitioner's objection?

6  A    Yes.

7  Q    Why with as that?

8  A    Because I have the full custody of the child.

9  Q    You heard Mr. Tatari testify today that before you went

10  to the Ivory Coast, he and you were jointly making decisions

11  for the child; is that correct?

12  A    No, it's not.

13  Q    What was actually happening?

14  A    I was making all the decisions but I wanted to include

15  my ex-husband.

16  Q    Did you obtain an emergency U.S. passport for your

17  child?

18  A    Yes, I did.

19  Q    And when did you do that?

20  A    When I was in Ivory Coast.

21  Q    Why did you go to the Ivory Coast?

22  A    My close friend invited me to their beach house in

23  Ivory Coast with the child.

24  Q    And why did you obtain an emergency U.S. passport for

25  the child when you were in the Ivory Coast?

1   A    Because, at that time, his U.S. passport was expired

2   and I obtained the Turkish passport by myself to O.T. and

3   that Turkish passport, I lost it.

4   Q    So you're saying you previously obtained a Turkish

5   passport for the child?

6   A    Yes.

7   Q    And how did you obtain that?

8   A    I just went to passport place and said I need a

9   passport for my child and then they said, okay.

10  Q    Did you need petitioner's consent or signature?

11  A    Nothing.

12  Q    And why didn't you need his consent or signature?

13  A    Because I have full custody of the child.

14  Q    Why didn't you go to the Turkish consulate to obtain a

15  new Turkish passport for your child after you lost it in the

16  Ivory Coast?

17  A    Because where we are staying in Ivory Coast, it was

18  closer to the American embassy.

19  Q    How did you obtain the passport, the U.S. passport for

20  the child?

21  A    I went there with the child.  I told my situation, I

22  lost my Turkish passport for the child and then I -- they

23  asked me if I have the custody.  I said yes and they wanted

24  to see me see the divorce decree and I gave in divorce

25  decree.

1  Q    Okay.  I'm going to show you Respondent's Exhibit J-2

2  and I'll just scroll through it quickly.

3       Do you recognize this document?

4  A    Yes.

5  Q    What is it?

6  A    This is the papers that I filled in at the embassy.

7  Q    Okay.

8            MS. LUTCHEN:  Your Honor, I move to admit this

9  document into evidence.  This is Respondent's Exhibit J-2.

10            THE COURT:  What is the exhibit number?

11            MS. LUTCHEN:  J-2.

12            THE COURT:  J-2 will be received.

13            (Respondent's Exhibit J-2 was marked in evidence.)

14  Q    Ms. Durust, I am directing your attention to Page 2?

15  A    Yes.

16  Q    Do you see it?

17  A    Yes.

18  Q    What is this document?

19  A    This document says that mother has the custody, see

20  attached forms.

21  Q    And what forms did you give the?

22  A    Divorce decree.

23  Q    Okay.  And is this?

24  A    And then it's saying we can do direct return because

25  the lady there notified me if you have the Social Security

1    Number with you, we can give you one year of emergency

2    passport but if you have -- if you don't have the Social

3    Security Number of your child, we can only give emergency

4    passport for ten days.

5    Q    So would you have been able to obtain the child's

6    temporary U.S. passport without the Social Security Number?

7    A    Without the Social Security Number, I would obtain it

8    for only ten days.

9    Q    Did you obtain the child's Social Security Number?

10   A    Yes.

11   Q    And how did you obtain it?

12   A    I have begged his dad to give it to me.

13   Q    Why did you beg his dad to give it to you?

14   A    Child got second, he started vomiting with fever, so we

15   went to hospital there and they asked for the Social

16   Security Number in Africa and I didn't have it, so he gave

17   it to me.

18   Q    Did you get your ex-husband's consent to obtain the

19   temporary U.S. passport for the child?

20   A    No, I did not.

21   Q    And were you able to obtain it without his consent?

22   A    Yes.

23   Q    Before your trip to the Ivory Coast, did you seek your

24   ex-husband's signature to obtain a U.S. passport for the

25   child?

1    A    Yes, I did.

2    Q    And why did you do that if you had sole custody?

3    A    Because I -- he told me that he would come to the

4    appointment when we do the -- apply for the new one but he

5    did not show up at the appointment.

6    Q    All right.

7    A    And why did I do it?  Because it would expedite the

8    passport getting it because I had the ski trip with the

9    child to France.

10   Q    Did you obtain a permanent U.S. passport for the child?

11   A    Yes, I did.

12   Q    When?

13   A    April 2024.

14            (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2    BY MS. LUTCHEN:

3    Q    How did you obtain the permit and U.S. passport?

4    A    I was here as a holiday with the kids with my family.

5    It was during E time; there was no school.  I went to

6    Stamford, the passport government place.

7    Q    Did you give the passport government place any

8    documents?

9    A    I return, they asked for the emergency passport and I

10   gave the divorce decree that was translated in Istanbul.

11   Q    Did the U.S. passport agency require petitioner's

12   consent?

13   A    No.

14   Q    And why not?

15   A    Because I have the full custody of the child.

16   Q    After the child was born, did you and petitioner visit

17   the U.S. together?

18   A    Yes, several times.

19   Q    Did you visit the U.S. in 2021?

20   A    Yes.

21   Q    During --

22   A    August 2021.

23   Q    And during that visit, did you discuss moving to the

24   U.S. with the child?

25   A    Yes, we did discuss, and ex-husband was very open to

1  it.

2  Q    Why did you not move to the U.S. with the child at that

3  time?

4  A    Because trip went not good.  He was abusive

5  psychologically and physically, and in order to protect my

6  child, I wanted to get a divorce.

7  Q    In the following year, in 2022, did you have

8  conversations with petitioner about moving to the U.S. with

9  your child?

10  A    Yes.

11  Q    When?

12  A    When I was in the U.S. with the child again for a

13  month, he went to daycare kindergarten in U.S., and then he

14  was very happy, and then I talked again with him.

15  Q    And did petitioner consent to the child attending

16  kindergarten?

17  A    No, he did not, but he did go because I had the full

18  custody.

19  Q    Were there any other times you discussed moving to the

20  U.S. with the child with your ex-husband?

21  A    Yes.  When the time that O.T., the child, that he hate

22  for the Turkish school, ex-husband called me and I reminded

23  him this is not his only option.

24  Q    Did you move to the U.S. with the child?

25  A    Yes, I did.

1   Q    When did you do that?

2   A    I moved August 2024.

3   Q    Why did you move to the U.S.?

4   A    It is because I want O.T. to attend the school in the

5   U.S.

6   Q    When did you first decide to move to the U.S.?

7   A    I first decide late July.

8   Q    Did anything happen in late July that made you decide

9   to move to the U.S.?

10  A    Yes.  I started applying to schools, two public

11  schools, one private school, and I wanted to get -- if O.T.

12  was accepted to schools, I wanted to know before he got

13  accepted.  So that's why my decision's at July.

14  Q    Why did you not tell your ex-husband earlier?

15  A    Because O.T. was in dad's care at that time, and I

16  was -- I was afraid his abusive and his angry behaviors

17  towards the child if he knew about my decision.

18  Q    You saw a document --

19            MR. MIN:  Objection.

20            THE COURT:  I'll sustain the objection.  Strike

21  that last answer.

22  Q    We saw a document earlier today where you told

23  petitioner that you didn't plan to move to the U.S. in June

24  of 2024.  Why did you say that in June 2024?

25  A    Can you repeat the question?  I was thinking something

1    else.

2    Q      Sure.

3           Earlier today there was a document that showed in

4    June of 2024 you said you weren't planning to move to the

5    U.S. with the child.  Do you remember seeing that?

6    A      Yes.

7    Q      Why did you tell petitioner you had no plan to move to

8    U.S. with the child in June 2024?

9    A      Because I enrolled O.T. to another school and I still

10   didn't know if he got accepted to other schools in U.S.  I

11   still didn't apply to schools in U.S.

12   Q      After you moved to the U.S., did you file a petition in

13   the Turkish court?

14   A      Yes, I did.

15   Q      And what was that petition?

16   A      To reschedule the seeing dates for the dad.

17   Q      And why did you file that petition?

18   A      Because I want the child to see his dad.

19   Q      You were here today when Mr. Tatari testified that he

20   didn't see his child for 120 days, right?

21   A      No, that's a lie.

22   Q      When you moved to New York, did Mr. Tatari ask to see

23   your child?

24   A      No.

25   Q      When did he first ask to see him?

1   A    He ask to see him through lawyers, through you.

2   Q    And when was that?

3   A    It was, like, 29th of November.

4   Q    So petitioner didn't try to see the child any time

5   before the 29th of November?

6   A    No, no.

7   Q    Okay.  Would you have said yes if he asked to see him?

8   A    Yes, of course.

9   Q    You also heard Mr. Tatari testify that you prevented

10  him from speaking with the child.  Is that accurate?

11  A    No, it's not.  I told him you can call us whenever you

12  want, you have the access, and he was calling, and one day

13  he said your mom will go to jail, and O.T. got so scared.

14  And after that day he did not call for eight days straight.

15  The dad did not call us.

16  Q    Can you describe your relationship with the child?

17       MR. MIN:  Objection.  Relevance?

18       THE COURT:  I'll sustain the objection.

19  Q    You heard Mr. Tatari testify that you moved to the U.S.

20  with the child because you're afraid of losing custody in

21  Turkey; is that right?

22  A    No.

23  Q    Are you afraid of losing custody in Turkey?

24  A    No.

25  Q    Why?

1   A    Because all the allegations that he's saying, they are

2   lies.  I'm a good mom.

3         MS. LUTCHEN:  Nothing further.

4   CROSS-EXAMINATION

5   BY MR. MIN:

6   Q    Hi, good afternoon.

7   A    Hello.

8   Q    If you have any difficulty understanding did of my

9   questions, of course ask me to clarify or restate.

10  A    Okay.

11  Q    I'm happy to do so.

12  A    Okay.

13  Q    I know it's getting late.

14        Have you filed any cases other than in Turkey

15  related to your son?

16  A    Yes.

17  Q    Where?

18  A    Where or --

19  Q    Where?

20  A    Istanbul.

21  Q    I'm sorry.  I said other than in Turkey.  Aside from

22  Turkey.

23  A    No.

24  Q    Do you agree that the Turkish courts are aware

25  decisions related to your son should be made, correct?

1   A   Can you repeat it?

2   Q   Of course.

3   A   I don't understand.

4   Q   Of course.

5           Would you agree that it is appropriate for the

6   Turkish courts to make decisions with respect to your son,

7   O.T.?

8           MS. LUTCHEN:  Objection.  This isn't within the

9   scope of for her to decide what's appropriate.

10          THE COURT:  Overruled.

11  A   Can I have the question again?

12  Q   Of course.

13          MR. MIN:  Your Honor, can I ask the reporter to

14  read it back?

15          (Record read.)

16  A   Can Turkish courts make decisions about my child?  Is

17  that the question?

18  Q   No.  I'm asking you, you would agree that the Turkish

19  courts are the appropriate courts --

20  A   Yes.

21  Q   -- to make those decisions?

22  A   Yes.

23  Q   Right.  Not a court in New York.

24  A   A court in New York?

25  Q   Yes.

1   A    Yes.

2   Q    Right.  The Turkish courts are the ones that should be

3   deciding custody issues related to O.T.?

4   A    Yes, because I got divorced in Turkey.

5   Q    At some point in 2024, you received notice of a

6   delivery order, correct?

7   A    What is delivery order?

8   Q    You received notice that you were to hand over O.T. to

9   the father for his scheduled visitations, correct?

10  A    Yes.

11  Q    Do you recall when that was?

12  A    I -- I don't know the dates.

13  Q    It was after the removal in August 2024 to New York,

14  though, correct?

15  A    Yes.

16  Q    You haven't complied with that directive, have you?

17  A    No, I -- before that order, my lawyer said rescheduling

18  of the dates.

19  Q    But you received the order stating that you had to turn

20  over O.T. to the father for his scheduled visitation times,

21  correct?

22            MS. LUTCHEN:  Objection, relevance.

23  A    I did not see the order.

24  Q    But I thought you just testified that you received

25  notice of that order.

1  A    But -- you mean that he needs to see his kid?

2  Q    Yes.

3  A    That's the order?

4  Q    Yes.

5  A    Okay.  He needs to see when the Court says the dates

6  and then he will see.  It's still ongoing.  They're

7  rescheduled.

8  Q    So I want to go back to the divorce protocol and the

9  divorce decree.

10         Would you agree that you and Mr. Tatari spent some

11 time negotiating the terms of the divorce protocol?

12 A    The lawyers did, yes.

13 Q    The lawyers that represent each of you?

14 A    Yes, of course.

15 Q    Weeks?  Months?  How long would you say?

16 A    We separated the houses August 2021.  Since August, the

17 protocol went over and over.

18 Q    Did you negotiate the terms of 3.7, 3.4, 3.8 with

19 Mr. Tatari through the lawyers?

20 A    Yes.  But in the protocol, in the beginning, it says

21 that I have the full custody, so that's what mattered to me.

22 Q    I'm not asking that.  I'm asking --

23 A    Yes, we did --

24 Q    You spent time negotiating those terms?

25 A    Yes, yes.

1    Q    Why would you feel the need to spend time negotiating

2    those terms if they had no legal effect, if they were

3    meaningless?

4    A    Because we are agreeing on divorce.  Two parties are

5    agreeing.  That's why.

6    Q    Right.  But why wouldn't you just agree to anything he

7    asks for if it has no meaning?

8    A    I only wanted the custody.  That was my main want.

9    Q    Right.  My question is:  Why wouldn't you just agree to

10   anything else he wanted immediately if those terms had no

11   legal meaning?

12   A    It does not matter what we agreed on.  Whatever the

13   judge said that day from my lawyer, I knew that was the

14   order.

15   Q    So as long as it's not in the divorce decree, then it

16   doesn't matter?

17   A    No, it's in the divorce decree.  I'm not saying that.

18   Q    3.4, 3.7, 3.8 is in the divorce decree?

19   A    It's in the divorce protocol.

20   Q    Is it in the divorce decree?

21   A    But it's not binding.

22   Q    Is it part of the decision of the divorce decree?

23   A    No.

24   Q    No.  Okay.

25   A    Because also if those parts are binding to you, what

1   are the parts that he's not paying the activities, the

2   nanny, and the other promises that he made me?

3   Q    So is that binding or is that not binding?

4   A    It's not binding.  That's why I filed others.

5   Q    So his promises to pay financial support is not

6   binding, that's your testimony?

7            MS. LUTCHEN:  Objection.  Calls for a legal

8   conclusion.

9            THE COURT:  Overruled.

10  Q    His promises or the provisions of the divorce protocol

11  that relate to money and finances, is it your testimony that

12  those provisions are not binding either?

13  A    It's not binding, but it has a -- how do you say in

14  English?  I don't know.  If you read those parts, it has a

15  judgmental -- no, it has a judicial, like, fee that if he

16  doesn't pay, if I open up the order saying he's not paying

17  the things he's not paying, he needs to pay me more money.

18  But in the other things, the judge on the day told me -- to

19  us, not only me -- that 3.7 is not binding because it's not

20  obligated for me.  It doesn't say because I have the

21  custody.

22  Q    Is it your understanding that if something is part of

23  the judicial decision, that it is binding on the parties?

24  A    Can you repeat the question, please?

25  Q    Sure.

1          Is it your understanding that if a provision is

2    part of the divorce decree, the judicial decision, that it's

3    binding on the parties?

4    A    I don't understand the question.

5    Q    Sure.  I'll break it down.

6          Are the financial provisions ever the divorce

7    protocol part of the decision that the judge made?

8    A    Are?

9    Q    Are they?  Are they part of the decision --

10   A    What are?  What are?

11   Q    The financial provisions of the divorce protocol, are

12   those part --

13   A    No.

14   Q    -- of the decision?

15   A    No.

16   Q    Okay.

17   A    Judge does not make those decisions.  Judge only that

18   day made the decisions of the seeing dates that child can

19   see his dad.  In her order, there's nothing that she says.

20   Q    What about 3.4, 3.7, 3.8 --

21   A    It's not in order --

22   Q    Let me finish.  3.7, 3.4, 3.8, are those part of the

23   decision?

24   A    Yes.

25   Q    They are part of --

1   A    No, I -- can you -- I said yes.  I didn't understand.

2   Q    No problem.  Apologies.

3        3.4, 3.7, 3.8, are those three provisions of the

4   divorce protocol part of the decision?

5   A    No.

6   Q    So I'm going to show you a document that's been

7   pre-marked as Petitioner -- in evidence as Petitioner's

8   Exhibit 29.

9        (Exhibit published.)

10  Q    You heard the testimony of your expert witness,

11  correct?

12  A    What did you ask?

13  Q    Sure.  I asked:  You heard the testimony of your expert

14  witness, correct?

15  A    Yes.

16  Q    And you heard him testify that the decision which

17  starts on page 2 of 5, Bates numbered 585, right?  Number 2

18  is what you say gives you custody --

19  A    Custody of parties joint child, it starts from there.

20  You're asking?

21  Q    It starts with number 1, that's the decision, right?

22  A    Yes.

23  Q    You heard your expert testify that number 4, the

24  divorce protocol, is not part of the decision, right?

25  A    Not -- what?

1    Q    Not part of the decision.  You heard your expert

2    testify that it's not part of the decision, correct?

3    A    Yes.

4    Q    Okay.  Now, I'm going to direct you to page 5 of 5,

5    Bates number 588, and you see 4.2 here, right?  That says

6    that the provisions of the protocol dated January 18, 2022,

7    except for those related to personal relationship, shall be

8    approved in accordance with article 184/5 of the Turkish

9    Civil Code and considered part of the decision.

10            You see that, correct?

11   A    Yes.

12   Q    That protocol includes the financial provisions 3.4,

13   3.7, 3.8, correct?

14            The document speaks for itself.  I'll move on.

15   A    The protocol --

16   Q    I'm going to show you the divorce protocol that you

17   guys signed, and I want to point out a difference.  It's

18   Bates page 601.  So 4.2 here --

19            THE COURT:  What document are you showing to the

20   witness?

21            MR. MIN:  30.

22            THE COURT:  This is the divorce protocol, not the

23   decision?

24            MR. MIN:  That's right.

25            THE COURT:  Okay.

1   Q    You see here 4.2 starts:  The parties have agreed on

2   the matters concerning the divorce and its ancillary issues,

3   right?

4   A    You're asking questions that I'm not understanding.

5   Q    I'm just asking, do you see where it says the parties

6   have agreed?

7   A    Yes.

8   Q    That's all I'm asking.

9   A    Yes.

10  Q    Now, this is what you and Mr. Tatari agreed to, right?

11  A    Yes.

12  Q    We're going to go back to what we just saw, 4.2 here.

13            THE COURT:  What document are you talking about?

14            MR. MIN:  29, back to 29 now.

15            (Exhibit published.)

16  Q    And this is the divorce decree the judge wrote, who

17  added on top of your protocol this language about how the

18  protocol is considered part of the decision.  This is not

19  copy and pasted from your protocol.  This is written by the

20  judge stating, in bold, that the protocol is part of his or

21  her decision, correct?

22            MS. LUTCHEN:  Objection.

23            THE COURT:  Overruled.

24            Is that what it says?  You see that's what it

25  says?

1           THE WITNESS:  I see it, yes.

2           THE COURT:  Okay.

3           THE WITNESS:  I don't understand what the comment

4    is this.  Can I see the up version of this paper?

5           MR. MIN:  Of course.  This is the first page.

6           THE COURT:  What exhibit is it again?

7           MR. MIN:  29, Your Honor.

8           THE COURT:  Is that your translation?

9           MR. MIN:  Yes, the TransPerfect one.

10          THE WITNESS:  Can we go with my -- the document

11   that we obtained, I obtained by notary?  Because I don't --

12   I don't know the difference between this and the other one.

13          MR. MIN:  You attorney can chose to do that if

14   they so wish.

15   Q    A couple of paragraphs below, I'm going to go back to

16   that page 5 of 5, the decision was read aloud.  Do you see

17   that part?

18   A    I want to see the first part of this.  Can you go the

19   up page of this, please?

20   Q    Sure.

21   A    So this is the protocol going on, no?  That's 3.5, 3.6,

22   those are the protocol that we agreed with my ex-husband.

23   Q    Yes.

24   A    That's not the decision the Court gave.

25   Q    But do you see where it says the provisions the

1   protocol considered part of the decision, right?

2   A    I want to see the papers that I obtained in Turkish.

3   Q    I'm sure you will at some point, but I want you to

4   answer my question, please.

5   A    Yes, I do see it.

6   Q    And you see where it says below:  The decision was read

7   aloud and explained in accordance with procedure, right?

8   A    Yes.

9   Q    And you didn't appeal this decision, correct?

10  A    How?

11  Q    I'm sorry?

12  A    How?

13  Q    How?

14  A    Yes.

15  Q    I don't know how.  I don't know how one appeals in

16  Turkey.  But did you appeal or did you not appeal this?

17  A    I did not appeal.  I don't understand.

18  Q    Is it your testimony that the judge in Turkey told you

19  that even though the judicial decision makes references to

20  certain provisions, such as 3.4, 3.7, 3.8, that it had no

21  legal effect?  Is that your testimony?

22  A    Yes.  She said once you have the sole custody, it's not

23  binding, those parts.  But do you want for us to write?

24  We're going to write those points.  She said that.

25  Q    Write points that are meaningless?

1  A    No, the especially part that if I wanted to live

2  abroad, she said you can decide to live abroad.

3  Q    So just that point was meaningless or also all the

4  other points were meaningless?

5  A    She reminded me my custodial right.  I don't need --

6  Q    But I want to be clear, because it seemed like earlier

7  you said --

8  A    She only said that part, yes.

9  Q    Only 3.7 was meaningless?

10  A    No, not only that.  3.7, 3.8, she said that.

11  Q    Not 3.4?

12  A    No.

13  Q    So you would agree that you and Mr. Tatari have to make

14  decisions on school together?

15          MS. LUTCHEN:  Objection.

16  A    No.

17  Q    But the judge didn't declare 3.4 to be meaningless, but

18  your understanding still is that it is meaningless, is that

19  your testimony?

20          MS. LUTCHEN:  Objection.  That misstates her

21  testimony.

22          MR. MIN:  I'm asking her to clarify her testimony.

23          THE COURT:  Overruled.  I'll let her answer.

24  A    I know from the Court that I have the full custody of

25  child and I don't need his permission to decide about the

1   schools.  It's not binding, the protocol.  If he doesn't

2   like my decisions, he can open up a custody that he did no

3   Turkey.

4   Q    So --

5   A    And if I'm not happy of his actions toward child, you

6   know, he needs to pay on things and I can open up a file in

7   Turkey too, and I did and he did.

8   Q    So you spent weeks or months negotiating an agreement

9   that had no legal effect for a judge to write a decision

10  that had no legal effect?  That's your testimony?

11            MS. LUTCHEN:  Objection to form.

12            THE COURT:  I'll sustain the objection to the form

13  of the question.

14  A    He wanted to --

15            THE COURT:  No, there's no question pending.

16            THE WITNESS:  Okay.

17  Q    Where in this divorce decree does it state that

18  Mr. Tatari needs your permission to travel abroad with the

19  child?

20  A    Can you ask that question again, please?

21  Q    Of course.

22            Where in this divorce decree does it say that

23  Mr. Tatari needs your permission to travel abroad with the

24  child?

25  A    It does not say.

1  Q    But you testified earlier that he does, absolutely he

2  does?

3  A    Because I did not allow him to travel.  Did he travel

4  outside of Turkey?  Not once he traveled with the child,

5  because I did not allow outside of Turkey.

6  Q    What countries are you a citizen of?

7  A    I am?

8  Q    What countries are you a citizen of?

9  A    In Turkish.

10 Q    What's your immigration status in the U.S.?

11        MS. LUTCHEN:  Objection.  Relevance.

12        THE COURT:  Overruled.

13 A    Right now?

14 Q    Yes.

15 A    Right now I'm obtaining a B-1 Visa.

16 Q    What's your immigration status right now in the United

17 States?

18 A    I still have time to --

19 Q    What is your immigration status currently in the United

20 States?

21 A    My lawyer can answer that.  I cannot answer that.

22 Q    You have no idea?

23 A    I do have idea.

24 Q    Okay.  So I'd like you to answer the question then,

25 please.

1    A    I still hold tourist Visa.

2    Q    And allows you to stay in the United States for how

3    long?

4    A    Six months.

5    Q    Six months.  And how long have you been here?

6    A    It's been four months.

7    Q    And when does the tourist Visa expire?

8    A    February.

9    Q    Do you know the date?

10   A    What?

11   Q    Do you know the date?

12   A    20th.

13   Q    And currently at this time, you have no other

14   immigration status other than that?

15   A    No.

16   Q    When did you arrive in the United States with O.T.?

17   A    When did I arrive to the United States?

18   Q    Yes, with O.T.

19   A    When you say O.T., I understand something.

20   Q    Sorry.

21   A    August 20th.

22   Q    August 20th.  Okay.  So when you wrote to Mr. Tatari on

23   August 21st and told him that you were planning on moving to

24   the United States, to New York, you were actually already in

25   New York at that time, correct?

1  A    Yes.

2  Q    You were lying to him, right?

3  A    I wasn't lying.

4  Q    You weren't lying?

5  A    I told him before that I have plans towards moving, but

6  I came here and notified him.

7  Q    Okay.  But when you wrote him on August 21st that you

8  were planning to move to New York, that was a lie, correct?

9  Because you already had moved to New York, correct?

10  A    Yes.  But I'm still undecided because it depends on the

11  kid.  If kid is unhappy, if O.T. is not happy here, I made

12  the school in Turkey for two years froze, so I may turn

13  back.

14          MR. MIN:  Your Honor, if I may just have a moment.

15          THE COURT:  Do you have much more with this

16  witness?

17          MR. MIN:  No, very short.

18          THE COURT:  Okay.

19  Q    Ms. Durst, I want to show you an exhibit pre-marked as

20  Petitioner Exhibit 12.

21          (Exhibit published.)

22          MS. LUTCHEN:  Your Honor, I object to showing the

23  witness this.  What's in evidence is the English

24  translation.

25          MR. MIN:  Well, for identification purposes it's

1  kind of hard, Your Honor, to identify a document that's not

2  the original.

3           THE COURT:  Is this in evidence?

4           MR. MIN:  No.  I'm asking her to identify it.

5           THE COURT:  Okay.

6           Can you identify this document?

7           THE WITNESS:  I need to read first.

8           THE COURT:  What's the number?

9           MR. MIN:  12, Your Honor.

10          THE WITNESS:  I don't know this document.

11 Q    Isn't this the delivery order we were speaking about

12 earlier requiring you to turn over O.T. for a scheduled

13 visitation with the father?

14 A    In reading that, but I didn't see it before.

15 Q    But you instructed your lawyer to file --

16 A    I heard, but I did not see it.

17 Q    You heard about it.  You instructed your lawyer to file

18 an application to cancel and try to vacate this order,

19 correct?

20          MS. LUTCHEN:  Objection.  That's privileged,

21 whatever she instructed her lawyer.

22          THE COURT:  I'm sorry.  No, I'll allow that

23 question.

24          You were aware that this order existed, correct?

25          THE WITNESS:  I heard from the lawyer, yes.

1      THE COURT:  And did you, upon learning that, ask

2   your lawyer to try and vacate this order?

3      THE WITNESS:  What does vacate mean.

4      THE COURT:  Pardon me?

5      THE WITNESS:  What does vacate means?

6      MR. MIN:  To make it stop.

7      THE COURT:  To make the order nonbinding.  Get rid

8   of the order.

9      THE WITNESS:  He -- I don't know what he responded

10   to this order.  I don't know what he did.

11      THE COURT:  But you were aware that an order

12   existed, but you didn't see the order; is that right?

13      THE WITNESS:  Yes.

14      THE COURT:  Okay.

15      MR. MIN:  I'm sorry, Your Honor.  I'm not sure I

16   heard the answer.

17   BY MR. MIN:

18   Q    Did you have your lawyer seek to get rid of that order?

19   A    No, I don't know.  He told me this happened, but I

20   don't know what he did.  We didn't discuss this.

21   Q    You didn't discuss the order.  After he told you about

22   the order, you never discussed it again?

23   A    No.

24   Q    You're not aware that the Turkish court rejected your

25   application to cancel this order?

1    A    No, I don't -- I do not know.

2    Q    If I show you an application made in your name to

3    cancel this delivery order, that would be a complete

4    surprise to you?

5    A    Yes.

6              (Pause in proceedings.)

7              THE COURT:  Mr. Min, do you have other questions?

8              MR. MIN:  No further questions, Your Honor, at

9    this time.

10              THE COURT:  Do you have anything?

11              MS. LUTCHEN:  Yes, redirect.

12   REDIRECT EXAMINATION

13   BY MS. LUTCHEN:

14   Q    Ms. Durust, Mr. Min showed you delivery orders.  Do you

15   remember seeing that?

16   A    No.

17   Q    The order that he just had up on the screen?

18   A    I did see here, yes.

19   Q    Is it your understanding that those orders have no

20   effect and that they're not binding?

21   A    Yes.

22   Q    And is it your understanding that they're not binding

23   until the Court rules on your change of access petition?

24   A    Yes.

25              (Continued on the following page.)

*N. Durust - Redirect/Ms. Lutchen*                              386

1   EXAMINATION BY

2   MS. LUTCHEN:

3   (Continuing.)

4   Q    I'm going to pull up a document Petitioner's Exhibit 22.

5        Can you see the document?

6   A    No.

7   Q    I can't either.  It's not on.

8        Do you see it now?

9   A    Yes.

10  Q    Do you remember Mr. Min showing you Section 4.2 in a

11  different translation?

12  A    Yes, I do remember.

13  Q    I'll ask it again.

14       Do you recall Mr. Min showing you Section 4.2 of the

15  divorce protocol in a different translation?

16  A    Yes.

17  Q    Okay.  Do you see what it says here in this

18  Respondent's Exhibit 22?

19  A    Yes.

20  Q    And is this the translation that you obtained?

21  A    Yes.

22  Q    And do you see what it says, The articles of the

23  protocol are annexed to the court order?

24  A    Yes.

25            MR. MIN:  Objection.

1        MS. LUTCHEN:  I'm asking her what she sees in the

2    document.

3        MR. MIN:  I know.  But counsel just skipped a

4    bunch of words and made it sound like one coherent sentence.

5    There are a lot of words in between that that were not read

6    into the record.

7        THE COURT:  What's your question?

8        MS. LUTCHEN:  I'm asking if what the bolded

9    language says is that the divorce protocol is annexed to the

10   court order.

11       MR. MIN:  Your Honor, that's not what it says.  It

12   also says, "be approved."  Counsel is misrepresenting, I

13   think, very purposefully what the document says.

14       THE COURT:  It says what it says.

15   Q    What is your understanding that the divorce protocol

16   was put into the document to show what the divorce protocol

17   said and what your agreement was?

18   A    Yes.

19   Q    And that it was not put in the document as a court

20   order?

21   A    Yes.

22   Q    You testified to Mr. Min that you did not allow your

23   ex-husband to travel with the child; is that right?

24   A    Yes.

25   Q    Okay.  And is it correct that you were able to not

*N. Durust - Redirect/Ms. Lutchen*          388

1   allow him to travel with the child because you have sole

2   custody?

3   A    Yes.

4   Q    And that the divorce decree provides you with sole

5   custody?

6   A    Yes.

7   Q    Mr. Min asked you about your immigration status.

8        Are you taking steps to obtain a different immigration

9   status in the U.S. ?

10  A    Yes.

11  Q    What steps are you taking?

12  A    It's undecided.  I have options.

13  Q    Are you working with a lawyer to decide what your

14  options are?

15  A    Yes.

16            MS. LUTCHEN:  Nothing further.

17            THE COURT:  All right.  Thank you.

18            Do you have any additional evidence or does

19  respondent rest?

20            MR. HAMBELTON:  Respondent rests.

21            THE COURT:  I have a opening in the morning and

22  I'll just direct the parties to appear tomorrow morning at

23  10:00 o'clock and we'll just discuss at that point how you

24  want to -- or how we should further proceed in terms of

25  argument or submissions.  We'll address those issues in the

*Proceedings*                                              389

1    morning, okay?

2                MR. MIN:  Thank you, your Honor.

3                THE COURT:  All right.

4                MR. HAMBELTON:  Was one of the options that we

5    will argue tomorrow morning or we'll just set a new date for

6    either argument or submission?

7                THE COURT:  We'll just discuss tomorrow.  I won't

8    make you argue tomorrow.  We'll just discuss what we're

9    doing.  What we should do.

10               MR. MIN:  Your Honor, would it be possible since

11   we'll be back tomorrow morning to pack up some stuff but not

12   take it out until tomorrow?

13               MR. HAMBELTON:  Can we leave it in the closet?

14               THE COURT:  You can leave it in the closet just

15   don't leave it on the table.

16               MR. MIN:  Thank you, your Honor.

17               (WHEREUPON, this matter was adjourned to

18   December 13, 2024, at 10:00)

19

20                              *   *   *

21

22

23

24

25

390

1                          I N D E X

2

3       **WITNESS**                                    **PAGE**

4

5       **TALAT YAZICI**

6            DIRECT EXAMINATION BY MR. MIN              144

7            CROSS-EXAMINATION BY MR. TZUR              156

8

9       **ECEGUL (AJ) ELTERMAN**

10           DIRECT EXAMINATION BY MR. MIN              166

11           CROSS-EXAMINATION BY MR. TZUR              188

12           REDIRECT EXAMINATION BY MR. MIN            195

13           RECROSS-EXAMINATION BY MR. TZUR            197

14

15      **ZUHTU ONUR TATARI**

16           DIRECT EXAMINATION BY MR. MIN              199

17           CROSS-EXAMINATION BY MR. HAMBELTON         232

18           REDIRECT EXAMINATION BY MR. MIN            274

19

20      **EMEHRAN INAL**

21           DIRECT EXAMINATION BY MR. HAMBELTON        287

22           CROSS-EXAMINATION BY MR. MIN               305

23

24

25

391

1                    I N D E X (Cont'd)

2

3

4    **ALI UGUR CORBACIOGLU**

5        DIRECT EXAMINATION BY MR. WARD            315

6        CROSS-EXAMINATION BY MR. MIN             330

7        REDIRECT EXAMINATION BY MR. WARD         342

8

9    **NEVA DURUST**

10       DIRECT EXAMINATION BY MS. LUTCHEN        344

11       CROSS-EXAMINATION BY MR. MIN             366

12       REDIRECT EXAMINATION BY MS. LUTCHEN      385

13

14

15

16

17

18

19

20

21

22

23

24

25

392

**<u>E X H I B I T S</u>**

Petitioner's Exhibit 40                    147

Petitioner's Exhibit 22                    157

Petitioner's Exhibit 43                    169

Petitioner's Exhibit 42                    173

Petitioner's Exhibit 30                    201

Petitioner's Exhibit 5                     225

Respondent's Exhibit W-2                   235

Respondent's Exhibit P-1                   246

Respondent's Exhibit M-3                   248

Respondent's Exhibit T-1                   249

Respondent's Exhibit V-1                   251

393

**E X H I B I T S** (Cont'd)

Respondent's Exhibit N-3                              258

Respondent's Exhibit V-2                              264

Respondent's Exhibit L3                               268

Respondent's Exhibit W1                               272

Petitioner's Exhibit 4                                279

Respondent's Exhibit Y-1                              290

Respondent's Exhibit X-1                              290

Respondent's Exhibit M-1                              323

Respondent's Exhibit A-1                              352

Respondent's Exhibit J-2                              358